1

2

3

4    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5      IN AND FOR THE COUNTY OF ALAMEDA

6    BEFORE THE HONORABLE JOSEPH HURLEY, JUDGE

7       Department No. 704

8

9  THE PEOPLE OF
  THE STATE OF CALIFORNIA,

10

       Plaintiffs,

11

    vs.          No. 151929

12
  MATTHEW MULLER,

13
       Defendant.

14  _____/

15

16    REPORTER'S TRANSCRIPT OF PROCEEDINGS

17    PRELIMINARY HEARING/MOTION TO SUPPRESS

18     GALE-SCHENONE HALL OF JUSTICE
       PLEASANTON, CALIFORNIA

19
       September 2, 2015

20

21
      A P P E A R A N C E S

22

23  For the People:     NANCY O'MALLEY, DISTRICT ATTORNEY
             By:  JERRY A. HERMAN

24         Deputy District Attorney

25  For the Defendant:    THOMAS A. JOHNSON, ESQ.

26   The Defendant was also present in custody.

27

28   Reported by:   LEINAALA YEE GRAY, CSR #2941


                          1


1              I N D E X

2   WITNESSES FOR THE PEOPLE:

3   CHUNG YEN

4          Direct Examination by Mr. Herman          9

5          Cross-Examination by Mr. Johnson          21

6   SERGEANT CHRISTOPHER SHEPARD

7          Direct Examination by Mr. Herman          40

8          Cross-Examination by Mr. Johnson          50

9   DETECTIVE KEVAN WOODS

10          Direct Examination by Mr. Herman          66

11          Cross-Examination by Mr. Johnson          69

12              ---o0o---

13   EXHIBITS:              ID          EVID

14   People's Exhibit 1          46          52

15   People's Exhibit 2          68          69

16              ---o0o---

17

18

19

20

21

22

23

24

25

26

27

28

2

1  September 2, 2015, P.M.                    Department 704

2              P R O C E E D I N G S

3        THE COURT:  Now, Mr. Herman, let's call Muller.

4  People versus Muller.

5          Before we do anything else, I am not sure if at

6  last count I had three or four or more requests for cameras.

7  The Rules of Court indicate we're supposed to get those

8  requests 10 court days in advance.  It's not lost on me that

9  this was put over less than 10 days ago, but no requests

10  were made at that time that complied with the Rules of

11  Court.

12          Nonetheless, I say all that because I became aware

13  this Monday morning and informally told both sides before I

14  do anything about cameras in the courtroom, I'm probably

15  supposed to get the position of the defense and the

16  prosecution if they have a position.

17          What's your position, Mr. Herman?

18          MR. HERMAN:  I believe ID is an issue.

19      THE COURT: Is he in custody?

20      MR. HERMAN:  He is in custody.

21      THE COURT:  Okay.  We shouldn't do this until we

22  get him here, hmm?  Forgive me.

23      Why don't you state your appearances for the

24  record.

25      MR. HERMAN:  Jerry Herman for the People.

26      MR. JOHNSON:  Good afternoon, Your Honor.  Tom

27  Johnson on behalf of Mr. Muller and he is in custody.

28      THE COURT: Have you already waived the One

3

1  Session Rule?

2      MR. JOHNSON:  We have.

3      THE COURT:  Okay.  You're not going to mind if we

4  keep interrupting your hearing --

5      MR. JOHNSON:  Not at all.

6      THE COURT:  -- with small things.  As you can see,

7  we have lots of small things.

8      (Other cases called.)

9      THE COURT:  Okay.  We have the defendant here on

10  Muller.  Muller?

11      THE DEFENDANT:  Yes, sir.

12      THE COURT:  People versus Muller.  The first

13  issue, as I was explaining to both sides, is I have --

14  that's okay.

15      THE BAILIFF:  Oh, are you just going to do it

16  temporarily?

17       THE COURT:  Yes.

18       THE BAILIFF:  All right, Your Honor.

19       THE COURT:  It's just a temporary thing for now.

20       I have these numerous requests about cameras in

21  the courtroom.

22       Mr. Herman, what's your position?

23       MR. HERMAN:  Your Honor, I'm objecting to photos

24  or cameras in the courtroom or videos.  ID is going to be an

25  issue in this case.  I think it could compromise the D.A.'s

26  case if photos are taken of the defendant so I'm asking the

27  Court to disallow it.

28       THE COURT:  What about pictures of your witnesses?

4

1       MR. HERMAN:  I'd prefer that the privacy of the

2  witnesses be safeguarded inside the courtroom.

3       THE COURT:  Okay.  What's your position?

4       MR. JOHNSON:  Submitted.

5       THE COURT:  Submitted.  You don't take a position?

6  You don't care about pictures of your client?

7       MR. JOHNSON:  Well, I -- let me take a step back.

8       I don't object to what the district attorney is

9  asking for, that they be excluded.  There are matters of

10  identity that are at issue.  There is another case pending

11  in federal court.

12        THE COURT: So I've heard.

13        MR. JOHNSON:  And so then the most prudent thing

14  to do, Your Honor, would be -- in the protection of

15  Mr. Muller's rights would be to exclude them.

16            In terms of pictures of witnesses and people that

17  are not Mr. Muller, then I do submit it.  I don't have an

18  opinion one way or the other.

19            THE COURT:  Oh, if Mr. Herman objects doesn't

20  carry a lot of weight with me in terms of any balance I'm

21  supposed to do, but if you are also indicating you don't

22  want his picture taken or videos of him, especially in red

23  garb, and you're both asking for it, that carries a lot of

24  weight.

25            There are third-party interests here.  Does

26  anybody -- did anybody representing the press either want to

27  speak or bring a lawyer to speak?

28            MS. HURD:  Well, we don't have a lawyer but I'm

5

1  sure I can --

2            THE COURT:  Ma'am, you --

3            MS. HURD:  I'm sorry --

4            THE COURT:  -- you have got to be identified.

5            MS. HURD:  My name is Cheryl Hurd.  I'm with NBC

6  Bay Area News and I --

7            THE COURT:  Spell your last name.

8            MS. HURD:  H-U-R-D.

9        THE COURT:  Okay.

10        MS. HURD:  And I can probably speak on everyone's

11  behalf.  It's -- this is a high profile case.  We realize

12  that.  And there are ways to -- I know you have a problem

13  with showing him in a particular light, but it's also, you

14  know, freedom of the press, and we would like to be able to

15  do our jobs and do that.

16        And there's also ways that we can show him without

17  showing his face.  We can show the courtroom and not, you

18  know, zero in on it.

19        THE COURT:  You didn't come here to take pictures

20  of me.

21        MS. HURD:  Well, I'm not -- you know --

22        THE COURT:  It would be dangerous to your

23  equipment.  Let me --

24        MS. HURD:  I don't know about that.  But someone

25  else might want to speak on his behalf.

26        MR. STONE:  My name is J.R. Stone with KRON 4

27  News.

28        THE COURT:  Stone?

6

1        MR. STONE:  Yes.

2        THE COURT:  S-T-O-N-E?

3        MR. STONE:  Yes.

4        THE COURT:  Go ahead.

5        MR. STONE:  I would just make the argument for

6   cameras.  His picture's already out there and it's a picture

7   that has been around the Internet here, there.  I don't

8   think identity is that big of an issue seeing that his

9   picture is already all over the place.

10       THE COURT:  You seem far less concerned about his

11  rights than the prosecutor.  Anything else you want to tell

12  me?

13       MR. STONE:  No.  That's just the point I would

14  like to make.

15       THE COURT:  Okay.  Thank you all.  I have to be

16  concerned about his rights.

17       Freedom of the press isn't blocked, because you're

18  all here.  You can report whatever you want to report.  Far

19  be it from me to even comment on accuracy when you have that

20  freedom.

21       Nonetheless, his rights do carry substantial

22  weight and I don't think you're here to take pictures of my

23  staff or myself.  There is some reality that even pictures

24  of the victims may not be fair to them without some prior

25  input by them, as the prosecutor pointed out.  So there will

26  be no cameras while this case is going forward in this

27  department at this time.

28       Now we're done until we're ready to call that

7

1   case.  Except for how many witnesses do you expect to call

2  today?

3       MR. HERMAN:  I expect to call three witnesses,

4  Your Honor.

5       THE COURT:  Does the defense have any witnesses

6  you expect to call today?

7       MR. JOHNSON:  We don't expect to call any

8  witnesses, Your Honor.

9       THE COURT:  Okay.  With that in mind, why don't

10  you go ahead and get your people lined up, Mr. Herman.

11       We'll take a break.  Leave him here.  I have at

12  least two pleas to take.  Okay.

13       (Other cases called.)

14       THE COURT:  People versus Muller.  We're here now.

15  The defense will request and the People have no objection to

16  excluding all witnesses?

17       MR. HERMAN:  Yes, Your Honor.  That's correct.

18       THE COURT:  And you wanted to tell me that you

19  designated an investigating officer?

20       MR. HERMAN:  Yes.  We would like Deputy Miguel

21  Campos designated as our investigating officer.

22       THE COURT:  Who is that?  Okay.  You can sit

23  there.

24       He is designated as such and will remain in court

25  even if he may be a witness here or at the trial.

26       I believe that means we're ready to go forward

27  now.  As I've hinted before, there may be one or two

28  interruptions left.  We'll do that when we do that.

1      First witness, Mr. Herman.

2      MR. HERMAN:  The People would call Chung Yen.

3      THE COURT:  Come right over here, sir.

4      THE WITNESS:  Thank you, sir.

5      THE COURT:  Raise your right hand.  My clerk will

6  swear you in.

7              CHUNG YEN,

8        called as a witness on behalf of the People,

9        having been first duly sworn by the Clerk, was

10        thereafter examined and testified as follows:

11      THE WITNESS:  Yes, I do.

12      THE CLERK:  Thank you very much.  Please have a

13  seat.

14      THE WITNESS:  Thank you.

15      THE COURT:  Proceed.

16      THE CLERK:  If I can ask you to spell your first

17  and last name for the record, please.

18      THE WITNESS:  First name is C-H-U-N-G, last name

19  is Y-E-N.

20      THE CLERK:  Thank you very much.

21      MR. HERMAN:  Thank you, Your Honor.

22        DIRECT EXAMINATION BY MR. HERMAN

23      MR. HERMAN:  Q.  Mr. Yen, I'd like to direct your

24  attention to June 4th of 2015.  On that date can you tell us

25   where it was that you were living at?

26   A.      We live at 1617 North Terracina Drive in Dublin,

27   California, 94568.

28   Q.      All right.  And on that night, June 4th of 2015,

9

1   do you recall about what time you went to bed?

2   A.      Some -- about 11 o'clock.

3   Q.      All right.  And at that time who was present in

4   your household?

5   A.      My wife, my daughter, and I.

6   Q.      All right.  And at some point in the early morning

7   hours the next day, June 5th, were you awakened?

8   A.      Yes.  By a person.

9   Q.      This person --

10   A.      I was -- we were asleep.  Sorry.  We was asleep at

11   that time.

12   Q.      Okay.  Did something wake you up?

13   A.      Yes.  A person.  Yes.

14   Q.      This person who woke you up, where were you when

15   you woke up?

16   A.      We was lying down on the bed.

17   Q.      And this person, where was the person?

18   A.      Probably was about five, six feet away from our --

19   from the feet of my bedroom.

20   Q.      Five or six feet away from the foot of your bed?

21   A.      Yes.  Correct.

22   Q.      Okay.  Well, when this woke you up, what did you

23   notice about this person or what was it that woke you up, if

24   you can tell us?

25   A.      He -- he -- he order us, like he told us, like, my

26   daughter -- "Your daughter is okay, sir.  The -- they are

27   okay.  Listen what I say."  And he ask us to turn our

28   face -- my -- our face down to the pillow.

