PHILLIP A. TALBERT
United States Attorney
MATTHEW D. SEGAL
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>                    v.<br><br>MATTHEW D. MULLER,<br><br>                          Defendant. | CASE NO.  2:15-CR-205 TLN<br><br>SENTENCING MEMORANDUM OF THE UNITED STATES<br><br>DATE: March 16, 2017<br>TIME: 9:00 a.m.<br>COURT: Hon. Troy L. Nunley |

## I.      **INTRODUCTION**

Matthew Muller should be sentenced to forty years of incarceration.  Muller is extremely dangerous.  Public safety requires that he be imprisoned until he is old and weak.  Muller's conduct was depraved and egregious:  he invaded a stranger's home, kidnapped a woman, video-recorded himself as he raped her, and used elaborate artifice to convince his victims that he was just one member of a professional crew.  Just punishment requires that Muller suffer a severe sentence that accounts for the entirety of his culpable conduct.

Forty years in a no-parole system is a very long sentence.  Muller earned it through careful planning and hard work.  But in this particular non-homicide case, which resolved by a prompt guilty plea, a sentence in excess of forty years would be greater than necessary to comply with the purposes of sentencing.

///

## II.   MULLER'S COMPLETE REAL CONDUCT IS THE BASIS FOR HIS SENTENCE

Kidnapping is the offense of conviction, but Muller's sentence is based on culpable acts beyond those necessary to establish the elements of that crime.  The objective of federal sentencing, both before and after the guidelines, is to sentence defendants based on all of their conduct, rather than on what particular offense was charged.  *See United States v. Booker*, 543 U.S. 220, 253 (2005).  According to the Supreme Court, "This point is critically important.  Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity.  That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute . . . . It consists, more importantly, of similar relationships between sentences and *real conduct*."  *Id.* at 253-54 (emphasis added).

The Court has received letters expressing concern that the Defendant will not be punished for the state crimes that he committed in the course of the kidnapping offense.  The Court is well equipped to address this concern.  Real conduct sentencing holds defendants accountable for charged, uncharged, and even acquitted conduct that occurred during the offense of conviction.  *See United States v. May*, 706 F.3d 1209, 1213 (9th Cir. 2013).  It holds defendants accountable even for relevant conduct that federal authorities had no jurisdiction to charge.  *See United States v. Yip*, 592 F.3d 1035, 1038 (9th Cir. 2010); *United States v. Newbert*, 952 F.2d 281, 284 (9th Cir. 1991).

The sixty-six-page PSR in this case is comprehensive.  The core facts of the offense are as follows:

> At approximately 3:00 a.m. on March 23, 2015, [Matthew Muller] broke into Aaron Quinn's and Denise Huskins' home on Mare Island in Vallejo, California. They were restrained, blindfolded, and headphones were placed over their ears. They were also drugged, and Quinn was directed to release his financial information and passwords to [Muller]. Huskins was taken to another room and ultimately kidnapped from her home by [Muller]. She was placed in the trunk of Quinn's vehicle, transported to another vehicle, and placed in the trunk, still blindfolded and bound; she was taken to a cabin in South Lake Tahoe, California. Quinn reported the kidnapping to the Vallejo Police Department (VPD) at approximately 1:53 p.m. after he woke up from being drugged. Between March 23, 2015, and March 24, 2015, Huskins was sexually assaulted on two occasions. On March 25, 2015, sometime in the morning hours, Huskins was released by the subject in Huntington Beach, California.

1   PSR ¶ 5.  The advisory guidelines range is increased for each of these aspects of Muller's relevant

2   conduct:  he made a ransom demand, he threatened his victims with an apparent weapon, he raped a

3   victim, and threatened to harm her family if she spoke to law enforcement.  PSR ¶¶ 71-82; U.S.S.G.

