THOMAS A. JOHNSON, #119203
KRISTY M. Kellogg, #271250
Law Office of Thomas A. Johnson
400 Capitol Mall, Suite 1620
Sacramento, California 95814
Telephone: (916) 422-4022

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>            Plaintiff,<br><br>      v.<br><br>MATTHEW MULLER,<br>            Defendant. | Case No.: 2:15-cr-00205-TLN<br><br>DEFENDANT'S SENTENCING<br>MEMORANDUM AND OBJECTIONS<br>TO THE PSR<br><br>Date:   March 16, 2017<br>Time:  1:30 p.m.<br>Judge:  Hon. Troy L. Nunley |

## I – INTRODUCTION

The Pre-Sentence Report ("PSR") recommended a sentence of Life based upon a Total Offense Level of 43 and a Criminal History Category I.   Defendant asks the Court to find that the Total Offense Level is 41 which has a sentencing range of 324 to 405 months.  If the Court finds the Offense Level to be Level 41, we ask the Court to sentence Mr. Muller to the middle of the guideline range for a total of 360 months.  If the Court finds the Offense Level is 43 or above, the factors under 18 U.S.C. § 3553(a) provide a substantial basis for the Court to conclude that Mr. Muller should be sentenced to 30 years.   Defendant hereby submits the following Sentencing Memorandum and objections to the Pre-Sentence Report ("PSR").

## II - OBJECTIONS TO THE PSR

**A.**     **The Factors Under 18 U.S.C. § 3553(a) Warrant a 30 Year Sentence**

A sentence is substantively unreasonable if its length is excessive given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a). United States v. Cantrell, 433 F.3d 1269, 1280 (9th Cir.2006).  Based upon the circumstances of this case, there are mitigating factors the Court should consider when determining the appropriate sentence:

### *1.     History and Characteristics of Mr. Muller:*

Matthew Muller grew up in Fair Oaks, California.  After graduating from Bella Vista High School, Mr. Muller enlisted in the Unites States Marines in 1995.  While in the military, he was stationed at Camp Pendleton in San Diego, California, Virginia, Okinawa, Japan, El Toro, California, Miramar, California, and the United Arab Emirates. In July 1999, he was honorably discharged. While in the military Mr. Muller earned the Good Conduct Medal on October 1, 1998.  He also received a National Defense Ribbon, Seas Service Deployment Ribbon, a Certificate of Commendation, and Navy and Marie Corps Achievement Medal.  Mr. Muller is a life member of the Disabled American Veterans since 1999.

Up until Mr. Muller was 21 years-old, he was generally in good health and had not experienced any significant mental health issues.  Unbeknownst to Mr. Muller or the Muller family, the storm clouds of mental illness were beginning to take form.  Following Mr. Muller's distinguished service for the United States, Mr. Muller gained entrance into Pomona College which is widely regarded as one of the most prestigious academic institutions on the West Coast.  He graduated summa cum laude in 2002.  However, his mental health had begun to decline.  He was diagnosed with depression and anxiety and was prescribed Prozac.  *See* PSR ¶ 114. Despite the onset of mental illnesses, Mr. Muller was able to gain admission into Harvard Law School.

1    While Mr. Muller was attending Harvard Law School, his mental health became
2    progressively debilitating.  By his second year, he lost his ability to work and experienced
3    bad depression and anxiety.  *See* PSR ¶ 115. He was working with immigration victims
4    of domestic violence and he unfortunately took on more stress from their life stories and
5    pain.  *See* PSR ¶ 115.  By his third year of law school, in 2005, he developed paranoia
6    and thought he was being tracked by the government and thought he had a break with
7    reality.  *See* PSR ¶ 116.

8    Mr. Muller's mental health problems had become a day to day issue.  His periodic
9    episodes of depression and manic behavior had taken their toll.  By November of 2009,
10   his then wife filed a missing person's report on him.  *See* PSR ¶ 118.  By early 2010, Mr.
11   Muller was a complete mess at work and his depression reached deeply into his life.  He
12   was basically paralyzed, physically and emotionally.  *See* PSR ¶ 120.  Mr. Muller had
13   suicidal thoughts.

14   Mr. Muller was initially diagnosed with anxiety and depression. It was not
15   discovered until years later that he suffers from a bipolar disorder.  In 2009, Mr. Muller
16   was feeling very suicidal and sought treatment from a doctor who prescribed him
17   Wellbutrin, an antidepressant.  When Wellbutrin is taken by a person who is bipolar, it
18   can cause that person to have a manic episode.  This is exactly what happened to Mr.
19   Muller. He described having paranoia and he disappeared for approximately 2 weeks
20   until he was found by police in Utah in September of 2009.

