1   Matthew Muller
    Reg. No. 72875-097
2   U.S. Penitentiary Tucson
    P.O. Box 24550
3   Tucson, AZ 85734
4   Pro Se

**FILED**

AUG 0 3 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

5

6

7              **UNITED STATES DISTRICT COURT**

8              **EASTERN DISTRICT OF CALIFORNIA**

9                                    2:15-cr- 205 TLN EFB

10  UNITED STATES OF AMERICA,         No. 4:18-cv-00376-RCC-PSOT

11                 Respondent,        MOTION FOR EXTENSION OF TIME IN
                                      WHICH TO FILE OBJECTIONS TO
12         v.                         MAGISTRATE JUDGE'S FINDINGS AND
                                      RECOMMENDATIONS
13  MATTHEW MULLER,

14                 Movant.

15

16         For the reasons set forth below, Movant Matthew Muller requests that the Court extend by

17  45 days the time in which to file objections to the Magistrate Judge's Findings and

18  Recommendations (ECF No. 65).

19         In a July 18, 2018, Order, the Magistrate Judge recommended dismissal of certain

20  claims made in Movant's Motion to Vacate (ECF No. 61). The Order further directs Movant to

21  submit any objections to the recommendations within fourteen days of their service.

22         Movant learned of the July 18 Order on July 26 and received it from prison authorities

23  on July 30, 2018. See Mov.'s Decl. para. 11 (attached as Ex. A). As usually calculated for

24  service by mail, the deadline for objections under the terms of the Order would be August 4,

25  2018, extending the deadline to August 6, 2018, since the former date falls on a Saturday.

26  Accordingly, Movant would have only seven days from actual receipt of the recommendations in

27  which to respond.

28

1    Within a few weeks of filing his motion under 28 U.S.C. § 2255, Mr. Muller was

2  falsely charged with criminal conduct by prison officials, in retaliation for pro bono legal

3  assistance he had been providing other inmates. See Pl.'s Verified Compl. in *Muller v. United*

4  *States*, No. 4:18-cv-00376-RCC-PSOT (Dist. Az., Aug. 2, 2018) (attached as Ex. B). Movant

5  was placed in segregated confinement and denied treatment for his psychiatric illness. Prison

6  officials instigated and enabled attacks by other inmates against Mr. Muller, causing him to be

7  raped and beaten. *Id.* They then refused to provide psychiatric care as Movant lapsed into severe

8  depression and nearly committed suicide. *Id.*

9    As a result of his wrongful detention in late April, Movant has been unable to send

10  further planned filings to the Court and has been denied access to his legal materials until a few

11  weeks ago. Id.; Mov.'s Decl. paras. 4, 9. He is also in poor mental health, and although not

12  completely debilitated, is impaired in his ability to promptly respond to the Magistrate Judge's

13  recommendations of July 18. Mov.'s Decl. para. 6.

14    Accordingly, Movant respectfully requests an additional 45 days in which to respond

15  to the Court's Order--to and including September 20, 2018. Such an extension is reasonable in

16  terms of both the typical impediments faced by imprisoned litigants and the particular

17  circumstances Mr. Muller has faced. *See Houston v. Lack*, 487 U.S. 266 (1988); *Silva v. Di*

18  *Vittorio*, 658 F.3d 1090, 1101-02 (9th Cir. 2011) (holding that prisoners have a constitutional

19  right of meaningful access to the courts); *Kelly v. Small*, 315 F.3d 1063, 1070 (9th Cir. 2002)

20  (finding an "exercise of discretion to stay the federal proceedings is particularly appropriate"

21  where a prisoner would be denied a reasonable opportunity to pursue his claims in the absence of

22  such a stay).

23    In the alternative and in the event the Court does not grant the requested stay, Movant

24  hereby objects to the Magistrate Judge's findings to the extent they recommend dismissal of any

25  part of Movant's claim. Further, Movant submits that the procedure allowed for bringing the

26  objections—absent the requested extension—is unreasonable and as applied to Movant violates

27  the due process clause of the U.S. Constitution. *See, e.g., Armstrong v. Manzo*, 380 U.S. 545, 552

28

Motion for Extension of Time                    2                    United States v. Muller

1    (1965) (holding that a fundamental requirement of due process is the opportunity to be heard—

2    "an opportunity which must be granted at a meaningful time and in a meaningful manner").

3             WHEREFORE, Movant submits that the motion should be granted.

4

5    Respectfully submitted this second day of August, 2018.

6

7                                                                    By: /s/Matthew Muller
                                                                              Matthew Muller

8

9             Those recommendations also took much longer to reach Mr. Muller

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Huei Dai, certify that the Respondent in this matter is registered with the CM/ECF system and

will automatically be served with a copy of the foregoing document when it is entered by the

Clerk. Done this second day of August, 2018.

By :

Huei Dai

# EXHIBIT A

## Declaration of Movant Matthew Muller

STACY SCHEFF
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611, TUCSON AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364

Attorney for Matthew Muller

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

MATTHEW MULLER,

Plaintiff,

v.

United States; R.L. Rhodes Acting
Warden USP Tucson;
Juan Baltazar, Complex Warden USP
Tucson;
W.J Jusino, Associate Warden USP
Tucson;
Lori Mitchell, Legal Assistant USP
Tucson;
John Does 1-25 employees at USP
Tucson

Defendants.

No. 4:18-cv-00376-RCC-PSOT

**DECLARATION OF MATTHEW MULLER IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION AND TEMPORARY
RESTRAINING ORDER**

I, Matthew Muller, declare under penalty of perjury:

1. I am the plaintiff in this case. I make this declaration in support of my motion for a preliminary injunction and temporary restraining order ("TRO").

2. I have read the averments made in the complaint and verify under penalty of perjury that they are true. I adopt those facts as part of this supporting declaration.

3. As stated in the Verified Complaint, I was subjected to segregated confinement because I was giving legal help to another inmate I believe was wrongfully convicted. At least seven officials at U.S. Penitentiary Tucson--ranging from correctional officers to senior prison management--have told me explicitly that I should stop helping inmates with their legal matters. Some officials were threatening, and some were just trying to help me avoid trouble from other officials. But they all were clear that I would be retaliated against if I did not stop helping inmates.

