MATTHEW D. MULLER
1684 Decoto Road. #274
Union City, CA 94587

*In Pro Per*

FILED

APR 17 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,

Respondent,

v.

MATTHEW DANIEL MULLER,

Movant.

No. 2:15-cr-00205-TLN-EFB

**MOVANT'S MOTION TO STAY PROCEEDINGS FOR 90 DAYS**

## I. INTRODUCTION

The Movant Matthew Muller respectfully requests that the Court stay proceedings in this matter for 90 days. The requested stay is needed for Mr. Muller to seek counsel and respond to misconduct by his former attorney affecting these proceedings. It is also needed to respond to newly discovered evidence that prosecutors intercepted and withheld a key letter from Movant to his family that would likely have resulted in a change of plea. The requested stay will not prejudice the Government.

## II. PROCEDURAL POSTURE

The movant submitted his motion to vacate sentence to U.S. Penitentiary Tucson officials for mailing on March 30, 2018. (ECF No. 61.) The Court granted Mr. Muller *in forma pauperis* status on

July 18, 2018. (ECF No. 65.) On March 4, 2019, the Court dismissed the motion to vacate in part and ordered the Government to respond to Grounds 12(e) and 13 of the motion within 60 days. (ECF No.91.) The Court ordered Movant's trial counsel to file a declaration responding to allegations of deficient performance within 60 days. (*Id.*) The court denied Movant's second request for appointment of counsel. (*Id.*)

## III. RELEVANT FACTS

In February of this year, trial counsel Thomas Johnson and Kristy Horton were served subpoenas requiring them to produce Movant's client file. Exhibit A (Declaration of Matthew Muller). Trial counsel had evaded repeated requests for the file from Movant and two attorneys representing him in his state case, involving the same alleged conduct as this matter. *Id.*

Mr. Johnson mailed a large box of documents to the state court in response to the subpoena. It was transferred to Movant's detention facility, then opened and its contents photographed with Movant present per standard facility procedure. *Id.* Files inside the box were haphazardly assembled. Mr. Muller located a file folder containing copies of letters he had mailed to his family while detained in Alameda and Sacramento counties. The letters contained various annotations and were accompanied by notes indicating they had been reviewed in the course of creating a document responding to the instant motion to vacate. *Id.* Also included and notated was a print-out of messages Movant sent his family in 2018 via the federal prison inmate e-mail system. *Id.*

Neither Mr. Muller nor his family ever provided trial counsel with these documents. Exhibits A-D (declaration and affidavits from Movant and his family). Movant knows of no source besides the U.S. Attorney's Office likely to have obtained Mr. Muller's letters and messages from both state and federal detention facilities. The content of notes and annotations reflects sharing of Movant's confidential information between trial counsel and prosecutors. The file folder containing the documents appears to have been inadvertently enclosed in the box of papers. Exhibit A.

Also in the folder was an original letter written by Movant shortly after he pleaded guilty in 2016. Mr. Muller submitted the stamped, addressed letter to jail deputies for mailing, but Movant's family confirms they never received any such letter nor a copy. Exhibits A-C. The letter disclosed that Mr. Muller was having serious cognitive difficulties at the time he pleaded guilty. Exhibit E (relevant portion of letter; the full letter includes personal information Movant does not wish to publish). Mr. Muller confides to his parents in the letter: "This may be difficult to hear, but I believe 100% that the actual circumstances for my case meet the federal standard for 'not guilty by reason of insanity.'" Mr. Muller stated that nonetheless, he pleaded guilty because he believed it best for Aaron Quinn and Denise Huskins, among other reasons. *Id.*

Due to the sudden change in trial counsel's advice and recommendation of a guilty plea, Mr. Muller's parents had not had an opportunity to speak with him in detail about the matter. Exhibits A-C. Mr. Muller's parents were concerned about their son's well-being and capacity to make sound decisions at that time. However, they relied on Mr. Johnson's representations that Movant had no viable mental defense. *Id.*

## IV. TRIAL COUNSEL'S THREATS TO MOVANT AND HIS FAMILY

Since the time Mr. Muller filed his § 2255 motion and disclosed trial counsel's deficient performance, Tom Johnson has campaigned Movant and his family to withdraw the motion. When Mr. Muller would not, Johnson resorted to threats. Exhibits A through D are three affidavits and a declaration describing what amounts to eh extortion of Movant's family by Tom Johnson.

Trial counsel initially convinced Mr. Muller's parents that their son was exercising poor judgement and would cause himself harm unless they could convince him to withdraw his motion. *Id.* Movant's parents trusted in Mr. Johnson and lobbied Movant to drop the motion. When their efforts did not succeed, Johnson told them "I know Matthew's deepest, darkest secrets," and made it clear he would reveal them if the motion was not withdrawn. *Id.*

At the same time Johnson threatened Mr. Muller's family with the release of secrets about Mr. Muller, he threatened Mr. Muller with the release of secrets about his family. Johnson intimated that he had learned compromising information about Mr. Muller's family that he would be forced to make public if the claim against him was not dropped. Exhibit A. Tom Johnson would not disclose what the information was or why he would be forced to publicize it. Mr. Muller and his family tried to determine which of them might be hiding something. They eventually decided that by chance or design, Johnson had turned the family against each other with intimations of secrets that did not exist. *Id.*

Mr. Johnson's threats are only the most serious branch of a broader course of conduct involving other unethical acts. It is expected those matters will be raised in a more comprehensive future filing.

## V. PROSECUTORIAL MISCONDUCT

The prosecution's misconduct in this matter has risen to a level that affects the fundamental fairness of the proceedings — as to both the trial phase and this postconviction motion.

The U.S. Attorney's Office appears to have intercepted and strategically withheld a key letter from Mr. Muller to his family. There is a substantial likelihood the information in the letter would have spurred an intervention by Movant's parents. *See* Exhibits A - C. That in turn could result in a change of plea, which presumably is exactly why prosecutors concealed the letter.

