MCGREGOR W. SCOTT
United States Attorney
MATTHEW D. SEGAL
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>MATTHEW MULLER<br><br>　　　　　　　　Defendant. | CASE NO. 2:15-CR-205 TLN<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 |

## I.　INTRODUCTION

The defendant today seeks to use his mental health as an affirmative defense to the kidnapping of Victim 1 and a means of undoing his guilty plea to that exact crime. But it is too late. His ineffective assistance claim should be rejected because the defendant has not shown that he pleaded guilty pursuant to any incompetent, prejudicial advice to forego an insanity defense. The defendant's claim that his mental health rendered his plea involuntary is procedurally barred and plainly incredible given what the defendant told the district court under oath, at the moment of truth, during the plea proceeding. No evidentiary hearing is necessary on this record. The Court should reject the defendant's collateral attack on his conviction and sentence.

//

//

//

## II. FACTS

### A. Muller planned and executed an elaborate scheme to kidnap Victim 1, rape her, and conceal his identity as the sole person responsible.

At approximately 3:00 a.m. on March 23, 2015, the defendant broke into Victim 1 and Victim 2's shared home on Mare Island in Vallejo, California. PSR ¶ 5. The defendant threatened them with an apparent firearm, electric shock, and facial laceration. PSR ¶ 21. As a result of the threats, the defendant was able to restrain, blindfold, and drug his victims, and place headphones over their ears. PSR ¶¶ 5, 21. The defendant directed Victim 2 to disclose his financial information and passwords. He left Victim 2 in the residence with an elaborate contrivance to convince Victim 2 that he remained under surveillance and could not call the authorities without endangering Victim 1. The defendant took the bound, drugged, and blindfolded Victim 1 away, put her in the trunk of Victim 2's car, moved her to the trunk of his own (stolen) car, and brought her to the defendant's cabin in South Lake Tahoe, California. PSR ¶¶ 5, 23. Between March 23, 2015, and March 24, 2015, Muller held Victim 1 as a prisoner and he twice raped her. PSR ¶¶ 32, 53-54. He also made a $17,000 ransom demand of Victim 2. PSR ¶ 12.

On March 25, 2015, sometime in the morning hours, Muller released Victim 1 in Huntington Beach, California. PSR ¶ 5. Throughout the drive from South Lake Tahoe to Huntington Beach, the defendant made Victim 1 wear blacked-out swim goggles so that she could not see his face. PSR ¶ 25. When Muller released Victim 1, he warned her that if she went to law enforcement, he would harm her family. PSR ¶¶ 58, 65.

Part of Muller's psychological manipulation of Victim 1 involved acknowledging the suffering that he was causing her:

> [Victim 1] said he was so manipulating that he knew how to use his "niceness" put her in a position of no power or control. Muller continued with the compliments and told her, "You are so strong; you are handling this very well." Victim 1 said Muller seemed in awe that she was doing so well. Muller told her she would suffer from this for a very long time. When Muller put her in the trunk of the car, he gave her a comforter to stay warm, then actually apologized that he had to lock her in the trunk.

PSR ¶ 50.

During the kidnapping, Muller informed the press that he would release Victim 1. But he did so with some sophistication. He used a Singapore-based anonymous email service and stripped all

metadata from the audio file in which she spoke to prove she was alive. PSR ¶ 19. On March 26, 28, 30, and 31, 2015, the defendant sent other emails to the press and the Vallejo Police Department. PSR ¶¶ 34-38; PSR pages 38-66. Together, the emails combined truths and lies about the offense, expressed regret, and, crucially, maintained the defendant's anonymity. PSR page 39 ("[W]e feel deep remorse and horribly regret our slide into criminality . . . We will not turn ourselves in nor reveal our identities. Even after we 'come out' we don't think there will be any link allowing the police to identify us.").

**B.  After attempting to kidnap a woman in Dublin, Muller was arrested and identified as the Vallejo kidnapper-rapist.**

Of course, Muller did not "regret" his "slide into criminality" enough to cease scheming to kidnap young women. So, on June 5, 2015, Muller appeared in Dublin to attempt a kidnapping with the same modus operandi. PSR ¶¶ 39-40. The residents of the house fought him off. *Id.* Muller was identified because, when he fled the Dublin residence, he left behind his mobile phone. PSR ¶¶ 42-43. On June 8, 2015, when Alameda County sheriff's deputies searched Muller's South Lake Tahoe residence, they found Victim 2's computer and many of the tools Muller had used in his kidnapping of Victim 1: among other things, zip ties, taped-over swim goggles, and a water pistol modified to look like a laser-sighted firearm. PSR ¶ 44.

