# Attachment 2

| | |
|---|---|
| **From:** | Segal, Matthew (USACAE) |
| **Sent:** | Thursday, February 11, 2016 4:25 PM |
| **To:** | Tom Johnson (taj@jgrlawfirm.com) |
| **Cc:** | Coppola, Heiko (USACAE); Harrison, Jamielynne (USACAE) |
| **Subject:** | Muller |

Tom,

Attached please find a draft of a plea agreement for Mr. Muller.

The Government reserves the right to require modifications up to the point that it is signed by both parties.

-Matt



**Matthew D. Segal | Chief, Special Prosecutions Unit | Eastern District of California**
Robert T. Matsui United States Courthouse | 501 I Street, Suite 10-100 | Sacramento, CA 95814
*t* 916/554-2708 | *f* 916/554-2900

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
HEIKO P. COPPOLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>MATTHEW D. MULLER,<br><br>          Defendant. | CASE NO.  2:15-CR-205 TLN<br><br>PLEA AGREEMENT<br><br>DATE: February 18, 2016<br>TIME: 9:00 a.m.<br>COURT: Hon. Troy L. Nunley |

## I.  **INTRODUCTION**

### A.  **Scope of Agreement**

The indictment in this case charges the defendant with a violation of 18 U.S.C. § 1201 (kidnapping).  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.  **Court Not a Party**

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances

concerning the criminal activities of defendant, including activities that may not have been charged in the indictment.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.      DEFENDANT'S OBLIGATIONS

### A.      Guilty Plea

The defendant will plead guilty to violation of 18 U.S.C. § 1201 (kidnapping), the sole count of the October 1, 2015 indictment.  The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

The defendant acknowledges that the crime to which he is pleading guilty is listed in 18 U.S.C. § 3143(a)(2), and agrees that he will be remanded into custody upon the entry of his plea.

### B.      Fine

The defendant reserves the right to argue inability to pay a fine, but he agrees to pay whatever fine the Court might order.  The defendant understands that this plea agreement is voidable at the option

of the government if he fails to pay the stipulated fine as required by this plea agreement.

**C.** **Special Assessment**

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

**D.** **Agreement to Cooperate**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government.  As used in this plea agreement, "cooperation" requires the defendant:  (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

**E.** **Defendant's Violation of Plea Agreement or Withdrawal of Plea**

If the defendant, cooperating or not, violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government.  The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein.  One way a cooperating defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete.  Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement.  The determination whether the defendant has violated the plea agreement shall be decided under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right: (1) to prosecute the defendant on any of the counts to which he pleaded

guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice.  The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision to exercise the options stated in the previous paragraph.  Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions.  The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition: (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

**F.   Forfeiture**

The defendant agrees to abandon all of his right title and interest to the United States Secret Service in an abandonment or forfeiture proceeding to the following listed items seized during the investigation of the crime to which he is pleading guilty.  Those items are listed on Attachment B.

**G.   Sentence**

The defendant agrees that he should be imprisoned for at least 30 years and will not ask the

Court to impose a lower sentence.

### III.    THE GOVERNMENT'S OBLIGATIONS

#### A.    Non-Prosecution

The government agrees not to prosecute the defendant for any crimes that are complete on the date of this agreement and based on the facts set forth in Attachment A.  This non-prosecution provision shall have no effect if this agreement is voided as set forth herein, or as provided in paragraphs III.B.3 (Cooperation),  II.E (Defendant's Violation of Plea Agreement), VI.B (Guidelines Calculations), and VII.B (Waiver of Appeal) herein.

#### B.    Recommendations

##### 1.    Incarceration Range

The government agrees not to ask the Court to sentence the defefendant to a term of imprisonment any longer than 45 years.  The government may argue for all of the guidelines applications and policy statements identified VI(B)(1) and VI(B)(2), so long as its ultimate sentencing recommendation does not exceed 45 years, based on the guidelines, 18 U.S.C. § 3553(a), and this plea agreement.

##### 2.    Acceptance of Responsibility

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of defendant's offense level if he clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

#### C.    Use of Information for Sentencing

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also understands and agrees that nothing in this Plea Agreement

bars the government from defending on appeal or collateral review any sentence that the Court may impose.

Further, other than as set forth above, the government agrees that any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable guideline range, pursuant to U.S.S.G. § 1B1.8., unless the information is used to respond to representations made to the Court by the defendant, or on his behalf, that contradict information provided by the defendant during his cooperation.

## IV.    ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty:

1.   First, the defendant kidnapped, seized, or confined Denise Huskins;

2.   Second, the defendant held Denise Huskins for ransom, reward or other benefit; and

3.   Third, the defendant used or caused to be used an instrumentality of interstate or foreign commerce in committing or in furtherance of the kidnapping.

The defendant fully understands the nature and elements of the crimes charged in the indictment to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.    MAXIMUM SENTENCE

### A.    Maximum Penalty

The maximum sentence that the Court can impose is life incarceration, a fine of $ 250,000, a 5 year period of supervised release and a special assessment of $100.  By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct.  The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.    Violations of Supervised Release

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to  5 years of additional imprisonment.

# VI.    SENTENCING DETERMINATION

## A.    Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

## B.    Guidelines Calculations

### 1.    Agreed Calculations

The government and the defendant agree that the following sentencing guidelines variables apply:

| | |
|---|---|
| Base offense level:<br>U.S.S.G. § 2A4.1 | 32 |
| Ransom demand<br>U.S.S.G. § 2A4.1(b)(1) | +6 |
| Sexual exploitation of victim<br>U.S.S.G. § 2A4.1(b)(5) | +6 |

### 2.    Disputed Guidelines Applications

The parties have no agreement as to whether the Court should apply one or more of the following:

| | |
|---|---|
| Use of a dangerous weapon<br>U.S.S.G. §§ 2A4.1(b)(3) | +2 |
| Use of a special skill<br>U.S.S.G. § 3B1.3 | +2 |

| | |
|---|---|
| Obstruction of justice | +2 |
| U.S.S.G. § 3C1.1, application note 4(K) | |
| | |
| Departure Based on Inadequacy of CHC | Up to Category VI |
| U.S.S.G. § 4A1.3(a)(2)(E) | |

### 3. No Other Guidelines Apply

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, (except that the government may move for a departure or an adjustment based on the defendant's cooperation [§5K1.1] or post-plea obstruction of justice [§3C1.1]).

