# Attachment 6

| | |
|---|---|
| **From:** | Segal, Matthew (USACAE) |
| **Sent:** | Thursday, September 15, 2016 3:50 PM |
| **To:** | Tom Johnson (taj@jgrlawfirm.com) |
| **Cc:** | Coppola, Heiko (USACAE) |
| **Subject:** | Muller Plea Agreement - Short |
| **Attachments:** | Muller Plea Agreement - Short.pdf |

Tom,

Attached please find a plea agreement that I have revised in light of our meeting yesterday.

The original deadline was for today, but I understand that you have a scheduling issue.  If Muller wants to enter a plea pursuant to this agreement, please file on ECF, as soon as possible, a memorandum with the Court asking that next week's appearance be moved to Sept. 29 and that the case be scheduled for change of plea.

-Matt

**Matthew D. Segal | Chief, Special Prosecutions Unit | Eastern District of California**
Robert T. Matsui United States Courthouse | 501 I Street, Suite 10-100 | Sacramento, CA 95814
*t* 916/554-2708 | *f* 916/554-2900

PHILLIP A. TALBERT
Acting United States Attorney
MATTHEW D. SEGAL
HEIKO P. COPPOLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:15-CR-205 TLN |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE: September 29, 2016<br>TIME: 9:00 a.m. |
| MATTHEW D. MULLER, | COURT: Hon. Troy L. Nunley |
| Defendant. | |

## I.  INTRODUCTION

### A.  Scope of Agreement

The indictment in this case charges the defendant with a violation of 18 U.S.C. § 1201 (kidnapping).  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.  Court Not a Party

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances

PLEA AGREEMENT                          1

concerning the criminal activities of defendant, including activities that may not have been charged in the indictment.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.   DEFENDANT'S OBLIGATIONS

### A.   Guilty Plea

The defendant will plead guilty to violation of 18 U.S.C. § 1201 (kidnapping), the sole count of the October 1, 2015 indictment.  The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### B.   Fine

The defendant reserves the right to argue inability to pay a fine, but he agrees to pay whatever fine the Court might order.

### C.   Special Assessment

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering

a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

### D. Defendant's Violation of Plea Agreement or Withdrawal of Plea

If the defendant, cooperating or not, violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. One way a cooperating defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete. Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement. The determination whether the defendant has violated the plea agreement shall be decided under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right: (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision to exercise the options stated in the previous paragraph. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition: (1) all statements made by the defendant to the government or other designated law

enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### III.     THE GOVERNMENT'S OBLIGATIONS

#### A.     Non-Prosecution

The government agrees not to prosecute the defendant for any additional crimes that are complete on the date of this agreement and based on the facts set forth in Attachment A.  This non-prosecution provision shall have no effect if this agreement is voided as set forth herein, or as provided in Paragraphs II.D (Defendant's Violation of Plea Agreement), and VII.B (Waiver of Appeal) herein.

#### B.     Recommendations

##### 1.     Incarceration Range

The government agrees not to ask the Court to sentence the defendant to a term of imprisonment in excess of 40 years.  The government may argue for all of the guidelines applications and policy statements identified in Paragraph VI(B), so long as its ultimate sentencing recommendation does not exceed 40 years, based on the guidelines, 18 U.S.C. § 3553(a), and this plea agreement.

##### 2.     Acceptance of Responsibility

The government will recommend a three-level reduction (if the offense level reaches 16) in the computation of defendant's offense level if the Court determines that the defendant has accepted responsibility for his conduct as defined in U.S.S.G. § 3E1.1.

The defendant understands that the government may oppose any adjustment for acceptance of responsibility based on factors set forth in that U.S.S.G. § 3E1.1.  For example, the government may argue that no acceptance adjustment should be given if, after entering his plea, the defendant falsely denies, or frivolously contests, relevant conduct that the court determines to be true.  *See* U.S.S.G. § 3E1.1, Application Note 1(A).

### 3. Relief from Recommendation Obligation

Nothwithstanding any other provision of this plea agreement, if the Court at the time of sentencing determines that the defendant does not qualify for an adjustment for acceptance of responsibility, the government may ask the Court to impose any sentence up to the applicable statutory maximum(s).

### C. Use of Information for Sentencing

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

## IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty:

1. First, the defendant kidnapped, seized, or confined Denise Huskins;
2. Second, the defendant held Denise Huskins for ransom, reward or other benefit; and
3. Third, the defendant used or caused to be used an instrumentality of interstate or foreign commerce in committing or in furtherance of the kidnapping.

The defendant fully understands the nature and elements of the crimes charged in the indictment to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V. MAXIMUM SENTENCE

### A. Maximum Penalty

The maximum sentence that the Court can impose is life incarceration, a fine of $250,000, a 5 year period of supervised release and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant further agrees, as noted above, that he will not attempt to

discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B. Violations of Supervised Release

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to 5 years of additional imprisonment.