10

1    Q.      So he mentioned your daughter?

2    A.      Yes.  Correct.

3    Q.      He asked you to put your face down on the pillow?

4    A.      Yes.

5    Q.      Did you see whether or not the person had anything

6    in his possession?  His or her possession?

7    A.      All I know is he hold the flashlight.

8    Q.      What can you tell us about the flashlight?

9    A.      It's very bright and look like yellow.  Bright

10   yellow light.

11   Q.      Was he pointing the flashlight in any direction?

12   A.      To our face.

13   Q.      When he was pointing the flashlight in your face,

14   you were in bed?  Were you in bed with your wife?

15   A.      Yes, correct.

16   Q.      All right.  And as he said this to you, when he

17   said put your face down on the pillow, tell us what you did.

18   A.      So I just try listen to him and turn my face back

19   to him to check it out who is it.  You know, what's going on

20   here, you know.

21   Q.      When -- when you looked back at him, when you

22   checked to see this person, what happened?

23   A.      He just ask me to turn my face down to the pillow

24   and so that -- that's it.

25   Q.      Did you do that?

26   A.      Yes, I did.

27   Q.      Now, you've been referring to this as a "him."

28   Was there something about this person at the foot of your

                                    11


1   bed that made you believe it was a male?

2   A.      His voice.  Yeah.

3   Q.      Okay.  Now, after this person said the second time

4   to put your face down in the pillow, tell us what happened

5   next.

6   A.      He just show -- or tell us, you know, you do --

7   tell us that you do -- will put your face down, I will come

8   over and tie you up.  Tie us up.  Yes.

9   Q.      Now, when he said this, you and your wife were

10   still in bed?

11   A.      Yes.

12   Q.      What did he do?

13   A.      He walk to our bed and --

14   Q.      Now, your face was down in the pillow.  How could

15  you tell that he was walking around the bed?

16  A.      The light.  The flashlight.

17  Q.      Okay.

18  A.      We feel the flashlight was -- was on the left side

19  of my wife side.

20  Q.      Which side of the bed did he walk to?

21  A.      It -- my headboard this, so it should be this side

22  (witness indicating).

23  Q.      Would it have been the side of the bed that you

24  were sleeping on or the side of the bed that your wife was

25  sleeping on?

26  A.      My wife.  Side of my wife bed.

27  Q.      When he got to your wife's side of the bed, tell

28  us what happened next.

12

1  A.      He -- when he -- I believe he touch -- when I feel

2  he touch my -- my hand which is behind my back already, when

3  I feel he touch it, my hand, I jump off the bed and fought

4  with him.

5  Q.      Now, when you fought with him, describe for us as

6  much as you can how the two of you fought.

7  A.      I struggle.  Yes, I swing my -- my fist and he

8  swing back to me -- swung back to me and I try to pull --

9  because he just wearing a mask so I try to use my right hand

10  to pull the mask down.

11  Q.      Okay.  I'm going to slow you down just a little

12  bit.

13  A.      Okay.

14  Q.      Now, during this -- when this struggle started,

15  was your wife still in the bed?

16  A.      No.  She ran away.

17  Q.      Where did she run?

18  A.      I believe in the bathroom.

19  Q.      All right.  Now, you told us -- you mentioned a

20  mask just now.  At this point when you're struggling with

21  this -- this person who is in your bedroom, are you able to

22  determine the size of this person?

23  A.      I think he's -- yes.  I think he's -- I feel he's

24  bigger than me.

25  Q.      How tall are you?

26  A.      Five-seven, five-eight.

27  Q.      And how much taller was this person than you?

28  A.      About five-11 or five-10 or something like that.

13

1  Q.      Okay.  Did this person appear to be a big build,

2  small build, medium build?  How was this person built?

3  A.      Big build.  Bigger than me.

4  Q.      Okay.

5  A.      I can feel it when I -- I struggle with him.

6  Q.      Okay.  How about the clothing?  What do you

7  remember about the clothing?

8   A.      I can -- it's all black.

9   Q.      Okay.  You said the person was wearing a mask?

10  A.      Yes.

11  Q.      During the struggle did you -- were you able to

12  grab ahold of the mask?

13  A.      Yes, I did.  I pulled the mask down, yes.

14  Q.      And when you pulled the mask down, did any part of

15  this person's face get exposed?

16  A.      I believe so, this side (witness indicating).

17          MR. HERMAN:  May the record reflect that the

18  witness is taking his left hand and putting it on his left

19  cheek.

20          THE WITNESS:  Yeah.  Yeah.  Yeah.

21          THE COURT:  Yes, he did.

22          MR. HERMAN:  Q.  Were you able to see anything

23  other than the left cheek of this individual who was in your

24  bedroom at this time?

25  A.       His skin.  His skin.

26          THE COURT:  Skin.

27          MR. HERMAN:  Q.  And was -- the skin on his left

28  cheek?

14

1   A.      Yes.  Right.

2   Q.      Is that what you saw?

3   A.      Yes.

4    Q.    What color was the skin?

5    A.    White.

6    Q.    Tell us what happened next.

7    A.    And I -- I -- when -- when I struggle with him and

8    I feel like, you know, I need help, so I call my wife,

9    "Honey, go get a gun."

10   Q.    Now, did you have a gun?

11   A.    No.  I did not.

12   Q.    Why did you say that?

13   A.    Just scare him out.

14   Q.    And how many times did you yell, "Honey, go get a

15   gun"?

16   A.    Twice.  At least twice.

17   Q.    Now, when you yelled out, "Honey, go get a gun,"

18   what, if anything, did this person who you were struggling

19   with do?

20   A.    To my opinion, I think he try to get away.

21   Q.    So did he do anything in order to get away?

22   A.    That time he's at once -- we -- we -- we fought,

23   so I don't know that maybe -- I got hit from -- from his

24   object.

25   Q.    Were you ever hit with anything besides hands?

26   A.    That's all I have -- you mean his or mine?

27   Q.    Did he ever -- did this person you were struggling

28   with, did this person ever hit you with anything besides his

15

1   hands?

2   A.      The metal object.

3   Q.      A metal object?

4   A.      Metal object.  Yes.  Metal.  Yes.

5   Q.      Now, did you ever see him holding anything in his

6   hands?

7   A.      I believe because of the flashlight.  Because that

8   flashlight was the -- the flashlight was point at me in the

9   beginning and I think that's the flashlight.  He hit me with

10  the flashlight.

11  Q.      Where did he hit you on with the flashlight?

12  A.      The head.

13          MR. HERMAN:  May the record reflect that the

14  witness took his left hand and put it up on the left side of

15  his head above his left ear?

16          THE WITNESS:  Yes.

17          THE COURT:  Yes.

18          MR. HERMAN:  Q.  Now, when he hit you on the head

19  with this metal object, what happened at that point?

20  A.      So he -- he hit me, like, you know, we struggle

21  and -- and after that, he ran away.

22  Q.      So after he hit you with this object, he ran away?

23  A.      Yes.

24  Q.      All right.  This was after you said, "Honey, get

25  the gun"?

26  A.      Yes.  Correct.

27  Q.      Now, when he ran away, where did you see him go?

28   A.      Downstair.

16

1   Q.      And your bedroom was upstairs?

2   A.      Yes, correct.

3   Q.      All right.  So you saw him go down the stairs?

4   A.      Uhm-hmm.

5   Q.      Tell us what you did once you saw this person

6   running down the stairs.

7   A.      I hold my head because I feel wet, so I hold my

8   head and I call my wife and my daughter and I chasing him.

9   Chase him downstairs.

10   Q.      Did you go downstairs?

11   A.      Yes, I did.

12   Q.      Well, now, once you got downstairs, were you able

13   to see anybody down there?

14   A.      No.  I did not.

15   Q.      Did you see this person down there?

16   A.      No.  No one.

17   Q.      Once you were downstairs, you didn't see anybody.

18   Tell us what you did then.

19   A.      I went -- first I got to use the restroom.  So

20   scared, I went to the restroom.  And after that, I look -- I

21   go -- I check my sliding door, my back -- my back house

22   sliding door and see that door was opened about this much

23   (witness indicating) and I --

24          THE COURT:  "This much" being about six inches.

25          THE WITNESS:  Six inches.  Yeah.  Yeah.

26          THE COURT:  He put his hands together a half a

27  foot apart.

28          MR. HERMAN:  Thank you.

                                17


1          THE WITNESS:  And I go up to the front door, make

2  sure the door was locked.  But the door wasn't locked.  The

3  front door wasn't locked.

4          MR. HERMAN:  Q.  The front door wasn't locked?

5  A.        No.

6  Q.        Okay.  What is the next thing you remember doing

7  at that point?

8  A.        My wife, she came down.  I call her, she came

9  down, she gave me the phone.

10  Q.        And did you call anybody else besides your wife?

11  A.        No.  And I talk -- I spoke with the dispatcher --

12  Q.        Was there -- was there anybody else at your home

13  besides your wife?

14  A.        My daughter.

15  Q.        Did you call your daughter also?

16  A.        Yes.  I call.  Make sure she's okay.

17  Q.        And you were still downstairs?

18  A.        Yes, I was.

19  Q.        Did either your wife or your daughter come

20  downstairs?

21  A.      Yes.

22  Q.      Which one of them, or both?

23  A.      My wife came down first.  Gave me the phone first,

24  and my daughter came down later.

25  Q.      Okay.  Now, you said your wife came down and gave

26  you the phone.  Was your wife on the phone with anybody?

27  A.      She was on the phone with a dispatcher.  Police.

28  Q.      Your wife called the police?

18

1  A.      Yes, correct.

2  Q.      All right.  When she handed you the phone, did you

3  talk to the dispatcher?

4  A.      Yes.  She asked me -- they asked me how am I

5  doing.  Are you okay, you know.  Where are you?  Stuff like

6  that.  Where am I?

7  Q.      And how were you at that point?

8  A.      At the kitchen.  Islands of the kitchen.

9  Q.      Okay.  Were you injured in any way?

10  A.      Yes, my -- was bleeding.  My head was bleeding.

11  Q.      Once your daughter and your wife are downstairs,

12  you talk to the dispatcher on the phone, shortly after that,

13  did anybody arrive at your home?

14  A.      The police officer.

15  Q.      And when the police officers arrived at your home,

16  before you opened the door, did you do anything?

17   A.      We just -- then we -- I still hold the phone

18   and the dispatcher, "Just walk to the front door."  So went

19   to look through the window, see -- to see police outside,

20   and we couldn't see anybody, because later we know the

21   police were on the left and right of the house; not in front

22   of the door.  We could, you know, look in front of the door

23   but no one there in front.  But they asked us to open the

24   window -- open the front door so we can walk out.

25   Q.      Did you do that?

26   A.      Yes, I did.  I walk out of the house.

27   Q.      And when you walked out of the house, did you see

28   the police?

19

1   A.      Yes.  I did.

2   Q.      All right.  Now, sometime shortly after that, were

3   you taken to the emergency room?

4   A.      Yes.  About maybe 10 or 15 minutes later they

5   took -- they took me to the ER.  Emergency room.

6   Q.      And which hospital was it, if you recall?

7   A.      ValleyCare down on -- off of Santa Rita.

8   Q.      All right.  When you got to ValleyCare, were you

9   treated for your injuries?

10   A.      Yes.

11   Q.      And what type of treatment did you receive?

12   A.      Got a cut on the head.  They use three staples to

13   hold the wound together.

14  Q.      All right.  Those three staples, how long did they

15  stay in?

16  A.      Two weeks.

17  Q.      And did you go back to the hospital to have them

18  removed or did you have them removed some other way?

19  A.      No.  I did not go back to the hospital.  My wife,

20  she remove it.

21  Q.      What does your wife do for a living?

22  A.      She's an RN nurse.

23        MR. HERMAN:  Okay.  Thank you.

24        THE COURT:  At this point why don't we take a

25  short recess.  Just stay right there, sir.  Let me call the

26  other matter.