4   § 2A4.1; U.S.S.G. § 3C1.1.[1]   But even then, "the Guidelines are not the only consideration."  *Gall v.*

5   *United States*, 552 U.S. 38, 49 (2007).  Federal sentencing requires an individualized assessment in light

6   of all the facts presented.  *Id.*

7        The victims have submitted detailed, courageous statements regarding the terrifying and

8   continuing effect Muller's offense has had on them.[2]  Dkt. 51-2.  Notwithstanding the fact that only one

9   victim was actually carried away and raped in the course of the offense, both qualify as victims because

10  they were both "directly and proximately harmed as a result" of the kidnapping.  *See* 18 U.S.C.

11  § 3771(e)(2)(A).  No prosecutor's summary could better express the horror of Muller's crime.

12  ### III.        THE STATUTORY FACTORS FAVOR A SENTENCE OF FORTY YEARS
13              IMPRISONMENT

14       **A.        Introduction**

15       The remainder of this Sentencing Memorandum focuses on concerns outside the Guidelines that

16  favor a sentence of forty years.  Muller committed the Vallejo kidnapping as part of a series of similar

17  crimes.  Muller's serial crimes show his dangerousness and merit a very lengthy sentence "to protect the

18  public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Muller's premeditated

19  psychological manipulation of the victims is not captured by the Guidelines and weighs against a

20  variance below forty years.  18 U.S.C. § 3553(a)(2)(A).  Muller's psychological troubles are no reason

21  to sentence below forty years.  They do not bear on his culpability, and Muller has presented no

22  evidence that psychological treatment could ever make him less dangerous.  Finally, the possibility of

23  state prosecution has no bearing on how this Court should fashion its sentence to punish the Defendant

24  and protect the public.

25  ///

26       [1] The guidelines range would be 168-210 months if this defendant had done none of these things
    except make a ransom demand, and plead guilty.  *See* U.S.S.G. § 2A4.1(a), (b)(1).

27       [2] Further, Ms. Huskins has bravely stated through counsel that the Government "may mention
28  any and all facts for sentencing, including the rapes."

### B.   A Series of Escalating Similar Crimes

Muller committed this offense as part of a pattern of escalating conduct.  The PSR does not increase Muller's criminal history category pursuant to U.S.S.G. § 4A1.3(a)(2)(E), but the Court should still sentence in light of the evidence that this offense was the penultimate one in a pattern of similar serious crimes.  *See United States v. Truong*, 587 F.3d 1049, 1052 (9th Cir. 2009); 18 U.S.C. § 3553(a)(2)(C).

In 2009, Muller moved from Cambridge, Massachusetts to Menlo Park, California.  PSR ¶ 105. On September 29, 2009, in Menlo Park, a masked man entered a woman's residence, bound her hands and feet, put a mask or goggles over her eyes, and alternately warned her "stop screaming, or I'll hurt you," and reassured her to "calm down" during the "robbery."  PSR ¶ 85.  The intruder demanded information useful for identity theft and gave the victim a soporific liquid like Nyquil.  PSR ¶ 101.

On October 18, 2009, a woman in Palo Alto was similarly restrained, blindfolded, and ordered to turn over financial and electronic account information.  A man who seemed to be part of a group told her he was going to rape her.  He attempted to do so, but the victim talked him out of carrying out the rape. The intruder ordered the victim to choose between drinking Nyquil, being injected with a drug, or being shocked with a stun gun.  PSR ¶ 86.

Muller was questioned as a suspect in these incidents.  He was identified because, a few days earlier, police had contacted him acting suspiciously near where the home invasions later occurred.  PSR ¶ 86.  Then, while under overt investigation, on November 13, 2009, Muller fled to Utah and instructed his then-wife not to tell anyone where he was going.  PSR ¶¶ 117-8.