21   Eventually, Mr. Muller began working as an attorney in San Francisco, CA.  Mr.
22   Muller worked for various law firms.  While working at one firm, he was employed with
23   a firm for approximately six months before he had a "break."  He explained he became
24   paranoid and thought his boss was "bugging my phone" and spying on him through his
25   computer.  Mr. Muller admitted copying the firm's database to find out how they were
26   watching after he was fired before leaving that firm.  They sued him in United States
27   District Court and retrieved their database from him.  *See* PSR ¶ 134.

28

3

1    Mr. Muller's mental health disorder has caused him difficulties throughout his
2  adult life. He has had problems in his relationships, he has been terminated from
3  employment, and disbarred from practicing law. Many of the people who have submitted
4  letters of support on behalf of Mr. Muller feel that Mr. Muller would have never
5  committed this crime had he been properly medicated.  The PSR notes that since being in
6  custody and taking regular medications, Mr. Muller has never felt better than he has in 10
7  years. *See* PSR ¶ 69.

8    Mr. Muller stated he is "sick with shame about what happened."  He also
9  acknowledged that his actions hurt people.  He said, "All I've wanted to do in life is help
10 people.  I've done the exact opposite.  I am very sorry."  *See* PSR ¶ 66.

11   Mr. Muller is responsible for this crime and has admitted his offense at a very
12 early stage of the case.  He has done everything possible to show remorse and his
13 characteristics of compassion and generosity are reflected in his life history.  Co-workers,
14 professors, and friends describe him as kind, compassionate, and thoughtful.  He also
15 suffers from a profound and powerful mental illness.  This mental illness drove him to the
16 depths of despair, depression, and crime.  We do not seek to excuse his criminal conduct
17 by blaming it on his mental illness.  But saying that his mental illness had nothing to do
18 with these crimes also grossly understates the power of a truly debilitating mental illness.

19   We urge the Court to review the letters Mr. Muller wrote to the San Francisco
20 Chronicle regarding this crime.  The author, Matthew Muller, is obviously deeply
21 affected by his mental illness when these letters were written, referring to non-existent
22 conspiracies and one percenters.  The letters inform this Court exactly where Mr.
23 Muller's mental health was at the time and show how much he was struggling with
24 reality.  Prior to the onset of his symptoms, Mr. Muller led a successful, productive life –
25 he served in the military and obtained educational degrees from prestigious institutions.
26 Now that he is being properly medicated for his bipolar disorder he is doing well.  There
27 are numerous letters in support of Mr. Muller from parents who knew him like Nancy and
28 Robert Bayer; to Patrick and Susan Laskey who describe him as a thoughtful and

compassionate person.  Former professions and co-workers describe him as hardworking and generous. Two additional letters of support have been included and labeled <u>Exhibit A</u>.

   We also ask the Court to take a long look at his acceptance of responsibility and how that should shape the sentencing decision regarding Mr. Muller's sentence.  As the Court knows, trials can be terribly difficult on all participants, especially on victims.  Mr. Muller admitted his crimes early and that fact should weigh heavily in this matter.  Time and time again the prosecutors hammer away at a defendant's insistence on a trial.  It is a simple fact that defendants are told repetitively that early admissions count.  And they should matter here.  In the plea agreement, the government will ask for a sentence no more than 40 years.  We are asking the Court to impose a sentence of 30 years.  Thirty years is exactly where Mr. Muller's sentence should end up.  It means Mr. Muller is not released until he is over 60 years-old.  The sentence consumes much of his adult life and is 5 years more than a person could receive in California for first degree premediated murder which has a sentence of 25 years to life.   Given the history and characteristics of Mr. Muller, we ask the Court to find that a sentence of 30 years is appropriate.


   **2.   *Disparity:***

   The statute on sentencing factors cites the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).  While there have not been many kidnapping cases in the Eastern District for the past decade, other serious cases that involved life sentences or requests for life sentences provide the Court some guidance on disparity.