4. Based on these contacts and on my observations of what has happened to other inmates who give legal help, there is an unwritten policy at USP Tucson of punishing inmates who offer legal assistance to others. This custom applies whether or not an inmate accepts money for his services (I did not), and whether or not an inmate limits his assistance to legal matters not

2

involving prison staff (I did so limit myself).

5. On about April 30, 2018, I was confronted by Lieutenant Schied in the Special Housing Unit ("SHU") where I was detained. He told me that if I did not like the difficult conditions in the SHU, then I should stop helping inmates with their legal work. When I stated that I would continue to help any inmate I believed to be innocent, Schied yelled at me, threatened me with false disciplinary and criminal charges, and forced me into a cell with a dangerous inmate he either knew would harm me or bribed to harm me.

6. On about May 2, 2018, I was raped by that inmate. Even after that, I still could not get moved out of the cell--until on May 4 he assaulted me again and I was moved.

7. I was then put into a cell with a different, almost equally volatile inmate. He attacked me, leaving me with multiple bleeding lacerations to my face and various contusions and swelling.

8. The physical impacts of these attacks were not pleasant. But they were nothing compared to the mental agony I endured from the combined effect of the attacks, the degrading conditions of confinement, and the refusal of

3

proper treatment for my long-time psychiatric illness. Things got so bad that my parents hired an attorney, Stacy Scheff, just to help me get treatment and survive the SHU. They are both retired public school teachers who have two other adult children unable to work because of psychiatric illness. So, it is a big expense for my family.

9. Even with an attorney, I could not get the help I needed. At first, prison officials blocked me from even seeing Stacy. Then they kept me from calling her. One of the three letters I sent to her via confidential legal mail--the most important letter--never arrived. It was hard for me to do much of anything while I was that depressed, so the different obstacles the prison threw up were successful in keeping her from helping me much.

10. After begging for psychiatric treatment again and again, I finally gave up and could no longer endure the mental suffering. I made plans to kill myself. And I am quite sure I would have, if my cellmate Cody Jackson had not become suspicious. He opened up some sealed envelopes while I was away from the cell, read suicide notes I had written and figured out my plans to kill myself. Cody contacted my lawyer Stacy, and together with her and some other inmates managed to get another Bureau psychologist to have me released from the SHU so that I could begin to recover.

4

11. In part because of my detention in the SHU, I am currently dealing with an extradition request from Solano County, California.  I had been in the middle of negotiating a resolution to those charges when I was sent to the SHU in April.  I asked SHU officials again and again to allow me to contact my attorney for that process, but it was weeks before that was allowed.  As a result, negotiations broke down and Solano County continued with their extradition request.

12. Right now, as a result of everything that happened in the SHU, I am in poor mental health.  I have recovered a good bit in the month since my release.  But I am far from being ready to deal with the stress of transferring to a new institution and facing a new case.

13. Based on my health history, I think there is a high likelihood that the stress of that process would cause me to relapse into a serious depressive episode with high suicidality.  The transfer will never be easy.  But a few more months to recover could well be the difference between a difficult process and a lethal one.

14. I have tried requesting a delay in my extradition for mental health

reasons.  But I need to prove that it is really needed.  So Stacy arranged for a psychological examination that would help me prove the need and also serve at least two other purposes.

15. First, I had a pending § 2255 motion that I wanted to support with a mental health examination.  I was in solitary confinement for nearly two years during my federal criminal proceedings.  Much like what happened in the SHU here, I became severely depressed.  I pleaded guilty not because I was guilty, but because I did not care what happened to me.  I did not contest any of the untrue things people were saying about me.  My depression made me think I was worthless and so deserved to have bad things happen to me and said about me.  I was planning to commit suicide anyhow, so it didn't matter to me whether I was free or imprisoned for life.  It seemed easiest and cheapest for my family for me to just plead guilty.  So that is what I did.

16. The one silver lining about how bad my depression got in the SHU was that it was very similar to the way things happened in jail during my trial. So I wanted an expert to examine me while I was in that state of depression, and then testify and report on whether he thought I would be competent to plead guilty under those circumstances.  The expert could use tests and analyses to prove how depressed I was.  From what I understand, there are

6

certain cognitive impairments consistent with depression that could be measured. But only if the expert assessed me while I was depressed.

17. If the prison had not blocked my legal visit like they did, I would have had a chance to have my mental health and cognition assessed under circumstances very relevant to my § 2255 claims. I am still suffering from depression now, I believe, even if it is not as bad as a month ago. It is horrible being depressed, so I am doing everything I can to recover. At the same time, I still want to be assessed while I am measurably depressed. So I need a psychological examination as soon as possible.

18. Even more important than my own case, I hope to prove how restrictive confinement often causes depression or makes it much worse. And how severe depression, in turn, causes people to plead guilty when they are not. I thought that what happened in my case was very rare. But I have already interviewed two inmates at USP Tucson who experienced the same. They both committed a lesser offense they were accused of--one very minor--but ended up pleading guilty to major crimes because depression left them without the will to fight or to care what happened to them.

19. Since I have such a well-documented history of suicidal depression, and because I was in very poor mental health following confinement in the SHU, I

7

figured I could make the best of a bad situation.   I wanted to get an assessment right away to show how someone in my condition has no business making decisions that affect their lives and the lives of their families.

20.   Of course, a mental health examination would also prove how much I suffered as a result of things that happened in the SHU.   That is not why I wanted the exam, but it is probably a reason why prison officials are trying to block it.   But suing the Bureau of Prisons for damages is one of the last things on my mind right now.   I am just trying to get healthy and survive the next few months.   I only want to be left alone for a while, so I can get better.

21. Once that happens, I do plan to continue helping inmates with their cases--especially their § 2255 motions.   I think any jurist would be as shocked as I was to learn how many cases there are of probable innocence among inmates here.   Just one such case in the entire prison would be too many.   But there are certainly more.   I taught classes at Harvard on credibility assessment and screened hundreds of prospective clients in a fairly high-fraud area of law (asylum claims).   I am not naive about people making up stories to get what they want.   These are real cases of innocent people with long prison sentences.