In the course of litigating his state criminal matter, Mr. Muller has learned of other probable subterfuge by prosecutors. AUSA Matthew Segal knew of material unlawful conduct by officers who connected Mr. Muller to this case. The 90-day stay is requested in part to further develop proof of that matter. Mr. Muller also learned that AUSA Segal discussed his prosecution of this matter with the presiding judge in Mr. Muller's related state case. The judge advised that he steered the conversation away from any substantive discussion. Exhibit A (Movant is uncertain whether this conversation occurred before or after the judge's assignment to the case. In any event, the judge's disclosure indicated Mr. Segal either knew the judge was or could soon become the presiding judge.) There is also evidence

Mr. Segal coordinated with a private attorney hired by the Aaron Quinn and Denise Huskins to appear at Movant's sentencing hearing and attempt to present arguments. Mr. Segal had already vitiated Movant's plea agreement by failing in his written submissions to argue for a 40-year sentence under the Guidelines. He sought to further circumvent the plea argument through his cooperation with a private prosecutor who would argue for a life sentence.

## VI. CIRCUMSTANCE WARRANT A 90-DAY STAY FOR MOVANT TO SEEK COUNSEL

Mr. Muller has been unsuccessful in his requests for appointed counsel, and now asks for time to marshal resources and seek retained counsel. Those resources continue to be exhausted by expenses in his pending state case. However, Movant will prioritize this matter. Without counsel he is unlikely to prevail against the coordinated efforts of the Government and his former attorney. This case carries an effective life sentence. The outcome of the state case is irrelevant if Movant's 40-year term of imprisonment stands.

In deciding whether to grant a stay, courts balance the hardship and inequity that the requesting party will suffer if forced to proceed, the prejudice to the opposing party, and the orderly administration of justice. *CMAX, Inc. v. Hall*, 300 F. 3d 265, 268 (9th Cir. 1962). As set forth above, Mr. Muller faces serious hardship, inequity, and an effective life sentence if forced to proceed without the opportunity to obtain counsel. Further, trial of Movant's state court charges is expected to begin soon. Exhibit F (state court hearing schedule; April 9 trial date has been vacated pending discovery matters). Disclosure of Movant's privileged information is likely to prejudice him at trial.

The Government faces no hardship from a stay, and indeed has recently requested and received multiple extensions of filing deadlines. The brief pause in proceedings will not affect the orderly administration of justice.

///

///

WHEREFORE the Court should grant the requested 90-day stay of proceedings.

Respectfully submitted,

Dated: April 17, 2019

Signed: ______________________

Matthew D. Muller, *In Pro Per*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br>Respondent,<br>v.<br>MATTHEW DANIEL MULLER,<br>Movant. | No. 2:15-cr-00205-TLN-EFB<br>**[PROPOSED] ORDER GRANTING STAY** |

Having reviewed and considered the Movant's Motion to Stay Proceedings, and good cause appearing, IT IS HEREBY ORDERED THAT:

1. The Court's Order (ECF No. 91) directing the Government to file a response to Grounds 12(e) and 13 of the Movant's motion to vacate sentence (ECF No. 61) is stayed to and including July 16, 2019. The Government is ordered to file its response within 30 days of the expiration of the above stay, not later than August 15, 2019.

2. The Court's Order (ECF No. 91) directing the Government to file an opposition or statement of nonopposition to the motion to amend (ECF No. 75) is stayed to and including July 16, 2019. The Government is ordered to file its opposition or statement of nonopposition within 15 days of the expiration of the above stay, not later than July 31, 2019.

3. The Court's Order (ECF No. 91) directing Movant's trial counsel to file a declaration in response to the motion to vacate sentence (ECF No. 61) is stayed until further order of the Court.

Dated:__________________ Signed:__________________________

Hon. Troy L. Nunley
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,

Respondent,

v.

MATTHEW DANIEL MULLER,

Movant.

No. 2:15-cr-00205-TLN-EFB

**[PROPOSED] ORDER GRANTING STAY**

Having reviewed and considered the Movant's Motion to Stay Proceedings, and good cause appearing, IT IS HEREBY ORDERED THAT:

1. The Court's Order (ECF No. 91) directing the Government to file a response to Grounds 12(e) and 13 of the Movant's motion to vacate sentence (ECF No. 61) is stayed to and including July 16, 2019. The Government is ordered to file its response within 30 days of the expiration of the above stay, not later than August 15, 2019.

2. The Court's Order (ECF No. 91) directing the Government to file an opposition or statement of nonopposition to the motion to amend (ECF No. 75) is stayed to and including July 16, 2019. The Government is ordered to file its opposition or statement of nonopposition within 15 days of the expiration of the above stay, not later than July 31, 2019.

3. The Court's Order (ECF No. 91) directing Movant's trial counsel to file a declaration in response to the motion to vacate sentence (ECF No. 61) is stayed until further order of the Court.

Dated:____________________ Signed:______________________________
Hon. Edmund F. Brennan
U.S. Magistrate Judge

# Exhibit A

## Declaration of Matthew Muller

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,

Respondent,

v.

MATTHEW DANIEL MULLER,

Movant.

No. 2:15-cr-00205-TLN-EFB

**DECLARATION OF MATTHEW MULLER**

I, Matthew Muller, declare:

1. I am the Movant in this matter and am making this declaration to describe recent developments in my case. In light of these developments, I am requesting a 90-day stay to seek counsel.

2. I previously described how my former attorney Tom Johnson missed the deadline to notice an insanity defense by over 20 weeks. Unknown to me and my family, the U.S. attorney filed a motion to pretermit the defense based on the long overdue notice. A hearing was scheduled at which Mr. Johnson would have had to explain himself.

3. Up until then, Mr. Johnson had told my family and me we were pursuing a mental defense. Then he changed his advice rather suddenly. He told me the only way to avoid a life sentence was to plead guilty. He said a mental defense would not work because my behavior was "just too organized." Due to poor mental health I did not care about my future. I just wanted to do what was best for everybody because I had plans to kill myself eventually anyway.

4. A year and a half later I had regained my health. My wife discovered the motion to pretermit my mental defense. Mr. Johnson had left that out of the case file he sent me even though he represented that it contained all documents filed by either party. Now we understood Mr. Johnson's sudden change of heart about my mental defense.

5. I filed for postconviction relief. Mr. Johnson quickly began lobbying me to withdraw the motion, which pointed out his malfeasance. He told me that if I did not, he would have to "open [my] file up to the prosecution." It happened I knew the law well on that point and told Mr. Jonson that was not true at all.