FBI analysis of the seized property revealed how carefully Muller had planned:

> During a search of Muller's laptop computer and other devices, which were found at the South Lake Tahoe cabin, agents located files that had recordings of Muller's voice dubbed over what sounded like whispers, video files of the sexual assaults of Victim 1, and videos of drone flights in residential neighborhoods. They also found a video file depicting Victim 2 and Victim 1 [in a private moment]. The video had been shot from a drone through the window of their home; it is unknown when exactly the video was taken. Additionally, agents found videos of the "peeping tom" allegations outlined in the emails Muller sent to the San Francisco newspaper. Further, during a search of Muller's storage locker, agents found drone boxes, consistent with the video evidence they discovered on his laptop computer, including videos of drone activity as outlined in Muller's emails to the San Francisco Chronicle and the VPD.

PSR ¶ 45 (footnotes omitted). Muller's rapes were marked by significant premeditation. Muller carefully video recorded the evil acts he committed against Victim 1. The FBI later recovered the video files from his computer in South Lake Tahoe. "These video files were of the two rapes; the first one which depicted Victim 1 crying throughout and the second one after Muller told her she needed to 'act'

better to make it believable." PSR ¶ 45 n.6. "For one of the rapes, Muller taped an iPad to the ceiling over the bed, taped another iPad on a mirror to the right of the bed, put a recording device near the bottom left of the bed, and propped what appeared to be a Go-Pro device on the headboard. While assembling the devices, he also made sure the angles were correct by sitting on the bed and viewing himself." PSR ¶ 45 n.7.

### C.  **Evidence linked Muller to similar crimes on the Peninsula.**

Muller was suspected in three similar offenses that occurred on the Peninsula when Muller was in the area. PSR ¶¶ 83-88. The district court did not adopt the government's position that Muller had committed these offenses.

### III.  PROCEDURAL HISTORY

The complaint in this case was signed on June 29, 2015 and unsealed on July 13, 2015. Dkt. 1, 5. Two days later, counsel was already analyzing an insanity defense, thinking about the Rule 12.2 deadline and its implications, and negotiating with the government about it. Attachment 1. Thus, even pre-indictment, seasoned counsel knew the case and viewed any potential mental defense as more in the nature of mitigation. *Id.*

On September 21, 2015, Muller was brought to federal court after he pleaded in Alameda for what he had done in Dublin. Dkt. 6; PSR ¶¶ 3, 93. He remained detained. Dkt. 6, 8. On October 1, 2015, the Grand Jury returned a one-count indictment charging kidnapping. Dkt. 12. The defendant pleaded not guilty. Dkt. 14.

For months after that, the parties reached agreements on discovery, continuances, and filing deadlines. Dkt. 14-24. There were also plea discussions.

The government made a plea offer on February 11, 2016. Attachment 2. The proposal was for the defendant to argue for a sentence of no less than 30 years, and the government to argue for a sentence no more than 45 years. *Id.* at 4-5. The factual basis for the plea agreement contained statements about Muller's rape of Victim 1 and about similar acts on the Peninsula between 2009 and 2012. *Id.* at A-1 – A-5.

Counsel made a counter-offer on March 11, 2016. He proposed that Muller plead guilty to the indictment and agree to a factual basis that included uncharged acts from 2009. The parties would have

argued for a sentence between 32 years and 40 years.  Attachment 3.  However, counsel's proposal also required "[a] formal agreement from El Dorado County and Solano County that no state charges will be filed for conduct committed by Mr. Muller in the respective counties." *Id.*

On June 23, 2016, the district court denied the defendant's motion to suppress.  Dkt. 31.  The district court ordered that trial would commence, as previously scheduled, on January 30, 2017.  Dkt. 31.