### C. Variance

Either party may argue for any kind of variance so long as that party's ultimate request is that the defendant be sentenced to no less than 30 years imprisonment and no more than 45 years imprisonment.

### D. Supervised Release Term

The parties agree that the defendant's sentence should include supervised release terms that upon release, the defendant shall be subject to the most intensive monitoring that is technologically available. His location and activities should be subject to oberservation as much as future technogy and law allow in light of this agreed-upon term.

## VII. WAIVERS

### A. Waiver of Constitutional Rights

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

### B. Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant unconditionally agrees as part of his plea/pleas, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case. The

1  defendant specifically gives up the right to appeal any order of restitution the Court may impose.

2  In addition, regardless of the sentence the defendant receives, the defendant also gives up any

3  right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

4  aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

5  Notwithstanding the agreement in paragraph III.A (Nonprosecution) above that the government

6  will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea,

7  dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is

8  pleading guilty, the government shall have the rights set forth in paragraph II.E (Defendant's Violation

9  of Plea Agreement) herein.

10  **C.**     <u>Waiver of Attorneys' Fees and Costs</u>

11  The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

12  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

13  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

14  (including without limitation any charges to be dismissed pursuant to this plea agreement and any

15  charges previously dismissed).

16  **D.**     <u>Impact of Plea on Defendant's Immigration Status</u>

17  Defendant recognizes that pleading guilty may have consequences with respect to his

18  immigration status if he is not a citizen of the United States.  Under federal law, a broad range of crimes

19  are removable offenses, including offense(s) to which the defendant is pleading guilty.  Indeed, because

20  defendant is pleading guilty to kidnapping, removal is presumptively mandatory.  Removal and other

21  immigration consequences are the subject of a separate proceeding, however, and defendant understands

22  that no one, including his attorney or the district court, can predict to a certainty the effect of his

23  conviction on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty

24  regardless of any immigration consequences that his plea may entail, even if the consequence is his

25  automatic removal from the United States.

26  **VIII.**     **ENTIRE PLEA AGREEMENT**

27  Other than this plea agreement, no agreement, understanding, promise, or condition between the

28  government and the defendant exists, nor will such agreement, understanding, promise, or condition

PLEA AGREEMENT        9

exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

**IX.    APPROVALS AND SIGNATURES**

**A.    Defense Counsel:**

I have read this plea agreement and have discussed it fully with my client.  The plea agreement accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: _____          _____
                                            THOMAS A. JOHNSON
                                            Counsel for Defendant

**B.    Defendant:**

I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this plea agreement.  In addition, no one has threatened or forced me in any way to enter into this plea agreement.  Finally, I am satisfied with the representation of my attorney in this case.


Dated: _____          _____
                                            MATTHEW D. MULLER, Defendant


**C.    Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: _____          BENJAMIN B. WAGNER
                                            United States Attorney


                                            _____
                                            MATTHEW D. SEGAL
                                            Assistant United States Attorney

# EXHIBIT "A"

## Factual Basis for Plea

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

<u>Denise Huskins is Kidnapped, Released, and Doubted</u>

Between 3:00 a.m. and 5:00 a.m. on March 23, 2015, Matthew Muller kidnapped Denise Huskins from the Vallejo residence of her boyfriend Aaron Quinn. At 1:55 p.m. that day, Quinn reported the crime and described circumstances that were so bizarre that many came to suspect that Quinn was responsible for Huskins's disappearance.

According to Quinn, a team of kidnappers broke into his residence, drugged him and Huskins, and used Quinn's vehicle to carry her off. His residence had red duct tape laid down on the floor, a surveillance camera taped to the ceiling, and zip ties on a coffee table. Quinn and Huskins had been woken up in bed by a bright light shining in his eyes and the sound of a stun gun. The intruder(s) ordered the two of them to lie face down on the bed and submit to the zip-tie binding of their hands and feet. The intruder(s) put Quinn in a closet, blindfolded him with taped-over swim goggles, and put headphones on his ears. The headphones played a message that addressed him by name and gave him various instructions, including a warning that he was going to be given diazepam. The recording cautioned that if Quinn resisted, his girlfriend (identified by name as his ex-girlfriend rather than Huskins) would be hurt by electric shock or the cutting of her face. The kidnapper(s) had personal information about Quinn and demanded passwords to Internet accounts and the home router. Quinn was warned that the camera would be used to monitor him. Quinn never saw more than one person at once, but heard talking as if there had been more than one person.

For a while on March 23, 2015, Vallejo Police Department had Quinn's phone. On that date, there were two calls to Quinn from a TracPhone. Tower data from those calls indicated an origin in South Lake Tahoe. Video from a Target store shows that that phone was purchased by a white male on March 2, 2015.

Quinn received a ransom demand for $15,000 via email. During the early morning hours of March 24, 2015, an FBI polygrapher interrogated Quinn, who maintained his account of the crime. Later that same day, someone purporting to represent a group of kidnappers sent an anonymized email to the SF Chronicle. It stated that Huskins would be returned, and "We will send a link to her location after she has been dropped off. She will be in good health and safe while she waits. Any advance on us or our associates will create a dangerous situation for Victim F. Wait until she is recovered and then proceed how you will. We will be ready." The email attached a link to a "proof of life" audio file in which Huskins said she was alright. No ransom was ever paid.

At about 9:48 a.m. on March 25, 2015, Huskins appeared, apparently unharmed, in Huntington Beach. Her description of the break-in was substantially the same as Quinn's. She said that there were several subjects who woke them holding guns with red lasers. She talked about the zip ties, the threat to cut or electrically shock her, and the demand for passwords. She confirmed what Quinn had said about the supposed financial motive of the kidnapper(s). She said that she had been ordered to drink a sedative, was driven off in the trunk of Quinn's Toyota Camry and then transferred to the trunk of another car.