## VI. SENTENCING DETERMINATION

### A. Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B. Guidelines Arguments

The government and the defendant have no agreements about the application of the guidelines. The defendant understands that the government is free to argue that the guidelines advise a sentence of life imprisonment. The defendant is aware of the following guidelines provisions and understands that the government may argue that they apply in this case:

| | |
|---|---|
| Base offense level:<br>U.S.S.G. § 2A4.1 | 32 |
| Ransom demand<br>U.S.S.G. § 2A4.1(b)(1) | +6 |
| Sexual exploitation of victim<br>U.S.S.G. § 2A4.1(b)(5) | +6 |

///

PLEA AGREEMENT                                  6

| | |
|---|---|
| Use of a dangerous weapon<br>U.S.S.G. § 2A4.1(b)(3),<br>Application Note 2, § 1B1.1 Application Note 1(D) | +2 |
| Use of a special skill<br>U.S.S.G. § 3B1.3 | +2 |
| Obstruction of justice<br>U.S.S.G. § 3C1.1, application note 4(K) | +2 |
| Departure Based on Inadequacy of CHC<br>U.S.S.G. § 4A1.3(a)(2)(E) | Up to Category VI |

### C. Supervised Release Term

The parties agree that the defendant's sentence should include special supervised release terms designed to protect the community. Upon release, the defendant should be subject to the most intensive supervision, surveillance, and monitoring that is technologically available at the time of his release.

1) His location and activities should be subject to as much surveillance as future technology and law allow.

2) His person and property, and all data related to his activity, should be subject to any kind of warrantless, suspicionless search by any law enforcement officer or probation officer at any time of day or night.

The defendant agrees that he poses a high danger of reoffending absent such special conditions of supervised release.

### VII.   WAIVERS

#### A. Waiver of Constitutional Rights

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

#### B. Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant unconditionally agrees as part of his plea/pleas, however, to

give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the agreement in Paragraph III(A) (Nonprosecution) above, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in paragraph II.D (Defendant's Violation of Plea Agreement) herein.

### C. Waiver of Attorneys' Fees and Costs

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

### D. Impact of Plea on Defendant's Immigration Status

Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including offense(s) to which the defendant is pleading guilty. Indeed, because defendant is pleading guilty to kidnapping, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

## VIII.   ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition

exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

### IX.  APPROVALS AND SIGNATURES

**A.  Defense Counsel:**

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: _____                 _____
                                              THOMAS A. JOHNSON
                                              Counsel for Defendant

**B.  Defendant:**

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: _____                 _____
                                              MATTHEW D. MULLER, Defendant

**C.  Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: _____                 PHILLIP A. TALBERT
                                              Acting United States Attorney


                                              _____
                                              MATTHEW D. SEGAL
                                              Assistant United States Attorney

PLEA AGREEMENT                               9

**EXHIBIT "A"**

**Factual Basis for Plea**

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

Automobiles, the Interstate Highway System, the U.S. Highway System, mobile telephones, the Internet, and the Global Positioning System (GPS) of earth-orbiting satellites are all facilities and instrumentalities of interstate commerce.

Between 3:00 a.m. and 5:00 a.m. on March 23, 2015, on Mare Island in Vallejo, California, the defendant broke into the home occupied by Aaron Quinn and Denise Huskins ("the Victims"). Muller used a modified water pistol to simulate a lighted firearm. He also had an electric stun gun. Muller used those devices to intimidate the Victims and ordered them to lie still while he used zip ties to bind them. He placed blacked-out swim goggles on their eyes. He made each Victim drink a liquid soporific. Defendant used headphones to play the Victims a message warning against resistance. The recording warned that in the event of noncompliance, Huskins would be hurt by electric shock or the cutting of her face. The defendant collected information from Quinn about his various financial and Internet accounts. The Victims overheard multiple voices whispering.

Muller forced Huskins to get into the trunk of Quinn's Toyota Camry, which he used to move her to a stolen Ford Mustang. Muller then put Huskins in the Mustang and drove her to his residence in South Lake Tahoe. From Vallejo, the most direct route to South Lake Tahoe requires use of Interstate 80, part of the Interstate Highway System, and U.S. Route 50, part of the U.S. Highway System. Muller then held Huskins at his South Lake Tahoe residence. At times, she was secured to a bed with a zip tie and a bicycle lock. When Muller was in the room with her, she was blindfolded on his command.

While Muller was in South Lake Tahoe confining Huskins, Muller used a TracPhone to call Quinn's phone. The defendant also used the Internet to send emails from Quinn's email account back to Quinn. The emails demanded from Quinn, as ransom to release Huskins, two separate payments of $8,500, each to come from different accounts that Quinn held at separate FDIC-insured financial institutions.