27        (Other cases called.)

28        THE COURT:  Back on the record.  We'll move

20

1  forward.

2        You were done, correct, with direct?

3        MR. HERMAN:  Yes, Your Honor.

4        THE COURT:  Cross-examination.

5        MR. JOHNSON:  Thank you, Your Honor.

6            CROSS-EXAMINATION BY MR. JOHNSON

7        MR. JOHNSON:  Q.  Good afternoon, Mr. Yen.

8  A.      Thank you, sir.

9  Q.      How old are you, sir?

10  A.      Sixty now.

11  Q.      And do you remember what day of the week June 4th,

12  2015, was?

13  A.      Not really.  I don't remember.

14  Q.      You can't remember if it was a Saturday, a Sunday,

15  or a midweek day?

16  A.      No.

17  Q.      Had you worked that day?

18  A.      Yes, I did.

19  Q.      And were you scheduled to work the next day?

20  A.      I don't remember.

21  Q.      So let's take you to the early morning hours of

22  June 5th, 2015.  How many bedrooms in your home at 1617

23  North Terracina?

24  A.      One, two, three, four bedrooms.

25  Q.      And you and your wife are in one bedroom?

26  A.      Yes.

27  Q.      And your daughter was in another?

28  A.      Yes.

21

1  Q.      Were there any other residents of the house?

2  A.      No.

3  Q.      So it was just you, your wife, and your daughter

4  that lived there; is that right?

5  A.      Correct.

6  Q.      And so then you guys go to bed about 11:00 p.m.;

7  is that right?

8  A.    Yes.

9  Q.    Did you and your wife go to bed together?

10  A.    Yes.

11  Q.    And where was your daughter when you went to bed?

12  A.    She still watch TV, I believe.

13  Q.    When you went to bed, was your daughter watching

14  TV?

15  A.    Correct.  Yes.

16  Q.    And so you assume that when you went to sleep she

17  was still watching TV; is that fair to say?

18  A.    Yes, I assume she still downstairs.  That's our

19  normal schedule, you know.  We went to bed early because we

20  have to go to work.  I assume she still downstairs watching

21  the TV.

22  Q.    Okay.  And then at some point in the early morning

23  hours of June 5th, you are awakened, correct?

24  A.    Correct.

25  Q.    How are you awakened?  What causes you to wake up?

26  A.    There was a man in our bedroom and use a

27  flashlight and wake us -- or wake us up.

28  Q.    Did you wake up first or did your wife?

22

1  A.    I don't recall.  I don't know if she was first or

2  I was first.  I don't recall.

3   Q.      And you told the district attorney a few moments

4   ago, Mr. Yen, that you were struck in the head.  Do you

5   remember testifying to that?

6   A.      Yes.

7   Q.      Did you have some sutures or staples put in later

8   that morning?

9   A.      Yes.

10  Q.      How many?

11  A.      Three staples.

12  Q.      Had you -- this is a hard question.  Sorry to have

13  to ask it, sir.  But had you had anything to drink or ingest

14  in terms of a controlled substance that evening?

15  A.      No.

16  Q.      Do you have a clear memory of the morning of

17  June 5th, 2015?

18  A.      June 5th --

19  Q.      Let me ask it a different way.  Do you have a

20  clear memory of what happened in your home that night?

21  A.      Yes.

22  Q.      Were you ever diagnosed with a concussion or loss

23  of consciousness or anything?

24  A.      No.

25  Q.      And so as you sit here now, you feel like you

26  remember the event pretty clearly; is that fair to say?

27  A.      That's correct.

28  Q.      So then you're woken up by a person being in your

1  bedroom, correct?

2  A.      Yes.

3  Q.      And who's the first person that spoke?  You, your

4  wife, or this person in your bedroom?

5  A.      The person in the bedroom -- in our bedroom.

6  Q.      And could you tell the Court what this person

7  said?

8  A.      This person say, "Your daughter is okay.  Listen

9  what I say.  Everything will be okay."  Okay?

10        And we took -- we heard that voice, we just woke

11  up and we turn back -- I don't know my wife, she woke up

12  first, I woke up first, I don't know.  But we heard that

13  noise.  We turn up.  We see the big yellow flashlight into

14  our face.

15  Q.      And were you laying face down at the time?

16  A.      Face up.

17  Q.      And then did you turn over?

18  A.      He ask us to turn over.

19  Q.      And then what happened after you were told to turn

20  over, asked to turn over?

21  A.      We turned over.  We turned over, put our face to

22  the pillow.

23  Q.      And did this person speak again?

24  A.      Yes.

25  Q.      What did the person say the next time he spoke?

26  A.      Same thing.  "Put your face -- turn your face down

27  to the pillow, sir."

28  Q.      And did you do that?

24

1  A.      I try to listen to him but I want to know what's

2  going on so I turn my back -- turn my head back again to --

3  to -- just my curiosity.

4  Q.      And did you see a person in the room?

5  A.      Yes.

6  Q.      And you described this person as bigger than you,

7  correct?

8  A.      Correct.

9  Q.      So something -- some person that's taller than

10  five-seven; is that fair to say?

11  A.      That's fair, yes.

12  Q.      And then when you turned around and saw the

13  person, did you see anyone else in the room other than that

14  one person?

15  A.      Just only one person.

16  Q.      And did you hear any other voice other than that

17  one person?

18  A.      Only one -- only one person.

19  Q.      So from what you remember of that early morning

20  event in your bedroom and in your home, there was one person

21  that was the intruder or the burglar, correct?

22  A.      Correct, yes.

23  Q.      How much time passed before you began to struggle

24  or fight with this person?

25  A.      Probably two -- two minutes or one minutes or so,

26  something like that.  Maybe three minutes.  I -- I -- some

27  -- that about that time.

28  Q.      I'm sure it's difficult to estimate time.

                                25

1  A.      Yes.

2  Q.      Is it fair to say, Mr. Yen, that it was a couple

3  of minutes before you started struggling with him?

4  A.      You mean time I struggle with him in the -- in the

5  foughting time?

6  Q.      Let me ask the question differently then.  That's

7  a good question, sir.  How long was this person in the room

8  before you began struggling with him?

9  A.      Well, I could say it was about two or three

10  minutes.

11  Q.      Two or three minutes?

12  A.      That's correct.

13  Q.      Was your wife laying in bed with you when you

14  began struggling or was she at a different location when you

15  began struggling?

16  A.      When we struggle with that person, my wife, she

17  ran away.  Was not with me at that time.

18  Q.      And then when you were struggling with this

19  person, was it like a -- was it like a fight?  Like

20  punching?  Was it a wrestling match?  What was happening,

21  sir?

22  A.      To me, I remember I swung at him and I tried to

23  keep my curiosity -- I want to see who is it.  Alway think

24  in my head I have to find out who is this person.  So the

25  first thing I fought with him, I just try to pull his face

26  mask down so I want to know who is it here.  That's my

27  first -- first thing in my mind.

28  Q.      So your first instinct was to see if you could

26

1  pull the person's face mask off or pull it down so you could

2  get a look at the person?

3  A.      That's correct.

4  Q.      And while you're doing this, your wife is not in

5  the room anymore; she's left the room?

6  A.      Yes, correct.

7  Q.      And where had she gone?

8  A.      She went to our bathroom.

9  Q.      And is that the time that you began yelling to

10  her, "Go get the gun"?

11  A.      Yes.

12  Q.      But there wasn't a gun, was there?

13  A.      No.

14  Q.      But, nonetheless, you yelled that two or three

15  times?

16  A.      Two times, yes.

17  Q.      Did you yell it loud enough for the person that

18  you were struggling with to hear?

19  A.      Yes.  Very loud.

20  Q.      And so you were trying to create a belief in the

21  person that you were struggling with that either you or your

22  wife had a gun that you could access.  Isn't that what

23  happened, sir?

24  A.      Yes.  In my mind, yes.

25  Q.      And in your mind, if you could create that

26  illusion that there was a gun, maybe this person would leave

27  the home, correct?

28  A.      In my mind, I just want to scare the person away.

27

1  Q.      Okay.  And how long -- and this means in terms of

2  seconds or minutes, Mr. Yen -- how much time expired between

3  the time that you yelled, "Go get the gun," or, "Honey, go

4  get the gun," between that time and the time that the person

5  that was in your room fled?

6  A.      Some -- very quick.  I just -- I couldn't make a

7  time.  Maybe 20 second, 30 second, or very quick.

8  Q.      So, at any rate, it's under a minute, correct?

9  A.      Yes.

10  Q.       So you're yelling, "Honey, go get the gun.  Honey,

11  go get the gun."  You're fighting this guy, trying to pull

12  his mask off.  Your wife runs away.  In the meantime, the

13  person you're struggling with breaks free and leaves the

14  home; is that fair to say?

15  A.      Yes.

16  Q.      Did you see the person run downstairs?

17  A.      I saw that person ran out of my -- my bedroom

18  door.

19  Q.      Did you follow the person downstairs?

20  A.      I just take a second to my head -- I try to

21  hold -- I feel wet so I stay hold like this, and I -- I look

22  around and I chasing him, yeah.

23  Q.      Did you chase him down the stairs and out the

24  door?

25  A.      I chase him downstairs.  I stand on my stairway,

26  look left and right, I didn't see anybody.

27  Q.      Where was your daughter's bedroom?

28  A.      It's on opposite side of our bedroom.

28

1  Q.      Was it upstairs or downstairs?

2  A.      Upstairs.

3  Q.      And were there lights on in the house when this

4  was occurring or lights off?

5  A.      All lights was off.

6  Q.      Was it completely dark in the house or was there

7  some ability to see?

8  A.      All darks.  Darks in the house.

9   Q.      So you run down the stairs in pursuit of this

10  person and you don't see them down there, correct?

11  A.      No.

12  Q.      Did you see anybody else down there?

13  A.      No.

14  Q.      Did you hear any other voices?

15  A.      No.

16  Q.      So the one person that was in the house in your

17  opinion had fled the house, correct?

18  A.      I assume so, yes.

19  Q.      Well, they weren't in the house, right?

20  A.      The -- the person?

21  Q.      Yes.  There was nobody else in the house besides

22  you, your wife, and your daughter at that point; fair to

23  say?

24  A.      Yes.  Yes.

25  Q.      So what's the very next thing that happened once

26  you get to the bottom of the stairs and realize the person

27  is gone?

28  A.      I use the restroom, and I go back to the sliding

29

1   door.  Because I need to go to restroom badly so I use the

2   restroom first, and then I went to the sliding door.  I see

3   the sliding door open about six inches, about this much.

4   Q.      Okay.

5   A.      Yeah.

6  Q.      You told Mr. Herman on direct examination that

7  you'd used the restroom.  Did you get sick in the restroom?

8  Did you -- was it -- did the stress of the event cause you

9  to use the restroom?

10  A.      I believe the stress of the event, yes.

11  Q.      Okay.  And then, Mr. Yen, you said that you could

12  feel a wetness to the side of your head; is that correct?

13  A.      Yes.

14  Q.      Is that what you got the sutures for?

15  A.      The what?

16  Q.      The sutures or the staples?

17  A.      Yes.  Correct.

18  Q.      And how many did you receive for that, sir?

19  A.      Three.

20  Q.      And who -- and your wife took them out?

21  A.      Yes.

22  Q.      How much longer after -- how many days after the

23  event did she take the sutures out?

24  A.      On the paper, doctor say it's about --

25         THE COURT:  Staples.

26         MR. JOHNSON:  Staples?

27         THE COURT:  Yes.

28         MR. JOHNSON:  Fine.  Sorry, Your Honor.

30

1  Q.      Staples?

2   A.      Staples, yes.

3   Q.      How many days after you received the staples were

4   the staples removed?