On November 29, 2012 in Palo Alto, a woman reported that she awoke in her bedroom to a man who had entered her apartment as she slept.  The man pinned her to her bed and hurt her.  She believed she was going to be raped or killed, but the man left after stealing some property.  That woman lived less than a mile from Muller's wife's address.  PSR ¶ 87.  Two weeks later, Palo Alto police stopped Muller for a traffic violation.  PSR ¶ 92.  When they arrested him on an outstanding warrant, they found him in possession of burglary tools.  *Id.*  Muller would not even give a straight answer about where he lived. *Id.*

///

1    Muller was finally caught by Alameda County authorities.  It is not hard to guess what Muller

2    had planned to do in the early morning hours of June 15, 2015 in Dublin.  PSR ¶ 39.  Muller, "who was

3    wearing black clothing and a mask over his face, entered the master bedroom and woke the [adult

4    occupants of the house] with a red laser beam and a flashlight.  The [parents] were ordered to lie face

5    down on the bed and told if they followed the burglar's instructions, their daughter would be safe."  *Id.*

6    Muller fled after a melee, but left behind zip-ties and the cell phone that led to his arrest.  *Id.*  Muller has

7    been convicted of this offense.  PSR ¶ 93.

8    The foregoing are undisputed facts in the PSR and the Court may rely on them.  *See United*

9    *States v. Ameline*, 409 F.3d 1073, 1085-86 (9th Cir. 2005) (en banc).  In light of the similarities,

10   Muller's proximity to the crimes, his 2009 flight under investigation, his 2012 arrest in possession of

11   burglary tools, the Vallejo kidnapping, and the Dublin burglary, the Court should go further and infer

12   that Muller committed all five of these attacks and impose a sentence that sufficiently protects the

13   community from his further crimes.

14   ### C.   The Psychological Manipulation of the Victims

15   After meeting Muller, the Probation Officer has concluded, "Muller is very intelligent and knows

16   how to manipulate things in his favor."  PSR p. 32.  Denise Huskins similarly observed, "He used his

17   charm and intellect to psychologically torture her."  PSR ¶ 57.  It was an important aspect of the offense

18   in this case that Muller used elaborate artifice to convince his victims that he was only one reluctant

19   member of a gang.  As Muller later wrote in his March 28, 2015 email to the press, "The details of the

20   case are unusual, and include conflicting information and deliberate obfuscation.  This was intended, in

21   order to make the crime more likely to succeed and to cover our tracks in case it did not."  PSR at p. 42.

22   Muller is obviously intelligent and capable of effective planning and self-presentation.  He holds degrees

23   from Pomona College (B.A. 2003) and Harvard Law School (J.D. 2006).  PSR ¶ 127.  He was an

24   instructor in the Harvard Law School Clinical Program on Refugee Rights and Human Rights Law and

25   speaks four languages.  PSR ¶¶ 130, 135.

26   Muller had conducted reconnaissance on his Vallejo victims[3] and he came prepared to use

27

28   ___

[3] Muller used a drone to record video of the victims together in the home.  PSR ¶ 45.  There is evidence that Muller actually entered the house some time prior to the kidnapping.  PSR ¶ 45 n.8.

artifice to terrorize.  His "gun" was a water pistol that Muller had painted black and duct-taped to a

flashlight and laser pointer.  PSR ¶ 44.  Muller brought headphones with a pre-recorded message in

which the "group" threatened to punish noncompliance with electric shock or facial laceration.  PSR

¶ 88.  Muller had a military-style vest that had a wireless speaker in one of its mesh pockets.  PSR ¶ 45.

That speaker was able to play the audio file that agents later found on Muller's computer:  apparent

sounds of a group of people urgently whispering to each other during the kidnapping.  PSR ¶ 45 n.5.

Although Muller blindfolded the victims and made it clear they were not to look up, Muller also had a

blow-up mannequin clothed in military-style fatigues and attached to large bendable wires to stand it

upright.  PSR ¶¶ 21, 44.

Muller also used this deceit to manipulate Denise Huskins.  She recognized that Muller was

using power and reassurance to control her.  She told the Probation Officer,

> Muller was so manipulating that he knew how to use his "niceness" to put
> her in a position of no power or control.  Muller continued with the
> compliments and told her, "You are so strong; you are handling this very
> well."  Ms. Huskins said Muller seemed in awe that she was doing so well.
> Muller told her she would suffer from this for a very long time.