   In the Eastern District of California, a defendant pled guilty to charges of kidnapping and brandishing a weapon.  <u>United States v. Bustos</u>, Case No. 1:08-CR-297-LJO-3. On October 8, 2009, the Court sentenced Bustos to a term of 171 months imprisonment, consisting of 87 months on Count Two for Kidnapping, in violation of 18 U.S.C. 1201(a) and a consecutive 84 months on Count Three for Brandishing a Firearm

During a Crime of Violence, in violation of 18 U.S.C. 924(c)(1)(A). *Id.* at Doc. 50, p. 2. On appeal, the Ninth Circuit dismissed the brandishing count and defendant was resentenced to 108 months for the kidnapping.  The case involved 3 defendants who had kidnapped a jewelry store owner in order to steal the inventory from the store.  One of the defendants flirted with the jewelry store owner and went to a hotel to have sex.  After they had sex at the motel, the defendant left the room and called the co-defendants.  The other co-defendants came into the motel room and pointed guns at the victim and told him to sit down and shut up. *See Id.* at Doc. 30, pg. 11-12.

In June of 2016, a woman was sentenced in Illinois for kidnapping the case of United States v. Nicole Eason, Case No. 2:15-cr-20015-JES-DGB.  A jury convicted Ms. Eason of 2 counts of kidnapping and 1 count of transporting a minor with the intent to engage in sexual conduct.  Evidence at trial established that in 2006 through 2008, the Easons sought to adopt through an informal process sometimes referred to as private ''re-homing,'' in which the legal adoptive family can no longer care for a child and transfers the child to another's custody.  In 2007, authorities say the Easons communicated with a minor's parents about rehoming and misrepresented material facts about their background to gain the parents' trust.  Based on the misrepresentations, one of the minor's parents transported the child across state lines in 2007 to live with the Easons.  The minor testified that while in the Easons' custody for nearly a month, both Nicole and Calvin Eason repeatedly sexually and physically abused her. Evidence at trial also established that in 2008, the Easons kidnapped a second minor in the same manner, who was with them a few days.  That child and a third identified minor victim testified that the Easons subjected them to inappropriate sexual behavior and ''grooming'' while in their custody. All three minors also testified about deplorable conditions in the Eason home.

In Nicole Eason's case, the Government asked for a sentence of life plus 20 years and the defendant asked for 240 months.  The court sentenced Ms. Eason to 40 years in March 2016.

1    In 2009, life sentences in the Eastern District of California were given to Allen

2  Harrod and Michael LaBrecque, Case No. 2:03-cr-00384-WBS.  A federal jury returned a

3  guilty verdict in February 2008 of six counts of the interstate travel of four minors for the

4  purpose of engaging in unlawful sexual conduct, and one count each for the transfer of

5  Harrod's seven-year-old son to LaBrecque for the purpose of producing sexually explicit

6  images of the boy. In sentencing the defendants, the judge noted that the case represented

7  one of the most serious cases he had adjudicated during this tenure as a Federal District

8  Court Judge. For more than a decade, Harrod and LaBrecque and their wives, engaged in

9  ritualistic sex acts with children from the two families as part of a religion started by

10  Harrod and followed by LeBrecque and his wife. Harrod's self-proclaimed religion that

11  promoted the sexual abuse of children. Children of both Harrod and the LaBrecque

12  testified at trial about the sexual abuse inflicted by each defendant. Evidence revealed

13  that LaBrecque would begin to sexually train his daughters when they were about seven

14  or eight years old. Evidence offered at trial, however, revealed one daughter was as

15  young as four years old when the sex began.  The evidence also revealed that one of the

16  purposes of transporting Harrod's son to Texas was to train him in sexual activity for the

17  purpose of someday assuming Harrod's role as the patriarch of the two families.

18    A life sentence was given in United States v. Jerry Lee Hendricks, 2:12-cr-20025-

19  SEMDGB. In that case, the defendant received a sentence of life imprisonment plus 20

20  years for his conduct, which included taking photographs of himself sexually abusing a

21  seven-year old female. Mr. Hendricks, however, had more than 14 prior convictions for

22  child sexual abuse out of the State of South Carolina, and had nevertheless continued to

23  perpetrate on minor victims.

24    In United States v. Percy Love, III, 2:13-CR-0306, defendant was convicted by

25  jury of 4 counts of sex trafficking of a minor and sentenced to 420 months imprisonment.