1   22. What I *have* been naive about is trusting to good faith and the integrity of

2   prison officials. I thought that if I was respectful and judicious about who I

3
4   helped and how, I would be left alone to do my work. Who could take issue

5   with helping the innocent go free? Apparently, it is not that simple.

6

7
8   23. Most Bureau employees do their jobs and try to be fair with inmates.

9   But some officials are not so benign. They think inmates deserve whatever

10  sort of treatment they see fit to mete out. These officials are seldom held to
11
12  account when that treatment amounts to abuse. Fellow officers are reluctant

13  to break the code of silence, so they stand aside. And courts are perennially

14  skeptical of prisoners' inexpert claims. Many judges are quick to credit
15
16  officious explanations of how harsh measures are necessary, or how convicts

17  always lie and manipulate. So abuse-prone employees—many of whom would
18
19  serve well in a culture of accountability—are allowed to run a mock and

20  corrode prison life for inmates and officers alike.

21

22
23  24. I do not have the answer to these problems. But I at least know it is

24  critical that prison officials be restrained from blocking the courthouse doors,

25  or from barring the prison doors against attorneys seeking to access their
26
27  clients. That is exactly what the Defendants are doing to me. I at least am

28  lucky enough to have a wife and family who can help me overcome the

9

1    barriers, and legal skills when I am well enough to use them.  Most inmates

2    are not so lucky.

3

4

5    25.  I respectfully ask that the Court hold the Defendants accountable for

6    intentionally obstructing inmates' access to justice under false pretenses of

7    maintaining security and order.

8

9

10   I, Matthew Muller, declare under penalty of perjury that the foregoing is true

11   and correct.  Done this thirtieth day of July, 2018, in Tucson, Arizona.

12

13

14                                        Signed: /s/ Matthew Muller

15                                                Matthew Muller

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

Verified Complaint in Muller v. United States

STACY SCHEFF
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611, TUCSON AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364

Attorney for Matthew Muller

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Matthew Muller,

Plaintiff,

v.

United States; R.L. Rhodes Acting Warden USP Tucson;
Juan Baltazar Complex Warden USP Tucson;
W.J. Jusino, Associate Warden USP Tucson;
Lori Mitchell, Legal Assistant USP Tucson;
John DOES 1-25 employees at USP Tucson,

Defendants

No. 4:18-cv-00376-RCC-PSOT

**VERIFIED COMPLAINT FOR**

**INJUNCTIVE AND DECLARATORY**

**RELIEF Hearing requested**

## INTRODUCTION

1.      This is an action for narrow injunctive and declaratory relief under the Court's federal

question jurisdiction. Plaintiff Matthew Muller, a federal inmate, alleges that Defendants violated

the Constitution and agency regulations by refusing to allow an examination by forensic

psychologist George Goldman and legal visits by the undersigned's paralegal William Fuller.

2.      Dr. Goldman was employed by Mr. Muller's attorneys to meet with the Plaintiff at U.S.

Penitentiary Tucson. He will assess Plaintiff's mental health and produce an expert report for use

in time-sensitive criminal and civil court filings. Plaintiff seeks an order allowing this routine legal interview to proceed over Defendants' unexplained objections. He also seeks an order allowing legal visits by Mr. Fuller for case-related purposes.

3.     Defendants' refusal to allow Dr. Goldman and Mr. Fuller access to Plaintiff are the only actions from which Plaintiff seeks relief. However, to provide context, Plaintiff will describe how the Defendants' obstructionism is part of an ongoing pattern of retaliation against Mr. Muller for the pro bono legal help he offers other inmates. As a result of this retaliation, Mr. Muller has been subjected to false disciplinary charges; has been assaulted and raped at the instigation of prison officials; has suffered months of segregated confinement in degrading conditions; and very nearly committed suicide as a result of the severe psychological harm Defendants inflicted upon him.

4.     Plaintiff has sought for nearly a month to reach an informal resolution with Defendants. Prison officials have offered no justification for denying an examination by Dr. Goldman and have offered only pretextual reasons for barring Mr. Fuller. Following six letters, administrative remedy requests and multiple conferences, Defendants will not allow the visits or elaborate on their reasons for refusal.  Given pressing deadlines in the legal matters for which the expert report is needed, Plaintiff had no reasonable alternative but to file this action.

## **JURISDICTION**

5.     The Court has jurisdiction to hear this matter and provide the requested relief pursuant to its general federal question jurisdiction under 28 U.S.C. §1331.

6.     This Court may also grant relief under the Administrative Procedures Act, 5 U.S.C. § 701

et seq., in conjunction with 28 U.S.C. § 1331.

7.      This Court has jurisdiction to provide mandamus relief pursuant to 28 U.S.C. § 1361.

## PARTIES

8.      The Plaintiff Matthew Muller is, and was at all times during the allegations presented herein, a federal inmate at the U.S. Penitentiary Tucson ("USP Tucson") in the District of Arizona.

9.      The Defendant United States is the sovereign entity having control over the Federal Bureau of Prisons ("BOP") and its parent agency the U.S. Department of Justice ("DOJ"). The United States has waived sovereign immunity in this matter pursuant to 5 U.S.C. § 702.

10.     The Defendant Robbie Rhodes resided at all relevant times in Pima County, Arizona, in the District of Arizona. He was employed by the BOP as Acting Warden of USP Tucson from at least April 1, 2018, through June 27, 2018. He and his successors are sued in their official capacities.

11.     The Defendant Warden Balthazar currently resides in Pima County, Arizona, in the District of Arizona. He is employed by the BOP as Warden of USP Tucson and assumed this position on June 27, 2018. He and his successors are sued in their official capacities.

12. The Defendant Assistant warden Jusino resided at all relevant times in Pima County, Arizona, in the District of Arizona. She is employed by the BOP as an Associate Warden of USP Tucson. She and her successors are sued in their official capacities.

13.     The Defendant Lorri Mitchell resided at all relevant times in Pima County, Arizona, in the District of Arizona. She is employed by the BOP as a Legal Assistant at USP Tucson. She and her successors are sued in their official capacities.

14.     Defendants DOES 1-25 resided at all relevant times in Pima County, Arizona, in the District of Arizona. They are employees and contractors of the BOP at USP Tucson, Federal Correctional Complex Tucson and elsewhere.