6. Mr. Johnson became more direct and suggested he would still have to share my information. Moreover, he said he had learned things about my family while working on the case, and that these things were in the file and would be revealed as well.

7. At the same time Mr. Johnson was threatening me that he would release information about my family, he was threatening my family that he would release information about me. It caused a great deal of confusion and mistrust in my family. There were events relating to my charges that were a known quantity. But Mr. Johnson seemed to suggest there was some other compromising information. Nobody knew who to believe and who might be hiding something.

8. Mr. Johnson's conduct was so unexpected that it took my family a while to figure out what was happening. And what was happening was that Mr. Johnson was committing extortion against us. Even with a lawyer who had bungled a deadline and then covered it up at his client's expense, you would not expect criminal conduct. But that is exactly what Mr. Johnson was engaged in.

9. Worse, Mr. Johnson was targeting our family relationship and using it to control us. He was not saying "do what I want or I am going to harm you." He was saying "do what I want or I am going to harm your loved one." And what Mr. Johnson wanted was for me to give up my right of access to the court. Because the truth would make him look bad.

10. Mr. Johnson has shown an ongoing willingness to misrepresent as needed to further his interests. Most recently in my case, he lied on paper to a Superior Court judge about his availability to testify. Mr. Johnson's testimony was needed at an evidentiary hearing. He was duly subpoenaed. In response, Mr. Johnson sent a letter directly to the judge's chambers. It stated that he and his associate Kristy Horton (also subpoenaed) were unavailable because they were both needed for a hearing before Judge Shubb that was "expected to last all day." on the same day as my afternoon hearing.

11. Due to the irregularity of an ex parte communication directly to chambers, the judge gave me the letter. My wife followed up and learned that Mr. Johnson's "all day" hearing only lasted until 11:55 am, and Judge Shubb had an afternoon calendar. Further, there is no record of Kristy Horton appearing at the hearing. Both were told their testimony would be short, and they could testify anytime between 1:30pm and 4:00pm at a court approximately 50 minutes from their office.

12. As one might expect of an attorney, Tom Johnson's untruths are sophisticated and difficult to prove. Only when something unexpected happens, such as the judge handing me his ex parte letter, does it become possible to see the deception.

13. Another such unexpected disclosure recently happened. After seeking my client file for a year and receiving only part of it, my file was subpoenaed from Mr. Johnson through the court. (He and Kristy Horton had deflected multiple requests from my attorney to forward the file voluntarily.) Mr. Johnson finally sent the file. Included in one folder were some materials he likely did not intend to send.

14. The materials reflect that Mr. Johnson has been sharing documents and coordinating directly with the U.S. Attorney's Office to oppose my motion. Mr. Johnson appears to have been given copies of many letters I wrote to my parents from jail, presumably collected by the U.S. Attorney's Office. The letters are highlighted and annotated.

15. The mark-up indicates that the letters have been mined for quotes that presumably will be used to support whatever post hoc rationalization Mr. Johnson offers for dropping my mental defense.

For example, Attachment 1 is a page from a letter I wrote to my parents from jail in 2015. No copy of it was ever given to Mr. Johnson by my family or me, so the page most likely was provided by the U.S. Attorney's Office. I received the page with green mark-up pointing to a paragraph favorable to Mr. Johnson. Attached was a post-it note flagging the excerpt as showing "Matt's confidence in + respect for Tom."

16. Indeed at the time I wrote the letter, I had no reason to doubt Mr. Johnson. There is additional relevant context: Mr. Johnson felt he was spending too much time answering questions from my family. He asked me to encourage them to contact him less. This portion of the letter was my diplomatic effort to do so, suggesting for example that my parents "read a book about the process. That should familiarize you with a lot of it if you want to know what's going on." I further stated that "it will help us a lot to manage that relationship [with Mr. Johnson] and keep him positive and enthusiastic about the case."

17. This was a nice way of saying that Mr. Johnson was getting annoyed with us and I was worried it could hurt the case. That is a difficult nuance to bring out in response to what will likely be presented in soundbite form as unmitigated praise for Mr. Johnson.

18. Another passage is about a terrible experience I had at a psychiatric hospital I was sent to from the jail, as well as my time in the acute psychiatric ward at Santa Rita Jail. They were very difficult experiences. And that was due to the conditions there, which I understood then, and also because of my mental state at the time, which I understand now. I had been left in empty cells with nothing but my thoughts. One did not even have a toilet, and the guard let me out so seldom that I began saving milk cartons to urinate into. The excerpt also includes a note written on a post-it note *quoting* something my mother wrote in a letter after my plea — again, with the apparent goal of rationalizing Mr. Johnson's abandonment of my mental defense. The letter excerpt is enclosed as Attachment 2.

19. I did improve after a move to a normal cell, because I was allowed books and a few other items. And likely also because the antipsychotics they had started me on were beginning to take effect. What the letter reflects more than anything is Mr. Johnson's irresponsibility in failing to have my examined as quickly as possible and my psychological state properly documented.

20. Other mark-up and underlined soundbites indicate Mr. Johnson will say he dropped the mental defense because of my and my family's fears about a psychiatric facility. We had nothing but my one bad experience and Hollywood portrayals of "insane asylums" to go by. Those turn out to be inaccurate, as I have since learned. It was Mr. Johnson's responsibility to give us accurate information about that, or better yet, to consult a professional in the field. In any event, it was not something we discussed in any detail before Mr. Johnson dropped the defense. He never spoke about how that related to any guilt-phase defense decisions. Mr. Johnson simply used it to rationalize his actions after the fact.

21. Another set of documents included are printouts of messages I sent my parents through the prisoner e-mail system Corrlinks. *See* Attachment 3. These are documents that likely could only be obtained from the U.S. Bureau of Prisons. That is worrisome, because a group of officials at U.S. Penitentiary Tucson has reason to act against me.

22. I was threatened when I arrived in Tucson not to do any legal work for inmates, since they knew I had been a lawyer. I met inmates I was convinced were innocent and could not stand by. I stayed "under the radar" for a while, working only on innocent cases and nothing adverse to prison officials. But there was a pervasive pattern of mail tampering by prison officials that was causing inmates, including those I was helping, to miss deadlines and lose their cases. I had to do something.