On August 25, 2016, the government sent counsel a letter that stated,

> Earlier, the Government informally advised you that it would not impose a plea bargaining deadline until after Mr. Muller had opportunity to litigate his motion to suppress.  But that time has passed and the Government will soon begin preparing for trial.  If Mr. Muller wants a plea agreement in which the United States agrees to limit its sentencing recommendation to a prison term of forty years, he must sign a plea agreement and enter his plea by September 15, 2016.

Attachment 4.  The letter set forth why the government believed that Muller risked receiving a life sentence absent a plea agreement.  *Id.* at 2.  The letter further explained that the U.S. Attorney's Office could not protect Muller from state court prosecution.  *Id.* at 2.  The letter concluded, "The prosecutors have been patient up to this point.  But if Mr. Muller wants a deal for less than a life sentence, now is time for him to decide." *Id.*

On September 8, 2016, the government moved to exclude a defense of insanity and expert witness testimony on mental condition.  Dkt. 34.  The motion was noticed for September 22, 2016, and expressly contemplated that the defendant might respond by attempting to make a Rule 12.2 notice.  The courts of this district typically hear motions in limine on the day of trial or shortly before.  But the reason for the early filing was that "if Defendant Muller responds by attempting to make a late Rule 12.2 notice, the Government will need time to move for, arrange, and conduct its own examination of Defendant.  *See* Rule 12.2(c)(1)(B).  Taking up this matter forthwith is the best way to protect the trial date." Dkt. 34 at 2.

On September 13, 2016, the government notified the defendant that at trial, the government would offer the Dublin and Peninsula similar acts as evidence pursuant to Fed. R. Evid. 404(b).  Attachment 5.

On September 14, 2016, counsel for both sides met.  As a result, the government extended a new plea offer.  Attachment 6.  The defendant could argue for any sentence at all, the government would

argue for a sentence no greater than 40 years, and the factual basis would not require the defendant to directly admit that he had raped Victim 1.  Instead, the factual basis said that the FBI had found on Muller's computers, "digital video recordings of Muller and Victim 1 together in Muller's South Lake Tahoe residence.  Victim 1 was blindfolded and fully under Muller's control."  Plea Agr. at A-2.  The plea agreement was revised one more time.  Attachment 7.

On September 29, 2016, the defendant pleaded guilty pursuant to the plea agreement.  Dkt. 39.  The undersigned believes that the district court discussed with the defendant that he was taking medications, but did not grant the government's request to inquire publicly and specifically about the defendant's particular medications and their dosages.  Dkt. 37.  The plea colloquy unfolded in a way that showed the defendant was lucid and understood exactly what was happening.  The Court found his plea voluntary and intelligent and accepted it.[1]

The PSR later richly detailed the defendant's psychiatric history and medicines.  PSR ¶¶ 114-125.  The PSR found that the guidelines sentence was life, indicated no reason for a variance, and recommended a life sentence.  PSR ¶ 168.  The government kept its promise at sentencing.  The government wrote, "Forty years in a no-parole system is a very long sentence.  Muller earned it through careful planning and hard work.  But in this particular non-homicide case, which resolved by a prompt guilty plea, a sentence in excess of forty years would be greater than necessary to comply with the purposes of sentencing."  Dkt. 54 at 1.  The district court did not follow Probation's recommendation, but instead sentenced at the upper end of the range contemplated by the plea agreement:  40 years.  Dkt. 59.

On April 9, 2018, the defendant broke his promise and filed a collateral attack.  Dkt. 61; Plea Agr. ¶ VII.B. (waiving collateral attack).  The Court screened out most of his claims and ordered the government to respond on two subjects:  (1) the defendant's complaint that counsel's decision not to file a Rule 12.2 notice of insanity defense made counsel's recommendation of a plea bargain constitutionally ineffective and (2) the defendant's claim that his plea was not knowing and voluntary.  Dkt. 65 at 9.  The district court adopted the findings and recommendations.  Dkt. 91.

---

[1] The government has ordered a transcript of this proceeding, but it is not available at this writing.