In interviews in Huntington Beach and Vallejo, Huskins described the residence where she was held. It was quiet residence with a queen-sized bed, dresser, and blocked windows. She complied with instructions to wear blacked-out swim goggles whenever the kidnapper(s) entered the room. She was allowed to shower, brush her teeth, and change clothes, and was assured that she would be released unharmed after the kidnapper(s) got money. Huskins did not say so in Huntington Beach when she was dropped off, but she told Vallejo investigators said that a kidnapper claimed that some other member of

the gang had instructed him to sexually penetrate her on camera to use for blackmail if she reported the crime to authorities. This happened twice. The second time, she was instructed to make it look like voluntary intercourse. She was later drugged again and driven to Huntington Beach, where she was dropped off. A citizen observed her with dark circles around her eyes, which is consistent with having had swim goggles on her face.

At 9:27 p.m. on March 25, 2015, about twelve hours after Huskins was dropped off unharmed, Vallejo Police Department's Public Information Officer gave a press statement that the whole affair had essentially been a hoax. Huskins re-interviewed with FBI around noon on March 26th and disclosed the sexual assault for the first time. A sexual assault response examination did not reveal evidence of non-consensual sex.

<u>Anonymized Emails Describing the Crime from the Perpetrator's Perspective</u>

At 2:13 p.m. on March 26, 2015, Henry Lee of the SF Chronicle received an email purporting to be from the kidnappers. These emails, transmitted through a server in Singapore, purported to be from a group of criminals who had been doing home invasions and car thefts on Mare Island for some time and had decided to try kidnapping for ransom. The writer said they felt badly for what they had done and thought it was terrible that Huskins was being publicly doubted by law enforcement. The emails appeared written by a reasonably educated person. They attached pictures of a black spray-painted water pistol with a flashlight and laser pen attached.

The morning of March 27, 2015, Huskins was interviewed again and confronted with inconsistencies in her earlier statements.

At 4:39 p.m. on March 28, 2015, Henry Lee got another anonymized email again claiming responsibility for the kidnapping, decrying Huskins's treatment by police, and expressing remorse for the crime. A number of corroborating photos were attached: fake guns, cameras, computer equipment, zip-ties, and a photo of the room where Huskins had been held.

On March 30, 2015, Kenny Park, Vallejo P.D.'s public information officer, got an anonymized email threatening to harm him unless he apologized to Huskins. An email to him the next day took back the threat and further described the operation, including its use of an aerial drone.

<u>Alameda Sheriff's Deputies Arrest Muller and Search His Residence</u>

At 3:34 a.m. on June 5, 2015 in Dublin, California, someone broke into a house that had a husband, wife, and young adult daughter. The mother and father woke to a flashlight in their faces and were told to lie down and be bound with zip ties. They fought the intruder and called 911. The intruder fled. But he left his cellular phone behind.

Dublin Police Services of Alameda Police Department responded. An officer picked up the cellular phone and called 911 with it in order to get the originating phone number. Once they got the number, they used search warrants and a ruse call to the subscriber's residence to identify Matthew Muller as the phone user and identify his residence in South Lake Tahoe.

The search of Muller's residence and stolen white Mustang revealed instrumentalities of the Huskins kidnapping. Among other things, Dublin investigators seized taped-over swim goggles, a water pistol with a laser pointer taped to it, mobile phones, computers, and zip ties. One of the computers, which forensic examination later revealed to be Aaron Quinn's, was stuck under Muller's mattress. The GPS history of the stolen Mustang contained as a user-input destination the place in Huntington Beach where Huskins was dropped off. Officers seized a military-style mesh vest. In its pockets, they found blacked-out swim goggles, a portable speaker, and duct tape.

<u>FBI Follows Up</u>

FBI heard about the Dublin arrest through law enforcement channels.  Based on what Dublin had gathered, FBI and the deputies concluded that Muller had committed the Huskins kidnapping.  With Muller in Alameda County custody on the Dublin burglary, FBI executed search warrants at Muller's South Lake Tahoe residence, at his biological parents' respective residences, at a Vallejo storage locker, and on the electronic devices seized by Dublin.

In South Lake Tahoe, FBI photographed the room where Huskins had been held.  It matched the photo attached to one of the anonymized emails.  They also found a blonde hair under the bed and seized a piece of cardboard that matched the one used to black out the window in the room photograph.  In the Vallejo storage locker, FBI found aerial surveillance drones consistent with the narrative in the anonymized emails.

On the computers, the FBI found video recordings that Muller made on the two occasions he raped Huskins.  One of the recordings captures Muller first setting up recording devices in the room and then leading the blindfolded Huskins into the room.  Besides Huskins, Muller is the only person there.

FBI chemists analyzed a sample taken from a stain on the floor where Aaron Quinn had been bound and forced to drink a tranquilizer.  It contained a mixture of drugs that cause drowsiness.

## Other Acts

### Mountain View 2009

On September 29, 2009, Mountain View Police responded to a home-invasion.  The victim was awakened at 5 a.m. by a man dressed in dark clothing.  The man told her that this was robbery and to stop screaming or he would hurt her. The assailant told the victim to remain calm and that he was there for identity theft purposes and not robbery.  He handcuffed her and bound her ankles with a Velcro restraint.  The victim described the assailant as "nerdy or geeky" because he kept asking technical questions about her computer. He later placed a black mask or goggles over her eyes.

After a period of time, the assailant told the victim he was going to rape her.  The victim asked if he had a condom and then pleaded with him not to rape her.  As a result the assailant said he wouldn't rape the victim.  The assailant then went through the victim's Blackberry contact list and asked her who each person was.  He sent the victim's boss a test message indicating that the victim had the flu and wouldn't be coming to work.  The assailant to the victim that he'd planted evidence in the residence but did not provide any further details. At some point the victim was forced to drink a small amount of a substance she thought was Nyquil.