On March 24, 2015, the defendant, purporting to represent a group of kidnappers, sent an email from one of Quinn's email accounts to a reporter for the *San Francisco Chronicle*. It stated that Huskins would be returned, and "We will send a link to her location after she has been dropped off. She will be in good health and safe while she waits. Any advance on us or our associates will create a dangerous situation for Denise. Wait until she is recovered and then proceed how you will. We will be ready." The email attached a link to a "proof of life" audio file in which Huskins said she was alright. No ransom was ever paid.

On March 25, 2015, the defendant put Huskins in the Mustang and used the car's Global Positioning System to navigate to a location in Huntington Beach, where he dropped off Huskins at about 9:48 a.m. The only practical ways to do this drive required use of the Interstate Highway System and/or the U.S. Highway System.

At 9:27 p.m. on March 25, 2015, Vallejo Police Department's Public Information Officer gave a press statement that the whole affair had not been an authentic kidnapping.

At 2:13 p.m. on March 26, 2015, using a server in Singapore, Muller sent an email to the *Chronicle* reporter. The email represented that a group of criminals who had been doing home invasions and car thefts on Mare Island for some time had decided to try kidnapping for ransom. The writer said they felt badly for what "they" had done and thought it was terrible that Huskins was being publicly doubted by law enforcement. The email attached pictures of instrumentalities of the kidnapping offense, including a black spray-painted water pistol with a flashlight and laser pen attached.

At 4:39 p.m. on March 28, 2015, Muller sent the reporter another anonymized email again claiming responsibility for the kidnapping, decrying Huskins's treatment by police, and expressing remorse for the crime. A number of corroborating photos were attached: fake guns, cameras, computer equipment, zip-ties, and a photo of the room where Huskins had been held. The email stated that the supposed group of perpetrators had subdued Quinn and Huskins "by threat."

On March 30, 2015, Kenny Park, Vallejo P.D.'s public information officer, got an anonymized email threatening to harm him unless he apologized to Huskins. An email to him the next day took back the threat and further described the operation, including its use of an aerial drone.

On June 8, 2015, Dublin Police Services of the Alameda County Sheriff's Department searched Muller's South Lake Tahoe residence and his stolen white Mustang. They were investigating a similar, separate nighttime residential burglary committed on June 5, 2015 in Dublin. The Dublin investigators seized items described by the Victims and depicted in the email attachments. They seized taped-over swim goggles that still had a blonde hair stuck to them. They seized a water pistol with a laser pointer taped to it. They seized computers. They seized zip ties. One of the computers Muller had stolen from Quinn. The GPS history of the stolen Mustang contained as a user-input destination the place in Huntington Beach where Huskins was dropped off. Officers seized a military-style mesh vest. In its pockets, they found the blacked-out swim googles, a portable speaker, and duct tape.

On June 30, 2016, the FBI conducted a second search of Muller's South Lake Tahoe residence. They also searched Muller's biological parents' respective residences, a Vallejo storage locker, and the electronic devices seized by the Dublin investigators.

In South Lake Tahoe, FBI photographed the room where Huskins had been held. It matched the photo attached to one of the anonymized emails. They also found a blonde hair under the bed and seized a piece of cardboard that matched the one used to black out the window in the room photograph. In the Vallejo storage locker, FBI found aerial surveillance drones consistent with the narrative in one the anonymized emails.

On the computers, the FBI found a sound recording that appeared designed to simulate people whispering to each other and they found a sound recording consistent with the instructions that had played on the headphones during the Vallejo break in. They also found digital video recordings of Muller and Huskins together in Muller's South Lake Tahoe residence. Huskins was blindfolded and fully under Muller's control.

FBI chemists analyzed a sample taken from a stain on the floor where Aaron Quinn had been bound and drugged. The stain contained a mixture of drugs that cause drowsiness.

Muller met with a reporter from KPIX while incarcerated in the Alameda County Jail. In an attempt to limit what information the reporter could use in her subsequent story, Muller frequently began his responses to her questions with the phrase "off the record and on background." The Alameda County Jail automatically and overtly records jail conversations.

//
//
//
//
//
//

     Muller indicated during the interview that the Huskins kidnapping had not been random. Muller was not surprised that he was linked to the Huskins kidnapping and noted whether it was discovered independently or by the FBI, the kidnapping was going to "come out." Muller stated that his "terrible disease" caused the crimes. Muller admitted that he acted alone and that there was "no gang."

     Muller was aware that the Huskins kidnapping was labeled a hoax by the police and "that's why those emails were sent after she got back." He admitted that he sent the emails to the *Chronicle*.

Dated: _____           _____
                                        MATTHEW D. MULLER, Defendant