5   A.      On the paper it said 10 days.  We do maybe a

6   little bit after that.  Maybe two weeks or little bit, one

7   or two day after that.

8   Q.      Now let's go back to the scene, Mr. Yen.  Once you

9   get downstairs and once you use the restroom, did you then

10  contact your wife and your daughter?

11  A.      Yes.  After I use the restroom, I call my daughter

12  and my wife.  I say, "Are you -- you guys okay?"

13  Q.      Did you have to awaken your wife, awaken your

14  daughter?

15  A.      I did yell.  I don't know if she's asleep or not.

16  I didn't go upstairs again.

17  Q.      So you yelled from the bottom of the stairs up to

18  the top of the stairs?

19  A.      Yes.  Correct.

20  Q.      And where was your wife at the time that you were

21  yelling for your daughter?

22  A.      I assume she's talking -- she was talk on the

23  phone.

24  Q.      Okay.  You did not make a phone call, correct?

25  A.      I did not.

26  Q.      And so you can't tell us when that phone call was

27  made, right?

28  A.      No.  I did not.  But --

1  Q.      When your wife came downstairs, did she come

2  downstairs with the phone in her hand?

3  A.      Yes.

4  Q.      And then what did you do once your wife came

5  downstairs?

6  A.      She just said, "Honey, dispatcher want to talk --

7  officer want to talk to you."  So she hand me the phone when

8  I -- I talk to dispatcher.

9  Q.      And was that a cell phone that you and your wife

10  share?

11  A.      That's her cell phone.  I have my own cell phone.

12  Q.      Okay.  Fair enough.  Did the dispatcher say that

13  the officers were at your house?

14  A.      Yes.

15  Q.      Where was your daughter at the time that you and

16  your wife were at the -- in the downstairs part, talking to

17  the dispatch officer?

18  A.      She still in the room.  I believe she on her way

19  down.

20  Q.      When you say you believe, you don't have an exact

21  memory of it but you think that's what happened?

22  A.      I didn't see her so I -- I think maybe she

23  still -- she still up there.

24  Q.      Okay.  Fair enough.  The officers come to the

25  door.  Did you walk out of the door or what did you do?

26   A.        Yeah.  We -- he -- they order us to walk out the

27   door.

28   Q.        And did you do that?

32

1   A.        We do that.  My wife and I do that.

2   Q.        And what about your daughter?

3   A.        I believe she came out eventually.  Yes.  Maybe

4   one minute, 30 seconds later she came down.

5   Q.        And, Mr. Yen, on issues regarding time and place

6   and who was where, when, if you don't remember something

7   exactly, you can say, "I don't have an exact memory."  Do

8   you understand that?

9   A.        Okay.

10   Q.        Do you remember exactly when your daughter came

11   downstairs?

12   A.        No.  I don't.  You ask me the question.  I say no,

13   I don't remember.

14   Q.        Okay.  Did you and your wife leave the home at the

15   same time?

16   A.        Leave the home where?

17   Q.        Did you walk out the front door of the house at

18   the same time?

19   A.        Yes.

20   Q.        And when you walked out the front door of the

21   house, were there police officers there?

22   A.      Yes.

23   Q.      How many police officers did you see outside the

24   front of the home when you walked out?

25   A.      I don't know how many.

26   Q.      Was it more than one?

27   A.      More than one, yes.

28   Q.      Was it more than three?

                                33


1    A.      Yes.

2    Q.      Was it more than 10?

3    A.      I don't know.

4    Q.      Was it between, say, three officers and 10

5    officers that were outside?

6    A.      That's fair to say, yes.

7    Q.      So -- and how many police cars or emergency

8    vehicles did you see outside?

9    A.      I don't know how many.

10   Q.      More than one?

11   A.      Yes.

12   Q.      And while you walked outside with your wife, did a

13   police officer make immediate contact with you?

14   A.      Yes.

15   Q.      And did one police officer talk to you and one

16   talk to your wife, or did you talk to the same person?  Only

17   if you remember, Mr. Yen.

18   A.      I don't remember.

19  Q.      Okay.  And then at some point when you were

20  outside, did your daughter come outside?

21  A.      Eventually, yes.  I saw she outside, yes.

22  Q.      And what is your daughter's name?

23  A.      Kelly.

24  Q.      Was Kelly escorted out of the house by a police

25  officer or did she walk out of the house on her own?

26  A.      You ask me that question.  Now I don't recall.

27  I cannot say believe.  I know she walk out by -- by herself

28  so --

34

1  Q.      Okay.  But at some point you remember that you

2  were in the front yard with Kelly and your wife; is that

3  right?

4  A.      Yes.

5  Q.      Were you guys all standing together?

6  A.      Yes.

7  Q.      At some point did you see Kelly with a cell phone

8  in her hand?

9  A.      That's I don't know.  I don't recall.

10  Q.      When you saw Kelly leave the home, did you see her

11  with a cell phone?

12  A.      Repeat the question again.

13  Q.      You don't recall Kelly leaving the home with her

14  cell phone in her hand?

15   A.        Her personal phone or whose phone?

16   Q.        Anybody's phone?

17   A.        I don't know.

18   Q.        Okay.  Once you're outside and you're talking to

19   your wife, did more -- talking with your wife to the police,

20   did more and more police officers appear on scene?

21   A.        I don't recall that.  I don't stand there and

22   count how many -- how many police officers was outside.  I

23   don't -- I don't -- I don't count.  I don't remember that.

24   Q.        Okay.  Fair enough.

25          That evening, though, or that morning, we should

26   say, you were seen by a paramedic; is that right?

27   A.        Yes.

28   Q.        Was this a paramedic from a fire engine?

35

1   A.        Yes.

2   Q.        Where were you seen by the paramedic from the fire

3   engine?  At your home or at the hospital?

4   A.        Repeat the question again, please.

5   Q.        Did the paramedic first treat you while you were

6   at your home?

7   A.        Yes.

8   Q.        Did that occur in the living room or in the front

9   yard or at any other location?

10   A.        The front door.

11   Q.        Were you on the front porch when you were seen by

12  the paramedic?

13  A.      Yes.  The front door.

14  Q.      And how much time expired between the time that

15  you first walked out of the house after speaking with

16  dispatch and the time that the paramedic came to see you?

17  A.      Maybe 10 minutes or so.  Five, 10 minutes.

18  Q.      How long were you at the house after you left the

19  house before you went to the hospital?

20  A.      Say one more time, please.

21  Q.      How long were you out in the front yard after

22  leaving the house?

23  A.      You mean get on the ER person vehicle to the

24  hospital?

25  Q.      Yes.

26  A.      It's about five, 10 -- 10 minutes or so.

27  Q.      Ten minutes or so?

28  A.      Yes.

                                    36


1  Q.      And did anybody ever tell you that they didn't

2  want you standing on the front porch; that you should go to

3  a police car with them?

4  A.      No.

5  Q.      Did anybody ever tell you, "We don't want you

6  standing on the front porch.  Your life is in danger.  We've

7  got to move you out of here"?

8    A.    No.

9    Q.    Did you hear any police officer say to the

10   emergency people, "We don't want you coming into this house.

11   The house is still a crime scene and there's a suspect

12   loose"?

13   A.    Yes.

14   Q.    And at some point did your wife -- was your -- let

15   me take a step back.  Was your wife with you the whole time?

16   A.    Yes.

17   Q.    And she was standing on the front porch, too?

18   A.    Yes.  Outside, yes.

19   Q.    And your daughter was standing on the front porch,

20   too, correct?

21   A.    Yes.

22   Q.    And so you were all standing out there for, say,

23   10 or 15 minutes?

24   A.    Yes.

25   Q.    Did anybody give you a Kevlar vest or a vest to

26   put on because you were in danger?

27   A.    No.

28   Q.    Did anybody say, "Listen, we need to go back

37

1    inside the house away from this open area"?

2    A.    Say that again.

3    Q.    Did the officers tell you that you needed to go

4    back inside the house out of the open area?

5  A.      No.

6  Q.      When is the first time you went to the police

7  station?

8  A.      After they stitch -- the stitches -- staple into

9  my wound.  They took me to the police station.

10  Q.      And then did you do an interview with them at the

11  police station?

12  A.      Yes.

13  Q.      Do you remember talking to an officer by the name

14  of Shepard or Campos?

15  A.      I believe Campos.

16  Q.      The person seated to my right?

17  A.      Yes.

18  Q.      Did you lock the front door to your residence that

19  night?

20  A.      Yes.

21  Q.      Did you see a sign of forced entry anywhere in the

22  home?

23  A.      No.

24  Q.      You talked about the sliding glass door a few

25  moments ago.  Could you tell us again where the sliding

26  glass door is in the home?

27  A.      The back of our house.  Back -- sliding back door.

28  Back house.  Back the -- back of the house.

38

1    MR. JOHNSON:  Thank you, Your Honor.

2    THE COURT:  Any redirect?

3    MR. HERMAN:  No, Your Honor.

4    THE COURT:  May the witness be excused?

5    MR. JOHNSON:  Yes, Your Honor.

6    MR. HERMAN:  Yes, Your Honor.

7    THE COURT:  Thank you very much.

8    THE WITNESS:  Thank you, sir.

9    THE COURT:  You are excused.

10    THE WITNESS:  Thank you, Your Honor.

11    THE COURT:  We'll take a short 10-minute recess.

12  Try to start up a little after 3:30 if you have your witness

13  lined up.

14    MR. HERMAN:  Thank you.

15    THE COURT:  And for stipulations, we'll have those

16  ready when we come back.

17    MR. HERMAN:  Yes.  I'll go ahead and provide them

18  to the Court, if I may.  They are signed stipulations.  I'm

19  going to ask it be made a part of the record for this

20  hearing.

21    THE COURT:  Okay.

22    (Recess.)

23    THE COURT:  Okay.  People versus Muller.  Both

24  counsel are present.  The defendant's present.

25    Mr. Herman, your next witness.

26    MR. HERMAN:  People would call Sergeant Chris

27  Shepard.

1  right over here and raise your right hand, my clerk will

2  swear you in.

3              SERGEANT CHRISTOPHER SHEPARD,

4          called as a witness on behalf of the People,

5          having been first duly sworn by the Clerk, was

6          thereafter examined and testified as follows:

7          THE WITNESS:  I do.

8          THE CLERK:  Thank you.  Please have a seat.  And

9  if you could please spell your first and last name for the

10  record.

11         THE WITNESS:  My first name is Christopher,

12  C-H-R-I-S-T-O-P-H-E-R.  And my last name is Shepard,

13  S-H-E-P-A-R-D.

14         THE CLERK:  Thank you very much.

15             DIRECT EXAMINATION BY MR. HERMAN

16         MR. HERMAN:  Q.  Sergeant Shepard, can you tell us

17  what you do for a living?

18  A.      I'm a sergeant with the Alameda County Sheriff's

19  Office.

20  Q.      I want to direct your attention to June 5th of

21  2015 shortly after 3:30 in the morning.  At that time were

22  you dispatched to a call?

23  A.      Yes, I was.

24  Q.      Where were you dispatched?

25  A.      I was dispatched to 1617 North Terracina Drive in

26  Dublin.

27  Q.      When you arrived there, tell us what happened.

28  A.      We were dispatched to a suspicious circ, possible

40

1  home invasion robbery.  Deputies Dormer and Feroz arrived on

2  scene slightly before I did.

3         When I arrived on scene, we didn't see any cars in

4  the area and we just saw lights on inside the house.

5  Q.      Let me slow you down a little bit.  So when you

6  arrived, there were only two people there before you?

7  A.      That's correct.

8  Q.      That is Deputy Feroz and Deputy Dormer?

9  A.      That's correct.

10  Q.       Describe this area for us.

11  A.       It is on the east side of Dublin.  It's a

12  residential area.  It's newly built and the backyard of the

13  residence backs up to an open space that's vast and goes all

14  the way out to the City of Livermore.