PSR ¶ 55.  When Muller committed rape, he was video recording it, he wanted it to look a certain way,

and he was disappointed when it first did not.  PSR ¶¶ 32, 45 n.6, 53-4.  Muller wanted to rape under the

false pretense that he, the rapist, was unwilling and coerced.  He wanted to try to avoid full recognition

of his depravity.  This continued until the moment he released Ms. Huskins.  Muller told her that he was

sorry that they had "met under these circumstances."  PSR ¶ 56.

Muller used the story of a kidnapping crew to the same end in his emails.  On March 26, 2015,

the "group" expressed concern for Ms. Huskins:

> In what I suppose would be a case of reverse Stockholm syndrome, we
> (and particularly the one in charge of holding her during the operation)
> were very impressed with the strength she showed and who she was as we
> passed the time talking to her. We are criminals I suppose, but we have
> consciences and seeing the impact of our actions on someone deeply
> affected us and caused us to reconsider our lives.

PSR at p. 39.[4]  Muller still wanted Ms. Huskins to believe that the rape was a result of an "argument

---

[4] Only Muller ever talked to Ms. Huskins.  And prior to the assault, the cameras were already
recording when he carefully set them up and tested their viewing angles.  Muller was the only one there.

1   within the team."  PSR at p. 40.

2       Muller did not reconsider his life.  Rather, he went on to carry out the unsuccessful similar attack

3   in Dublin.  The Court at sentencing will reflect on Muller's track record of carrying out serial acts of evil

4   while uttering false words of kindness, excuse, and regret.  Muller's cannot be credited when he says,

5   "All I've wanted to do in life is help people.  I've done the exact opposite.  I am very sorry."  PSR ¶ 67.

6       **D.**     **Muller's Psychological History Does Not Favor a Sentence Below Forty Years**

7       Some of Muller's claims about his psychological history are verified and some are not.  PSR

8   ¶¶ 114-125.  The Plea Agreement in this case contemplated a lengthy presentence investigation so that

9   Muller could seek an opinion about his mental condition.  Plea Agr., Dkt. 43, ¶ VI.E.  But there is no

10  expert evidence to support the conclusion that any mental condition makes Muller any less morally

11  culpable for his crime and there is no expert evidence to support the conclusion that any kind of mental

12  health treatment could ever make Muller any less dangerous.

13      Nothing about Muller's mental health history changes what is required for just punishment and

14  public safety:  Muller must remain incarcerated until he is physically enfeebled from old age.

15      **E.**     **The Possibility of State Prosecution Does Not Favor a Lower Sentence in Federal**

16  **Court**

17      There have been public reports that a district attorney is considering charges against Muller.  But

18  the possibility of such proceedings should not affect this Court's sentence, which itself must reflect

19  Muller's full relevant conduct, culpability, and dangerousness.  Moreover, this Court should not reduce

20  Muller's federal sentence based on speculation.  There is no guarantee that he will face consecutive

21  punishment by another sovereign.  *See Truong*, 587 F.3d at 1052.

22      **IV.**     **CONCLUSION**

23      The Government respectfully requests that the Court sentence Muller to no more and no less than

24  forty years.  As Muller will no doubt argue, under section 3553(a) a district court should exercise its

25  sentencing discretion in a way that is sufficient, but not greater than necessary to accomplish the

26  purposes of sentencing.  The so-called parsimony clause "is a guidepost, an overarching principle that

27  _____

28  PSR ¶ 45 n.7.

1  directs judges in the appropriate exercise of their sentencing discretion within the sentencing range

2  authorized and consideration of factors prescribed by Congress."  *United States v. Chavez*, 611 F.3d

3  1006, 1010 (9th Cir. 2010).  Muller's culpability and dangerousness together require that he be

4  sentenced to forty years imprisonment.

5

6   Dated:  March 13, 2017                    PHILLIP A. TALBERT
                                             United States Attorney

7

8                                    By:   /s/ MATTHEW D. SEGAL
                                           MATTHEW D. SEGAL
9                                          HEIKO P. COPPOLA
                                           Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28