26  Defendant beat one of the minors when she tried to leave him and burned her with

27  cigarettes.  The PSR indicated that the Total Offense Level was 43, Criminal History VI

28  which has a guideline recommendation of life.  The AUSA asked for life and the

defendant asked for 236 months. The Court sentenced defendant to 420 months.  Sex trafficking of minors is conduct that is similar to kidnapping.  If the Court declines to follow the defense's arguments regarding a dangerous weapon enhancement, Mr. Muller is the same Total Offense Level as the defendant in <u>Love</u> but Mr. Muller only has a Criminal History I whereas Love had a Criminal History VI.  It would be an inequitable result for Mr. Muller to receive a life sentence in comparison with the conduct in the <u>Love</u> case.  Thus, a sentence of 30 years avoids an unwarranted disparity.

**B.**   **<u>There Should Be No Enhancement Pursuant to USSG § 2A4.1(b)(3) Because a Dangerous Weapon Was not Used During the Offense.</u>**

The PSR adds 2 levels because "defendant used what appeared to be a firearm during the course of the kidnapping of Denise Huskins, as well as a Taser or some other electrical device."  Application Note 2 of the USSG § 2A4.1 provides:

> A dangerous weapon was used" means that a firearm was discharged, or a "firearm" or "dangerous weapon" was "otherwise used" (as defined in the Commentary to § 1B1.1 (Application Instructions)).

A "dangerous weapon" is an instrument capable of inflicting death or serious bodily injury. U.S.S.G. § 1B1.1, application note 1(d). Pursuant to USSG §2A4.1, comment. (n.2) and USSG §1B1.1, comment. [n.1(D)(ii)], "Dangerous weapon" also includes an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument. The phrase "otherwise used" means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon. U.S.S.G. § 1B1.1, application note 1(g).

In <u>United States v. Bonilla-Guizar</u>, 729 F.3d 1179, 1188 (9th Cir. 2013), the Ninth Circuit held that brandishing a weapon or possession a firearm alone did not support the enhancement under § 2A4.1. The term "brandished" is defined to "mean[ ] that all or part

of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." USSG § 1B1.1, comment. (n.1(C)).

The PSR notes that Mr. Quinn "was awoken by a bright light shining in his eyes, an electrical noise similar to a 'stun gun'." *See* PSR ¶ 7. Mr. Quinn only stated he heard something electrical like a stun gun but neither reported seeing a stun gun or stating that it was "used" against them. Ms. Huskins does not mention hearing any such noises and stated she woke up to subjects holding guns with lasers. "They were told that they would not be harmed and that it was only financial." *See* PSR ¶ 21. During the execution of the search warrant, no firearm was seized but law enforcement did find a black spray painted water pistol with a laser and flashlight attached to it. *See* PSR ¶ 44. No stun gun or similar electrical device was seized.

Based upon the information in the PSR, we object to this enhancement. The PSR only indicates that something that appeared to be a firearm or dangerous weapon was possessed or brandished. No firearm or weapon was discharged or "otherwise used" during the offense. Both victims were informed from the beginning that the purpose was not to harm them but to obtain money. It is not clear what was making the electrical sound and no weapon capable of inflicting death or serious bodily injury was found during the execution of the search warrant. Therefore, the Court should decline to add this enhancement.

## **III – CONCLUSION**

Based upon our objections and the analysis of the sentencing guidelines as they are applicable to the facts of Mr. Muller's case, we believe that Mr. Muller should be sentenced to the following:

| | |
|---|---|
| Base Offense Level = | 36 |
| Ransom demand = | +6 |
| Sexual Exploitation of Victim = | +6 |
| Acceptance of Responsibility = | -2 |

| USSG 3E1.1(b) Reduction = | -1 |
| Obstruction of Justice = | +2 |
| Total Offense Level = | 41 |

The Sentencing Table provides a guideline range of 324 to 405 months for a Total Offense Level of 41 and a Criminal History Level I.

We would ask that the Court considers the factor in 18 U.S.C. § 3553(a) in light of these objections and recommends sentence of 360 months (30 years). Such a sentence would satisfy the goals of sentencing: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant. 18 USC §§ 3553(a)(2)(A) – (C). As can be seen by the letters of support, Mr. Muller has exhibited great kindness in his life towards others. Mr. Muller acknowledges that he needs to be punished for his crimes but a life sentence would be too great of a sentence given the totality of circumstances of this case. We ask the Court consider sentencing Mr. Muller to 360 months imprisonment.


Dated: March 13, 2017


Respectfully Submitted,

 /s/   Thomas A. Johnson
THOMAS A. JOHNSON
Attorney for Matthew Muller