## FACTS

15.     Matthew Muller is a former attorney who arrived at USP Tucson hoping to use his legal skills to help wrongly convicted prisoners. Following two years of detention at various facilities, he had a perfect record of institutional conduct. He had filed no lawsuits or complaints against any jail or prison official until the events of the last several months at USP Tucson.

### *Bop Officials Intimidate Mr. Muller to Prevent Him from Helping Fellow Inmates*

16.     Within an hour of Plaintiff's arrival at USP Tucson on June 29, 2017, BOP Special Investigative Supervisor ("SIS") Gallion and, on information and belief, SIS Madrid pulled Mr. Muller into a back room of the receiving area. The officers stated that they knew he had been an attorney. They threatened that if he gave legal help to other inmates, he would be subjected to "diesel therapy" a brutal regimen of bussing from prison to prison with long stretches of segregated confinement in between.

17.     Consequently, Mr. Muller concealed his legal experience from other inmates at first. He eventually met an inmate he was convinced was innocent. Mr. Muller felt a moral and religious responsibility to help that inmate, a former police officer named Christopher Eads with a wife

1    and three children. So he offered to review the case to see how Mr. Eads might be exonerated.

2

3    18.    Both during his professional life and in prison, Mr. Muller's legal work has been a

4    manifestation of his political and religious beliefs in equal justice. Before his career was cut

5    short by psychiatric illness, Mr. Muller worked or interned at eight nonprofit law firms in four

6    metropolitan areas. As a faculty member at Harvard Law School, he taught human rights law

7    and was associate director of a clinical program providing free legal services. Mr. Muller has

8    never charged any inmate for his work on their case.

9

10   19.    Mr. Muller was soon helping many different inmates. He aided with everything from

11   postconviction relief to veterans' issues to routine legal services such as drafting powers of

12   attorney. He filed multiple successful appellate briefs, helped three inmates obtain appointed or

13

14   pro bono counsel in their habeas corpus cases, won disability benefits for two severely ill

15   inmates who were leaving prison and assisted many inmates whose matters are still pending

16   before the courts. Mr. Muller also taught introductory law classes and helped add resources to

17

18   the prison's law library.

19   20.    Mr. Muller was assisted by his wife, Huei Dai, who obtained information and documents

20

21   not available through the prison library or research system. Together and in less than a year, they

22   donated over 2,000 hours of their time and at least $1,200 in expenses towards inmates' legal

23   matters.

24

25   21.    Mr. Muller declined to handle certain types of legal matters. Fearing reprisal, he avoided

26   cases relating to prison conditions or staff members. Although approached by many inmates

27   seeking advice on civil rights matters or denial of medical care, Mr. Muller told them he could

28

1    not help due to the likelihood of retaliation.

2

3    22.    Plaintiff is aware of many instances of prison staff retaliation, both against complaining

4    inmates in general and against "jailhouse lawyers" in particular.

5

6    23.    In October of 2017, Plaintiff's neighbor Mr. Strauss helped a fellow inmate successfully

7    sue the prison to obtain vital medical care.  Staff retaliated by "shaking down" the entire unit

8    (conducting an invasive search and confiscating minor contraband that is usually tolerated, such

9    as extra food and blankets). Afterwards, they told inmates "you can thank Strauss for this." Staff

10   then reported that inmates were threatening Mr. Strauss, and that for his protection he had to

11   placed be in administrative segregation ("the hole").  He was then transferred involuntarily to

12   another prison.

13

14

15   24.    Other retaliation schemes Mr. Muller has witnessed or heard of include: staff planting

16   contraband in a targeted inmate's property or bribing another inmate to do so; bribing an inmate

17   to falsely report some other misconduct by the targeted inmate; falsely stating an inmate

18   threatened or harassed an officer—especially a female officer; bribing an inmate to attack a

19   targeted inmate and then segregating and/or transferring the target "for his protection"; claiming

20   that an inmate is becoming "too influential" or "too famous" and must be transferred for security

21   reasons; placing a targeted inmate in segregation for investigation of unspecified misconduct or

22   threats; alleging suspicious communications with relatives or the public and restricting the

23   targeted inmate's correspondence and visiting privileges.

24

25

26   25.    To avoid becoming a target of any such scheme, Mr. Muller tried to be as judicious as

27   possible about cases he handled. Mr. Muller also refrained from filing complaints about staff

28

1  misconduct against him.  This misconduct included officers tampering with his privileged legal

2  mail, failing to deliver law-related books he ordered, and an incident in which officers knowingly

3  restrained him from restroom facilities and Plaintiff was forced to defecate on himself in front of

4
   others.  The last incident was in retaliation for Mr. Muller confronting an idle officer about
5
6  refusing to get up and open a door for so long that an elderly inmate with advanced prostate

7  cancer urinated on himself.

8
9  26.     Plaintiff's hope was that if he tolerated such misconduct and worked only on matters that

10  did not directly involve the prison, he would be left alone by staff.  This was not to be the case.

11
12  *Bop Officials Retaliate Against Mr. Muller for His Pro Bono Legal Activities*

13  27.     On April 25, 2018, Mr. Muller was called to the lieutenant's office.  There, he was

14  detained for giving Christopher Eads information about how his family could mount an

15  innocence campaign using social media.

16

17  28.     SIS Madrid claimed it was a criminal act for Mr. Muller to provide such

18  information.  She charged him under the BOP's highest offense category, used for such acts as

19
   murder and rioting.  Significantly, the high-level charges required automatic segregation of Mr.
20
21  Muller in the Special Housing Unit ("SHU").  Mr. Muller was thereby prevented from continuing

22  his pro bono legal activities, from completing work on several cases with critical deadlines and

23  from teaching law classes.

24

25  29.     Mr. Muller's personal effects were seized and he was searched, handcuffed and brought

26  before a lieutenant for reading of the charges.  He was then escorted to a restricted wing of the

27
   prison containing the SHU, where he was strip-searched twice and required to surrender his
28

1    standard prison uniform and put on an orange tee-shirt, shorts and foam shoes.

2
3    30.     In the SHU, Mr. Muller was denied his prescribed psychiatric medication as well as an

4    antipsychotic he requires at times of high stress. He sent several requests for help to the SHU

5    psychologist, Ms. Johnson.