23. I collected examples of mail problems and created a declaration I could use to help excuse deadlines. Eventually one of my declarations never made it to court and we assumed it had been intercepted and read by prison officials.

24. Around that time I was cited for "illegal use of the mail" for writing about how an inmate's

family could help with his exoneration campaign. They threw me in the "Special Housing Unit" (SHU), commonly known as "the hole."

25. When I complained, they moved me in with a violent cellmate who they said would "teach [me] about the SHU." He raped me. The next cellmate they gave me beat me until I was bleeding from multiple facial lacerations and other injuries. My family had no idea what had happened or why I had stopped communicating.

26. The Bureau of Prisons (BOP) subsequently interfered with my access to an attorney my family hired to help. They entirely blocked a forensic psychiatrist my attorney retained from visiting and examining me. A BOP psychologist had made various misrepresentations in my health records in an attempt to cover up what happened to me.

27. I have also recently learned of misconduct by federal prosecutors. They concealed important evidence of unlawful conduct by the Alameda County Officers who connected me to this case. I am still obtaining evidence about this matter and hope to have definitive proof soon. I also learned that AUSA Matthew Segal raised the matter of my case with the judge presiding of my related state proceedings. The case was not discussed in detail. But it is of concern no matter what that AUSA is discussing this ongoing prosecution at social events such as the one where he met with my judge.

28. I cannot hope to oppose the coordinated efforts of both a former attorney and prosecutors who have shown willingness to use unethical means. Nor can I expect to receive fair treatment from federal prison officials who caused my rape and beating and are now defendants in the resulting civil case. I see, in the notes left in my file, a document taking shape that will skillfully invite the court to ignore the fatal defects in my conviction and maintain the status quo.

29. For example, I see highlighter and arrows pointing at the name Wellbutrin in a message to my family intercepted by the BOP. It is a drug that is both the only reliable means in keeping me alive and also a contributor to past psychotic breaks. In the message, I tell my parents that the only way I will

live through another long period in local jail conditions is to receive this medicine. I expect this attempt to stay alive will be used to tell the court I am still taking the medicine that caused the problems in the past. They will say I will be a danger if released. What they will not say, is that I worked with an Alameda county psychiatrist and we found an antipsychotic that counters Wellbutrin's adverse effects and is not oversedating. Nor will they explain the other circumstances that were necessary to induce psychosis.

30. The document will also fail to explain the complexity of the psychiatric issues involved. That takes an expert and an opportunity I was denied by the malfeasance of my attorney. Prosecutors filled the void with uninformed and opportunistic arguments. If the question was dangerousness or the need for shackling, I was seriously ill and prone to psychosis. If the issue was character or responsibility, I was not ill at all, just bad. If the Government wants to argue mental health issues with expert assistance and the requested detail. That is exactly what I am seeking. Prosecutors argued repeatedly that mental health lay opinions offered in my support should be disregarded as unreliable. This would be no less true of their own commentaries on my mental health and history.

31. I know the reality of what has happened before and since my charges, and I know the applicable law. My motion to vacate is absolutely meritorious. From my work on prisoners' § 2255 cases, I also know the reluctance of courts to overturn even a plainly defective conviction on collateral review. If my motion is to have any possibility of being fully and fairly litigated, I will need the assistance of counsel. I hope the court will give me the time I need to seek that assistance.

I, Matthew Muller, declare under penalty of perjury that the above is true and correct.

Respectfully submitted,

Dated: April 17, 2019

Signed: ______________________

Matthew D. Muller, *In Pro Per*

# Attachment 1

## Excerpt From Letter to Family, Copy Obtained By Prosecutors and Provided To Tom Johnson To Aid Opposition To Motion To Vacate



30 October 2016

Dear Mom and Dad,

Let me apologize in advance for a poorly organized, stream-of-consciousness letter. It's either that or no letter, or one that arrives much later than you need it. I need to explain that it's difficult for me to write you at all. It's not emotionally difficult, it's not a matter of broaching subjects that are difficult to talk about. I feel a bit of that, but no more than is natural. By and large I actually want to share what I'm thinking and how I'm doing. That's because I'm feeling and doing well by most measures - extremely well considering the circumstances - and I want you to know that because I hope it can bring you a little peace in the midst of all this. What I mean to say is that it is very difficult to write as a matter of cognitive process and "will power," though that latter term has some connotations of choice and agency that don't apply here. It's hard for me to do a good job explaining this. It will help if you read a bit about it by Googling schizophrenia or schizoaffective and looking for information about "negative symptoms," especially one called avolition. This is just if you want to understand, maybe that doesn't help you. For me at least, understanding the mental health aspects of this - seeing it through a lens of empirical and clinical data - has helped me process everything and come to terms with it. But even as the person who has had the subjective experiences, who knows the symptoms,



(3)

all of the various elements of what happened and various bizarre circumstances. This may be difficult to hear, but I believe 100% that the actual circumstances for my case meet the federal standard for "not guilty by reason of insanity." I say this with the same objective appraisal as I used to explain why the motion to suppress that Tom filed would almost certainly fail. The big problem is that so many of the facts that must be established to meet that standard involve my subjective psychological experience. My story would fit the contours of known diagnoses and would be corroborated by certain bizarre circumstances that make sense in view of the delusion, and by other circumstantial evidence (e.g. files and browsing history on my computer reflecting obsessions with the Batman movies or Nancy Grace or a bunch of other things).

to keep tabs on things now, and it feels great when you check in with me about things and [illegible] give me a chance to explain parts of it [illegible] that [illegible] or [illegible] — and at this point [illegible] doesn't exclude [illegible] — [illegible] I [illegible] opposing attorney in the room and don't talk about anything I wouldn't want overheard. Another thing you can do is read a book about the process [illegible] you with a lot of it [illegible] you want to know what's going on. Nolo is a great [illegible] the [illegible] through the hypo [illegible] the [illegible] is [illegible] the Nolo.edu. [illegible] sells them [illegible].