U.S. RESP. TO DEF'S MOT. UNDER 28 U.S.C. § 2255

6

IV. **COUNSEL'S DECISION NOT TO NOTICE A MENTAL DEFENSE AND INSTEAD RECOMMEND A GUILTY PLEA WAS NOT INEFFECTIVE.**

A. **Demanding standards apply to any collateral attack based on a claim of ineffective assistance of counsel.**

Under 28 U.S.C. § 2255, a district court may discharge or re-sentence a defendant if it concludes that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. A defendant may not prevail on a motion under § 2255 merely by showing that some error occurred before the trial court. Rather, relief is available only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979), abrogated on other grounds by rule, (internal quotation marks and citations omitted).

Under section 2255, a court may grant a petitioner a hearing "'[u]nless the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255). A court may deny a hearing if the petitioner's allegations, viewed against the record, fail to state a claim for relief or "are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996) (citations omitted). "To earn the right to a hearing," the defendant is "required to allege specific facts which, if true, would entitle him to relief." *Id.* Mere conclusory statements in a section 2255 motion are insufficient to require a hearing and a court may appraise a petition by what is reasonably credible. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980). A court may also deny an evidentiary hearing if the claim is "grounded in speculation." *Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir. 2008).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). This is an objective inquiry focused on what is reasonably competent, not on what counsel may have thought of his own performance. *Harrington v. Richter*, 562 U.S. 86, 110 (2011). In *Strickland*, the Supreme Court established a two-pronged test that requires a defendant to establish by a preponderance of the evidence:

(1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced his defense. *Id.* at 687. "If either prong is not met, [the Court] must dismiss the claim." *United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir. 2002).

There is a strong presumption that counsel's conduct fell within the wide range of reasonable representation. *Strickland*, 466 U.S. at 689. Judicial scrutiny of counsel's performance must be highly deferential because it is "all too tempting for a convicted defendant to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689. Counsel's strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Id.* at 690-91. Given the strong presumption in favor of competence, the petitioner's burden of persuasion is a heavy one. *Morrison*, 477 U.S. 365 at 384.

The objective reasonableness standard recognizes that defense counsel have a broad range of tactical choices. *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Strickland*, 466 U.S. at 689-90 ("Even the best criminal attorneys would not defend a particular client in the same way."). A tactical decision by counsel that is not objectively unreasonable, but with which the defendant disagrees, does not constitute ineffective assistance of counsel. *Hughes v. Borg*, 898 F.2d 695, 703 (9th Cir. 1990); *Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984).

A defendant alleging ineffective assistance also "must show there is some reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996). This standard is "rigorous" and "highly demanding." *Kimmelman v. Morrison*, 477 U.S. at 365, 381-82 (1986). In assessing prejudice, the Court must also consider the applicable legal standard. *Strickland*, 466 U.S. at 695 (*e.g.*, when conviction challenged, would fact finder have had a reasonable doubt, absent counsel's errors).

**B.     These standards apply to defeat the defendant's claim that he pleaded guilty because of constitutionally ineffective representation.**

The defendant contends that counsel advised a guilty plea because counsel had failed to notice an insanity defense. Def. Mot. ¶ 74. That is not the issue under *Strickland*'s objective inquiry. The

question is whether no competent attorney would have thought an insanity defense would have failed, and whether defendant was prejudiced by the decision not to present insanity as an affirmative defense. On this record, counsel's decision to recommend a guilty plea and not to notice or present an insanity defense was reasonable and the defendant was not prejudiced by it.  The defendant has failed to carry his burden to show otherwise.

1. Competence

In a trial case, the Supreme Court holds that it is not deficient performance for counsel to forego a weak insanity defense.  "Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak [insanity] claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009).  In a trial case, where defense counsel's failure to litigate a claim competently is the principal allegation of ineffectiveness, the defendant must also prove that the claim was meritorious and that there is a reasonable probability that the outcome would have been different. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (failure to move to suppress).