### Palo Alto 2009

On October 18, 2009, Palo Alto Police investigated a home-invasion burglary.  The victim, a Harvard doctoral student attending a fellowship at Stanford, was awakened in the early morning hours by a man dressed in all black clothing whose face was covered. The assailant told the victim that this was a robbery, bound the victim's ankles and arms with a Velcro restraint, place ear plugs in the victims ears and used surgical tape to cover the her eyes. The assailant then gave the victim three options: she could drink Nyquil, be stunned with a stun gun or injected with an unknown substance.  The victim chose Nyquil and as the assailant poured it down her throat, she coughed and spit it up all over herself.

The assailant asked the victim a number of questions related to her family, computer passwords etc. and then announced his intention to rape the victim.  The victim begged him to use a condom and the assailant even allowed the victim to feel the condom wrapper.  The victim managed to convince the assailant not to rape her by making up story about how she'd been raped in high-school.  The assailant reportedly told the victim that he did not want to victimize her again and decided to leave her alone.

The assailant left the residence but not before telling the victim that he had "planted evidence", pouring bleach all over the floor and threatening the victim's family is she went to the police.  Muller

was identified as potential suspect because police contacted him in the area after midnight on September 25, 2009.  He initially agreed to speak with investigators but then later declined on the advice of counsel.  The victim confirmed she had attended an event organized by Muller at Harvard in 2008.

Muller Abruptly Goes to Utah 2009

On November 13, 2009, while he knew he was under investigation for the above-described home invasions, Muller abruptly left the residence he shared with his then-wife in Menlo Park.  Muller's wife discovered that he was missing and Muller left her a note on a computer memory stick.  In the note, Muller said it was best for him to leave for "the good of everybody" and that he would be living completely "off the grid."  An email from Muller later that day indicated that he had problems beyond his mental health and hinted at potential criminal liability.  He indicated that he was leaving California, he would take his medication and would be in touch.

Muller called his then-wife on November 15, 2009 and revealed that he was in St. George, Utah.  Muller's wife drove to Utah, met with Muller, went to the local police department and had Muller removed from missing person system.

Muller's 2010 Bar Application

As part of the moral character investigation related to California bar admission, Muller disclosed that he suffered from bi-polar disorder and had a previous manic episode.  He attributed his illness to receiving anthrax vaccinations and his manic episode to be a reaction to an anti-depressant medication he had been prescribed.  Muller's psychiatrist confirmed that Muller experienced a manic episode because of anti-depressant use, cautioned that because Muller had only one manic episode that he may not be suffering from bipolar disorder, was psychologically stable and did not expect that he would have any psychological impediments to practicing law.  At least one of the recommendations for bar admission from the Harvard Clinical Law Program indicated that Muller functioned at a high level and no one would have thought, but for his admission, that he suffered from bi-polar disorder.

It is unclear whether the "manic episode" referred to by Muller and Dr. Smolowe is the "psychotic break in 2009" that Muller mentions during his interview with the KPIX reporter discussed below.

Palo Alto 2012

On November 29, 2012, police responded to a report of a home invasion burglary.  The victim reported to police that she had fallen asleep on the couch while watching television, woken up at approximately 1:00 a.m., turned off the lights and gone to bed.  The front door was locked.  The victim woke up and saw a shadow at the foot of her bed.  She sat up and screamed as the assailant jumped on her, grabbed her wrist and pushed her back down on the bed.  The assailant held the victim down and told her to shut up twice.  Victim believed the assailant was wearing a mask and gloves.  She screamed twice more and the suspect got off of her and left the room.  The victim believed she was going to be raped and/or killed.  She described that suspect as between 5 and 6 feet tall wearing a dark hooded sweatshirt and dark pants.  The suspect left two keys on the floor of her apartment and appeared to have stolen a bottle of water from the apartment.  It is believed that the suspect also moved the victim's computer from the coffee table to the couch.

The keys left behind by the assailant were later identified by a locksmith as "bump keys" which are a sort of master key that can open all door locks.  Analysis of DNA left on the keys was  not rlated to Muller.

Statement to Reporter

Muller met with a reporter from KPIX while incarcerated in the Alameda County Jail.  In an attempt to limit what information the reporter could use in her subsequent story, Muller frequently began

his responses to her questions with the phrase "off the record and on background."  The Alameda County Jail automatically and overtly records jail conversations.

Muller indicated during the interview that the Dublin home invasion and the Huskins kidnapping were not random.  Muller was not surprised that he was linked to the Huskins kidnapping and noted whether it was discovered independently or by the FBI, the kidnapping was going to "come out." Muller stated that his "terrible disease" caused the crimes. Muller admitted that he acted alone and that there was "no gang."

Muller was aware that the Huskins kidnapping was labeled a hoax by the police and "that's why those emails were sent after she got back."  He admitted that he sent the emails to the SF Chronicle.

Muller noted that he'd had a "huge" psychotic break in 2009.  Muller said when consulting with his psychiatrist, he had not disclosed all of his symptoms because he "didn't want that to be in the report" to the bar association.