15         The streets curve and it's very difficult to set

16  up a perimeter in that area based on the fact that it's all

17  rural land all the way out to the City of Livermore to about

18  Doolan Road.

19  Q.      When you arrived, tell us what your role was at

20  that time.

21  A.      Our role was to make contact with the residents.

22  When we got there, they weren't outside.  Dispatch called

23  inside.  They were somewhat hesitant to come out.  They

24  couldn't see us outside.  We told them to come outside and

25  then shortly after they opened up the door and came outside

26  to us.

27  Q.      When you say "they came outside," specifically who

28  do you remember coming outside at that point?

41

1  A.      Chung and Lynn Yen came out at that point.

2  Q.      The husband and wife?

3  A.      Yes.  That's correct.

4  Q.      Now, once they came outside -- and at that point

5  how many police officers were on scene at that point?

6  A.      Just three.  That's including me.

7  Q.      Okay.  Now, when they came outside, what was the

8  game plan, so to speak?  When they came outside, what were

9  you going to do?

10  A.      The game plan was we didn't have enough units to

11  have a perimeter in place plus an entry team, so we were

12  going to have to clear the house, make sure everybody inside

13  the house was safe, and once we cleared the house, then we

14  would set up a perimeter.

15  Q.      So when Chung and Lynn walked outside, did anybody

16  start to go inside?

17  A.      Yes.  They did.

18  Q.      And who was that?

19  A.      Deputies Feroz and Dormer.

20  Q.      And as Deputy Feroz and Dormer started to go

21  inside, did anybody else come out?

22  A.      Kelly Yen came outside.

23  Q.      And she came outside at the point where the

24  deputies started to enter?

25  A.      That's correct.

26  Q.      Now, at that point, to your knowledge, was there

27  anybody -- any other residents, people that lived there

28  inside the home other than the three people who were outside

42

1  at that point:  Lynn, Chung, and Kelly Yen?

2  A.      We weren't sure at the time because they were so

3  confused and they were kind of in shock, so I had to keep

4  Chung and Lynn outside and then Kelly had come out to us.

5        So just to make sure that there was nobody else in

6  danger inside the house, we went inside and cleared the

7  house.

8  Q.      Now, at this point did you all know whether or not

9  there was any suspects inside the house?

10  A.      We did not, although on dispatch they said the

11  suspect fled out the rear of the residence.  We didn't know

12  if there were any additional suspects or, you know,

13  sometimes when you get an update from dispatch from an upset

14  victim, sometimes there's some inaccuracies in that.

15  Q.      So when Feroz and Dormer go in, they are looking

16  to see if there's any other residents inside and also to

17  make sure there's no other suspects inside?

18  A.      That's correct.

19  Q.      So approximately how long does it take for Dormer

20  and Feroz to check the house?

21  A.      It's a pretty large house.  About anywheres

22  between five and 10 minutes to clear the house.

23  Q.      All right.  Now, while -- while that was going on,

24  where were you?

25  A.      I stayed outside the front door with Lynn and

26  Chung and Kelly.

27  Q.      Now, while you were outside, at some point were

28  you provided anything by any of the three residents?

43

1  A.      Well, first I was provided a description of the

2  suspect.  They said it was a white male, mid-twenties, thick

3  build, wearing all black, and was possibly wearing a mask.

4  And Chung had told me the mask -- when they were fighting,

5  that the mask -- he at some point pulled the mask down.

6  Q.      Okay.  Were you provided anything else?

7  A.      Yes, I was.  Later on I was provided a cell phone

8  from Kelly.

9  Q.      And when she handed you this cell phone, what, if

10  anything, did she tell you?

11   A.        She said she didn't know whose cell phone it was.

12   That she had located it on the counter outside of her

13   bedroom and she thought it might be the suspect's phone but

14   she didn't know whose phone it was.

15          MR. HERMAN:  And, Your Honor, I have provided the

16   Court with a -- two stipulations that are signed by both

17   defense counsel and myself.  I'd ask that those stipulations

18   may be part of this record.

19          MR. JOHNSON:  No objection.

20          THE COURT:  Well, do you so stipulate?

21          MR. JOHNSON:  I do.

22          THE COURT:  Those stipulations are now part of the

23   record.

24          MR. HERMAN:  Thank you.

25   Q.      All right.  Now, when Kelly provided you the

26   phone, at that point about how long had you been on scene?

27   A.      Probably somewhere close to between 10 and 20

28   minutes.

44

1   Q.      All right.  When you were given the phone, tell us

2   what you did.

3   A.      At that point I believed that this was a violent

4   crime.  We need to locate the suspect as quickly as

5   possible.  We didn't know if it was the suspect's phone but

6   we believed there's a good chance it was the suspect's

7  phone

8        We believed there was exigent circumstances to

9  locate the suspect.  It's a violent crime.  They were woken

10  with a laser.  To me, if somebody says they are woken with a

11  laser in a bedroom, that means somebody's pointing a gun at

12  them.

13        We didn't -- and then he had fled the residence.

14  We didn't know if he had fled into any adjacent residences

15  or if he was still in the area.  We were concerned that we

16  were at risk as well as the residents in the area were at

17  risk of also becoming victims of a violent crime.

18        So based on that, I dialed 911 from the cell phone

19  which went to CHP dispatch and then eventually to our

20  dispatch.

21  Q.      Let me back you up a little.  While you on -- you

22  were in constant contact with dispatch throughout this,

23  correct?

24  A.      That's correct.

25  Q.      And when you were provided the phone, did you let

26  dispatch know you were provided the phone?

27  A.      Yes, I did.

28  Q.      And did somebody at dispatch say, "Hey, we can do

45

1  this"?

2  A.      Dispatch told me, hey, if you dial 911 from this

3  phone, all cell phones will let you dial 911 from them even

4   if they are locked, but it will go to probably our dispatch

5   and then we will be able to get the cell phone number.

6   Q.      All right.  So once you were given that

7   information, you make the determination you've told us about

8   in terms of trying to identify the phone as the -- if the

9   phone's connected to the suspect in any way; is that

10  correct?

11  A.      That's correct.

12  Q.      All right.  And so do you dial the 911?

13  A.      Yes, I do.

14  Q.      And after you dial 911, are you provided any

15  information by dispatch?

16  A.      They provided the phone number.  However, at that

17  time we don't have any information on who that person is,

18  who it was associated with the phone number.

19          (People's Exhibit 1 was marked for

20            identification.)

21          MR. HERMAN:  Q.  Okay.  I want to show you a

22  document that's been marked People's Exhibit 1.

23          THE COURT:  While you gather that, the stipulation

24  was entered for purposes of the P.X.  It's also entered for

25  the purposes of the 1538.5 motion?

26          MR. HERMAN:  Yes.

27          MR. JOHNSON:  Actually, Judge, it's only offered

28  for purposes of this hearing.

46

1          THE COURT:  But this hearing in the context of

2   both the P.X. and the 1538.5.

3          MR. JOHNSON:  That's correct.

4          MR. HERMAN:  That's correct, Your Honor.

5          THE COURT:  Because this -- both of these go to

6   the phone:  The ownership of the phone, who's paid for, and

7   who it's possessed by --

8          MR. HERMAN:  Yes.

9          THE COURT:  -- and then also how it was found by a

10   member of the Yen family and given to the sergeant.

11          MR. HERMAN:  Yes, Your Honor.

12          THE COURT:  The other end of what he's already now

13   testified to.

14          MR. HERMAN:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. HERMAN:  Q.  Showing you what's been marked as

17   People's Exhibit 1, can you tell us what that is?

18   A.      This is a computer-aided dispatch printout that

19   states at what time units are coming -- what time the event

20   was created, where the address is, and what time -- what

21   date and time things are happening at that event.

22   Q.      And you've seen that document before, correct?

23   A.      Yes, I have.

24   Q.      That's a certified copy of the Sheriff's dispatch

25   event register?

26   A.      That's correct.

47

1  entry on the log?

2  A.    3 -- 0334 hours.

3  Q.    And looking at that log, can you tell when

4  dispatch provided you with the phone number from the cell

5  phone you were given by Kelly?

6  A.    0354 hours.

7  Q.    And at 0354 hours, dispatch put out the phone

8  number that they received when you punched in the 911?

9  A.    That's correct.

10  Q.    All right.  Thank you.

11      So, from the time you arrived, got Kelly and Chung

12  and Lynn outside, Deputy Feroz and Deputy Dormer went

13  inside, did the check, you were given the phone, made the

14  decision to touch -- that all happened within 3:34 and 3:54?

15  A.    That's correct.

16  Q.    So it all happened pretty quick?

17  A.    Yes.

18  Q.    All right.  Now, once you received the telephone

19  number from dispatch, at that point were other units and

20  other officers on scene?

21  A.    I had a few officers on scene.  We were setting up

22  a perimeter.  We were very short on people.  I called for a

23  helicopter.  One was unavailable.  I called for two other

24  units from the Tri-Valley and Pleasanton PD K-9.

25  Q.      What did you do with the cell phone?

26  A.      I handed it off to Deputy Feroz.

27  Q.      And did you task any units or other officers with

28  the follow-up of the investigation of the cell phone?

                                    48

1  A.      I did.  I handed it off to Deputy Feroz because he

2  was the primary on -- on-scene, and then Sergeant White was

3  tasked with the follow-up on the cell phone.

4  Q.      All right.  Now, at some point later, were you

5  ever provided information from the service provider,

6  Verizon, as to whether or not they were willing to provide

7  you with additional information?

8  A.      I was.

9  Q.      About how much longer?

10  A.      I'm guessing somewheres in the areas of maybe an

11  hour.

12  Q.      All right.  And at that point what information

13  were you provided?

14  A.      They said that -- Verizon says we can get the

15  information for the person on the phone; however, there

16  needs to be exigent circumstances.

17          And at that time the scene was secure.  Mr. Yen

18  had been transported to the hospital and I had enough

19  deputies there, and I made the decision that we would have

20  the detectives write a search warrant on it based on the

21  scene being more secure than it was when we first arrived.

22       MR. HERMAN:  All right.  Thank you.  No further

23  questions.

24       THE COURT:  If you had not thought through the way

25  to get the actual phone number, would you have still gone

26  ahead and done the search warrant on the phone even though

27  you didn't know what phone number it was?  In light of what

28  else you knew about the phone?  Do you understand my

49

1  question?

2       THE WITNESS:  No.

3       THE COURT:  You made a decision to get a search

4  warrant.

5       THE WITNESS:  Okay.

6       THE COURT:  If you didn't even have the phone

7  number, you just had the phone and the circumstances you

8  had, would you have gone ahead and gotten a search warrant?

9       THE WITNESS:  Yes.

10       THE COURT:  Okay.  And when you're there looking

11  at the phone that's just been given to you, did it occur to

12  you this phone might belong to some innocent third party who

13  left it there earlier and the Yen family just had noticed

14  it?

15       THE WITNESS:  Yes.  Yes.

16       THE COURT:  Did it occur to you that it might be a

17  phone that belonged to a third party who was totally

18  innocent but it had been left there by the defendant and

19  that this third party was also potentially a victim?

20        THE WITNESS:  Yes, it did.

21        THE COURT:  Okay.  Further cross?  Or cross?

22        MR. JOHNSON:  Yes, Your Honor.  Thank you.

23           CROSS-EXAMINATION BY MR. JOHNSON

24        MR. JOHNSON:  Q.  Good afternoon.

25  A.      Good afternoon.

26  Q.      So it's Sergeant Shepard?

27  A.      That's correct.

28  Q.      And so then you wrote a report in this case, did

50

1  you not, Sergeant?

2  A.      That's correct.

3  Q.      And do you have the report with you today?

4  A.      I have a copy of it.  Yes.

5  Q.      And does it begin at the top on Thursday,

6  June 5th, 2015, at 3:34 hours?

7  A.      That's correct.

8  Q.      Okay.  Just want to make sure we're working from

9  the same report.