6
7    31.     Mr. Muller has had a long and well-documented struggle with severe bipolar illness. He

8    is designated by the BOP as a "Care Level 2-MH" inmate requiring an elevated degree of

9    psychiatric care. Nonetheless, Johnson told him that he was perfectly healthy aside from a

10   vitamin D deficiency. She refused to provide any care or accommodations for Mr. Muller's

11   psychiatric illness.

12
13   32.     When Mr. Muller continued to request help from Ms. Johnson, she had him escorted from

14   his cell to the SHU lieutenant's office. There, Johnson and several officers surrounded Mr.

15   Muller while Lieutenant Schied commanded him to "shut up and get with the program." Schied

16   stated that "if you don't like the SHU, then you should stop doing inmates' [legal] paperwork."

17
18
19   33.     Mr. Muller replied that he was helping inmates he believed were innocent and would

20   continue doing so. Schied stated "There are no innocent inmates here. They're all

21   guilty." Plaintiff responded colloquially "I'll bet you a million dollars there are innocent inmates

22   here." Schied then said "Did you hear that? He just tried to bribe me. That's another shot

23   [disciplinary charge] for attempting to bribe an officer. In fact, I'm going to call SIS right now

24   and have you charged."

25
26
27   34.     Mr. Schied then placed a phone call and began discussing what the most serious offense

28   was that he could level at Mr. Muller. Schied stated that he wanted the FBI liaison contacted to

1   pursue criminal bribery charges. (An FBI investigator did come to the prison and interview

2   Plaintiff. The investigator was professional. But the questions he asked suggested that USP

3   Tucson staff may have attempted to falsely implicate Mr. Muller in an attack against an officer

4   committed months earlier by Mr. Muller's former cellmate.)

5

6   35.     Schied completed his call, turned to Plaintiff and stated "I think you need a new cell

7   mate. How about Gaines?" Several officers surrounding Plaintiff chuckled at this suggestion.

8

9   *Prison officers instigate sexual and physical assaults against Mr. Muller*

10   36.     Plaintiff was then taken from Schied's office back to his cell. Officers collected some of

11   Mr. Muller's belongings and threw away others. Plaintiff was escorted to a new cell, and saw on

12   the door a large sign with the letters "H.R.A."

13

14   37.     Plaintiff later learned that H.R.A. is an acronym for "House and Recreation Alone." This

15   designation is reserved for particularly violent inmates with a history of assaultive conduct

16   towards other inmates and staff. The "H.R.A." sign on a cell door warns officers on duty that

17   they are dealing with a high-risk inmate and that that individual is not to be mixed with any other

18   prisoner.

19

20   38.     The H.R.A. inmate was removed from the cell and escorted to the lieutenant's office

21   while Plaintiff was placed in the cell. After a short time, the inmate, Sam Gaines, returned and

22   was put in the cell with Mr. Muller.

23

24   39.     Mr. Gaines was not initially hostile toward Plaintiff. However, it quickly became clear

25   that Gaines was profoundly mentally ill. Mr. Gaines later disclosed that he suffered from

26   paranoid schizophrenia and that the BOP was not giving him all of the medications he needed to

control his condition.

40.     Mr. Muller also learned that Mr. Gaines was sexually interested in male and transgender inmates.  Mr. Gaines made several comments about Plaintiff's body and asked various questions of a sexual nature.  Mr. Muller stated that he was accepting of all sexual orientations but was heterosexual and that in any event he was happily married and sexually exclusive with his wife.

41.     Over the next few days, Mr. Gaines's behavior became more bizarre, including both threats and sexual comments.  He slept very little or not at all.  He seemed lucid for much of the day but spoke almost constantly—sometimes to himself and in apparent response to a running dialog in his head.  Mr. Gaines acknowledged that he "heard voices."  When asked during one of his lucid periods, he stated that at times the voices were telling him to kill Mr. Muller before Mr. Muller killed him.  He became increasingly suspicious of Mr. Muller and frequently commented that he knew Plaintiff and Lieutenant Schied were trying to "set him up" somehow.

42.     Between May 1 and May 4, Mr. Muller made numerous verbal requests and submitted at least six written requests to be moved, stating that he was in imminent danger from Gaines.  These included two written requests that he handed directly to Associate Warden Jusino and another associate warden on May 2.

43.     On the night of May 2, Plaintiff went to sleep wearing only boxers due to warm temperatures in the SHU.  He awoke from a deep sleep to find that his boxers had been pulled down, and that Mr. Gaines was behind him and penetrating him with his penis.

44.     Plaintiff pushed Gaines, jumped off the bed and began shouting.  Gaines said words to the effect of "What, you don't like African American men?"  Plaintiff replied that he was not

sexually interested in any men.  Gaines stated, "Sure you are, you're just shy."  Gaines then stated "Schied won't never put nobody in this cell if they ain't gonna fuck."

45.     Plaintiff later learned from other inmates that any time Gaines did have a cellmate in the SHU, it was a gay or transgender inmate because he would not accept any other.  Inmates in surrounding cells, such as Michael Hanson, stated that they had assumed Plaintiff must be gay because he had been put in a cell with Gaines.  They advised that SHU staff was aware that Gaines would only accept cellmates he could have sex with.

46.     Mr. Muller did not report the rape at that time—both because he realized that Lieutenant Schied had arranged the situation and was unlikely to help him, and because it is dangerous to be labeled a "snitch" in prison.  Contrary to Prison Rape Elimination Act (PREA) implementing regulations, there was no available confidential method of reporting a rape in the SHU.  The only avenue for such reporting was the SHU law library computer, which Plaintiff requested to use almost daily but was not allowed to access a single time in 64 days.

47.     Plaintiff told his family about the attack so that they could look up information about HIV/AIDS transmission for him.  He instructed them not to report the rape.  However, they contacted the warden and told him that SHU staff had caused Plaintiff to be raped.  The warden assigned investigation of the matter to Lieutenant Schied and other staff members who had caused or been complicit in the rape.  Therefore, Plaintiff declined to cooperate with the investigation.

48.     Gaines's attitude towards Mr. Muller became very hostile after he realized Plaintiff would not have sex with him.  He told Mr. Muller he was either going to leave the cell in handcuffs or

in a body bag, that it made no difference to Gaines and that Mr. Muller had better get staff to move him if he wanted out alive. Gaines said he did not care what Plaintiff said to get out, but that he had better "not put the police on" him. He showed Plaintiff a knife and kept referring to how he had made it and what it could do.