Y

So we [illegible] we [illegible] with Tom and it will [illegible] to manage that relationship and keep him positive and [illegible] about the case. Lawyers are people [illegible] By the way, Tom hasn't [illegible] or [illegible] for anything like that. I'm [illegible] an organization [illegible] [illegible] things [illegible] order [illegible] And as a thought exercise [illegible] of the case [illegible] [illegible] to figure out [illegible] [illegible] And in terms of [illegible] [illegible] major roles in the process [illegible] The most important players [illegible]

# Attachment 2

## Excerpt From Letter To Family, Copied By U.S. Attorney's Office And Provided To Tom Johnson In Aid Of Opposing Motion To Vacate

than my initial weeks in custody, my worst experience in jail so far was when they sent me to a psychiatric facility for a few days. I arrived and they wouldn't tell me what medication they were giving me. They told me to "talk to the doctor about it tomorrow" and said I would be forcibly restrained and given it as a shot if I wouldn't take it orally. I was put in a room with a bed, tie-down straps, and nothing else. I did get snacks, that was one amenity. But I was allowed no books or anything else. They took away and discarded my foam earplugs. The sound in the place was horrible. I had to ask an orderly to use the bathroom, when I could get their attention from my door. One who was on duty in the morning would say "OK, sure, in 5 minutes" and then laugh. I had to urinate into a milk carton. [illegible] I did my best to seem gr[illegible] the hell out of there. I got [illegible]ing, to a new cell, the one I'm [illegible]ng and my reserves were gon[illegible] John George (the psy[illegible]. I couldn't take even [illegible] the time I got back he[illegible]tdown, rolled up into ball sc[illegible]yself against the door of the cell screaming obsenities at the TV. By morning I was OK again and settled down. But the psychiatric facility had literally driven me

PP 21-23

[illegible]'s concerns about psychiatric facilities (I am also worried that [illegible] could be placed in a facility that will literally drive him crazy. That would be [illegible] of a good [illegible]

(23) (sorry these are out of order - I ran out of paper and then got more)

crazy.

The second worst environment I've been in was Santa Rita's Behavioral Health (psychiatric) Unit, due to the screaming and inmates up all night. And you're already aware of the psychiatric staff here keeping me on "suicide watch" not because it is called for or helping me (quite the opposite, which everybody but the chief of psychiatry acknowledges), but in order to cover them-selves just in case something happens.

In short, my health became better when I was taken out of the specialized psychiatric units. I am completely on board with spending my time in a place with a good environment and appropriate treatment for me. I am unconvinced that means a specialized psychiatric facility, absent very specific and reliable information about the experience at a particular place in the custody level that I would be admitted. I'm terrified of ending up some place like John George. I don't think I'm any sort of suicide risk anymore, not like before. But having to endure something like John George again on a long term basis - I think my condition would deteriorate precipitously.

A few things to keep in mind - it is typically the poorest prognosis patients that end up at that place in the system.

# Attachment 3

## Prisoner E-Mail Message Obtained By The U.S. Attorney's Office and Provided To Tom Johnson In Aid of Opposing Motion to Vacate

**Joyce Zarback**

**From:** MULLER MATTHEW D (72875097)

**Sent Date:** Wednesday, February 28, 2018 10:49 PM

**To:** joyzarback@gmail.com

**Subject:** IMPORTANT - mail from Tom Johnson

Hi mom, hi dad, hi Diana,

I'm writing because I received a letter from Tom Johnson today that was processed as regular inmate correspondence rather than as legal mail, because Tom didn't put the proper markings on the envelope. Unfortunately, there's a pervasive pattern of the BOP interfering with inmate legal mail, and they have unreasonably strict regulations about how envelopes must be marked in order for a letter or parcel to be considered "legal mail" and handled accordingly. My letter to Tom let him know--with underlining and highlighting for emphasis--that he MUST write prominently on the outside of the mailing the EXACT PHRASE "Special Mail - Open Only In The Presence Of The Inmate" and that the return address on the mailing MUST specify both his name and state that he is an attorney, as in "Thomas A. Johnson, Attorney," and it not sufficient that the return address state "Law Office of Thomas A. Johnson."

If Tom does not do exactly this, delivery of my file will be greatly delayed or may not happen at all, and DOJ officials will have read through and copied everything he sent. In short, I will be in a worse situation than I would be if he'd never sent anything at all. BOP policies on legal mail are unlawful, but I don't want to be the one who is forced to file a formal complaint or lawsuit because I need to get a missed deadline excused. I am trying to work within existing practices, illegal though they may be. Tom is probably used to working in a system where confidentiality and privilege are taken seriously and protected, but that is just not the case here. Even though what he sends is obviously legal mail from an attorney, it will not be treated as such unless it has exactly the markings I have described.

I would really appreciate it if you contact Tom and ask him to please follow the instructions in my letter for all correspondence with me, and especially my case file. If he has already sent something without the required markings, I need to know ASAP. Also ask him to check his junk mail and confirm me as a contact, as I've added him to my e-mail list. I will also try calling him tomorrow, [handwritten: From Corrlinks] but I don't know if I'll be able to get a legal call in time.

I know this seems like a small administrative detail, but if it goes the wrong way it will potentially be determinative of whether I get out of prison in 30-odd years, or never.

Also, I would really appreciate it if you could ask Tom to please use delivery confirmation so that the file he sends is trackable, and to send you the tracking number. Diana, since you're really good at this sort of thing, it would be great if you could take charge of the tracking number and let me know as soon as the mailing is delivered here. Also, since I have a P.O. Box address, I can't receive mail by FedEx or UPS, it has to be U.S. Postal Service, maybe Priority Mail would be a good compromise between speed and price, again making sure to tracking and delivery confirmation.

Thank you, sorry to write so much on this, I wouldn't if it were not so important.