In a plea-bargained case, the analysis is deferential and realistic about the uncertainties that face the parties prior to trial.  When counsel's performance is attacked for having foregone a defense and recommended a plea, the professional competence question is whether "no competent attorney would think [such a defense] would have failed[.]" *Premo v. Moore*, 562 U.S. 115, 124 (2011) (defense counsel did not file motion to suppress and advised a plea bargain).  The Supreme Court explains the reasons as follows:

> Acknowledging guilt and accepting responsibility by an early plea respond to certain basic premises in the law and its function.  Those principles are eroded if a guilty plea is too easily set aside based on facts and circumstances not apparent to a competent attorney when actions and advice leading to the plea took place.  Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks.  The opportunities, of course, include pleading to a lesser charge and obtaining a lesser sentence, as compared with what might be the outcome not only at trial but also from a later plea offer if the case grows stronger and prosecutors find stiffened resolve.  A risk, in addition to the obvious one of losing the chance for a defense verdict, is that an early plea bargain might come before the prosecution finds its case is getting weaker, not stronger.  The State's case can begin to fall apart as stories change, witnesses become unavailable, and new suspects are identified.

> These considerations make strict adherence to the *Strickland* standard all the more essential when reviewing the choices an attorney made at the plea bargain stage. Failure to respect the latitude *Strickland* requires can create at least two problems in the plea context. First, the potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real. The art of negotiation is at least as nuanced as the art of trial advocacy, and it presents questions further removed from immediate judicial supervision. There are, moreover, special difficulties in evaluating the basis for counsel's judgment: An attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial. In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel.

*Id.* at 125. The defendant's plea mitigated the risk that the prosecution would learn new things about Muller, further perfect its evidence (including of "other acts"), and use the defendant's mental health to do exactly what defense counsel feared, that is, decide and/or argue that the defendant was so dangerous that he had to remain forever imprisoned. Def. Mot. ¶ 77. If this was, as defendant concedes, a strategic choice at sentencing, it was certainly within the realm of competence at the plea bargaining stage.

It was well within the broad range of competence for counsel to anticipate that an insanity defense would not succeed in this case. The defendant would have had to prove by clear and convincing evidence first, that he had a severe mental disease or defect, and second, "as a result, the defendant was unable to appreciate the nature and quality or the wrongfulness of his acts." Ninth Circuit Pattern Jury Instruction 6.4 (Insanity); 18 U.S.C. § 17. The defendant's motion fails this test on its face. The defendant today claims that a mental health expert concluded that his "alleged conduct was clearly caused by serious mental illness, and that it was highly unlikely he would ever have engaged in such alleged conduct but for that illness." Def. Mot. ¶ 76. That is only half of the necessary showing. The defendant fails to explain how any evidence would support a clear and convincing finding as to the second element of any insanity defense, namely that "the defendant was unable to appreciate the nature and quality or the wrongfulness of his acts." Ninth Circuit Pattern Jury Instruction 6.4. Defendant's conclusory claim that he has studied his case and "has determined he would have a very strong insanity defense to the charge in this case" is exactly the kind of conclusory claim that does *not* entitle him to a hearing. *Hearst*, 638 F.2d at 1194.

Counsel was well within his professional judgment to advise the defendant that his conduct had

"just been too organized" to support an insanity defense. Def. Mot. ¶ 71.  Indeed, Muller elaborately planned both to carry out and avoid responsibility for kidnapping and rape.  Before the offense, Muller surveilled his targets through the window of their residence, created audio files to play and convey the false impression that there was a group of kidnappers, set up headphones to play for his victims voice-disguised instructions mixed with violent threats and soothing music, bought zip ties to bind his victims, found swim goggles and taped them over to use as blindfolds, and altered a water gun to appear in the dark as a laser-sighted pistol.  During the kidnapping, Muller those instrumentalities as planned.  He also used a foreign-located anonymous email service to conceal his identity, admitted to Victim 1 that he knew he was causing her to suffer, and constructed a multi-angle camera setup to video record his two rapes.  Then, once Muller decided to release Victim 1, he drove with her blindfolded and captive for hours to let her go far away from where he had imprisoned and raped her.  Later, after the offense was complete, Muller sent another series of untraceable emails with a false story and statements of regret. And then he tried to do the same thing to a young woman in Dublin.