Dated: _____     _____

MATTHEW D. MULLER, Defendant

**Attachment B**

Evidence Seized by FBI

| Item # | Collected On | Barcode | Acquisition Event | Description |
|---|---|---|---|---|
| 1B296 | 8/7/2015 16:41 | E5276184 | (U) Evidence received from Silicon Valley RCFL | (U) Silver Acer Laptop, S/N WOI101304E436B97377211, (DPS item #A69979) |
| 1B295 | 8/7/2015 16:41 | E5276183 | (U) Evidence received from Silicon Valley RCFL | (U) Silver Acer Laptop, S/N WOI101304E436B973A7211, (DPS item #A69978) |
| 1B294 | 8/7/2015 16:41 | E5276182 | (U) Evidence received from Silicon Valley RCFL | (U) Samsung Galaxy Note 4 cell phone, Model: SM-N910V,, IMEI: 99000482457921 7, (DPS item #A69939) |
| 1B293 | 8/7/2015 16:41 | E5276181 | (U) Evidence received from Silicon Valley RCFL | (U) Lenovo Laptop, Model: Yoga 2 Pro 20266, S/N: YB04740312, (DPS item #A69973) |
| 1B292 | 8/7/2015 16:41 | E5276180 | (U) Evidence received from Silicon Valley RCFL | (U) Black ASUS laptop, Model: U50F, S/N: 9CN0AS112103500,  (DPS item #A69980), |
| 1B291 | 8/7/2015 16:41 | E5276179 | (U) Evidence received from Silicon Valley RCFL | (U) IBM Travel Star 20 GB hard drive, Black Western Digital External hard dri, S/N: WXK1E32ANYSH |
| 1B290 | 8/7/2015 15:45 | E5276178 | (U) Evidence received from Dublin Police Services | (U) Black LG cell phone, model: LGL34C,  S/N: 412CQSF2045454,  (DPS item #A70007). |
| 1B289 | 8/7/2015 15:45 | E5276177 | (U) Evidence received from Dublin Police Services | (U) Silver and red "Think Tank Learning" USB 1GB memory card, (DPS item #A69974) |
| 1B288 | 8/7/2015 15:45 | E5276176 | (U) Evidence received from Dublin Police Services | (U) Black Western Digital external hard drive,  S/N: WX11E33A3461 (DPS item #A69975). |
| 1B287 | 8/7/2015 15:45 | E5276175 | (U) Evidence received from Dublin Police Services | (U) Silver Apple Iphone, model A1549, IMEI: 354407068131944 (DPS item #A69976). |
| 1B286 | 8/7/2015 18:52 | E5276174 | (U) Search of 2007 Red Ford Mustang | (U) Clear liquid from inside 20 oz Dasani water bottle. |
| 1B285 | 8/7/2015 18:52 | E5276173 | (U) Search of 2007 Red Ford Mustang | (U) Bobbing pin. |
| 1B283 | 8/7/2015 18:52 | E5276171 | (U) Search of 2007 Red Ford Mustang | (U) Envelope and documents to include Notice of pending lien sale for a 2007 Ford Mustang. |
| 1B282 | 8/7/2015 18:52 | E5276170 | (U) Search of 2007 Red Ford Mustang | (U) White blanket. |
| 1B280 | 8/7/2015 18:52 | E5276168 | (U) Search of 2007 Red Ford Mustang | (U) Raley's receipt dated 02/02/15, store number # 307. |
| 1B279 | 8/7/2015 18:52 | E5276167 | (U) Search of 2007 Red Ford Mustang | (U) 2 used brown napkins. |
| 1B278 | 8/7/2015 18:52 | E5276165 | (U) Search of 2007 Red Ford Mustang | (U) Passenger side sun visor. |
| 1B277 | 8/7/2015 18:52 | E5276166 | (U) Search of 2007 Red Ford Mustang | (U) Inateck FEU3NS-1E 2.5" SATA HDD External enclosure hard drive. |
| 1B275 | 8/7/2015 18:52 | E5276163 | (U) Search of 2007 Red Ford Mustang | (U) Used gauze. |
| 1B274 | 8/7/2015 18:52 | E5276162 | (U) Search of 2007 Red Ford Mustang | (U) 1 package Curity Gauze sponges. |
| 1B273 | 8/7/2015 18:52 | E5276161 | (U) Search of 2007 Red Ford Mustang | (U) Prescription pill bottle for Matthew Daniel Muller, dated Dec 12, 2014, for Bupropion HCL. |
| 1B269 | 8/7/2015 18:52 | E5276157 | (U) Search of 2007 Red Ford Mustang | (U) White coffee cup with black lid. |
| 1B268 | 8/7/2015 18:52 | E5276156 | (U) Search of 2007 Red Ford Mustang | (U) 20 oz plastic Dasani water bottle, had contained clear liquid. |
| 1B267 | 8/7/2015 18:52 | E5276155 | (U) Search of 2007 Red Ford Mustang | (U) Broken pieces of glass. |
| 1B266 | 8/7/2015 18:52 | E5276154 | (U) Search of 2007 Red Ford Mustang | (U) Faded Safeway receipt date 5/13/2015, Safeway coupons, faded Wells Fargo ATM receipt. |