10        So then when you got to the scene, about what time

11  was it?  If you were dispatched at 3:34, what time did you

12  get to the scene?

13    A.    I'm not exactly sure. I'd have to check the CAD

14    printout, but I was coming from the station which is on the

15    far end of town.  It's on the exact opposite end of town.

16    Q.    Okay.

17          Your Honor, is the event register/CAD log -- is

18    the event register/CAD log in evidence already?  Was it

19    moved in?  Or was it just --

20          MR. HERMAN:  I haven't moved it in --

21          THE COURT:  There's nothing in evidence yet except

22    for the stipulation which is quasi in evidence.

23          MR. JOHNSON:  Could we move the CAD log into

24    evidence?

25          MR. HERMAN:  I have no objection to that.

26          THE COURT:  What CAD log are we talking about?

27          MR. HERMAN:  What's been marked as People's 1,

28    Your Honor.

                                    51


1           MR. JOHNSON:  It's the computer-aided dispatch

2     log, Your Honor.

3           THE COURT:  It's now in evidence by your motion

4     and your agreement.

5           MR. HERMAN:  Thank you.

6           THE COURT:  It's in evidence.

7           MR. JOHNSON:  May I approach the witness, Your

8     Honor?

9           THE COURT:  That will be People's 1.

10      (People's 1 was admitted into evidence.)

11      THE COURT:  Certainly.  Neither side has to ask

12  about approaching the witness.

13      MR. JOHNSON:  Thank you, Your Honor.

14  Q.    So I'm just going to ask you some questions about

15  that exhibit to see if it refreshes your recollection about

16  what happened when on June 5th, 2015.

17      Was the 911 call placed from the residence at

18  3:34 a.m.?

19  A.    That's what it looks like here on this CAD

20  printout.

21  Q.    And then between 3:34 and 3:35 a.m., the person

22  making the phone call, in this case would be Mrs. Yen, was

23  giving a description -- or Mr. Yen was giving a description

24  of the person, correct?

25  A.    It appears that way, yes.

26  Q.    And then taking you to 3:36 a.m., it says,

27  "Subject ran through the back door," correct?

28  A.    That's correct.

52

1  Q.    And so you knew when you got there, Sergeant, that

2  -- or you believed when you got there that it was one person

3  that was in the home; is that fair to say?

4  A.    It's fair to say that we believed the person who

5  made the call was in the home, yes.

6   Q.      But that there was only one subject slash

7   perpetrator that had been in the Yen home that evening; is

8   that fair to say?

9   A.      That's fair to say.

10  Q.      And so then look down at the entry at 3:39 a.m.

11  3:39 a.m. It says, "Husband, wife, DTR." What does that

12  mean? 3:39:41?

13  A.      I have no idea. That's shorthand that the

14  dispatchers write. I don't know.

15  Q.      Okay. Is that the code that you use with the

16  Dublin Police Department? DTR?

17  A.      I -- I haven't -- I'm not -- unfamiliar with it.

18  I have not heard DTR. That's -- I think that's shorthand of

19  what they wrote on the CAD.

20  Q.      Okay.

21          THE COURT: You just said, "I'm not unfamiliar

22  with it"?

23          THE WITNESS: I'm not familiar with it.

24          THE COURT: You're not familiar with it. In other

25  words, you don't know what it means?

26          THE WITNESS: No.

27          THE COURT: Even if they might, you don't?

28          THE WITNESS: That's correct.

53

1           THE COURT: And you're a sergeant.

2           THE WITNESS: Yes.

3       THE COURT:  Okay.

4           MR. JOHNSON:  Q.  And what does it mean at

5   3:40 a.m. that 1A71 will take the field?  What's that mean?

6   A.      So 1 Adam 71 is answering up saying that he's

7   going to take a position near a field.

8   Q.      Okay.  So 1 Adam 71 is a police officer, correct?

9   A.      That's correct.  He is.

10  Q.       And did you order people to take positions around

11  the home?

12  A.      Initially I believe it was 1 Adam 71 was the unit

13  that started actually calling a perimeter on -- on the way

14  there.

15  Q.      Okay.  But when you got to the home, Feroz and

16  Dormer were already present, correct?

17  A.      That's correct.

18  Q.      And you saw no other people in the front yard

19  besides Dormer and Feroz, correct?

20  A.      That's correct.

21  Q.      And then shortly thereafter you saw Mr. and

22  Mrs. Yen, correct?

23  A.      That's correct.

24  Q.      Okay.  And then about 15 or 20 minutes after that

25  time is when you came into possession of the Samsung phone;

26  is that fair to say?

27  A.      I'm not sure if it's that long of a time frame,

28  but somewheres in that area.

1  Q.     Okay.  Let me ask you this, Sergeant.  When you

2  look at your report, there aren't specific times listed for

3  when events happened; is that fair to say?

4  A.     That's correct.

5  Q.     Have you reviewed your report prior to testifying

6  today?

7  A.     That's correct.

8  Q.     And you wrote your report, it looks like, a couple

9  of days after the event in question.

10  A.     On the top of the form it says June 7, 2015,

11  08:18:25.

12  Q.     Uhm-hmm.

13  A.     That may have been the time that it was approved

14  in the -- in the cue, in the computer system.  I'm not sure

15  if that's the exact time the report was written.

16  Q.     Okay.

17  A.     This incident --

18  Q.     And then, Sergeant, for instance, the events that

19  occurred when you were there, from the time that you met the

20  Yens in the front yard and until the time that you got

21  possession of the phone, until the time that you gave

22  possession of the phone back to Dormer, until the time that

23  a perimeter was set, none of those times or none of those

24  events are noted by time in your report, correct?

25  A.     That's correct.

26  Q.      And your report starts at 3:34 a.m. and the final

27  entry says that you noticed the sun was rising, correct?

28  A.      That's correct.

55

1  Q.      And do you remember the sunrise that day being at

2  about 5:45 a.m.?

3  A.      I'm not exactly sure.

4  Q.      And why did you not, Sergeant, include the time

5  frame of when you were doing certain things in the report

6  that you wrote if you were writing it for the purposes of

7  establishing exigency?

8  A.      I didn't include times because it's done in --

9  it's done in how everything occurred.  However, I'm not

10  sitting, watching, like logging everything on my watch every

11  time I'm doing everything.

12         And we're short on people, so the amount of people

13  that I had that I had to supervise for this type of incident

14  was -- I was left with very little people to actually cover

15  the scene.  I need a minimum of four people to set up a

16  perimeter and I need at least three people on an entry team

17  and I'm calling other agencies asking for helicopters.  I'm

18  calling asking for a canine.  I'm talking to my -- you know,

19  Sergeant White on the phone saying -- telling him to call my

20  lieutenant.

21         So I'm tasked with a multitude of things and it's

22  not realistic to say that every time I do something I'm

23   going to look at my watch and then write down the exact time

24   that it occurred.

25         THE COURT:  Okay.  The report he's referring to,

26   you didn't even write that until sometime later off notes;

27   is that right?

28         THE WITNESS:  I may have written it the next day

56

1   and it got approved the following day.

2         THE COURT:  That's what I mean.  So you're writing

3   this the next day.

4         THE WITNESS:  Yes, that's correct.

5         THE COURT:  So it's what you did on your notes.

6         THE WITNESS:  Yes.

7         THE COURT:  And it's easier to notice the sun was

8   coming up than to write down the time at that particular

9   moment even as you wrote other times down specifically.

10        THE WITNESS:  That's correct.

11        THE COURT:  Okay.

12        MR. JOHNSON:  Q.  When did the exigency to -- you

13   said in your direct testimony that you believed that there

14   were exigent circumstances and you needed to locate the

15   suspect.  When did the exigency or emergency end?  At what

16   time?

17   A.      I'm not exactly sure what time, but I'd say once

18   Mr. Yen was at the hospital, I believed that he was safely

19   out of the area. Once I had enough units on scene and we

20   had to finish the -- searching the area or I had enough

21   units searching the area and I knew the house was secure and

22   I had enough officers to actually secure the family, that's

23   when I determined that these people were safe.

24          And I had yards that were being searched in the

25   area with canines.  So once I determined most of these yards

26   in the area surrounding were safe, we weren't getting any

27   additional calls, nobody was calling and saying there's a

28   man in my house, that's how -- that's when I determined that

57

1   the exigency was in place no longer.

2   Q.      Did you secure the neighborhood?

3   A.      We did the best that we could to secure the

4   neighborhood with the limited amount of units that we had

5   and the geographical layout of that neighborhood.

6   Q.      What time did you secure the neighborhood?

7   A.      I'm not going to say that we secured the entire

8   neighborhood.  It's impossible to say you secured an entire

9   neighborhood.

10          We set up a perimeter and we really only were able

11   to set up a perimeter on the west because the eastern half

12   is rural land and that was an impossible area to cover with

13   the units that we had.

14   Q.       Why were the Yens allowed to stand on their front

15   porch for 10 or 15 minutes if you had concern for their

16  safety?

17  A.      Well, they were -- that's where I had all of my

18  resources.  All of my resources were at the house and in

19  front of the house, so that would have been the safest area.

20  I had more deputies in that area.

21  Q.      Did you ever ask -- if you were concerned about

22  their immediate safety, did you ever ask any deputy to put

23  them in a car, to take them away, to put them in the house,

24  anything like that, other than just having them stand out in

25  front of the house?

26  A.      No.  I didn't have the resources at the time.

27  Q.      You understood, Sergeant -- you understood that

28  when you received the phone, the phone had a pass code on

58

1  it?

2  A.      That's correct.

3  Q.      Did you try to swipe it?

4  A.      I don't know -- I can't recall trying to swipe it.

5  I had to do something to dial 911 from it so I don't know

6  what -- I don't remember what I had to do to dial 911.  I

7  don't know if it was swiping the screen or where you touched

8  in a certain area.  I don't recall.

9  Q.      But you did by- -- you did bypass the first screen

10  so that you could get a phone call out of the phone,

11  correct?

12   A.      I don't even really what the first screen looked

13   like.  I know I dialed 911 from the phone.  Remembering what

14   that screen looked like, it was in my hand for a very short

15   period of time.

16   Q.      Okay.  And so you were the one that dialed 911,

17   correct?

18   A.      That's correct.

19   Q.      But you didn't write in your report when you

20   dialed 911.  You can just say based upon this CAD log,

21   Exhibit 1 of the People, that it occurred at 3:54 a.m.,

22   correct?

23   A.      That's correct.

24   Q.      And could you take us to 3:54 a.m., 34 seconds?

25   What makes you think that at 3:54:34, a 911 call was placed

26   from the phone that you were given from Kelly Yen?

27   A.      You know, I'm not familiar with exactly how they

28   enter this or what that actually means, Verizon Wireless.

59

1   Maybe it means I made contact with Verizon Wireless.  I can

2   tell you that 03:54:05 says, "CHP transferred 911 call,

3   suspect phone."

4   Q.      All right.  So are you 1A74?

5   A.      No.  I'm not.

6   Q.      Are you 1A72?

7   A.      No.

8   Q.      If you were concerned about the safety of

9  everybody involved, why were paramedics allowed on the scene

10  to treat Mr. Yen?

11  A.      It was exigent that he got treated.  He had blood

12  bleeding from his forehead.  We didn't know how badly he had

13  been injured and he said he was struck.  That's a serious

14  injury.

15  Q.      But even when you have something that's as life-

16  threatening as somebody who could be in danger of losing

17  their life, it's the practice of law enforcement to always

18  stage paramedics and fire until the scene is completely

19  secure and safe; isn't that true?

20  A.      That's true for most of the time, yes.

21  Q.      Did you in this case stage the paramedics or fire

22  at another location until your scene was completely safe and

23  secure?