49.     On May 3 and 4, Plaintiff made repeated verbal and written requests to be moved, stating that he was in imminent danger and that there was a high risk of violence due to Gaines's mental health issues. He did not sleep between the attack on the night of May 2 and May 4. Gaines began yelling complaints to the officers such as "You'd better recognize there is a problem right now, or you're going to need a blood [clean-up] crew up in here." The officers did not respond.

50.     In the late afternoon of May 4, Gaines lunged at Plaintiff and attempted to attack him. Plaintiff backed away and pushed the cell's emergency button to summon staff assistance. However, several minutes passed without staff arriving.

51.     The situation escalated further, with Gaines yelling at Plaintiff to get out right away or he would kill him. Mr. Muller banged on the cell door and yelled into the hall repeatedly. He saw that there were several officers standing and watching about 15 feet away. Although they could see that Mr. Muller was in distress, they did not approach the cell.

52.     After another several minutes, officers approached the cell and told Mr. Muller to "stop your bitch-fit" and stated that they would take him out.

53.     Mr. Muller was next placed with another gay inmate who had a history of violent conduct in prison and problems with cellmates. On May 8, the inmate attacked Mr. Muller. Knowing that he would be written up for fighting if he did more than defend himself, Plaintiff did not

1  punch back, but merely tried to protect himself. Plaintiff was punched at least ten times in the
2  head.

3

4  54.    During the beating, Mr. Muller pushed the emergency button, but again no staff members
5  arrived. While on his regular rounds, an officer looked in the cell and saw that Plaintiff was
6  disheveled and bleeding from multiple lacerations to his face. He was removed from the cell.
7

8  55.    Again, to avoid being labeled a "snitch" and creating an even more dangerous situation
9  for himself, Mr. Muller did not report that he had been attacked. He told Lieutenant Schied that
10 he had fallen off his bunk, though his facial wounds and bruising were obviously not consistent
11
12 with that story and it was likely understood what had really happened.

13
14 56.    Mr. Muller did not have conflicts with subsequent cellmates. However, he continued to
15 be denied recreation and was able to go outside only once in 64 days. In general, Plaintiff was
16 forced to contend with difficult conditions in the SHU, chief among them a nearly uninterrupted
17 lockdown in a small 7 x 10 foot cell with another prisoner.

18
19 57.    Mr. Muller was frequently denied basic supplies such as toilet paper, a mattress and
20 meals compliant with his Buddhist vegetarian diet. The SHU was infested with bedbugs and/or
21 lice, ants and cockroaches. Throughout his time in segregation, Plaintiff had a constellation of
22 bites and welts on his body, each raised and up to two inches in diameter, as well as rashes from
23
24 contracting ringworm in the SHU. The walls were contaminated with pepper spray residue that
25 caused Plaintiff skin inflammation, and one cell Mr. Muller occupied had what appeared to be
26 blood smeared on a portion of the wall.

27
28 58.    Plaintiff's cell was twice inundated with sewage. On one occasion the sewage was

allowed to stand in the hall outside his cell for over eight hours during the daytime, and Plaintiff

had to attempt to eat with the smell of feces and urine permeating the cell.  Plaintiff's cell was

flooded with clean or "gray" water four additional times.

### Prison Staff Systematically Block or Delay Mr. Muller's Efforts to Get Help

59.     Mr. Muller's family hired an attorney to assist with the situation.  That attorney, the

undersigned, was initially told she was not allowed to visit Mr. Muller.  Following a demand

letter, prison officials eventually allowed the visit.  Mr. Muller's repeated requests to call the

undersigned and another attorney handling his criminal matter were usually ignored.  A few calls

were later allowed, after weeks of requests.

60.     Properly marked legal mail sent to Mr. Muller arrived opened.  One of three privileged

and confidential letters Mr. Muller sent to undersigned counsel never arrived.  It was the only

one of the three containing sensitive and detailed information about staff misconduct in the

SHU.  Mr. Muller was not allowed a single visit to the SHU law library in 64 days, and staff

withheld law-related books sent to Mr. Muller by his wife.

61.     Mr. Muller repeatedly asked for forms on which he could file an administrative remedy

request, and for court forms.  None was provided.  Mr. Muller's family sent him copies of

remedy request forms they printed from the Internet.  Plaintiff completed several forms and

attempted to submit them to Warden R. L. Rhodes and Associate Warden Jusino.  Although he

explained that he was unable to obtain forms from SHU staff, Rhodes and Jusino refused to

accept the proffered forms because they were not the official versions printed on carbon paper.

62.     Mr. Muller next attempted to send a confidential and urgent remedy request to the BOP

Regional Office. It included details about the rape and other misconduct by SHU staff. Mr. Muller submitted the form via legal mail on June 3, 2018. Despite a request for expedited processing and assistance, Mr. Muller has not heard from the Regional Office or any official about this matter in nearly two months. This failure to respond is consistent with Mr. Muller's legal mail having been intercepted and discarded.

### Prison Staff Nearly Kill Mr. Muller Through Their Deliberate Indifference to His Mental Health Crisis

63.     Mr. Muller's mental health deteriorated rapidly in the SHU. He continued to request mental health treatment, as did his family and attorney in letters to the warden.

64.     In response to one letter, Ms. Johnson saw Plaintiff for ten minutes. Mr. Muller disclosed his symptoms and stated that he believed he was on the wrong medication. Unlike at previous meetings, Ms. Johnson listened somewhat sympathetically. But she did not provide any treatment or make any attempts to ameliorate his situation.

65.     By mid-June, Plaintiff was suffering severe depression and was highly suicidal. He sent messages to Ms. Johnson stating that his situation was dire and that he needed to be admitted to a psychiatric hospital. Barring that, he asked at least to be released from the SHU, stating "I am safe in general population and am not a threat to anyone but myself." The requests were ignored.

66.     Unable to get help, Plaintiff's health deteriorated further, and he made definite plans to kill himself. His preparations included a series of letters to be given to his family and others after he was dead, explaining why it was best that he dies.