Love,
Matt

**monty muller**

---

**From:** MULLER MATTHEW D (72875097)

**Sent Date:** Wednesday, September 12, 2018 12:19 AM

**To:** mullermonty@comcast.net

**Subject:** this and that

Thank you both for your help. It's not really fair to tell you "don't worry," but don't worry. I'm fighting as best I can. I really hate squealing like a stuck pig before the axe has even come down, but I understand there's not a lot of time for squealing once the axe hits. I've learned enough to know that I have to make my stand now, because by the time I get to Solano it might be too late. It's really a mistake to think about suicide in terms of will power or choices. It works that way about as much as any other terminal illness. Maintaining a will to live and trying to fight when you're in its grips is not irrelevant, not for suicide and not for cancer. But once it really comes for you, that's it. Believe me, you've both done all you can to make me want to fight it, to give me the will to live. Certainly never say to me something like "it's OK, you can let go, be at peace," because that will be music to my ears when I'm suicidal and I'll do exactly that. But you can't push too hard on the guilt buttons, because I will actually start to resent you for making me suffer and not understanding how I need to escape the pain. I'm not saying it's fair for me to resent you, I'm just saying that's what will happen based on experience. I will fight it for as long as I can. And this is really the pivotal moment, before I'm suicidal. My mind is vascillating back and forth between depression/anxiety/panic and a more normal state right now. And even during three or four hours of being in a bad mental state it's hard to remember why I shouldn't just give up, no matter how many little reminders or motivations statements I write on my hands to remind myself. So it's not going to be easy when/if that state sets in for the long haul.

If you want to know what to do, there are just two things I can think of: first, I need to be Wellbutrin/bupropion. I held off suicide in the Sacramento jail for a year and a half of deep depression, basically by making a bargain with myself that if I made it to a certain date in the future then I could kill myself if I still wanted to. I couldn't handle the prospect of having to continue living indefinitely, but I was able to do that much, and then pull through once the depression subsided. In the SHU here, on the other hand, the depression and suicidal thoughts sliced right through the Effexor and brought me to the brink of killing myself within weeks. I will probably still suffer depression on either drug, but for whatever reason bupropion is the one that does a much better job holding suicide at bay. So if I am sent to Solano, help me get on Wellbutrin ASAP. It will really help to have my medical records from Tom's file. Like I said, the prosecution produced more of my medical records than he ever bothered to get himself. They've misdiagnosed me here, in part because I don't have all of my medical records to present to them. I've learned to ask for help, but I've still been taught to be stoic and I default to that. I seem fine, so they assume I'm fine, and when I tell them I'm not, they don't believe me because I'm always trying not to let things show. I don't know how to be any other way. It's humiliating to have to be as active as I have been in seeking treatment and help. But I've done it.

The second thing is this: dad, you and mom have seemed to think that my impulse to help others has been my downfall, that if I'd just take care of myself then I wouldn't have these additional stressors and I'd be fine. First, you might as well ask me not to breath as try to kill that impulse. Second, it's actually one of the few things that has kept me alive. Besides you guys, that is the meaning in my life. You've already maxed out the anti-suicide effect of the guilt I'll feel for hurting you if I kill myself. If you want to have an additional effect when I'm feeling suicidal, then you can appeal to my sense of duty and remind me that I have a lot left to do and people to help. But asking me not to do that, or maybe instead to just teach people English or math or something is like asking an NFL linebacker to give up and go play ping pong. Maybe he should, given all the news with CTE lately, maybe it would be best for him and his family. But maybe it's too late to turn back the clock on his life and his training, maybe he's willing to pay the price for love of the game and his teammates and doesn't want to cut off his testicles and go play a nice safe round of ping pong. I'm not convinced the choice to continue helping people is as self-destructive as that, but even assuming it is, I don't know how to give it up. I'll wear the latest helmet and follow the new rules and the concussion protocol and so forth. But I'm pretty sure I can't just not play. I'm sorry for that. But at least you can use it to manipulate me if I turn suicidal again.

OK, back to work, hopefully I'll have a few hours of clear-headedness. I love you both, have a good night!!

# Exhibit B

## Affidavit of Monty Muller

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**PEOPLE OF THE STATE OF CALIFORNIA,**

Respondent,

v.

**MATTHEW DANIEL MULLER,**

Movant.

No. 2:15-cr-00205-TLN-EFB

**AFFIDAVIT OF MONTY MULLER**

I, Monty Muller, declare as follows:

I am the father of Matthew Muller and hired Tom Johnson to be his attorney. I am going to write briefly about how Tom was dishonest with our family and then threatened us. There is more that Tom has done to try to cover for his mistakes, and I can talk about that on the witness stand if I have that opportunity.

Nothing like what happened with our son Matthew has ever happened in our family. I am a retired principal and now organize officiating for high school sports in the area. Matthew's mother is a retired educator as well. My son's arrest was a shock for us all. We knew right away it must have something to do with the mental health problems that ruined his life.

We told Tom about Matthew's mental illness from the start. After learning more about the case, he told us that would be Matthew's defense. Tom was very sure of this and told us repeatedly it would be a strong defense.

We hired Tom because he was confident and well-spoken. He seemed to do good work at first. I had concerns at the time that the case was not going the way Tom said it would. When I became more insistent, he would meet with us and allay our concerns. Some things Tom said did not add up. But he was the expert and I trusted what he said. Tom is a very good talker.

Our biggest surprise came when Tom changed tracks and told us he was not going to use a mental defense after all. He never had Matthew evaluated by a criminal psychologist. Now he was telling us that Matthew had to quickly plead guilty for a sentence of 40 years. Tom said it was either that or life in prison if we waited.

Later, Tom asked us to pay for a psychological examination. I did not know why he had not organized one sooner. We came to his office expecting to meet with the psychologist and speak about Matthew and his case. But Tom just wanted us to sign a check and leave.

A year later we found out Tom had blown a deadline and never told us about it. He never discussed the results of the psychological exam, and for some reason never submitted it in Matthew's case. We later learned that the report said my son's behavior was caused by mental illness.

Matthew told us he was filing papers to open his case back up. Soon after that, Tom contacted the family and told us Matthew was making a big mistake. He convinced us Matthew was doing something in poor judgement and was harming himself. So we did as Tom said and asked Matthew to withdraw his appeal.

When our son did not do what Tom wanted, Tom grew more insistent. He continued trying to convince us that Matthew needed to drop his case. At one point, he told us he knew Matthew's "deepest, darkest secrets" and would reveal them if our son did not withdraw his complaint.

That was a threat. Tom had spoken in terms of what was wise and good for our son. But now he was making what I understood to be a bald threat. We spoke to another attorney and confirmed that Tom's conduct was plain wrong. At that point we pulled Tom off the case. He had been negotiating a deal with state authorities about other charges. But we lost all trust in Tom.