        The organization of the continuing offense against Victim 1 speaks for itself.  So do Muller's statements to Victim 1 that he knew he was causing her to suffer.  It also bears note that evidence that a defendant "repeatedly took steps to conceal the nature of his conduct" can easily defeat an insanity claim, because it shows that the defendant appreciated the nature, quality, and wrongfulness of his acts. *See United States v. Black*, 739 F.3d 931, 933 (6th Cir. 2014).  "A defendant's attempt to conceal his commission of a crime suggests that he knows the action is wrongful[.]"  *United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994) (affirming rejection of insanity defense).  In the case of a continuing offense, a defendant presenting an insanity defense must prove he was insane for "virtually the entire duration" of his crime.  *United States v. Alvarez-Ulloa*, 784 F.3d 558, 568 (9th Cir. 2015).  Kidnapping is a continuing offense that ends only when the victim ceases to be held.  *United States v. Garcia*, 854 F.2d 340, 344 (9th Cir. 1988).  But even after Muller decided to release Victim 1, he held her captive and blindfolded for the hours-long drive to Huntington Beach.  He did not somehow come to his senses and let her go.  Rather, he prolonged a continuing offense in order to avoid detection.  He was not insane.  Counsel was certainly not incompetent for foregoing such a defense.

        Any insanity defense would have been further wounded by evidence that Muller had over the

years broken into the homes of four other women. Muller committed the Dublin home invasion and attempted kidnapping *after* he had gotten away with the Victim 1 kidnapping and sent his various untraceable emails expressing regret.

In sum, the defendant has failed to show that counsel was outside competent judgment to recommend a guilty plea over an insanity defense. In hindsight, the defendant may be unhappy that counsel did not assert an insanity defense. But it is up to counsel whether to present an insanity defense. "[C]ounsel, and not his client, is in charge of the choice of trial tactics and the theory of defense[.]" *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987).

### 2. Prejudice

The defendant claims but for counsel's advice he would have gone to trial or only pleaded guilty to a "much better" offer. Def. Mot. ¶ 80. But there was no better offer. Thus, even if counsel's advice was deficient (which it wasn't), the defendant's recent, conclusory statement is not enough to carry his burden to show he would have gone to trial.

"Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). The contemporaneous evidence is that the defendant faced overwhelming evidence and wanted to plead guilty in a way that minimized his federal sentence and avoided prosecution in state court. Early on, the defense conceived of Muller's mental health as "mitigation." Attachment 1. The defense was focused not on a "Hail Mary" play for acquittal, but, rather, on negotiating a lower sentencing recommendation from federal authorities and a non-prosecution agreement from district attorneys. Attachment 3.

The weakness of any insanity defense demonstrates counsel's competence (*see supra*), and it also undermines any claim of prejudice. When a defendant pleads guilty and later attacks counsel's advice related to the plea, "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial[.]" *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). As the Supreme Court put it more recently, "A defendant without any viable

defense will be highly likely to lose at trial. And a defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial." *Lee*, 137 S. Ct. at 1966.

The defendant was also not prejudiced by counsel's competent decision not to file a Rule 12.2 notice. Any insanity defense would have been weak. Filing a notice was also freighted with risk. Counsel knew that such a notice would have triggered a government right to obtain a psychological examination of the defendant. Attachment 1. The results of such an examination could have convinced prosecutors that they needed to insist on a life sentence for public safety. Regardless, even at the time the government's motion was filed, if counsel had changed his mind about risking an examination and presenting a weak insanity defense, the district court still had discretion to allow an insanity defense to unfold in a way that did not delay the trial. Or the district court could have exercised discretion to continue the trial to allow the defendant's examination. *See United States v. Wagner*, 834 F.2d 1474, 1480 (9th Cir. 1987).

### C. If counsel had recommended an insanity defense over the plea Muller accepted, Muller would today be attacking that recommendation.

It can also be ineffective assistance for counsel to recommend that a defendant reject a plea offer based on incompetent advice to rely a defense theory. The Supreme Court in *Lafler v. Cooper*, 132 S. Ct. 1386 (2012) so held in the case of a defendant whose attorney had convinced him to reject a plea offer because he thought the prosecution could not establish intent to murder where the victim had been shot below the waist. *Id.* at 1383. Here, it is worth the thought exercise to consider whether counsel would have been ineffective if he had recommended an insanity defense over a plea bargain, and Muller had rejected the plea offer and been sentenced more severely after a trial. "Even the best criminal attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. In this plea case, the defendant can only prevail if he can demonstrate that no competent attorney would have advised him as counsel did. *Moore*, 562 U.S. at 124. Defendant cannot make that showing on these facts.