| | | | | |
|---|---|---|---|---|
| 1B265 | 8/7/2015 18:52 | E5276153 | (U) Search of 2007 Red Ford Mustang | (U) Clear plastic cup. |
| 1B181 | 7/20/2015 16:40 | E5554690 | (U) Evidence Received from CalDOJ | (U) Fifty four assets (copy) (BFS Case # LP-15-000212) |
| 1B180 | 7/20/2015 16:40 | E5554689 | (U) Evidence Received from CalDOJ | (U) Piece of red tape  (BFS Case # LP-15-000212) |
| 1B179 | 7/20/2015 16:40 | E5554688 | (U) Evidence Received from CalDOJ | (U) Piece of red tape  (BFS Case # LP-15-000212) |
| 1B178 | 7/20/2015 16:40 | E5554687 | (U) Evidence Received from CalDOJ | (U) Clear plastic bottle with cap containing clear liquid (BFS Case # LP-15-000212) |
| 1B177 | 7/20/2015 16:40 | E5554686 | (U) Evidence Received from CalDOJ | (U) Glass mug containing a dry colored residue on the bottom  (BFS Case # LP-15-000212) |
| 1B176 | 7/20/2015 16:40 | E5554685 | (U) Evidence Received from CalDOJ | (U) Knife labeled "Ginso" (BFS Case # LP-15-000212) |
| 1B175 | 7/20/2015 16:40 | E5554684 | (U) Evidence Received from CalDOJ | (U) Drinking glass containing a clear liquid and orange wedge (BFS Case # LP-15-000212) |
| 1B174 | 7/20/2015 16:40 | E5554683 | (U) Evidence Received from CalDOJ | (U) Drinking glass containing a clear liquid and orange wedge (BFS Case # LP-15-000212) |
| 1B173 | 7/20/2015 16:40 | E5554682 | (U) Evidence Received from CalDOJ | (U) Drinking glass containing a clear liquid (BFS Case # LP-15-000212) |
| 1B172 | 7/20/2015 16:40 | E5554681 | (U) Evidence Received from CalDOJ | (U) Drinking glass containing a clear liquid (BFS Case # LP-15-000212) |
| 1B171 | 7/20/2015 16:40 | E5554680 | (U) Evidence Received from CalDOJ | (U) Bottle labeled "Nyquil" (BFS Case # LP-15-000212) |
| 1B170 | 7/20/2015 16:40 | E5554679 | (U) Evidence Received from CalDOJ | (U) Bottle labeled "Nyquil" (BFS Case # LP-15-000212) |
| 1B169 | 7/20/2015 16:40 | E5554678 | (U) Evidence Received from CalDOJ | (U) Motion detector (BFS Case # LP-15-000212) |
| 1B168 | 7/20/2015 16:40 | E5554677 | (U) Evidence Received from CalDOJ | (U) Pair of goggles (BFS Case # LP-15-000212) |
| 1B167 | 7/20/2015 16:40 | E5554676 | (U) Evidence Received from CalDOJ | (U) Drinking glass containing a clear liquid (BFS Case # LP-15-000212) |
| 1B166 | 7/20/2015 16:40 | E5554675 | (U) Evidence Received from CalDOJ | (U) Pair of scissors (BFS Case # LP-15-000212) |
| 1B81 | 7/1/2015 17:20 | E5276095 | (U) Search of Central Self Storage | (U) Parrot AR Drone 2.0 |
| 1B80 | 7/1/2015 17:20 | E5276094 | (U) Search of Central Self Storage | (U) UDF R/C "UFO" box containing remote control and drone |
| 1B79 | 7/1/2015 17:20 | E5276093 | (U) Search of Central Self Storage | (U) Black Drone UAII R/C, mini drone |
| 1B78 | 7/1/2015 17:20 | E5276092 | (U) Search of Central Self Storage | (U) Indicia Matt Muller |
| 1B77 | 7/1/2015 17:20 | E5276091 | (U) Search of Central Self Storage | (U) Pliers with black duct on handle |
| 1B76 | 7/1/2015 17:20 | E5276090 | (U) Search of Central Self Storage | (U) 4 channel wireless video camera with receiver |
| 1B75 | 7/1/2015 17:20 | E5276089 | (U) Search of Central Self Storage | (U) Black duct tape roll |
| 1B74 | 7/1/2015 17:20 | E5276088 | (U) Search of Central Self Storage | (U) Black duct tape |
| 1B73 | 7/1/2015 17:20 | E5276087 | (U) Search of Central Self Storage | (U) Mattress pad with stains |
| 1B72 | 7/1/2015 17:20 | E5276086 | (U) Search of Central Self Storage | (U) White sheets |
| 1B70 | 7/8/2015 14:00 | E5557170 | (U) Evidence received from Vallejo PD | (U) Storage unit rental agreement - Muller (VPD case #15-3817 item #578-4) |
| 1B69 | 7/1/2015 22:00 | E5276058 | (U) Search of 8673 Hodge Place | (U) Certificate of release or discharge from active duty. (Matthew Muller) |
| 1B66 | 6/30/2015 20:19 | E5557166 | (U) ERT search of 2710 Genoa Ave | (U) Drop Cam packaging |
| 1B65 | 6/30/2015 20:19 | E5557165 | (U) ERT search of 2710 Genoa Ave | (U) Zip tie with possible hair attached |

| | | | | |
|---|---|---|---|---|
| 1B64 | 6/30/2015 20:19 | E5557164 | (U) ERT search of 2710 Genoa Ave | (U) NetGear Rangemax Wireless Router, s/n *1ML5857R009EC* |
| 1B63 | 6/30/2015 20:19 | E5557163 | (U) ERT search of 2710 Genoa Ave | (U) Open bag of zip ties |
| 1B62 | 6/30/2015 20:19 | E5557162 | (U) ERT search of 2710 Genoa Ave | (U) Bike lock |
| 1B61 | 6/30/2015 20:19 | E5557161 | (U) ERT search of 2710 Genoa Ave | (U) "P" trap |
| 1B60 | 6/30/2015 20:19 | E5557160 | (U) ERT search of 2710 Genoa Ave | (U) Shower head |
| 1B59 | 6/30/2015 20:19 | E5557159 | (U) ERT search of 2710 Genoa Ave | (U) Notebook containing indicia and handwritten notes |
| 1B58 | 6/30/2015 20:19 | E5557158 | (U) ERT search of 2710 Genoa Ave | (U) Strip of duct tape |
| 1B57 | 6/30/2015 20:19 | E5557157 | (U) ERT search of 2710 Genoa Ave | (U) Roll of duct tape |
| 1B56 | 6/30/2015 20:19 | E5557156 | (U) ERT search of 2710 Genoa Ave | (U) Trace evidence suspected to be a hair |
| 1B55 | 6/30/2015 20:19 | E5557155 | (U) ERT search of 2710 Genoa Ave | (U) Apple iMac laptop computer, model A1466, s/n C02K6HBFDRVC |
| 1B54 | 6/30/2015 20:19 | E5557154 | (U) ERT search of 2710 Genoa Ave | (U) Blanket with duct tape |
| 1B53 | 6/30/2015 20:19 | E5557153 | (U) ERT search of 2710 Genoa Ave | (U) Pillowcases |
| 1B52 | 6/30/2015 20:19 | E5557152 | (U) ERT search of 2710 Genoa Ave | (U) Blanket |
| 1B51 | 6/30/2015 20:19 | E5557151 | (U) ERT search of 2710 Genoa Ave | (U) Comforter |
| 1B50 | 6/30/2015 20:19 | E5557150 | (U) ERT search of 2710 Genoa Ave | (U) Blanket |
| 1B49 | 6/30/2015 20:19 | E5557149 | (U) ERT search of 2710 Genoa Ave | (U) Comforter |
| 1B48 | 6/30/2015 20:19 | E5557148 | (U) ERT search of 2710 Genoa Ave | (U) Bedding (sheets and pillowcases) |
| 1B47 | 6/30/2015 20:19 | E5557147 | (U) ERT search of 2710 Genoa Ave | (U) Bedding |
| 1B46 | 6/30/2015 20:19 | E5557146 | (U) ERT search of 2710 Genoa Ave | (U) Bedding |
| 1B45 | 6/30/2015 20:19 | E5557145 | (U) ERT search of 2710 Genoa Ave | (U) Black zip tie |
| 1B43 | 6/30/2015 20:19 | E5557143 | (U) ERT search of 2710 Genoa Ave | (U) Two brooms |
| 1B42 | 6/30/2015 20:19 | E5557142 | (U) ERT search of 2710 Genoa Ave | (U) Comforter, blanket, and pillow |
| 1B41 | 6/30/2015 20:19 | E5557141 | (U) ERT search of 2710 Genoa Ave | (U) Four sheets and a comforter |
| 1B40 | 6/30/2015 20:19 | E5557140 | (U) ERT search of 2710 Genoa Ave | (U) Carpet |
| 1B39 | 6/30/2015 20:19 | E5557139 | (U) ERT search of 2710 Genoa Ave | (U) Pillows |
| 1B38 | 6/30/2015 20:19 | E5557138 | (U) ERT search of 2710 Genoa Ave | (U) Sheets and comforter |
| 1B37 | 6/30/2015 20:19 | E5557137 | (U) ERT search of 2710 Genoa Ave | (U) Vacuum cleaner, Hoover Wide Path Fold Away |
| 1B36 | 6/30/2015 18:00 | E5276051 | (U) Search of 2011 Ford Mustang | (U) 1 white comforter. |
| 1B35 | 6/30/2015 18:00 | E5276050 | (U) Search of 2011 Ford Mustang | (U) 1 Hyatt regency key card. |
| 1B34 | 6/30/2015 18:00 | E5276049 | (U) Search of 2011 Ford Mustang | (U) Black Panasonic ear buds. |
| 1B33 | 6/30/2015 18:00 | E5276048 | (U) Search of 2011 Ford Mustang | (U) 2 receipts 1) McCarran Intl Airport Parking Receipt dated 04/29/15  2) Becks Receipt dated 08/31/12. |