24  A.      They were probably staged at a location prior to

25  entering.

26  Q.      Do you remember Mr. Yen being treated at the front

27  porch of the home by paramedics?

28  A.      I can't say for sure that I remember him being

60

1  treated at the front porch because I had a number of things

2  that I was performing at the time.  It's very possible.

3  Q.      Did you think, Sergeant, that when you were

4  calling 911 from the phone, that you were searching the

6  A.        I believed it was exigent and I believed it was an

7  exigent circumstance to call 911 from that phone.

8  Q.        So is that a yes, you realized that you were

9  searching it but it was exigent?

10  A.        Yes.

11  Q.        And then can you take a look at the People's

12  exhibit again.  So at 3:54:05, CHP says -- it says, "CHP

13  transferred 911 call.  Suspect phone."  Correct?

14  A.        Okay.

15  Q.        And then at 3:57:02, what is Verizon telling the

16  Dublin Police Department?

17  A.        They were saying, "Verizon faxing over form.  Will

18  not release the info for subscriber info unless

19  life-threatening emergency."

20  Q.        And so at 3:57 -- at 3:54, the 911 call is placed

21  from the phone.  At 3:57, the Dublin Police Department has

22  contacted Verizon and Verizon says we are not releasing

23  subscriber information unless it is a life-threatening

24  emergency, correct?

25  A.        That's not correct.  Actually, our dispatch is

26  contacting Verizon, not Dublin Police, so that conversation

27  is happening between our dispatch.  Not between me.  And --

28  Q.        That's fair.  Okay.  I get it.  So dispatch has

61

1  now heard from Verizon at 3:57, and Verizon is saying we're

2  not giving you subscriber information unless this is a

3  life-threatening emergency, correct?

4  A.      That's correct.

5  Q.      And it says Verizon is faxing over their form to

6  our agency and the form will be filled out to show it's a

7  life-threatening situation, correct?

8  A.      It says Verizon is faxing over a form.

9  Q.      Was that form ever filled out, to your knowledge?

10  A.      I don't have any knowledge on that.

11  Q.      Did you ever call dispatch and say fill out that

12  life-threatening emergency form; we have an exigency out

13  here?

14  A.      I did not.

15  Q.      And then -- then tell His Honor what happens at

16  4:12:02 a.m., approximately 15 minutes later.

17  A.      4:12 it says, "Late entry per 1 Sam 70.  Not

18  life-threatening emergency for cell phone info."

19  Q.      Okay.  So late entry per 1S70, 1S70 is a person.

20  It's a police officer, right?

21  A.      That's correct.

22  Q.      And it says, "Not life-threatening emergency for

23  cell phone info."  Correct?

24  A.      That's correct.

25  Q.      Who called dispatch to say 15 minutes later that

26  it was not life-threatening?

27  A.      Dispatch called me and they asked me and I made

28  the determination that the scene was secure, that I had

1   enough units there, and I wasn't going to say at that point

2   it was exigent.  So we had gotten the phone number, but we

3   weren't going to go any further because the exigency to me

4   was stale at that point.  We had enough units that I did not

5   believe at 4:12 that -- I believed we could protect the

6   family well enough that we -- and the neighborhood had been

7   searched -- that we were fairly sure that the -- at that

8   point there was no exigency.  That the family was safe and

9   for the most part the neighborhood was safe unless we, you

10  know, missed somebody.

11        THE COURT:  Connected with that same thought

12  process, you're also coming to the determination you're not

13  going to catch the guy either in the area.

14        THE WITNESS:  That's correct.

15        THE COURT:  So as that became less likely, the

16  exigency became less likely.

17        THE WITNESS:  That's correct.

18        THE COURT:  Okay.

19        MR. JOHNSON:  Q.  So what exactly happened between

20  4:50 -- 3:57 and 4:12 where it went from a life-threatening

21  event to a non-life-threatening event?

22  A.      More units were on scene.  We could better protect

23  the family.  I went from having myself and two units on the

24  scene in the very beginning to having a canine officer from

25   Pleasanton PD, two additional units from the Tri-Valley

26   substation, and a couple more of my patrol units arrived on

27   scene.

28   Q.      Tell the judge what time the canine units got to

63

1   the scene.

2   A.      One of the canine units was 0350.

3   Q.      0350?

4   A.      That's correct.  I'm not sure where the entry is

5   for the second canine unit.

6   Q.      And so if we -- if we look at your report where

7   you're saying the exigency by 4:12 had ceased, if we look at

8   your report, there's nothing in your report in terms of time

9   that says this -- the exigency was concluded, the scene was

10   secure.  There's nothing in your report that says that,

11   correct?

12   A.      That's correct.

13   Q.      And as you sit here now looking back, you know,

14   three months ago, you don't know exactly what time the first

15   canine unit got there, the second canine unit got there,

16   other support units came.  You can't say that now because

17   it's not in your report, correct?

18   A.      I can't say it now but that's why we have a

19   computer-aided dispatch.  They log just about everything on

20   scene.  So every time somebody gets on the radio and says

21   this is here or that's here, then all those things are

22   logged on scene.

23        There are times when things are not logged at

24   dispatch, but generally it's a running timeline of an event.

25   Q.     Can you look at the computer-aided dispatch

26   between 3:54 and 4:12 and tell me where it reflects that law

27   enforcement personnel have -- any law enforcement personnel

28   have arrived on scene between 3:54 and 4:12?

64

1   A.     It doesn't say that -- it doesn't say any

2   additional.  However, if you look at it, it will say 1 Adam

3   73 took a position at Volterra and Terracina.  1 Adam 72

4   took far south end of Terracina.  1 Adam 73 was off with a

5   suspicious vehicle.

6        So it tells you that we were set -- that the

7   perimeter units were in place at that time which makes the

8   scene more secure.

9        MR. JOHNSON:  Nothing further, Your Honor.

10       Thank you, Sergeant.

11       THE COURT:  Any redirect?

12       MR. HERMAN:  No, Your Honor.

13       THE COURT:  May the witness be excused?

14       MR. HERMAN:  Yes, Your Honor.

15       THE COURT:  Counsel?

16       MR. JOHNSON:  No -- yes, Your Honor.

17       THE COURT:  Thank you very much, Sergeant.  You

18   are excused.

19        You have one more witness?

20        MR. HERMAN:  Yes, Your Honor.

21        THE COURT:  Can we get him done in 20 minutes?

22        MR. HERMAN:  I hope so.

23        THE COURT:  Okay.  Make sure the sergeant doesn't

24   have People's 1.

25        MR. HERMAN:  Okay.  The People would call

26   Detective Kevan Williams.

27        THE COURT:  Don't -- Mr. Herman, that's why you

28   have an investigator.  Have him go make sure.  Mr. Herman,

65

1    don't leave.  Let's go.

2         Come on up, Officer.  Walk up here.  We're

3    swearing you in.  Raise your right hand.  My clerk will

4    swear you in.

5              DETECTIVE KEVAN WOODS,

6         called as a witness on behalf of the People,

7         having been first duly sworn by the Clerk, was

8         thereafter examined and testified as follows:

9    THE WITNESS:  I swear.

10        THE CLERK:  Thank you.  Please have a seat.

11        Please state your name and spell your first and

12   last name for the record.

13        THE WITNESS:  First name Kevan, K-E-V-A-N, last

14   name Woods, W-O-O-D-S.

15    THE CLERK:  Thank you.

16        DIRECT EXAMINATION BY MR. HERMAN

17    MR. HERMAN:  Q.  Detective Woods, can you tell us

18  what you do for a living?

19    THE COURT:  Counsel, you want to look at that and

20  make sure we have the right exhibit back here?

21    MR. JOHNSON:  Uhm-hmm.  That's it.

22    THE COURT:  Go ahead, Mr. Herman.

23    MR. HERMAN:  Q.  Can you tell us what you do for a

24  living?

25  A.    Yes.  Deputy with the Alameda County Sheriff's

26  Office.  I've been employed for approximately nine years.

27  Within the last eight months I've been assigned to detective

28  in the special investigations unit of Dublin Police.

66

1  Q.    I want to direct your attention to June 5th of

2  2015.  On that date were you assigned to any particular

3  investigation in Dublin?

4  A.    Yes, I was.

5  Q.    Tell us what you were assigned to.

6  A.    I was called out from my home and called out to

7  the address of 1617 North Terracina Place in Dublin in what

8  was thought of as a home invasion robbery.

9  Q.    When you got to the scene, did you meet with

10  Sergeant White?

11  A.      Yes, I did.

12  Q.      And Sergeant White, what is his role?

13  A.      He is the sergeant of the special investigations

14  unit in Dublin.

15  Q.      And are you part of that unit?

16  A.      Yes, I am.

17  Q.      Now, when you got on scene, were you tasked with

18  any duty?

19  A.      Yes, I was.  Sergeant White handed me a white

20  cellular phone in which he advised me a search warrant

21  needed to be written for the phone.

22  Q.      And what, if anything, information were you given

23  about the cell phone?

24  A.      I was told the phone number for the -- for the

25  cell phone, and they said it possibly belonged to the

26  suspect in the home invasion robbery.

27  Q.      Other than knowing the phone number to the cell

28  phone, what -- did you at that point -- or were you aware

67

1  that any other information about the cell phone was known?

2  A.      The only thing at that point -- nothing further

3  was known at that point.

4  Q.      You were informed about where it was found and who

5  found it?

6  A.      I was informed it was found inside of the house.

7  Q.      All right.  But in terms of information on the

8   phone, you had no information of that other than the phone

9   number?

10  A.      That's correct.

11  Q.      All right.  And did you write a search warrant?

12  A.      Yes, I did.

13  Q.      Once you wrote the search warrant, did you have a

14  judge review the warrant?

15  A.      Yes, I did.

16  Q.      And was the warrant signed?

17  A.      Yes, it was.

18          (People's Exhibit 2 was marked for

19           identification.)

20          MR. HERMAN:  Q.  I'm going to show you what's been

21  marked as People's 2 for identification.  Do you recognize

22  what that is?

23  A.      Yes.

24  Q.      What is that?

25  A.      That is the search warrant I authored the morning

26  of June 5th, 2015.

27  Q.      And after authoring the warrant and having a judge

28  review it, was the warrant signed by a judge?

68

1   A.      Yes, it was.

2   Q.      When was the warrant signed?

3   A.      Signed at 9:20 a.m., June 5th, 2015.

4    Q.      And after you had the warrant signed, what if

5    anything, did you do with the warrant?

6    A.      I returned to Dublin police station where I faxed

7    it to Verizon.

8    Q.      All right.

9    A.      Service provider.

10   Q.      Did the service provider then get back to you and

11   provide you with information about the phone?

12   A.      Yes, they did.

13          MR. HERMAN:  Thank you.  Nothing else.

14          THE COURT:  That was quick.  Cross-examination.

15          MR. JOHNSON:  Yes, Your Honor.  Thank you.

16              CROSS-EXAMINATION BY MR. JOHNSON

17          MR. JOHNSON:  Q.  Do you have the warrant there?

18   A.      Yes, sir.

19          THE COURT:  Should we mark that?

20          MR. HERMAN:  I think it's been marked as People's

21   2, Your Honor.

22          MR. JOHNSON:  I think he moved it in.  We did not

23   object.

24          MR. HERMAN:  We haven't moved it in yet.

25          THE COURT:  No.  I know you haven't.  I would have

26   said something.  Are you moving it in?

27          MR. HERMAN:  Yes, Your Honor.

28          THE COURT:  Any objection?

1      MR. JOHNSON:  No, Your Honor.

2      THE COURT:  No objection, it's in.  Search

3  warrant's in.  The affidavit's attached?

4      THE WITNESS:  Yes, Your Honor.

5      THE COURT:  That's part of what's in.

6      (People's Exhibit 2 was received into evidence.)