67.     Plaintiff's cellmate Cody Jackson had observed Mr. Muller sink further into

1    depression. He wrote messages to Ms. Johnson and Warden Rhodes—himself a trained

2    psychologist—stating that he feared for Mr. Muller's safety. No action was taken.

3

4    68.    Mr. Jackson became suspicious when Mr. Muller was evasive about the letters he was

5    writing. When Plaintiff was away from the cell, Mr. Jackson opened several sealed envelopes

6    and read the letters. He ascertained Mr. Muller's plans and confronted him about them. He

7    seized various items from Mr. Muller and convinced him to wait a short time longer, as it was

8    likely they would both soon be released from the SHU.

9

10   69.    Mr. Jackson was released from the SHU to general population first. Together with some

11   other inmates, he convinced Mr. Muller's regular psychologist Dr. Moreno to intervene. Dr.

12   Moreno met with Mr. Muller in the SHU on June 27, 2018 and obtained his release that day.

13

14   70.    On information and belief, Ms. Johnson misrepresented in Plaintiff's medical records that

15   he was healthy in the SHU, well-adjusted to the restrictive conditions and receiving appropriate

16   care.

17

18

19   71.    Shortly before his release from the SHU, Mr. Muller received an additional incident

20   report written by Defendant Lorri Mitchell. It included false charges that Mr. Muller was doing

21   legal work for pay contrary to prison rules.

22

23   72.    After his release from the SHU, Plaintiff learned that the inmate he had been trying to

24   help, Christopher Eads, was forced into a cell into a cell with a dangerous inmate. Mr. Eads

25   understood this to be in retaliation for fighting his case and for seeking help from Mr.

26   Muller. Mr. Eads was attacked and seriously injured, sustaining facial injuries that caused vision

27   problems and will require facial reconstructive surgery. Mr. Eads has since been transferred to a

28

1    lower security facility in Illinois.

2
3    *Prison Officials Refuse to Allow A Legal Visit by Forensic Psychologist George Goldman*

4    73.    On April 21, 2018, the undersigned's paralegal William Fuller contacted prison officials

5    to arrange a forensic examination of Mr. Muller. The exam, to be conducted by respected Tucson

6    psychologist Dr. George Goldman, would document Mr. Muller's poor state of mental health in

7    the SHU. It would also support claims about his mental health made in his motion under 28

8
9    USC § 2255 and in another pending criminal matter. Both matters were time-sensitive, and

10   Plaintiff so informed the Defendants.

11
12   74.    It was then—and it remains now—crucial that Dr. Goldman examine Mr. Muller as soon

13   as possible in order to assess and document the apparent causal link between Mr. Muller's

14   symptoms and restrictive conditions of confinement. Neuropsychological evidence of this link

15   will dissipate as time passes.

16
17   75.    After receiving no response from prison officials, Mr. Fuller again contacted the prison

18   on June 26 to inquire about the status of the earlier request. Defendant Lorri Mitchell replied

19   that the prison would not allow Dr. Goldman to examine Mr. Muller without a court order.

20
21   76.    On information and belief, Ms. Mitchell did not consult with the USP Tucson Warden or

22   with the BOP Western Regional Counsel before pronouncing this decision, in violation of BOP

23   policy and procedures.

24

25   77.    Between June 28 and July 20, 2018, Plaintiff and the undersigned made repeated attempts

26   to negotiate a visit by Dr. Goldman and to ascertain and address any concerns Defendants had

27   about the visit. Defendants declined to give any reason for their refusal, only restating that they

28

would not allow the visit to proceed unless a court ordered otherwise.

78.     Plaintiff and the undersigned sent Defendants a total of six letters via electronic mail and hand delivery. The letters cited Bureau policy indicating Dr. Goldman's legal visit should be allowed. The letters asked whether any further assurance of Dr. Goldman's history, conduct or qualifications was needed. Defendants did not respond. Plaintiff advised Defendants that he would seek a temporary restraining order (TRO) directing that the visit be allowed, as well as court costs and attorney's fees he incurred in filing an action. Defendants offered no reply other than to restate that Dr. Goldman's legal visit would not be allowed.

## *Defendants Refuse to Allow Any Unaccompanied Visit by The Undersigned's Paralegal, Imposing Additional Costs and Delays on Plaintiff*

79.     On July 20, Mr. Fuller sought to visit the prison in order to obtain Mr. Muller's signature on final documents and to collect exhibits from Mr. Muller. Plaintiff wished to file this action and a TRO request as soon as possible. Defendants refused to allow Mr. Fuller to visit without the undersigned present, citing his "background and history."

80.     On information and belief, Defendants did not consult with the BOP Western Regional Counsel prior to taking this action and did not act from any actual belief that Mr. Fuller posed an unacceptable threat to institutional security.

81.     Mr. Fuller is a former Bureau of Prisons prisoner with a perfect record of good conduct while incarcerated in BOP facilities. He has maintained a perfect record of conduct in the five-plus years since his release. He is now studying to become an attorney, with plans to specialize in criminal and prisoner rights matters.

82.     Various circumstances made it clear that the multiple delays imposed by Defendants were not in the nature of ordinary administrative friction or bureaucratic neglect.

83.     For example, the undersigned's paralegal Mr. Fuller initially made several legal visits to USP Tucson without incident.  No security concerns were raised, nor was he asked to submit to any background check.  This changed when Defendant Mitchell became involved in approving any legal visits to Plaintiff.

84.     On about July 2, 2018, Defendant Mitchell subjected Mr. Fuller to an invasive background examination.  Standard BOP forms request that legal visitors provide consent to any such check.  However, Ms. Mitchell performed the investigation without such authorization.  Then, using the information she had obtained from official government databases, Ms. Mitchell contacted Mr. Fuller's probation officer and requested that he be cited for violating the terms of his probation.  On information and belief, Ms. Mitchell claimed Mr. Fuller was in technical violation because he had e-mailed her from an address other than the one listed in his probation records.

85.     Despite Mitchell's efforts, Mr. Fuller demonstrated how the additional address had already been reported.  However, Ms. Mitchell's actions did succeed in adding time and trouble to the undersigned's handling of this matter.  In this, they are emblematic of Defendants' active efforts to obstruct and delay Plaintiff's access to counsel and the courts.