I have read the letter from my son that prosecutors apparently concealed from our family. We were very concerned about Matthew then, and also upset about the sudden change in plans and the 40-years "dead." However, we relied on Tom Johnson's representations that Matthew had no defense. We had not

talked with Matthew in detail about the psychology issues and charges, because there was no confidentiality. That letter would have been the first we heard about detail like my son believing he was receiving message through movies he watched. The letter would also have reinforced my concerns about Matthew's ability to make sound decisions that were in his best interests. Coupled with the surrounding circumstances, I also certainly would have intervened. Certainly I would have insisted on explanations from Tom Johnson.

Since then we have learned more about what Tom has been doing. For example, Matthew told us Tom also threatened to reveal some sort of secret information Tom had about the family. There was no such information, but it caused our family distress as we tried to figure out what information Tom might be talking about. We are going to find another attorney to help fix the damage Tom did to our son. But the family has limited resources for that. We are asking for time to make what arrangements we can. We hope you can give us that much.

I, Monty Muller, declare under penalty of perjury that the above is true and correct.

Dated: 4-16-19

Monty Muller

# California Acknowledgment Form

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Sacramento } ss.

On 4/16/2019 before me, Wairimu Kaggio, Notary (here insert name and title of the officer)
personally appeared Monty Moller

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Seal

WAIRIMU KAGGIO
Notary Public - California
Sacramento County
Commission # 2244976
My Comm. Expires Jun 2, 2022

WITNESS my hand and official seal.

WKaggio
Signature of Notary

## Optional Information

To help prevent fraud, it is recommended that you provide information about the attached document below.
***This is not required under California State notary public law.***

Document Title: Affidavit – Court Appeal # of Pages: 3

## Notes

# Exhibit C

## Affidavit of Joyce Zarback

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,

Respondent,

v.

MATTHEW DANIEL MULLER,

Movant.

No. 2:15-cr-00205-TLN-EFB

**AFFIDAVIT OF JOYCE ZARBACK**

I, Joyce Zarback, swears as follows:

1. I am the mother of Matthew Daniel Muller. I am a retired educator and now am a grandmother and church volunteer.

2. Together with Matthew's father Monty, I selected Thomas Johnson to represent my son after he was arrested. It was immediately apparent to the family that the arrest was the result of Matthew's severe mental illness. Ten years before, he had been successful, married and stable. Then he began a downward slide that included depression as well as several serious breaks with reality.

3. We discussed this with Tom Johnson. After meeting with Matthew, Tom advised us that Matthew had a clear defense to the charges against him because they resulted from mental illness.

4. We waited for Tom to have Matthew evaluated by a forensic psychologist. When we inquired about it,

Tom said he was still looking for the right professional. He never wavered from his assertion that Matthew's defense based upon his illness was a strong one.

5. It was a surprise when Tom informed us that Matthew would be pleaded guilty without ever being evaluated by a private psychologist. We asked about the psychological defense. Tom replied "we're not going to go that route." The change was sudden and made little sense in light of Tom's earlier advice. However, Tom told us that the plea was Matthew's only hope of avoiding a life sentence.

6. I believe we did express our consternation about why events were suddenly going forward on a scale of days where before they had unfolded over months. Tom focused us in on the next phase of the case. He told us we had an important role in the sentencing stage and gave us several tasks to complete. We went along with his advice.

7. Some months later -- and once again rather suddenly -- Tom told us to come to his office on short notice to meet a forensic psychologist who would evaluate Matthew. We expected at least a short meeting for an update on the case and the psychologist's role. However, Tom simply asked us to write a check and then leave.

8. We assumed the psychologist had written a letter that was positive for Matthew in the sentencing process. However, Tom seemed never to have used several things he requested we do to explain our son's life and illness. We eventually learned that Tom had also not submitted the psychological evaluation, even though it was favorable.

9. The following year, Matthew informed us he would be appealing his conviction. He stated that Tom had missed an important deadline and had him quickly plead guilty to avoid the embarrassment of admitting his mistake. That did seem to explain Tom's sudden change of heart about the psychological defense.

10. The family also recently learned that the U.S. Attorney apparently intercepted a letter Matthew wrote to explain his plea. In the letter, Matthew said he knew he qualified for a psychological defense, but that he pled guilty to save other people from trouble. He also disclosed that he was having cognitive problems. That certainly would have been good to know at the time.

11. Soon after Matthew filed his appeal, Tom contacted the family. He advised us that Matthew was making a very harmful mistake and that his appeal had been in poor judgement. Given Matthew's recent history, this did not seem implausible. We did not understand the particular reasons, but trusted that Tom had our son's best interests in mind. We agreed to try to convince Matthew to withdraw his appeal.

12. When Matthew did not drop his appeal, Tom became increasingly insistent. It seemed less like he was trying to protect Matthew and more like Tom was trying to help himself.

13. At one meeting, Tom told Monty and me that after spending so much time with Matthew, he knew our son better than we did. He said that he knew Matthew's deepest and darkest secrets, and suggested he would have to reveal them if the appeal was not withdrawn. I told Tom his words sounded like a threat.

14. From that point on, I strongly believed Tom's efforts were only focused on having Matthew withdraw his complaint. Tom certainly did not have our son's best interests in mind.

15. We have recently learned that Tom is going even further to protect his reputation at our expense. He has obtained letters between us and our son. Tom seems poised to use words written out of love and concern to portray himself in the best possible light.

16. Our family is very worried about what Tom will do now that we are disclosing his conduct. He has shown that he is willing to harm his own clients and threaten their families to preserve his reputation. Our hope is that a judge will take the time to inquire into Tom Johnson's conduct, rather than going the easier route of maintaining the status quo.

I, Joyce Zarback, declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/16/2019

Joyce Zarback

# California Acknowledgment Form

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Sacramento } ss.

On 4/16/2019 before me, Wairimu Kaggio, Notary, (here insert name and title of the officer)
personally appeared Joyce Eshov Zarback

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Seal

WAIRIMU KAGGIO
Notary Public - California
Sacramento County
Commission # 2244976
My Comm. Expires Jun 2, 2022

WITNESS my hand and official seal.