### V. VOLUNTARINESS OF THE DEFENDANT'S PLEA

The defendant's attack on the district court's acceptance of his plea despite defendant's current

claims about his mental state is procedurally barred. "[E]ven the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review." *Bousley v. United States*, 523 U.S. 614, 621 (1998). During the defendant's Rule 11 proceeding, the district court inquired about the defendant's mental state and heard that the defendant was taking medications but well aware of what he was doing. Then, the PSR extensively detailed the defendant's poor mental health. PSR ¶¶ 114-125. He never moved to withdraw his plea and he did not appeal the district court's acceptance of his plea as knowing and voluntary. The defendant thus procedurally defaulted his claim that his plea was not voluntary and intelligent.

The defendant's procedurally-defaulted attack on the voluntariness of his plea may only be raised on collateral attack if he can first demonstrate either (1) cause and actual prejudice or (2) actual innocence. *Bousley*, 523 U.S. at 622. He has not even purported to do so and may not raise such new matter in a reply brief.

There is no excuse for the defendant's procedural default because at the time judgment was entered. The record at the time of judgment contained a detailed description of the defendant's psychiatric history and all his medications and their dosages. PSR ¶¶ 114-125. *Compare United States v. Kaczynski*, 239 F.3d 1108, 1114 (9th Cir. 2001).

The defendant also cannot show actual prejudice. Even on direct appeal, the defendant would have failed. He cannot show that he would have gone to trial and obtained a better outcome. *See United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). The evidence of the defendant's guilt was overwhelming. Had the case tried, the government would have presented powerful testimony from the victims corroborated by the devastating evidence that was seized from the defendant's residence. The FBI had in its possession the instrumentalities of the offense and the horrific video-recordings that the defendant had made with his blindfolded victim. PSR ¶ 43-46, 45 n.6. The defendant's section 2255 motion attaches no evidence to overcome what everyone knew in 2016 and knows today: if this case had tried in federal court, the defendant would have been convicted. "[O]ne can fairly ask a defendant seeking to withdraw his plea what he might ever have thought he could gain by going to trial[.]" *Dominguez Benitez*, 542 U.S. at 85.

The defendant's current claim that he "was suffering a severe depressive episode," and even

thinking about suicide, Def. Mot. at 23, is insufficient to support a claim of involuntariness. "[D]efendants with mental illnesses can and often do enter knowing and voluntary pleas, so long as the judge can determine that the defendant is able to understand and participate in the proceedings[.]" *United States v. Dyer*, 892 F.3d 910, 914 (7th Cir. 2018). Moreover, in this case, it is not a sign of irrationality that the defendant had "pervasive thoughts of guilt, of hopelessness, of pointlessness and no future." Def. Mot. at 23. Rather, this shows that the defendant indeed understood the evidence, the law, and the Sentencing Guidelines. Anyway, Muller pleaded voluntarily according to his own sworn statement to the district court. "Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea." *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008). This is doubly so when those same oral assurances of voluntariness are also in the written plea agreement. *United States v. Kaczynski*, 239 F.3d 1108, 1114 (9th Cir. 2001).

The district court did not err in its inquiry into the defendant's condition. The defendant said that he was taking medication and the district court asked if the defendant understood what was happening. That was sufficient under Rule 11 in combination with the district court's other observations of the defendant during the proceeding. *United States v. Carter*, 795 F.3d 947, 952 (9th Cir. 2015). The district court did not have to ascertain the particular medications. *Id.* n.3.

## VI.   CONCLUSION

Based on well-settled law and the obvious facts already in the record, the defendant's motion to vacate should be denied without further hearing.

Respectfully submitted,

Dated: August 15, 2019

MCGREGOR W. SCOTT
United States Attorney

By: /s/ MATTHEW D. SEGAL
MATTHEW D. SEGAL
Assistant United States Attorney

CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Eastern District of California and is a person of such age and discretion to be competent to serve papers.

That on August 15, 2019, he served a copy of the UNITED STATES' RESPONSE TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255, by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at West Sacramento, California.

Addressee:

Matthew Muller
1684 Decoto Rd., #274
Union City, CA 94587

Dated: August 15, 2019

By: /s/ Matthew D. Segal
MATTHEW D. SEGAL
AUSA