| 1B32 | 6/30/2015 18:00 | E5276047 | (U) Search of 2011 Ford Mustang | (U) 1 Bounce lint roller. |
|------|-----------------|----------|----------------------------------|---------------------------|
| 1B31 | 6/30/2015 18:00 | E5276046 | (U) Search of 2011 Ford Mustang | (U) Driver side floor mat. |
| 1B30 | 6/30/2015 18:00 | E5276045 | (U) Search of 2011 Ford Mustang | (U) Passenger side floor mat. |
| 1B29 | 6/30/2015 18:00 | E5276044 | (U) Search of 2011 Ford Mustang | (U) 1 receipt dated 05/13/15 from National Towing. |
| 1B28 | 6/30/2015 18:00 | E5276043 | (U) Search of 2011 Ford Mustang | (U) 2 Hyatt House hotel key cards. |
| 1B27 | 6/30/2015 18:00 | E5276042 | (U) Search of 2011 Ford Mustang | (U) 1 green and white Colgate toothbrush. |
| 1B26 | 6/30/2015 18:00 | E5276041 | (U) Search of 2011 Ford Mustang | (U) 1 empty zip tie bag. |
| 1B25 | 6/30/2015 18:00 | E5276040 | (U) Search of 2011 Ford Mustang | (U) American airlines ticket for Matthew Muller dated April 24 2015. |
| 1B23 | 6/30/2015 18:00 | E5276038 | (U) Search of 2011 Ford Mustang | (U) 24 inch orange bolt cutters with store label. |
| 1B22 | 6/30/2015 18:00 | E5276037 | (U) Search of 2011 Ford Mustang | (U) Plastic bottle of "sensual massage" lubricant. |
| 1B21 | 6/30/2015 18:00 | E5276036 | (U) Search of 2011 Ford Mustang | (U) Black night vision goggle harness. |
| 1B20 | 6/30/2015 18:00 | E5276035 | (U) Search of 2011 Ford Mustang | (U) "Joseph" dress shirt white in color. Slim fit, size 15 1/2 - 35. |
| 1B19 | 6/30/2015 18:00 | E5276034 | (U) Search of 2011 Ford Mustang | (U) Blue blood pressure cuff, size 9.5 - 13.25 IN. |
| 1B18 | 6/30/2015 18:00 | E5276033 | (U) Search of 2011 Ford Mustang | (U) Plastic bottle containing "great lash maybelline". |
| 1B17 | 6/30/2015 18:00 | E5276032 | (U) Search of 2011 Ford Mustang | (U) Clear glass bottle containing "tru blend liquid makeup". |
| 1B16 | 6/30/2015 18:00 | E5276031 | (U) Search of 2011 Ford Mustang | (U) 1 clear bottle containing "make up for ever" foundation |
| 1B15 | 6/30/2015 18:00 | E5276021 | (U) Search of 2011 Ford Mustang | (U) Clear plastic ziplock bag containing various medical pills |
| 1B14 | 6/30/2015 18:00 | E5276030 | (U) Search of 2011 Ford Mustang | (U) Purple and white Lelo vibrator. |
| 1B9  | 6/30/2015 18:00 | E5276025 | (U) Search of 2011 Ford Mustang | (U) Section of head rest cover |