7      MR. JOHNSON:  Q.  What time did you get to the --

8  the scene in Dublin, the home?

9  A.      I arrived at approximately 5:26 a.m.

10  Q.      Were you the affiant on the warrant?

11  A.      Yes.

12  Q.      Did you say that you were dispatched at 4:10 a.m.?

13  A.      I was -- I received a phone call on my

14  county-issued cellular phone about that time.

15  Q.      And then you got there an hour later?

16  A.      Yes.

17  Q.      Was it a Samsung brand model Galaxy 4 cell phone?

18  A.      I'd have to refer to my spread of specifics, but I

19  do remember it was a Galaxy brand, yes.

20  Q.      Does each cell phone have its own serial number?

21  A.      Yes.

22  Q.      Do cell phones have locking screens?

23  A.      Yes.

24  Q.      Can you bypass a lock screen?

25  A.      I believe the only way to bypass a lock screen is

26  through some sort of advanced electrical equipment which I

27  don't have access to.

28   Q.        Can you bypass a lock screen by pushing -- making

70

1   the phone go into emergency mode?

2   A.        I believe so.

3   Q.        And is it true, sir, that once you go into

4   emergency mode, you're communicating to the phone -- the

5   user is communicating to the phone that it wants to make a

6   call, correct?

7   A.        That's correct.

8   Q.        And so you're going sort of underneath the lock

9   screen, are you not, to be able to access a phone key pad,

10   true?

11   A.        I do not access -- as far as I can remember about

12   the abilities of the phone, I don't remember -- I never

13   accessed the emergency screen, but what I can remember from

14   my experience is that the keypad screen is bypassed only to

15   place an emergency call or as to call 911 or something of

16   that nature.

17   Q.        But a cell phone, even if the pass code is not

18   accessed, is not used, and -- and a person is given entry

19   that way, a cell phone can communicate with the holder of

20   the cell phone even passively; isn't that true?

21   A.        I'm not sure I understand what you mean by that

22   question.

23   Q.        Well, for instance, a cell phone can give a person

24   an appointment reminder correct without entering a pass

25   code?

26   A.      Correct.

27   Q.      A cell phone can give you a text message, correct,

28   without --

                                71

1    A.      I'm not sure.

2    Q.      A cell phone could give you a missed call without

3    entering the pass code, correct?

4    A.      I believe so, but I'm not sure.

5    Q.      Did you try to swipe the lock screen on the phone?

6    A.      No.

7    Q.      Were you just asked to write a warrant for the

8    phone?

9    A.      Correct.

10   Q.      Did anybody ever tell you don't worry, we don't

11   have to write a warrant because the phone was abandoned?

12   A.      No.

13   Q.      Did you understand that even an abandoned piece of

14   property must at times have a warrant to access it?

15   A.      I'm sorry. Can you rephrase?

16   Q.      Did you understand that even a piece of property

17   that had been abandoned by someone would need a warrant to

18   access it, such as a computer or a personal cell phone?

19   A.      Yes.

20          MR. JOHNSON:  Nothing further.

21        THE COURT:  Did that search warrant ask for things

22  from the company or just from what's in the phone?

23        THE WITNESS:  From both, Your Honor.

24        THE COURT:  Okay.  Redirect?

25        MR. HERMAN:  No, Your Honor.

26        THE COURT:  Any recross?  Cross?  Further cross?

27        MR. JOHNSON:  No, Your Honor.

28        THE COURT:  May the witness be excused?

72

1        MR. HERMAN:  Yes, Your Honor.

2        MR. JOHNSON:  Yes, Your Honor.

3        THE COURT:  Thank you very much.  You're excused.

4  But don't take that with you.  We already had that problem

5  already.  We'll keep our own.  Thank you.

6        Any other witnesses?

7        MR. HERMAN:  Not as to the 1538 portion, Your

8  Honor.

9        THE COURT:  There are other witnesses as to the

10  P.X.?

11        MR. HERMAN:  We would have other witnesses for

12  further preliminary examination, yes.

13        THE COURT:  Okay.  You've put in all the evidence

14  as to the 1538.5 issue?

15        MR. HERMAN:  Yes, Your Honor.  And Exhibits 1 and

16  2 have been in and the stipulations are in.  Yes.

17       THE COURT: You would agree that all of the

18   evidence is in as to the 1538.5 issue?

19       MR. JOHNSON: We agree.

20       THE COURT: Okay. So what's the plan? What do

21   you all want to do?

22       MR. JOHNSON: Well, I think the plan, Your Honor,

23   is -- Mr. Herman and I hadn't actually talked to this so I

24   could propose a plan.

25       We'd like the opportunity to brief it further and

26   if we can have another brief on file in a week based upon

27   the testimony that was taken today, and then Mr. Muller --

28   Mr. Herman can have a week to respond and then we can be

73

1   back here in a couple, three weeks to get a ruling.

2       THE COURT: I'm not back here.

3       MR. JOHNSON: Okay. When are you back here, Your

4   Honor?

5       THE COURT: I have no specific plans to be back

6   here.

7       MR. JOHNSON: Okay. We can come --

8       THE COURT: Next week and the week after I'm in a

9   court in Hayward.

10       MR. JOHNSON: We can come to you.

11       MR. HERMAN: Can we -- can I have a moment?

12       THE COURT: Yes.

13       (Counsel confer.)

14          THE COURT:  Most of this is going to be legal

15  questions.

16          MR. HERMAN:  Yes, Your Honor.

17          THE COURT:  You have all the evidence.

18          MR. JOHNSON:  Yep.

19          THE COURT:  I don't know that we need a

20  tit-for-tat.  Why don't you each have a week to file

21  whatever you want to file?

22          MR. JOHNSON:  That's fine.

23          THE COURT:  And then a couple days later, a week

24  after that, you can have a ruling and continue with the P.X.

25  or do whatever else you're going to do.

26          MR. JOHNSON:  Yes, Your Honor.

27          THE COURT:  Does that sound fair?

28          MR. HERMAN:  Two weeks from today work?

74

1          THE COURT:  So everybody -- you each serve each

2  other and give me what you're going to give in writing by

3  September 9th.

4          MR. JOHNSON:  That's fine.

5          THE COURT:  And September 16th we'll meet at

6  11 o'clock in the morning in Department 513.

7          MR. JOHNSON:  Is that in Hayward?

8          THE COURT:  In Hayward.

9          MR. JOHNSON:  We'd love to come to Hayward, Your

11        THE COURT:  Shorter trip, isn't it?  As I recall.

12        MR. JOHNSON:  No.  It's about an hour-and-a-half

13  either way.

14        THE COURT:  Oh, you're Sacramento.

15        MR. JOHNSON:  Yes.  You say that like it's a bad

16  thing.

17        THE COURT:  It's an hour-and-a-half either way.

18        MR. HERMAN:  Did you want that in the afternoon?

19        THE COURT:  Well, everything that's not

20  Pleasanton, it's all downhill.

21        MR. HERMAN:  Did you want that in the afternoon,

22  Your Honor?

23        THE COURT:  No.  No.  I put it at 11:00 in the

24  morning would be the best fit.  It should be easy to fit.

25  You shouldn't have to wait around.  Most of the stuff should

26  be done.  Kind of piecemeal.  Just like 2 o'clock wasn't

27  such a good fit here, but 11:30 if all we're going to do is

28  that short stuff, I could fit it in easily.  So for 11:00,

75

1  the dust should be settled on the heavy morning stuff and

2  I won't be blocking -- and I have no idea what their

3  calendar looks like on a Wednesday afternoon.  So if I say

4  11:00 a.m., we can go with that.  Okay?  So further P.X.,

5  1538.5, 11 o'clock, September --

6        MR. HERMAN:  We need one other issue addressed.

7          MR. JOHNSON:  Your Honor, we're -- Mr. Muller is

8   prepared to give a 60-day waiver for the preliminary

9   hearing.

10         THE COURT:  Oh, I thought that had been done.

11         MR. JOHNSON:  We can do that right now.

12         THE COURT:  Well, he's done the One Session Rule

13   when we started.

14         Do you understand you have a right to a

15   preliminary examination within 60 calendar days?  You've

16   already waived the 10-day court days.  And obviously we're

17   now going at a more casual pace.  Although a lion's share of

18   the hearing has been done, it's not fully done.  We have

19   more than one session but we're putting it over two weeks.

20         To that extent and to the extent you have a right

21   to a speedy hearing within 60 days could be questioned, do

22   you waive the right to have that hearing within 60 days?

23         THE DEFENDANT:  Yes, Your Honor.  I waive the

24   right.

25         THE COURT:  Do you have any questions about it?

26         THE DEFENDANT:  No, I don't, Your Honor.

27         THE COURT:  Okay.  And, Counsel, do you concur?

28         MR. JOHNSON:  We do, Your Honor.

76

1          THE COURT:  And as I recall, I heard rumors of

2   this but you can't believe what you read in the press, your

3  client actually has a law degree so he knows his stuff

4  pretty well.

5       MR. JOHNSON:  I'm not commenting on that.

6       THE COURT:  Although he does have a law degree.

7       MR. JOHNSON:  He has a law degree.

8       THE COURT:  Okay.  Pretty good shape.  He knows

9  what he's doing.

10       MR. JOHNSON:  We are not talking about that either

11  but I will tell you we'll file something in Hayward in a

12  week.

13       THE COURT:  That will be good.

14       Do you plan on filing something?

15       MR. HERMAN:  Yes, Your Honor.

16       THE COURT:  So I know to look for both.

17       MR. HERMAN:  Yes.

18       THE COURT:  And obviously you're making sure it

19  gets to each other at least as quickly as it gets to the

20  Court.

21       MR. HERMAN:  Yes.

22       THE COURT:  Okay.  We will forward the file to

23  Hayward and then at 11:00 we can determine if we can -- if

24  we need to take further evidence.  Can we agree that we

25  don't have to have other witnesses lined up that day?

26       MR. JOHNSON:  Yes.

27       THE COURT:  We'll pick from that day if there's

28  more -- whatever other witnesses there are.

77

1          MR. HERMAN:  That would be preferable, Your Honor.

2          MR. JOHNSON:  Yes, Your Honor.

3          THE COURT:  And nobody's locked in.  If the

4 defense wanted to call witnesses, they could let us know

5 that day.  You said three to do this but I realize --

6          MR. HERMAN:  I'll have other witnesses for further

7 P.X.

8          THE COURT:  But not on that day.

9          MR. HERMAN:  Correct.

10          THE COURT:  All right.  Thank you all very much.

11          We're off the record.

12          (Whereupon, this proceeding was adjourned at the

13 hour of 4:25 p.m. and continued to September 16, 2015, at

14 the hour of 11:00 a.m.)

15                    ---o0o---

16

17

18

19

20

21

22

23

24

25

26

27

28

78

1  COUNTY OF ALAMEDA        )
                            )  ss.
2  STATE OF CALIFORNIA      )

3

4        I, LEINAALA YEE GRAY, do hereby certify:

5        That I am a Certified Shorthand Reporter in the

6  State of California, and an official reporter, in the

7  Superior Court for the Livermore-Pleasanton-Dublin Judicial

8  District, County of Alameda, State of California;

9        That on September 2, 2015, I fully and correctly

10  reported the within-entitled matter, PRELIMINARY

11  HEARING/1538.5 MOTION TO SUPPRESS OF MATTHEW MULLER, before

12  the Honorable Joseph Hurley, Judge;

13       That the foregoing pages, 1 through 79, inclusive,

14  are a full, true and correct transcription of my shorthand

15  notes taken at the aforementioned time and place.

16       IN WITNESS WHEREOF, I have hereunto subscribed my

17  name this 5th day of October, 2015.

18

19

20

21       _____

22       LEINAALA YEE GRAY, CSR #2941

24

25

26

27

28        End

79