86.     Legal visits at USP Tucson are visually monitored by prison staff at all times.  Legal

1   visitors are subject to a metal detector search and search of their personal effects upon entry and

2   exit. Visitors can also be searched with a sophisticated electronic device that detects the

3   presence of drugs. Inmates are fully strip-searched before and after legal visits and usually must

4
    change into a jumpsuit and foam shoes to enter the visiting room. Any items they carry in or out

5
    with them are subject to search.
6

7
    87.    Consistent with the importance of maintaining inmates' access to counsel, BOP
8
9   regulations suggest that visitor screening for attorneys and their assistants is to be more

10  permissive than screening for social visitors. Nonetheless, social visitors with more serious

11  and/or more recent criminal backgrounds than Mr. Fuller's have been approved by USP Tucson

12  staff for visiting privileges.

13

14  88.    In requiring the presence of the undersigned at all visits, Defendants failed to follow BOP

15  procedures for restricting legal visits, acted arbitrarily and capriciously, and imposed additional

16  costs for representation on Plaintiff. They also delayed the filing of this action by approximately

17
    one week.
18

19
                                    **CLAIMS FOR RELIEF**
20

21

22

23  FIRST CAUSE OF ACTION:

24  VIOLATION OF PLAINTIFF'S FIRST AND SIXTH AMENDMENT RIGHTS

25
    86.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.
26

27  87.    Defendants' practices unjustifiably obstruct the availability of professional representation
28

1     and other legal services to Mr. Muller.

2

3     88.     Plaintiff has suffered actual and ongoing injury as a result of Plaintiff's refusal to allow

4     Dr. Goldman's and Mr. Fuller's legal visits.

5

6     89.     First, the delay in the forensic examination has reduced its usefulness and legal

7     persuasiveness. It was crucial for Mr. Muller's mental health to be assessed when his symptoms

8     were at their worst. Dr. Goldman's examination was to include tests that measure present

9     symptoms such as cognitive slowing. Such "real-time" tests are more strongly corroborative of

10    actual psychiatric illness than a patient's self-report of past symptoms. Due to his release from

11

12    the SHU, Plaintiff is now recovering from the worst of his symptoms and tests will likely reflect

13    less severe symptoms.

14

15    90.     Second, on July 18, 2018, a U.S. Magistrate Judge for the Eastern District of California

16    recommended a partial denial of Plaintiff's 28 U.S.C. § 2255 motion, which motion included

17    claims relating to Mr. Muller's mental health. Mr. Muller had planned on submitting Dr.

18    Goldman's expert report in support of his § 2255 claims. If the examination had proceeded as

19    originally scheduled, Dr. Goldman could have submitted it in time to influence the decision on

20

21    Plaintiff's motion. It was expected that Dr. Goldman's report would corroborate Plaintiff's claims

22    that after a year in restrictive solitary confinement, he was too severely depressed to enter a

23    knowing, intelligent and voluntary guilty plea

24

25    91.     Third, on about July 12, the senior deputy district attorney of Solano County, California,

26    refused the request of Mr. Muller's criminal attorney Richard Dudek for a three-month delay in

27    proceedings. The delay was requested for mental health reasons, but Plaintiff was unable to

28

submit an expert report in support of his request, as he had previously informed Solano County he would.  Accordingly, Defendants' unlawful action likely played a role in Solano County's refusal.

92.     Fourth, Plaintiff has incurred additional legal expenses due to the requirement that the undersigned attend every legal visit.  The filing of this action was also delayed by at least one week.

SECOND CAUSE OF ACTION:

VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

93.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

94.     Defendants' actions violated the U.S. Constitution as set forth above, and therefore amount to agency action that violates the Administrative Procedures Act.

95.     Defendants also acted contrary to federal regulations and agency policy in refusing Dr. Goldman's and Mr. Fuller's legal visits.  Defendants' actions were arbitrary and capricious, failed to follow mandatory agency procedures and constitute abuses of discretion, in violation of the Administrative Procedures Act.

96.     Plaintiff has suffered actual and ongoing injury as a result of Defendants' violations of the Administrative Procedure Act, as set forth above.

**RELIEF REQUESTED**

WHEREFORE Plaintiff requests that the Court grant the following relief:

A. Issue a declaratory judgment stating that:

1. By refusing to allow a legal visit by a forensic expert acting through Plaintiff's civil and criminal attorneys, Defendants unjustifiably obstructed the availability of professional legal services to Plaintiff, in violation of the First and Sixth Amendments of the U.S. Constitution.

2. The visit by Plaintiff's expert was to be allowed under BOP regulations, and by refusing it Defendants acted arbitrarily and capriciously, abused their discretion and failed to follow mandatory agency procedures, in violation of the Administrative Procedures Act.

3. By refusing under pretext of security concerns to allow a legal visit by a paralegal supervised by Plaintiff's attorney, Defendants unjustifiably obstructed the availability of professional legal services to Plaintiff, in violation of the First and Sixth Amendments of the U.S. Constitution.

4. The visit by the undersigned's paralegal was to be allowed under BOP regulations, and by refusing it Defendants acted arbitrarily and capriciously, abused their discretion and failed to follow required agency procedures, in violation of the Administrative Procedures Act.

B. Issue an injunction ordering Defendants Baltazar, Jusino and Mitchell to:

1. Allow unaccompanied legal visit during standard business hours by Dr. George Goldman, with the first appointment to be available as soon as feasible and not later than four days from the date of this order.

2. Allow unaccompanied legal visits during standard business hours by paralegal William Fuller, provided that Mr. Fuller remains under the supervision of attorney Stacy Scheff, although

1    Ms. Scheff need not be present at any visit.

2
3    C. Grant such other relief to which it may appear Plaintiff is entitled.

4
     Respectfully submitted,
5

6
     Dated: August 2, 2018
7

8

9                                                      By:_____
                                                             STACY SCHEFF
10                                                         Attorney for Plaintiff
                                                             Matthew Muller
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    VERIFICATION

2    I, Matthew Muller, swear under penalty of perjury that the foregoing information is true and

3

4    correct.

5

6                                                                    _____

                                                                     Matthew Muller

7

8    Done this _____ day of July in Tucson, Arizona.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28