[signature]

Signature of Notary

## Optional Information

To help prevent fraud, it is recommended that you provide information about the attached document below.
***This is not required under California State notary public law.***

Document Title: Court appeal Affidavit # of Pages: 4

Notes

©2014 Golden State Notary, Inc. www.Notary.net (888) 263-1977

# Exhibit D

## Affidavit of Huei J. Dai

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,

Respondent,

v.

MATTHEW DANIEL MULLER,

Movant.

No. 2:15-cr-00205-TLN-EFB

**AFFIDAVIT OF HUEI J. DAI**

I, Huei J. Dai, declare:

1. I am Matthew Muller's wife. I am from Taiwan and came to the U.S.A. to start again and get away from my childhood of being molested by a relative I still had to see in Taiwan. I used to work as an office and human resources manager and earned my green card from that. But after seeing what happened to my husband, I began train myself to be a paralegal. And I hope one day I can work in a law office soon. Now I work with a nonprofit to help prisoners who are wronged by the legal system.

2. I knew Matthew since 2012. We met and fall in love after he lose his ATM card and I track him down to return it. Matthew and I lived together in Union City for a while. But he say he had to leave the relationship because of psychological problems. I did not understand then, but I do now.

3. In June of 2015 I learn Matthew was arrested when I heard it on the news. There is no way he could do what they said. I knew it must be from psychological problems he was having.

4.   I began to visit Matthew every week in jail. Our romance start again. He say I should find someone else, but I only want him. We get married right after he receive his prison sentence for 40 years.

5.   I start learn about law, because I thought what happen to my husband was wrong. I had a bad feeling about his lawyer Thomas Johnson. But Matthew's family didn't know me well yet so they assume Johnson is right and not me.

6.   And then I discover something. I was learning PACER and about § 2255 motions. I see some things on the docket about Matthew's mental health and want to understand. So I send a message to Matthew, "what is a motion to exclude defense of insanity and expert evidence on mental condition?"

7.   Matthew seems surprised and ask me to send him the document. It was something Johnson left out when he mails Matthew his file. It meant Johnson miss a deadline, and he never told anybody. That explain why he suddenly say Matthew should plead guilty without giving a mental defense.

8.   Matthew filed a § 2255 motion and I help with that. Soon I hear from his mom and dad that they think Matthew is making a mistake and it is bad for him. Then I find out that it was Johnson who tell them this. I tell them again he can't be trusted. For a while they don't believe me, but then Johnson start threaten them and they finally understand.

9.   Johnson even try to use me against Matthew. He sent me an e-mail one day and want me to call him. We talk and he say it is something to help Matthew and I should come to Sacramento to meet with him. I take the next day off work and drive from the bay area to see him.

10.   When I see Johnson, he doesn't talk to me about the Solano case like I expected (he was negotiating for Matthew). Tom want to know right away, why did Matthew file claims against him? He wants me to talk to Matthew to dropped the case or it would hurt Matthew.

11.   I couldn't believe it. Johnson find out from Matthew's parents that I have a lot of influence, and

so he try to use me. I see what is happening and walk out. Later I find out that Johnson charge Matthew's parents $500 for full hour for that meeting, even though I was there 10 minutes at most.

12. I have been working on Matthew's case since he was brought back to Solano County. We learn even more about Johnson. Last month he say that he and Kristy Horton cannot go to a hearing Matthew need them for. He send the judge a letter saying they are both in court all day that day. I think Johnson just lie more, and so I research and find out I'm right. Johnson was only in court a couple hours and had time for the Solano hearing. And I think Horton was not in court at all.

13. Thomas Johnson cannot be trusted. He is a lawyer who is supposed to help people, so everyone has a hard time believe in me. But I get proven right again and again. This court should not believe Johnson either, and should give my husband a chance to prove his case.

Respectfully submitted,

Dated: April 16, 2019

Signed: ______________________
Hueí J. Dai

# California Acknowledgment Form

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Sacramento } ss.

On 4/16/2019 before me, Wairimu Kaggio, Notary, (here insert name and title of the officer)
personally appeared Huei Jiun Dai

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in his/her/their authorized capacity(ies), and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Seal

WAIRIMU KAGGIO
Notary Public - California
Sacramento County
Commission # 2244976
My Comm. Expires Jun 2, 2022

WITNESS my hand and official seal.

Kaggio
Signature of Notary

## Optional Information

To help prevent fraud, it is recommended that you provide information about the attached document below.
***This is not required under California State notary public law.***

Document Title: Affidavit - Court appeal # of Pages: 3

Notes

# Exhibit F

## Docket Indicating Hearing Schedule in People v. Muller (April 9, 2019, Trial Date Postponed Pending Discovery Motions)

## Report Selection Criteria

**Case ID:** VCR231350
**Docket Start Date:**
**Docket Ending Date:**

## Case Description

**Case ID:** VCR231350 - People vs. MATTHEW DANIEL MULLER - DMS
**Filing Date:** Friday , January 26th, 2018
**Type:** VF - Vallejo Felony
**Status:** DENIED - DENIED

## Related Cases

*No related cases were found.*

## Case Event Schedule

| Event | Date/Time | Room | Location | Judge |
|---|---|---|---|---|
| MOT TO COMPEL | 05-APR-2019 08:30 AM | DPT 7 CRTRM 101 VALLEJO | Vallejo | KAM, TIM P. |
| MOTION | 05-APR-2019 08:30 AM | DPT 7 CRTRM 101 VALLEJO | Vallejo | KAM, TIM P. |
| TRIAL MANAGEMENT CONFERENCE | 05-APR-2019 08:30 AM | DPT 7 CRTRM 101 VALLEJO | Vallejo | KAM, TIM P. |
| JURY TRIAL | 09-APR-2019 08:30 AM | DPT 7 CRTRM 101 VALLEJO | Vallejo | KAM, TIM P. |
| MOTION | 09-APR-2019 08:30 AM | DPT 7 CRTRM 101 VALLEJO | Vallejo | KAM, TIM P. |

Certificate of Service

I, Huei Dai, certify that I served the foregoing documents on the Plaintiff by causing them to be file with the court's electronic document filing system. The Plaintiff is registered for electronic service of documents file in this matter.

Dated: April 17, 2019

Signed: ______________________
Huei Dai