## Evidence Seized by Dublin Police Services of Alameda Sheriff's Department

| Item # | Barcode | Description |
|--------|---------|-------------|
| Item 27 | A69955 | (U)Black wallet with a AAA card for MULLER |
| Item 28 | A69956 | (U) VCM II diagnostic tool for Ford/Lincoln |
| Item 29 | A69957 | (U) Ford key |
| Item 30 | A69958 | (U) Flat key |
| Item 31 | A69959 | (U) Verizon bill in MULLER's name |
| Item 32 | A69960 | (U) DMV paperwork in MULLER's name |
| Item 34 | A69962 | (U) ILCO key and keychain |

| Item 35 | A69963 | (U) Northface black gloves |
| Item 36 | A69964 | (U) Receipt from LILLY'S TIRE SERVICE |
| Item 37 | A69965 | (U) Single black cloth glove |
| Item 38 | A69966 | (U) Toshiba Hard Drive |
| Item 39 | A69967 | (U) Dog choker |
| Item 40 | A69968 | (U) Birthday card |
| Item 41 | A69969 | (U) MULLER Passport |
| Item 44 | A69972 | (U) Streamlight flashlight, black |
| Item 53 | A69981 | (U) Black knit glove |
| Item 54 | A69982 | (U) Black ski mask |
| Item 55 | A69983 | (U) Roll of Gray Duct tape |
| Item 56 | A69984 | (U) Black SF Giants ball cap |
| Item 57 | A69985 | (U) Black and leather glove |
| Item 58 | A69986 | (U) Black Duct tape |
| Item 60 | A69988 | (U) Pair of Midland walkie-talkies |
| Item 61 | A69989 | (U) DIAGENG Auto key programming tool |
| Item 62 | A69990 | (U) Cobra Radar Detector |
| Item 63 | A69991 | (U) Pair of black leather gloves |
| Item 64 | A69992 | (U) Bundle of Duct tape and zip ties |
| Item 65 | A69993 | (U) Handheld stun gun |
| Item 66 | A69994 | (U) Penis Enlargement Pump |
| Item 67 | A69995 | (U) Men's Steve Madden leather boot |
| Item 68 | A69996 | (U) Trust Fire AK-47 Flashlight |
| Item 69 | A66997 | (U) REI All weather pants |
| Item 70 | A69998 | (U) Black backpack w/ yellow box cutter and scissors |
| Item 71 | A69999 | (U) Knit black glove |
| Item 72 | A70000 | (U) 1911B Airsoft gun with Croser laser and silencer |
| Item 73 | A70001 | (U) Grey Wrangler cargo pants with brown belt |
| Item 74 | A70002 | (U) Master lock in package |
| Item 75 | A70003 | (U) Pink and Purple Speedo goggles with tape |
| Item 76 | A70004 | (U) 4 - 36" zip-ties |

| Item 77 | A70005 | (U) Black Swimming goggles with black tape over lens |
| Item 78 | A70006 | (U) Indicia found in trunk |
| Item 80 | A70008 | (U) Fast Trak |
| Item 82 | A70010 | (U) Home Depot Receipt |
| Item 83 | A70011 | (U) One pack of 24" zip ties |
| Item 84 | A70012 | (U) Ten unpackaged zip ties |
| Item 85 | A70013 | (U) Target receipt |
| Item 86 | A70014 | (U) Coleman brand flashlight |
| Item 87 | A70015 | (U) Streamlight Supertac flashlight |
| Item 88 | A70016 | (U) 3 Prescription bottles for MULLER |
| Item 89 | A70017 | (U) Theater Ticket |
| Item 90 | A70018 | (U) Letter from Veteran's Affairs |
| Item 91 | A70019 | (U) Condor ALICE belt with 2 ammo pouches |
| Item 91 | A70020 | (U) Swim goggles with blacked out lenses |
| Item 92 | A70021 | (U) Black Hanes t-shirt |
| Item 93 | A70022 | (U) Smith and Wesson Chief's Special "Dart gun" |
| Item 94 | A70023 | (U) Super Soaker painted black with a laser pointer |
| Item 95 | A70024 | (U) Used roll of Duct tape |
| Item 96 | A70025 | (U) Mesh vest with duct tape |
| Item 97 | A70026 | (U) Portable Speaker in Pocket of mesh vest |
| Item 98 | A70027 | (U) Black Diamond brand, black and gray jacket |
| Item 99 | A70028 | (U) Black Under Armour shorts |
| Item 100 | A70029 | (U) Black California wrestling shirt |
| Item 101 | A70030 | (U) Yellow Dewalt crow bar |
| Item 102 | A70031 | (U) Life size inflatable male doll |
| Item 103 | A70032 | (U) Camouflage tarp |
| Item 104 | A70033 | (U) ¼" wire |
| Item 105 | A70034 | (U) White cloth glove |
| Item 106 | A70035 | (U) Plaid CAL baseball cap |
| Item 107 | A70036 | (U) Green and Black OUTDOOR backpack |
| Item 108 | A70037 | (U) PVC Cutters |

| Item 109 | A70038 | (U) Wire cutters |
| Item 111 | A70040 | (U) Silver and black BULOVA watch |
| Item 112 | A70041 | (U) Mail and indicia for MULLER |
| Item 115 | A70044 | (U) Mail and indicia for MULLER |
| Item 126 | A70109 | (U) Duct tape from front passenger seat |
| Item 127 | A70110 | (U) Shirt from front passenger seat |
| Item 128 | A70111 | (U) Disposable cup |
| Item 129 | A70112 | (U) Home Depot Bag |
| Item 130 | A70113 | (U) Misc paperwork from passenger seat of mustang |
| Item 131 | A70114 | (U) Hair brush from font passenger |
| Item 132 | A70115 | (U) A&W plastic bottle |
| Item 133 | A70116 | (U) Empty water bottle |
| Item 134 | A70117 | (U) Plastic grocery bag |
| Item 135 | A70118 | (U) Tennis located in Rear passenger |
| Item 136 | A70119 | (U) Zip-tie portions from floor board |
| Item 137 | A70120 | (U) Pliers from rear driver side floor |
| Item 138 | A70121 | (U) Duct tape from rear seat area |
| Item 139 | A70122 | (U) Black Duct tape |
| Item 140 | A70123 | (U) Tools from trunk |
| Item 141 | A70124 | (U) Black/Gray tennis shoes |
| Item 142 | A70125 | (U) Black North Face Jacket |
| Item 143 | A70126 | (U) Lint roller |
| Item 144 | A70127 | (U) Black jacket and pants |
| Item 145 | A70128 | (U) Two pairs of gray pants |
| Item 146 | A70129 | (U) American Airlines tickets for MULLER |
| Item 148 | A70131 | (U) Black glove from trunk |