1  MATTHEW D. MULLER
2  1684 Decoto Road #274
   Union City, CA 94587
3  Phone: (415) 322-0492
   Fax: (415) 366-3326
4  matt@projectjusticeforall.org

5  *In Pro Per*

**FILED**

JAN 0 8 2020

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
       DEPUTY CLERK

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          CASE NO. 2:15-CR-205-TLN-EFB

12              Respondent,            **MOVANT'S REPLY TO GOVERNMENT
                                       OPPOSITION; MEMORANDUM OF**
13       v.                            **POINTS AND AUTHORITIES**

14  MATTHEW MULLER,

15              Movant.

16

17

18                    **INTRODUCTION**

19         Matthew Muller pleaded guilty after one year of isolation in conditions so extreme, they

20  were the target of a successful class action.  The United States chose to hold the Movant at a jail

21  that by then was well known for its poor treatment of inmates with mental health needs.  Mr. Muller

22  was such an inmate.  He was subject to severe "Total Separation" confinement not just despite his

23  mental illness, but *because* of it.  Mr. Muller had a perfect record of good conduct in custody, but

24  was nevertheless classified into "T-SEP" status because of his health history and recent psychiatric

25  hospitalization.

26         The psychological toll was high.  It could hardly not be, according to well-established

27  research on solitary confinement — of which "Total Separation" is one of the most extreme forms.

28  It crippled Mr. Muller's ability to assist in his own defense.  And it compromised his mind even

MOVANT'S REPLY:
MEMORANDUM OF POINTS AND AUTHORITIES              - 1 -

1    more severely at the moment of truth — during his plea hearing.

2           After one year alone in a concrete isolation chamber, Mr. Muller entered a courtroom

3    packed with people — more of them at once that he had seen in total all year. If left Mr. Muller's

4    sensory-deprived brain reeling. Although not apparent on his face, the effect told in Mr. Muller's

5    responses. During the plea colloquy, his replies to the few substantive questions were riddled with

6    errors. Crucially, Mr. Muller failed even to correctly report what psychiatric medications he was

7    taking. And he had not received those medications that morning, due to erratic treatment at a jail

8    with such poor care that it is now the subject of a consent decree.

9           Mr. Muller failed to accurately aid the Court in assessing his competence. It is small wonder

10   that he did little to aid in his defense. And the government took full advantage of that fact. Fresh

11   from threatening and nearly charging the victims themselves, prosecutors did not pause to

12   reconsider their tactics. They doubled down.

13          For the second time in this case, the government did not let the evidence get in the way of

14   a good theory. They simply concealed that evidence. Even from the actual victim, letting her

15   believe for *two years* that her SART DNA kit was lost and untested.[1] The government knew exactly

16   where it was.[2] And they knew the test results would not help their case.

17          The SART kit was tested, but the government's case never was. Prosecutors made sure of

18   that. They led defense counsel away from evidence that undermined their theory, apparently even

19   by altering transcripts of witness interviews. The evidence the government did want to use was

20   illegally obtained, or planted, and in at least one case instance was fabricated. This, too, was

21   hidden— including by means of forged judicial signatures, according to the enclosed report of an

22   FBI-training document forensicist.

23   ///

24

25   [1] *See Huskins, et al.* v. *Vallejo, et al*. No. 2:16-cv-603-TLN-EFB, Doc. 12-1 (E.D. Cal. Aug. 25, 2016)
     (victim's declaration, stating that she underwent a "SART exam, but have never been provided the results
26   of that exam nor will anyone tell me where I can find the results or if the exam kit even exists anymore.");
     *see also* Ex. F (excerpt of deposition in *Huskins v. Vallejo* reflecting that her attorneys were still seeking
27   the SART kit as of March 21, 2017).
     [2] *See* Ex. E (FBI evidence manifest showing they received SART kit on July 8, 2015); Ex. F (excerpt of
28   deposition confirming kit was given to an FBI task force officer on July 8, 2015).

MOVANT'S REPLY:                                          - 2 -
MEMORANDUM OF POINTS AND AUTHORITIES

1    Now prosecutors lean hard on the specious record the government broke the law to
2    create. The prosecution is eager to talk about the facts. And the Court should give them that
3    opportunity — at trial, against a defendant who is not crippled by extreme isolation and mental
4    illness.

5                                    **PROCEDURAL POSTURE**

6        **A.  Scope Of The Reply**

7            The government has opted to assert a procedural default defense. (ECF 113 at 14.)
8    Prosecutors assert that because the Movant failed to argue against their defense before they raised
9    it, he "may not raise such new material in a reply brief." (*Id.*) That is not the law. Procedural
10   default is an affirmative defense. *Insyxiengmay v. Morgan*, 403 F.3d 657, 665 (9th Cir. 2015);
11   *accord Oakes v. United States*, 400 F.3d 92, 96, 98 (1st Cir. 2005) (collecting cases). The Movant
12   is not required to negate an affirmative defense until it has been placed in issue. *See, e.g., Gomez*
13   *v. Toledo*, 446 U.S. 635, 640 (1980); *Boyd v. Thompson*, 147 F.3d 1124, 1128 (9th Cir. 1998).
14   Further, it should be no great surprise to the government that the Movant addresses this defense in
15   his reply, since that is exactly what he said he would do. (*See* ECF 61 at 9.)[3]

16           The Movant's reply is well within the scope of the government opposition, which
17   broadly addresses the purported facts and evidence. This filing also sets forth newly learned details
18   supporting the Movant's existing claims, and falls within the scope of those claims. The details
19   could not feasibly be articulated sooner for several reasons. First, the prosecution's unlawful
20   concealment of evidence prevented the Movant from discovering certain items and information
21   until within the last year. *See* 28 U.S.C. § 2255(f). Second, the Movant did not know until within
22   a few months ago on what claims he would proceed and whether an abeyance would be allowed.
23   (*See* ECF 107-12.) If possible, the Movant wished to avoid early disclosure of what information
24   and specific evidence he had about officials' unlawful acts. This was of strategic importance in his

25

26   [3] "The grounds presented herein were not raised earlier... due to the Movant's severe mental health
27   disability, due to concealment of circumstances giving rise to the grounds from Movant and for reasons to
     be discussed further... in response to any claims of waiver, procedural default, or noncognizability raised
28   in response to this motion."

MOVANT'S REPLY:                                      - 3 -
MEMORANDUM OF POINTS AND AUTHORITIES

1    state matter, in which law enforcement officers were to be examined at a motion to suppress hearing
2    originally scheduled for January 3, 2020.   Disclosing the evidence gives hostile witnesses an
3    opportunity to conform their testimony to it and to engage in follow-up concealment. Third, in late
4    November, Movant's family was in final discussions to retain counsel they could afford, but the
5    attorney they found he had a conflict. Ex. A (Movant's supporting declaration).   And fourth, the
6    Movant did not until one week ago have permission to use key discovery material from his state
7    case.   Permission was vigorously opposed by state prosecutors across three hearings, requiring
8    significant efforts and submissions by the Movant.   The material sought was crucial due to steps
9    taken by the government to deny the Movant access to any discovery from trial phase proceedings
10   in this matter. These obstructions are discussed further below.

11           In any event, the government made its choice to raise an affirmative defense, and the
12   Movant is afforded an opportunity to respond. Quoting the Supreme Court, prosecutors asked what
13   the Movant "might ever have thought he could gain by going to trial." (ECF 113 at 14.) The Movant
14   answers that question below.

15           **B. Procedural History**

16           The complaint in this matter was filed on June 29, 2015, and alleged one count of
17   kidnapping and one court of interstate transport of a stolen vehicle.  (ECF 1.)  The grand jury
18   returned an indictment for one count of kidnapping, filed October 1, 2015. (ECF 12.)  No accessory
19   liability was charged.

20           On September 29, 2016, the case was "resolved by a prompt guilty plea[.]" (Government
21   Sentencing Memorandum, ECF 54 at 1.)  In exchange for this plea, the government promised that
22   its "sentencing recommendation [would] not exceed 40 years, *based on the guidelines*...." (ECF
23   43 at 4 (emphasis added).)

24           On March 13, 2017, the government broke its promise and argued that "[t]he advisory
25   guidelines range is increased for each of these aspects of Muller's relevant conduct: he made a
26   ransom demand, he threatened his victims with an apparent weapon, he raped a victim, and
27   threatened to harm her family if she spoke to law enforcement." (ECF 54 at 3 (citing U.S.S.G.
28   § 3C1.1 (providing for a total offense score of 48 with the four enhancements advanced by the

MOVANT'S REPLY:                                    - 4 -
MEMORANDUM OF POINTS AND AUTHORITIES

1   government)).)  The government further argued that aspects of Mr. Muller's conduct were "not
2   captured by the Guidelines," and that although "[t]he PSR does not increase Muller's criminal
3   history category pursuant to U.S.S.G. § 4A1.3(a)(2)(E)," the Court should nevertheless sentence in
4   light of factors in that provision that increase the recommended term.  On March 14, 2017, the
5   government argued against a PSR objection that would have lowered Mr. Muller's recommended
6   sentence below life "based on the guidelines."  (ECF 56 at 1-2.)

7           On March 30, 2018, Mr. Muller submitted his § 2255 motion to prison officials for
8   mailing.  (ECF 61.)  The Movant's claims that counsel was ineffective and that his plea was not
9   knowing and voluntary were screened in by the Court.  (ECF 65, 91.)  On November 13, 2018, Mr.
10  Muller moved to amend his motion in order to affirm that all averments were made "as evidence
11  that Movant's plea was not knowing, intelligent and voluntary[.]" (ECF 75 at 3.)  On March, 2019,
12  the Court approved the amendment and specified that Mr. Muller was proceeding only on his claim
13  that his plea was not knowing, intelligent and voluntary.  (ECF 120.)

14                                    **ARGUMENT**

15          To succeed in a motion under 28 U.S.C. § 2255, a defendant must show that a defect of
16  constitutional magnitude had a substantial and injurious effect on the jury's verdict or the decision
17  to plead guilty. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  A defendant who pleads guilty
18  and affirms in court that the plea is knowing and voluntary faces a high but not insurmountable bar
19  in challenging the plea. *Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977).  He may prevail by
20  showing that his "representations at the time his guilty plea was accepted were so much the product
21  of such factors as misunderstanding, duress, or misrepresentation" that they rendered his plea "a
22  constitutionally inadequate basis for imprisonment." *Id.* at 75.  A plea is similary invalid if the
23  defendant is not equipped at the time it is entered to understand what he is told and to exercise
24  rational choice. *Godinez v. Moran.* 509 U.S. 389, 406-07 (1993).

25          Such was the case here.  During the packed plea hearing, Mr. Muller stood at the confluence
26  of mental illness and over a year of profound isolation.  The intense and extraordinary dual impact
27  prevented him from offering a competent plea and waiver of trial rights.  Even outside the hearing,
28  mental illness crippled his defense.   And even had that not been the case, the government's

MOVANT'S REPLY:                                    - 5 -
MEMORANDUM OF POINTS AND AUTHORITIES

1  misconduct made it impossible for any plea to be knowing and voluntary.

## I.  MR. MULLER'S MENTAL ILLNESS CRIPPLED HIS DEFENSE; TOGETHER WITH THE FALLOUT OF ONE YEAR'S ISOLATION, IT RENDERED HIS PLEA INVALID

### A.  Legal Standard

"Given the seriousness of the matter, the Constitution requires, among other things, that the defendant enter a guilty plea that is voluntary and that the defendant must make related waivers knowingly, intelligently, and with sufficient awareness of the relevant circumstances...." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (quotations omitted).  An assessment of whether Mr. Muller entered a constitutionally sound plea is a "two-part inquiry" addressing (1) whether that plea was knowing and voluntary, and (2) whether he was in an acceptable mental state to enter it. *Godinez v. Moran*. 509 U.S., 389, 407 & n.12 (1993).  "The focus of a competence inquiry is the defendant's mental capacity" at the relevant time.  *Id.* at 396.  As the government observes in its opposition, the critical time is "at the moment of truth, during the plea proceeding." (ECF 113 at 1.)  The prosecution's pre-plea memorandum similarly states that "[t]he competency 'test must be whether he has sufficient *present* ability'" to rationally understand the proceedings and consult with his attorney.  (ECF 37 at 2 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)) (emphasis added).)

The government's pre-plea memorandum goes on to describe the mental state that must accompany any valid guilty plea:

> Here, for the Court to accept his plea, Muller must not only be competent to understand the proceedings, but he must actually understand the proceedings and the rights he is giving up in his plea. *See Deere v. Cullen*, 748 F. 3d 1124, 1145 n.12 (9th Cir. 2013).  "A defendant's mental status is central to [the knowingness and voluntariness] inquiries; a defendant's impaired mental or emotional capacity can interfere with his ability to understand what he is being told and to exercise rational choice."  *United States v. Pattee*, 820 F.3d 496, 508 (2d Cir. 2016).

(ECF 37 at 2.)

Mr. Muller had exactly the sort of impaired mental state that interferes with a defendant's "ability to understand what he is being told and to exercise rational choice."  And it is the

1  defendant's choice that is the lodestone of both the knowing-and-voluntary inquirey and of

2  assessing prejudice from a plea defect.   In both cases, the court "focuses on a defendant's

3  decisionmaking [.]" *Lee v. United States,* 137 S. Ct. 1958, 1966 (2017) (quotations omitted).   A

4  court may ask a defendant what he may have gained by going to trial.   But "[t]he point of the

5  question is not to second guess the defendant's actual choice; if it is reasonably probable he would

6  have gone to trial absent the error, it is no matter that the choice may have been foolish. *United*

7  *States v. Dominguez Benito,* 542 U.S. 74, 76 (2005).

8       A defendant is entitled an informed choice that is an exercise of free will.   The Movant was

9  denied that choice.   Expert testimony will establish that in addition to th most acute impairment at

10  the plea hearing, Mr. Muller's decisions outside the hearing were dictated by mental illness.

11  ### B.  Mr. Muller Was Held For Over A Year In Conditions Of Extreme Isolation And Privation

12

13       The United States chose to hold Mr. Muller in a facility well known for its poor treatment

14  of inmates with mental health needs.   The extreme conditions are richly documented in a major

15  class action against Sacramento County. *See Mays et al.* v. *County of Sacramento*, No. 2:18-at-

16  01259-TLN-KJN (E.D. Cal. July 31, 2018) (hereinafter "*Mays*").   The Movant requests judicial

17  notice of all filings in *Mays*.  Fed. R. Evid. 201(c)(2); *United States v. Wilson*, 631 F.2d 118 (9th

18  Cir. 1980) (a court may take judicial notice of its own files and records).   Rather than reproduce

19  voluminous material, the Movant hereby incorporates herein the expert reports filed with the

20  complaint in *Mays*, identified in that matter as ECF numbers 1-2, 1-3, 1-4, 1-5 and 1-6.  The expert

21  reports were commissioned by Sacramento County and were based on observations in the nine

22  months leading up to Mr. Muller's guilty plea.   Several of the experts visited Mr. Muller's living

23  unit, and he was among the inmates interviewed and observed for the reports.  Ex. A.  Mr. Muller

24  further incorporates all declarations filed in that matter, including but not limited to those filed with

25  the motion for summary judgment. *See Mays* at ECF 62 *et seq*.

26  ///

27  ///

28

**1. Mr. Muller Was Consigned To "Total Separation" Status Through No Fault Of His Own, And Languished There For Over A Year**

As set forth in *Mays* summary judgment motion describing undisputed facts,

> [Sacramento County] operates an extreme isolation unit which it calls "Total Separation" or "T-Sep." according to national correctional experts... T-Sep is "unique to Sacramento County." ... People on T-Sep status can go weeks, months, and even years with little or no opportunity for social contact. They do not have cellmates and are confined to their cells for 23 ½ to 24 hours a day. Even during the 30 minutes of out-of-cell time, they are isolated. Moreover, [the jail] routinely withholds the 30 minutes out-of-cell time due to staffing shortages.... As a consequence, some people spend days at a time locked in their cells, with no access to fresh air or human contact.

*Mays* at ECF 62-1, p. 18-20 (citations to expert reports and the record omitted).

Other than the lead plaintiff in *Mays*, the Movant is aware of no inmate who spent longer in T-Sep status than Mr. Muller, who endured it for one and two-thirds years. Exs. A, I. Such isolation and privation would have a profound effect on any human being. It is even more harmful for inmates with preexisting mental illness, like Mr. Muller. These inmates "experience severe psychological trauma while on T-sep status." *Mays* at ECF 62-1, p.21. Experts hired by Sacramento County found that "[i]soplation is deleterious to many mentally ill," causes "deterioration in their conditions," and that inmates in T-Sep status were "becoming so ill that they must be committed." *Id.* (quoting from expert reports).

The extreme confinement was coupled with inadequate care by a staff so overwhelmed that it was resorting to improper means of dealing with acute needs. Inmates who sought care or admitted they were in crisis risked being put on display in "the classroom" — a "punitive" and "humiliati[ng]" practice that left Mr. Muller and others in fear of seeking help. *Mays* at ECF 1, pp. 29-31. Mr. Muller learned early on that requesting care could lead to a stay in "the classroom." Ex. A.

Mr. Muller and other inmates were not only placed on T-Sep despite their mental illness; they "were placed on T-Sep *because* of their mental illness.... [The jail's] classification criteria specifically calls for individuals to be placed on T-Sep if they exhibit 'severe psych issues'." *Mays* at ECF 62-1, p.21 (emphasis in original). Mr. Muller disclosed at his classification interview that

1   he had been sent to a psychiatric hospital some weeks earlier.  He was then consigned to T-Sep,

2   and remained in that status for his entire stay at the jail.[4]  Ex. A.

3          Mr. Muller's isolation and unmet care needs were exacerbated by living conditions that

4   were "stark and unlikely to meet constitutional standards."  *Mays* at ECF 1-2, p.10 (report of

5   corrections expert Eldon Vail).  The Movant and others on T-Sep status were held "in small, cold,

6   concrete cells" with "few sources of stimulation or links to the outside world," "no method to track

7   time," and with loud, unsettling noises and tirades erupting periodically from the sickest inmates.

8   *Id.* at ECF 62-1, p.21; Ex. A.  The T-Sep unit "often smell[ed] of feces and urine," with some

9   inmates who would defecate in the showers, and was generally filthy and infested with insects.  *Id.*

10  at 20-22.  One inmate in the T-Sep unit was observed to have "so many flies following him, that

11  when he moved there was a silhouette of no flies."  *Id.* at 22 (typographical error omitted).

12      **2.  The Delibitating Effects Of Such Extreme Conditions Are Well-Known**

13         As early as 1890, the Supreme Court took note of the stark impact solitary confinement

14  has on the human psyche.  The high court noted that in one study, "[a] considerable number of the

15  prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next

16  to impossible to arouse them, and others became violently insane; others still, committed suicide."

17  *In re Medley*, 134 U.S. 160, 168 (1890).  More recently, justices have urged lower courts to pay

18  closer attention to the debilitating effects of solitary confinement.  *E.g. Davis v. Ayala*, 135 S. Ct.

19  2187, 2209-10 (2015) (Kennedy, J., concurring).  In a law review article cited by Justice Kennedy,

20  a psychiatric expert described how symptoms associated with solitary confinement "appeared to

21  form a discrete syndrome" that included "panic attacks," "hypersensitivity to external stimuli," and

22  "difficulty with thinking, concentrating, and memory" — all symptoms "more commonly

23  associated with neurological illness."   Stuard Grassian, "Psychiatric Effects of Solitary

24  Confinement," *22 Wash. U.J.L. & Pol'y* 325, 335-37 (2006).

25         A neighboring district court found that placing mentally ill persons in solitary

26  confinement "is the mental equivalent of putting an asthmatic in a place with little air to breath."

27

28  [4] Mr. Muller also had a high profile case, but there were two other classifications — protective
    custody and administrative segregation — the jail used to address such concerns.

1  *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995) (noting "massive exacerbations of
2  existing mental illness as a result" of solitary confinement).  This Court has held that placement of
3  mentally ill inmates in solitary confinement "can and does cause serious psychological harm,
4  including decompensation, exacerbation of mental illness, inducement of psychosis, and increased
5  risk of suicide." *Coleman v. Brown*, 28 F.Supp. 3d 1068, 1095 (E.D. Cal. 2014).  Consequently,
6  this Court ordered that inmates with serious mental illness were not to be held in solitary
7  confinement "for a period of more than seventy-two- hours if the placement is for non-disciplinary
8  reasons." *Id*. at 1099-1100.

9       By the time Mr. Muller appeared at the plea hearing, he had been held in solitary
10  confinement for more than *one hundred and twenty times* the maximum period found permissible
11  by this Court.  During this full year stretch, he was allowed out of his cell at most thirty minutes
12  per day — only one-third the daily time already found suffocating by the *Madrid* Court.  *See* 889
13  F. Supp at 1229.  These conditions were extreme even as compared to other examples of solitary
14  confinement.  They are the debilitating backdrop to Mr. Muller's guilty plea.

15  **C. Mr. Muller's Mental State Was Severely Compromised At The Plea Hearing,**
16      **Making It Impossible For Him To Enter A Valid Plea**

17       At the jail, Mr. Muller spent ninety-eight percent of his time alone in a seven-by-eight
18  foot concrete box.  He was in the same room with other humans for a fraction of the remaining two
19  percent, and never more than a few at once.  This lasted a full year.  Then Mr. Muller was escorted
20  into the middle of a wide-open courtroom, packed with people, all focused on him.  The effect was
21  overwhelming.  Itcumulated with Mr. Muller's existing mental health symptoms and cognitive
22  problems he was experiencing.  Ex. A.

23       The impact on Mr. Muller would not have been readily apparent to the Court.  First, it
24  is a characteristic response of a sensory-deprived person to react to that deprivation, and to even
25  minor new stimula, by entering a dissociative state.  It is experienced as "a mental fog' in which
26  the individual cannot focus attention, and cannot, for example, grasp or recall when he attempts to
27  read or think." Grassian, *supra*, at 331.

28       Second, Mr. Muller is a former U.S. Marine raised by a wrestling coach.  The virtue of

1  stoic perseverance has been drilled into him throughout his life.  Mr. Muller's outward appearance

2  is therefore not a reliable indicator of his internal state.  As one example, when ten armed officers

3  rammed down the door and ran screaming into Mr. Muller's house the year before, an officer's

4  report found it distinctive that "Muller maintained an extremely calm composure and demeanor

5  throughout the encounter."  Ex. J.  Mr. Muller felt as terrified as any person would under such

6  circumstances.  He simply tried not to show it — as was the case at Mr. Muller's very public plea

7  hearing.  Ex. A.

8          Nonetheless, the effects were telling.  Except the words "yes," "no," honorifics, and

9  two-word affirmatives such as "it is," Mr. Muller spoke just seventeen words at the hearing.  And

10  they were riddled with errors.  Mr. Muller was asked "what type of medications are you currently

11  taking?"  He replied "mood stabilizers, antidepressants, and an antipsychotic."  Ex. H at 4.  This

12  was incorrect.  Mr. Muller was not receiving any mood stabilizers, although he should have been.

13  Ex. K (reflecting that Mr. Muller was receiving an antidepressant, an antipsychotic,

14  diphenhydramine to counteract shaking from the antipsychotic and an iron vitamin for anemia).

15  Ordinarily, Mr. Muller was very conscious of his medication and dosages, as reflected in medical

16  requests he submitted.  *Id.*  (Last page).  Records also show that Mr. Muller did not receive his

17  psychiatric medications the morning of the plea hearing.  *Id.*  (highlighted portion of medication

18  chart).  This may have contributed to Mr. Muller's inability to attend to the proceedings.

19          In sum, Mr. Muller was not receiving a medication that is the standard treatment for his

20  diagnosis, had missed his scheduled dose of psychiatric medication before the plea hearing, and

21  was too impaired even to accurately assist the Court in determining whether he was impaired.

22          Other responses reflect that in his impaired state, Mr. Muller's presence of mind was

23  severely limited.  When the Court asked "what is your current or most recent occupation," Mr.

24  Muller responded "lawyer, sir."  That was incorrect.  Mr. Muller last worked as an education

25  consultant before taking a mental health leave that continued until the time of his arrest.  He had

26  not practiced law since 2012.  Mr. Muller's jail intake interview reflects that when asked his last

27  occupation while not mentally impaired, he will accurately respond "education consultant."  Ex. K.

28  (initial assessment).  Instead of actually consulting his memory and processing the question, at the

1   plea hearing Mr. Muller appears to have given an automatic response that followed from his
2   preceding answer of "law school," stating "lawyer."

3           Similarly, when Mr. Muller's attorney gave a narrative response describing meetings at
4   which Mr. Muller seemed competent, the Court asked Mr. Muller if his attorney's description of
5   the meetings was correct.  Mr. Muller inaptly replied "I understand, sir."  This conveyed that he
6   did not understand.  The Court had to repeat the question, "is what he stated correct?"  The short
7   question made it easier to produce the expected response.  This was another example of the Movant
8   being insufficiently competent to reliably aid the Court in determining his competence.

9           Get out.  That was Mr. Muller's goal at the hearing — an urgent imperative an expert
10  can confirm was dictated by his amygdala rather than any part of his brain equipped to give
11  considered responses to life-changing questions.  The distress Mr. Muller felt at standing in a
12  packed court after innumerable hours alone is corroborated by his earlier actions.  Mr. Muller was
13  already sufficiently distressed by appearing in court in June 2016 that he urged his attorney to file
14  a waiver of appearance.  (ECF 32.)  This despite the fact that the court was just across the street
15  from the jail, and the fact that Mr. Muller never before or since has sought such a waiver. Ex. A.

16          Mr. Muller's situation at the plea hearing was akin to placing a defendant who is afraid
17  of heights on a tightrope fifty feet up, and then engaging that defendant in a plea colloquy.  In the
18  wake of one year of extreme isolation and intensifying mental illness, Mr. Muller was in no
19  condition during the plea hearing to enter a constitutionally sound plea.

20          If it finds that a defendant was not in a condition to understand the proceedings and
21  exercise rational choice at a plea hearing, a court goes no further.  The plea must be set aside.  In
22  contrast to unpreserved Rule 11 error or a broader "knowing and voluntary" assessment, there is
23  no prejudice analysis for an incompetent guilty plea.  The Supreme Court has disavowed any
24  possibility that "such a conviction could be saved even by overwhelming evidence that the
25  defendant would have pleaded guilty regardless." *United States v. Dominquez Benitez*, 542 U.S.
26  73, 84 n.10 (2004).

27  ///

28  ///

## D. Absent His Impairment, Mr. Muller Would Not Have Accepted The Government's Offer, Would Have Proceeded To Trial, And Would Have Actively Assisted In His Own Defense

As set forth in his § 2255 motion, Mr. Muller was suffering severe symptoms that impaired his ability to make rational decisions or assist in his own defense. Those symptoms and their effects are best explained by an expert witness with reference to Mr. Muller's history and contemporaneous records. However, there are objective indicia in the proceedings as well. These indicators are the same facts that establish prejudice: what Mr. Muller would have done differently but for his impaired state.

The prejudice inquiry in a plea challenge "focuses on a defendant's decisionmaking, which may not turn solely on the likelihood of conviction after trial." *Lee v. United States*, 137 S. Ct. 1958, 1966 (2017). That likelihood is nevertheless a starting point, since "defendants obviously weigh their prospects at trial in deciding whether to accept a plea." *Id.* However, when the "consequences [of conviction by trial or by plea] are similarly dire, even the smallest chance of success at trial may look attractive." *Id.* The Sentencing Guidelines were most likely to advise a life sentence on the facts alleged. As defense counsel acknowledged, "[a] 40 year sentence is actually a life sentence in all likelihood." (ECF 113-3 at 2.) Government counsel agreed that "[f]orty years in a no-parole system is a very long sentence." (ECF 54 at 1.)

It was most likely that Mr. Muller would die before the sentence recommended expired, and he remained exposed to the possibility of the sentence his Guidelines calculation. As one court puts it "[s]ilhouetted against these realities, the government's ululations about the benefits that inured to the petitioner by reason of his plea ring hollow.... [A]lthough the petitioner received a sentence guarantee, the length of that sentence [] hardly seems alluring." *Ferrara v. United States*, 456 F.3d 278, 296-97 (1st Cir. 2006). It would have been no great sacrifice for Mr. Muller to reject the plea agreement. And it is hardly far-fetched that a reasonable defendant in such circumstances might choose instead to proceed to trial.

Although judges may "look to contemporaneous evidence to substantiate a defendant's expressed preferences," the actual inquiry asks "what an *individual defendant* would have done...." *Lee*, 137 S. Ct. at 1967 (emphasis added); *see also Dominguez Benitez*, 542 U.S. at 85 (instructing that courts are "not to second-guess" a particular defendant's actual decision). The question of

MOVANT'S REPLY:
MEMORANDUM OF POINTS AND AUTHORITIES     - 13 -

1    what a particular defendant would have done is "an inquiry we have emphasized demands a case-

2    by-case examination of the totality of the evidence." *Lee*, 137 S.Ct. at 1966 (quotations omitted).

3          Mr. Muller submits that extreme solitary confinement together with poorly treated

4    mental illness rendered him unable even to assist in his own defense in the manner a typical

5    defendant would. *Cf. Godinez*, 509 U.S. at 396 ("a person whose mental condition is such that he

6    lacks the capacity… to assist in preparing his defense may not be subjected to a trial.") (quotations

7    omitted). The extent of Mr. Muller's impairment is even clearer upon consideration of what he

     himself would have done absent his debilitating circumstances. Before those circumstances arose,
8
     he was actively engaged in his own defense. Ex. L comprises excerpts from a ten-page
9
     memorandum sent to defense counsel in August 2015 explaining technical and legal details relevant
10
     to a motion to suppress. Mr. Muller suggested witness questions, offered to draft the reply brief,
11
     and indicated that he would take notes in court if allowed. This is a stark contrast to what Mr.
12
     Muller did to assist in his defense after a short time at the Sacramento County Jail — nothing at all.
13
          Mr. Muller's more recent activities in legal proceedings are even stronger evidence of
14
     his prior impairment, and of what he would have done but for it. In December of 2018, Mr. Muller's
15
     public defender was elevated to the bench. To avoid delay, Mr. Muller opted to represent himself,
16
     conducting preliminary examination and two evidentiary hearings for a motion to suppress. Ex. M
17
     (docket in *People v. Muller*, No. VCR231350) (Superior Ct. for the County of Solano); Ex. A.

18   When the Ninth Circuit issued a decision contrary to the Superior Court's ruling on his motion to

19   suppress, Mr. Muller knew of it within days and not only filed an interlocutory appeal, but also

20   obtained the ACLU's agreement to file a amicus curiae brief (although the brief was not filed for

21   strategic reasons). Ex. A.

22          Most significantly, Mr. Muller came within two court days of trial in the state matter,

23   which relates to the same allegations as this one. He had subpoenaed witnesses, created exhibits,

24   and prepared a jury survey. Then, at the final trial readiness conference, the prosecution disgorged

     a massive tranche of discovery on 67 optical discs. Mr. Muller delayed trial to review the evidence.
25
     There can be little better evidence that the Movant would have chosen trial than his having made
26
     exactly that choice later, after his extreme confinement and mental illness had abated. Mr. Muller
27
     turned down an offer for a ten-year sentence in his state case. Ex. A. This was even before he
28

MOVANT'S REPLY;                              - 14 -
MEMORANDUM OF POINTS AND AUTHORITIES

1   learned of evidence the prosecution had worked hard to conceal.  Taking that suppressed evidence

2   into account, the likelihood that Mr. Muller would have chosen trial easily satisfies any articulation

3   of the prejudice standard.  *See, e.g.*, *Dominquez Benitez*, 542 U.S. at 76 (prejudice standard is a

4   "reasonable probability" of a different result); *Hill v. Lockhart*, 424 U.S. 52, 59 (1985) (a "different

5   result" includes decision to reject plea offer); *Lee*, 137 S. Ct. at 1966-67 (proper inquiry is "what

6   an individual defendant would have done").  Mr. Muller has more than adequately shown a

7   reasonable probability that both a typical defendant and he in particular would have turned down

8   the government's plea offer.

9
10
**II.  PROSECUTORS SUPPRESSED EVIDENCE—THROUGH CONCEALMENT, THROUGH LIES, AND THROUGH ARTFUL DIVERSION—MAKING IT IMPOSSIBLE FOR MR. MULLER TO OFFER AN INTELLIGENT PLEA**

11   **A.  Legal Standard**

12        A guilty plea must be an "intelligent choice among the alternative courses of action open to

13   the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).  This presupposes that a

14   defendant will have a fair opportunity to ascertain those alternatives and exercise free will.  If

15   instead a plea is obtained through "misrepresentation or other impermissible conduct by state

16   agents," or the defendant cannot "rationally weigh the advantages of going to trial against the

17   advantages of pleading guilty," then the plea fails to meet the Constitution's mandate "that pleas of

18   guilty are voluntary and intelligently made by competent defendants [.]"  *Brady v. United States*,

19   397 U.S. 745, 750, 757-58 (1970).

20        A guilty plea and accompanying waivers "cannot be deemed intelligent and voluntary if

21   entered without knowledge of material information withheld by the prosecution."  *Sanchez v.*

22   *United States*, 50 F.3d 1448, 1452 (9th Cir. 1995) (quotations omitted).  Accordingly, the Ninth

23   Circuit has held "that a defendant challenging the voluntariness of a guilty plea may assert a *Brady*

24   [*v. Maryland*] claim."  *Id.* (citing cases from the second, sixth and eighth circuits); *accord United*

25   *States v. Wright*, 43 F.3d 491, 495 (10th Cir. 1994) (citing cases from four other circuits).[5]  Any

26
27
28
[5] *Ruiz* is not to the contrary.  It held that the government could require defendants to waive the right to impeachment evidence in exchange for a "fast-track" plea agreement.  *See* 536 U.S. at 633.  The Court noted that in contrast to exculpatory material, "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary" and knowing.  *Id.* at 629 (emphasis omitted).  In any event, the Movant entered no such waivers.  And *Ruiz* certainly does not grant prosecutors license to withhold exculpatory material.

1  other rule would encourage prosecutors "to deliberately withhold exculpatory material as part of
2  an attempt to elicit guilty pleas." *Sanchez*, 50 F.3d at 1453.

3       Due process requires that "exculpatory or impeachment material is disclosed at a time when
4  it still has value." *United States v. Houston*, 648 F. 3d 806, 813 (9th Cir. 2011); *see also United*
5  *States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001) (finding that delayed disclosure violates the
6  Constitution "where there is a reasonable probability that earlier disclosure of the evidence would
7  have produced a different result at trial or at a plea proceeding."). In a plea challenge, the effect of
8  multiple nondisclosures is assessed cumulatively and in conjunction with other defects,
9  "considering all of the relevant circumstances surrounding" the plea. *Brady v. United States*, 397
10  U.S. 742, 749 (1970); *Benn v. Lambert*, 283 F. 3d 1040, 1053 (9th Cir. 2002) (weighing cumulative
11  effect of government nondisclosures); *Sanchez*, 50 F.3d at 1452 (assessing "the totality of the
12  government's activity").

13       Undisclosed evidence is material when it "creates a reasonable doubt that did not otherwise
14  exist," *United States v. Agurs*, 477 U.S. 97, 112 (1976)," and there need be only a reasonable
15  probability that such reasonable doubt could have been created. *Kyles v. Whitley*, 514 U.S. 419,
16  434 (1995).

17  ## B. Basic Facts Suppressed By The Government Go Far Beyond Creating A Reasonable Probability Of A Reasonable Doubt

19       Facts disclosed in a nonfiction manuscript by Aaron Quinn and Denise Huskins, and
20  additional details that came to light in their civil suit against Vallejo, indicate that prosecutors were
21  not forthcoming with evidence they were required to disclose. These facts create a coherent picture
22  that the government actively concealed. Except where otherwise cited, the facts below are set forth
23  in the victims' manuscript, excerpts of which have been filed under seal and are referenced as Ex.
24  C. (Because the Movant was only allowed to excerpt 500 words, certain lesser details and
25  inferences are from the larger work.) The facts are conveyed as succinctly as possible while still
26  establishing the materiality of the prosecution's omissions and misrepresentations.

27       To begin with the detail prosecutors have worked hardest to suppress, then victims state
28  over a dozen times in their manuscript that there were multiple intruders. This conclusion was

MOVANT'S REPLY:                              - 16 -
MEMORANDUM OF POINTS AND AUTHORITIES

1   based on their objective perceptions of circumstances unlikely to have been faked. For example,

2   Mr. Quinn stated that he saw three beams of light, coming from different directions and moving

3   about in a way that indicated they were held by three people. Ms. Huskins stated that as she

4   interacted with on subject upstairs, downstairs she heard cabinets being opened and closed on one

5   side of the house and a power tool being used on the other. And before her eyes were covered, Ms.

6   Huskins actually saw multiple people. Ex. C.

7        Prosecutors still insist that there was a sole actor trying to seem like multiple people, such

8   as by playing recordings of whispers. This would be equally consistent with a small group of

9   subjects trying to seem like a larger one that could not be resisted. Ms. Huskins had that impression,

10  writing that the group was a "swarm" that had them "surrounded." Ex. C. But the government had

11  only a single viable suspect, and a theory that did not work well with multiple actors. So they

12  ignored the victims' repeated insistence that there had been multiple actors. *See*, *e.g.*, Ex. N (FBI

13  report describing victim complaint).

14       Prosecutors had good reason for their willful blindness. The information they had and were

15  concealing painted a problematic picture: that of a victim who was the romantic rival of an FBI

16  agent, who was being investigated as a suspect by that same agent, with another romantic rival of

17  them both a suspect as well — a police office who just been fired for his illegal use of law

18  enforcement resources that there was evidence were used to plan the attack. With the exception of

19  the officer being the one who committed the attack, none of the above facts is in dispute.

20       The woman at the center is Andrea Roberts, who had been involved with all three men, and

21  who the kidnappers said was their intended victim. Ms. Roberts began an extramarital affair with

22  the FBI agent — David Sesma — in 2010. The affair led to her divorce, and she continued seeing

23  him after. Ex. C. Around that time, Ms. Roberts also began a relationship with Aaron Quinn. She

24  ultimately chose an exclusive relationship with Quinn. They became engaged and moved into the

25  house from which the kidnapping occurred. Ex. C.

26       In 2013, a Fairfield police officer — Steven Ruiz — met Ms. Roberts, and she began a

27  second affair. Quinn and Ruiz did not know about each other for some time. Then in mid-2014,

28  Quinn "received both a voicemail and text message from the officer," who had found out about

MOVANT'S REPLY:
MEMORANDUM OF POINTS AND AUTHORITIES                - 17 -

1    Quinn and "was not taking it well." Ex. Q (Vallejo Police Department report). Ms. Roberts

2    continued living with Mr. Quinn, telling him she had ended the relationship with Ruiz. However,

3    she had not. Quinn caught Roberts talking on the phone with Ruiz several months later. Ex. C.

4    Quinn ended their engagement and Roberts moved out of the house in fall of 2014.

5         In September of 2014, Mr. Quinn began seeing Denise Huskins, who worked at the same

6    medical office as Quinn and Roberts. *Id.* They were together for a number of months. However,

7    Roberts continued to text Quinn asking to visit and stay the night. Ex. O. In March of 2015, shortly

8    before the break-in and kidnapping, Ms. Huskins found messages on Mr. Quinn's phone indicated

9    he was attempting to reunite with Andrea Roberts. Ex. O.

10        Stephen Ruiz continued to see Ms. Roberts. When Vallejo police made phone contact with

11   Roberts in the early morning the day after the kidnapping, they were quickly called back by Ruiz,

12   who "expressed concern [about] Roberts coming to the Police Department." Ex. O. Ruiz had just

13   been terminated from his police position for illegally using law enforcement databases to

14   investigate his social contacts. Ex. C.

15        When Mr. Quinn and Ms. Huskins were awoken by intruders in the early morning of March

16   23, they were each called by their first names. Ex. O. One subject had detailed information about

17   Mr. Quinn, including information that would not be aviliable in a public database. Exhibit C, O.

18   The subject asked several questions about Andrea Roberts: when had she last been at the residence,

19   when had she moved out, did she still have any belongings there. *Id.* The group later informed Mr.

20   Quinn and Ms. Huskins that they had mistaken Ms. Huskins for Andrea Roberts, who they claimed

21   was the intended target of the kidnapping. However, they had called Ms. Huskins by her correct

22   name from the beginning, even before they said they learned of their mistake. Exhibit O.

23        The group claimed to have financial motives. But they made an oddly small ransom

24   demand. They viewed Quinn's online bank account, but asked for much less than what was there.

25   They claimed this was to avoid federal reporting of a funds transfer, but they had not asked Quinn

26   to transfer funds. Quinn was told he was to withdraw money from his bank, and that he would use

27   his car to get there. But the group took Quinn's car and left it far from the house. *See Huskins v.*

28   *Vallejo* at ECF 12-6, p.6 (decl. of Plaintiffs' counsel asking also how a single intruder, "if he acted

MOVANT'S REPLY;                                          - 18 -
MEMORANDUM OF POINTS AND AUTHORITIES

1    alone, ended up at the house when no car was there and the stolen car he was using was several

2    miles away").

3          The government asks that all of these facts be dismissed as coincidence, and that nobody

4    look behind their label of "just bizarre." Behind, that label was the less bizarre explanation: an ex-

5    cop staging a crime to scare his girlfriend away from the ex- fiancé she was reuniting with., through

6    a rese that put his girlfriend in no danger, but ensured she would hear about it from her coworker

7    who was "mistaken" for her— also making it impossible for her to overlook that her ex-fiancé was

8    sleeping with the coworker.

9          Prosecutors have carefully curated the evidence to the defense, to this Court, and to the

10   public. Concealment of the DNA evidence — apparently showing two unknown contributors,

11   which did not fit the government's "lone actor" theory — is far from the only example of

12   prosecutors' efforts to make the facts fit their case. The Movant believes the government has even

13   gone so far as to alter purported "verbatim" transcripts of witness interviews given to the defense.

14   The Movant has been unable to obtain videos known to exist of key witness interviews. He does

15   not have the complete video or even audio of key initial interview with Aaron Quinn.

16         In the early part of the interview, police are asking Mr. Quinn who he believes might be

17   behind the kidnapping. According to the transcript, he states:

18              No. the only person that I can think of that would have… that kind
                of… cause he was the police officer that she was having the affair
19              with, was married and had 2 kids, that's the only person I can think
20              of that would have that sort of...

21   Ex. P. The ellipses are in the original, and the transcript uses another indicator, "[UI]," to label

22   unintelligible speech.

23         The exchange occurs after Mr. Quinn discussed how the kidnappers had detailed

24   information about him. On information and belief, the video record of the interview would reflect

25   that Mr. Quinn stated that the police officer — Stephen Ruiz — is the only person "who would

26   have that kind of *information*." That would mean that Mr. Quinn identified Ruiz as a suspect very

27   early, making the connection based on the unusually detailed information that the kidnappers had

28   — before Quinn knew Ruiz had been fired for illegal use of police databases. The potential

MOVANT'S REPLY:                              - 19 -
MEMORANDUM OF POINTS AND AUTHORITIES

1    omission of the word drastically changes the meaning of the passage.  Ruiz is mentioned elsewhere,
2    but not as someone who may be a suspect.

3          There were other indica of possible law enforcement involvement.  While Denise Huskins
4    was still missing, a detective told her mother "that 'in five years' he would love to tell us everything
5    he knew about the case.  I was puzzled by his statement because it suggested to me that he knew
6    something improper was happening.  But [he] was unwilling to clarify something improper was
7    happening.  But [he] was unwilling to clarify the situation any further." *Huskins v. Vallejo*, *supra*,
8    ECF 12-4 (declaration of Jane Huskins).

9          Prosecutors concealed key evidence, obscured it, or minimized the significance of various
10   facts and relationships that were significant for the defense.  One of those was the romantic
11   relationship between the apparent intended victim and a lead FBI agent in the case.  Prosecutors
12   sought to suppress any information that the agent, David Sesma, had a continuing romantic interest
13   in Andrea Roberts, that he wanted to be the one to save her from embarrassing attention in the case,
14   and that this affected decisions in the investigation — such as whether to pursue the evidence or
15   instead a "lone actor" theory in which Roberts would not even be a witness.

16         An FBI report reflects this suppression.  Ex.N.  The report states that Roberts "found out
17   information from a friend" that NBC journalist Jodi Hernandez would be airing a special on the
18   case highlighting her relationship with Sesma and the effect it was having on decisions in the case.
19   The report states that Roberts was in contact with government counsel, who "said that it's best for
20   his case to minimize media distractions." *Id.*  Roberts then called the journalist and falsely told her
21   that she and Sesma had only gone on one date, years ago.  After the telephone interview, Roberts
22   reported back to the government that she had spoken with the journalist and dissuaded her from
23   reporting anything about the relationship.  In short, the prosecution was in touch with a key witness,
24   told her an upcoming national broadcast about conflicts of interest in the case would be a problem,
25   at which point the witness called the journalist and lied about the conflict of interest, and finally
26   called back the prosecution to tell them it had worked.

27         In addition to fooling the media, the "one date" lie would have suggested to defense counsel
28   reviewing the report that the relationship had no relevance to the integrity of the investigation.  Such

MOVANT'S REPLY:                                          - 20 -
MEMORANDUM OF POINTS AND AUTHORITIES

1    misrepresentations and minimizations are far more damaging to the defense than simple
2    concealment.   They close off lines of inquiry, because defense counsel is entitled to rely on
3    prosecutors' production as accurate and complete. *See Strickler v. Greene*, 527 U.S. 263, 289
4    (1999) (the "petitioner reasonably relied" on the prosecution's open file policy in concluding that
5    they made full and accurate disclosures); *United States v. Bagley*, 473 U.S. 667, 682-83 (1985) (an
6    incomplete discovery response is tantamount to a misrepresentation, because it could "represent[]
7    to the defense that the evidence does not exist" and cause it "to make pretrial and trial decisions on
8    the basis of this assumption").

9            The Defense was hindered by prosecutors' minimization and misrepresentation.  However,
10   authorities did not limit themselves to these two tactics.

11   **C. The Digital Evidence In This Case Was Tampered With, And A String Of Unlawful**
12   **Searches Concealed**

13           When the Movant personally reviewed discovery in his state case — exactly what he would
14   have done in his federal case but for his debilitating circumstances — he quickly found a faked
15   inculpatory e-mail. Ex. Q.  It purported to be a checklist the Movant had sent himself with
16   preparations to imminently flee (he did not).  The e-mail listed a selectively chosen group of items,
17   some true some not, but included at least some that could only have been viewed by someone who
18   entered his home.  The e-mail and break-in were presumably effected by law enforcement officers.

19           This e-mail was just one example the Movant found of the many anomalies in the digital
20   evidence.  As with other examples, the Movant began with the truth and has had to work backwards
21   to try to prove it. The e-mail appeared to have been sent by a computer taken by authorities during
22   their illegal entry.  It was initially added to the list of evidence seized under a search warrant a few
23   days later.  As the investigation went forward, it was decided — the Movant believes by FBI agents
24   — that the computer and certain other evidence needed to "disappear."  Forensic examination of
25   the computer would disclose the officers' illegal searches and fabrications.

26   ///
27   ///
28   ///

1    The computer had initially been taken to the Regional Computer Forensic Laboratory for

2    analysis. After some effort, the Movant obtained from state prosecutors a partial RCFL report, in

3    which the computer had become a missing serial number in a listed sequence:

4

> SVE048814 – Lenovo Yoga 2 Pro Power Adapter
>
> SVE048815 – Acer Aspire Switch 10 laptop, 64GB, Model: SW5-012, SN: W0I101304E436B97377211
>
> SVE048816 – Acer Aspire Switch 10 laptop, 64GB, Model: SW5-012, SN: W0I101304E436B973A7211
>
> SVE048818 – IBM TravelStar IDE HDD, 20GB SN: TH-04C449-12567-17C-CZGW
>
> SVE048819 – Western Digital My Passport 1.0TB External HDD, SN: WXK1E32ANYSH
>
> SVE048842 – Samsung Galaxy Note 4 phone, Model SM-N910V, IMEI: 990004824579217·

10   Ex. R. Dublin Police Services was more creative in its report, filling the gap by shifting around a

11   description to make one item appear to be two:

12

> 4.SVE048815 (SVRCFL unique identifier): Acer Netbook, Model 1771H462, S/N: W0I101304E436B973A7211
>
> 5.SVE048816: Acer Netbook, Model T771H462. S/N: W0I101304E436B973A7211
>
> 6.SVE048817: IBM Travelstar 2.5" (laptop size) 20 GB PATA hard drive, S/N: TH-04C449-12567-17C-CZGW
>
> 7.SVE048818: Travel Star 20 GB IDE Hard Drive, S/N: TH04C4491256717CCZGW
>
> 8.SVE048819: Western Digital My Passport external USB hard drive, S/N: WXK1E32ANYSH
>
> 9.SVE048820: Samsung Galaxy Note 4 Cellphone, DPS: A60930, S/N: 990004824579217

17   Ex. S.  The electronic devices were next transferred to the FBI's Computer Analysis Response

18   Team (CART) at the Sacramento Field Office. Their lab notes have more obvious deletions. *See*

19   Ex. T.  (The Movant does not know whether the deletions were made by the FBI or state

20   prosecutor.)  The Movant's own forensic experts received and examined what they were told was

21   the full forensic and chain-of-custody materials maintained by the FBI. Consistent with there being

22   concealed devices, the expert found that the lab notes and chain of custody logs "appear to be a part

23   of a larger set of documents" that they were not given.  Ex. U.  Key information was missing, and

24   the expert found there was insufficient information and recordskeeping to authenticate any of the

25   digital evidence. *Id.*

26        Finally, the Movant sought to obtain the warrant returns he was never given, directly from

27   the court.  The court stamp showed they had been filed before the date the Movant believes

28   authorities attempted to remove evidence from the record. Mr. Muller not only found the computer

MOVANT'S REPLY:                                - 22 -
MEMORANDUM OF POINTS AND AUTHORITIES

1   missing, but other items as well, items moved from one search site to another, and items purportedly

2   seized that he never possessed — including cocaine.  There were numerous anomalies in the

3   documents, but Mr. Muller's family retained a former FBI forensic document examiner to inspect

4   just a few items.  He found that judicial signatures had very likely been forged.  *See* Ex. V.



17  The forged documents were exchanged for the original warrant returns in order to destroy records

18  of the electronic device authority used for illegal searching and fabrication of evidence, as well as

19  to remove other items from the record.  The Movant believes that additional documents have been

20  tampered with as well.

21  **D. The Movant Suffered Prejudice From The Prosecution Team's Misconduct**

22          The Movant has already shown a "reasonable probability that [he] would not have pleaded

23  guilty" even before authorities' misconduct is taken into account.  A defendant's plea decision is

24  assessed under a "totality of the circumstances" approach, *Brady v. United States*, 397 U.S. at 749,

25  and it is similarly the totality of the government's conduct and its effect on a defendant that is

26  considered when determining prejudice. *Kyles v. Whitley*, 514 U.S. 419, 440-41 (1995); *see also*

27  *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) (considering the cumulative effect of

28  government nondisclosures); *Sanchez*, 50 F. 3d at 1452 (considering the "totality of the

MOVANT'S REPLY:                                    - 23 -
MEMORANDUM OF POINTS AND AUTHORITIES

1  government's activity in this case").

2      Given the extent of the misconduct, the significance of the evidence concealed or
3  misrepresented, and the limited desirability of the plea agreement on offer, there is at least a
4  reasonable probability a typical defendant would have proceeded to trial. Mr. Muller certainly
5  would have.

6  **III.    THE GOVERNMENT BROKE THE PROMISES IT USED TO EXTRACT A**
7  **GUILTY PLEA, INVALIDATING ANY WAIVER OF AND CONTRIBUTING TO**
8  **THE OF THAT PLEA**

9      "The integrity of the criminal justice system depends upon the government's strict
10  compliance with the terms of the plea agreements into which it freely enters...." *United States v.*
11  *Heredia*, 768 F.3d 1220, 1230-31 (9th Cir. 2014). Prosecutors fell well short of strict compliance.
12  They broke their explicit promise to recommend a 40-year sentence "based on the guidelines." (*See*
13  ECF 43 at 4.) Further, plea agreements "can be broken either explicitly or implicitly," *id.* at 1231,
14  and the government did both. Prosecutors engaged in the same farce of compliance that *Heredia*
15  found unacceptable: mouthing the bargained-for sentence recommendation while arguing
16  aggravating factors inconsistent with that recommendation. *See id.* at 1239.

17      The plea agreement required that the government's "sentencing recommendation [would]
18  not exceed 40 years, *based on the guidelines*, 18 U.S.C. § 3553(a), and this plea agreement." (ECF
19  43 at 4 (emphasis added).) The government violated this term by arguing for an offense level of
20  48 — *six levels* distant from a range into which a 40-year sentence fell. (*See* ECF 54 at 3 (arguing
21  that relevant conduct called four enhancements, and stating "[t]he advisory guidelines range is
22  increased for each of these aspects of Muller's relevant conduct").) Then the government went
23  further. Using language substantially the same as that of the relevant Guidelines provisions, it
24  obliquely argued for upward departures because the Movant's purported conduct was "not captured
25  by the Guidelines" and because "[t]he PSR does not increase Muller's criminal history category."
26  (*Id.* at 3-4.) It then argued against any downward departures. (*Id.* at 3,7.)

27  ///

28

MOVANT'S REPLY:
MEMORANDUM OF POINTS AND AUTHORITIES     - 24 -

1    Prosecutors still were not done.  They expressed the concern that Mr. Muller "will not be

2    punished for the state crimes that he committed," then told the Court that it was "well equipped to

3    address this concern" by accepting the government's left-handed argument for a life sentence.  (*Id.*

4    at 2.)  Prosecutors not only knew that state charges were planned.  They had actually asked state

5    prosecutors to delay filing to ensure the Movant pleaded guilty before knowing state charges were

6    imminent.  *See* Ex. W (May 2016 letter from the victims' attorney to the Solano County District

7    Attorney urging her to file state charges right away "rather than deferring to the Assistant United

8    States Attorney's request to officially defer filing.").

9    If any doubt remained that prosecutors sought a life sentence "based on guidelines," their

10   final pre-sentence filing quelled it.  In order to keep Mr. Muller's Guidelines recommendation at

11   life, the government argued that a two-point weapons enhancement applied.  (ECF 56 at 1-2.)  And

12   they prosecutors again obliquely argued against any downward departure that might mitigate their

13   de *facto* recommendation.  (*Id.* at 2-3.)

14   When a plea is induced by the government's promise, that promise must be kept.  *See, e.g.*,

15   *Santobello v. New York*, 404 U.S. 257 (1971).  Prosecutors broke their promise.  At a minimum,

16   the appeal waivers in the plea agreement are unenforceable.  *United States v. Portillo-Cano*, 192 F.

17   3d 1246, 1250 (9th Cir. 1999) ("waivers of appeal must stand or fall with the agreement").  And

18   although the government's violation of the plea agreement may not by itself make the plea not

19   knowing and voluntary, the prosecution's bad faith combines with other factors to render it so.

20   **IV.  THE MOVANT'S CHALLENGE TO HIS PLEA IS NOT   PROCEDURALLY**

21   **DEFAULTED**

22   The government's opposition asserts that the Movant's claim has been procedurally

23   defaulted.  This defense is without merit.

24   A § 2255 motion cannot be made to do service for a direct appeal.  *United States v. Frady*,

25   456 U.S. 152, 165 (1982).  Consequently, all available claims should be raised on direct review.

26   *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976).  A previously available claim first brought on

27   collateral review can overcome a default defense where a movant shows "cause" why it should be

28   allowed, and "prejudice" from the claimed error.  *Bousley v. United States*, 523 U.S. 614, 622

1   (1998). A second exception applies where "a constitutional violation has probably resulted in the

2   conviction of one who is actually innocent.) *Murray v. Carrier*, 477 U.S. 478, 497 (1986); *Bousley*,

3   523 U.S. at 622.

4   **A. Mr. Muller Has Shown The Unavailability Of His Claims For Earlier Review Or Has**

5   **Established Cause For Not Bringing Them Sooner**

6   To show "cause," a movant must show that "some objective factor external to the defense"

7   impeded the possibility of raising the claim prior to collateral review. *Murray*, 477 U.S. at 488; *see*

8   *also id.* at 492 ("cause … requires a showing of some external impediment preventing [the movant]

9   from constructing or raising the claim.").

10   As set forth above and in the Movant's declaration, his compromised mental state would

11   not have been readily apparent to his attorney or to Mr. Muller himself. Ex. A.  In order to avoid

12   imposing greater emotional turmoil on his loved ones, Mr. Muller actively sought to maintain a

13   front of apparent wellness. *Id.*  His minimizing behavior was highly consistent with the observed

14   behavior of other inmates in solitary confinement. A leading expert describes how prisoners in

15   solitary confinement characteristically claim they are well when they are not:

16   
17   I expected that inmates would feign illness and exaggerate whatever
     psychiatric symptomology they suffered. I discovered, however,
     something very different. Contrary to my expectations, the prisoners
18   appeared to be extremely defensive about the psychiatric symptoms
     they were suffering in [solitary confinement] they tended to
19   rationalize away their symptoms, avoid talking about them, or deny
     or distort their existence all in an apparent effort to minimize the
20   significance of their reactions to isolation.

21   Grassian, *supra*, at 334. Such behavior was so characteristic that Dr. Grassian considered it

22   part of a syndrome of symptoms. *Id.* at 333-38. Grassian also notes ways in which inmates are

23   dissuaded from seeking care or accurately reporting their symptoms — as was the case with Mr.

24   Muller and the threat of "the classroom." *Id.* at 333.

25   The extent of Mr. Muller's impairment after over a year in solitary confinement was not

26   apparent to him until well after the time to seek direct review. Ex. A. Although some indica of Mr.

27   Muller's impairment at the plea hearing appear in the record, their significance was not clear

28   without more. It was exactly the sort of claim that "cannot be advanced without the development

1     of facts outside the record." *United States v. Jeronimo*, 398 F.3d 1149, 1156 (9th Cir. 2005). The

2     same is true of Mr. Muller's failure to assist meaningfully in his own defense. Counsel may have

3     believed Mr. Muller simply no longer wished to assist as he had before. It would not be clear this

4     stemmed from the dual toll of mental illness and solitary confinement. And because Mr. Muller

5     had been a lawyer, counsel may have reasonably believed he understood more than he actually did.

6        Mr. Muller's claim that the conduct of law enforcement and prosecutors rendered his plea

7     invalid similarly involves "facts outside the record." Indeed, the claim itself turns on the

8     prosecution's extensive efforts to *keep* facts "outside the record." Courts have recognized in the

9     context of *Brady* claims that cause and prejudice "parallel… the alleged *Brady* violation itself —

10    that evidence be suppressed by the state willfully or inadvertently, and that prejudice ensued."

11    *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

12        The same is true in this matter. If the Movant establishes that prosecutors concealed or

13    misrepresented evidence, and that this conduct was sufficiently concealed or misrepresented

14    evidence, and that this conduct was sufficiently egregious, he will have established "cause" for

15    excusing default. The violations described above also indicate the claims asserted were unavailable

16    on direct review. The Movant was under no "procedural obligation to assert constitutional error on

17    the basis of mere suspicion" of that error. *Banks v. Dretke*, 540 U.S. 668, 695-96 (2004).

18        Cause also exists for asserting on collateral review that the government violated the plea

19    agreement. First, the agreement was not invoked by the government and the Court until Mr. Muller

20    filed his § 2255 motion. Second, any claim the government broke its promise to make the agreed-

21    upon sentence recommendation "under the guidelines" would have been subject to plain error

22    review on direct appeal, since no objection was made below. It was not clear at that time how the

23    government's bad faith affected substantial rights. Further development was needed both to

24    establish the full breadth of that bad faith — such as actively delaying state charges while

25    suggesting to the Court they might never be filed — and also its effect on substantial rights. Further,

26    the government's promise-breaking totals up with other misconduct not apparent until collateral

27    review to render the Movant's plea invalid.

28

**B. If The Movant Shows Prejudice Arising From The Claimed Error Itself, He Has Also Shown Prejudice Excusing Any Default**

For practical purposes, the prejudice showing the Movant must make to excuse procedural default is coterminous with the showing required to succeed in the challenge to his plea. *Cf. Hein v. Sullivan*, 601 F.3d 897, 905 n.4 (9th Cir. 2010) (treating prejudice inquiries for *Brady* violations and prosecutorial misconduct the same despite "distinct formulation[s]," because both inquires ask whether the error had "some impact on the outcome of the proceeding"). However, the movant submits, as argued above, that no prejudice showing is required if the Court determines the Mpvant was not sufficiently competent during the plea hearing. Such a defect is structural and is prejudicial *per se. See Dominguez Benitez*, 542 U.S. at 84 n.10.

**V. THE MOVANT IS ENTITLED TO AN EVIDENTIARY HEARING**

Under 28 U.S.C. § 2255, "a district court must grant a hearing to determine the validity of a petition brought under that section '[u]nless the motion and the files and records of the case *conclusively show* that the prisoner is entitled to no relief.'" *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting § 2255) (emphasis in *Blaylock*). The Movant has articulated a valid claim and made a *prima facie* showing that he is entitled to relief. *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996) (an evidentiary hearing may be denied only where a § 2255 motion fails to state a claim, or the claims "are so palpably incredible or patently frivolous as to warrant summary dismissed.").

The Movant has established that an evidentiary hearing is required. For reasons well-established in psychiatric research, Mr. Muller's impairment at the plea hearing was by its nature hard to discern. *See Grassian, sup, at 333-34*; *cf. Bostic v. United States*, 298 F.2d 678, 680 (D.C. Cir. 1961) (judge's personal recollection that petition was competent during the plea proceeding was an insufficient basis for denying his § 2255 motion; an evidentiary hearing was required). Mr. Muller's claims are corroborated by the record. Expert testimony and discovery will make the matter clearer still.

It is also clear that the government went to some lengths to deceive the defense, the public and this Court. An evidentiary hearing can determine just how far they went.

**VI.  THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE ALL TRIAL-LEVEL DISCOVERY MATERIALS, AND TO CERTIFY THIS PRODUCTION IS IDENTICAL TO THAT PREVIOUSLY GIVEN TO DEFENSE COUNSEL**

Pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings, a movant may engage in discovery if "the judge in the exercise of his discretion and for good cause shown grants him leave to do so…." The Supreme Court has determined that "good cause" for discovery exists when a movant establishes a *prima facie* claim for relief. *Harris v. Nelson*, 394 U.S. 286, 290 (1969). Specifically, discovery is warranted "where specific allegations before the court show reason to believe the petitioner may, if the facts are fully developed, be able to demonstrate that he is… entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

Mr. Muller submits that his specific allegations — already supported by initial evidence — easily establish "reason to believe" that he "may" be able to show he is entitled to relief. *See id.* At this juncture, all that the Movant requests is what he should already have: the discovery materials previously provided to the defense.

Prosecutors sought to limit the Movant's access to discovery by setting as a condition for receiving it that his defense attorney destroy all materials after trial-level proceedings. Defense counsel found this request extraordinary. In an e-mail to prosecutors, he stated "I have never been asked to do this before. There are occasions where a client will seek relief by appeal or 2255 and it is helpful to have the discovery to assist." Ex. X. Counsel for the government replied with a revised proposed order, stating "please see if this revised discovery order addresses your concerns." Defense counsel responded "[t]his is fine. Thank you." *Id.* The order was entered. (ECF 16.)

It was therefore the understanding of both defense and government counsel that discovery materials would be available to Mr. Muller should he "seek relief by appeal or 2255." The express language of the order conveys this mutual understanding. (*See* ECF 16 at 1 ("Defense counsel shall not disclose any of the Discovery to any person *other than his respective defendant/client*, 'witnesses' and members of the defense team") (emphasis added).)

Nevertheless, government counsel refuses to provide even the discovery *index* that was created and previously given to defense counsel. Further, prosecutors contacted defense counsel

MOVANT'S REPLY;
MEMORANDUM OF POINTS AND AUTHORITIES                    - 29 -

1    last year to ensure that all discovery materials were destroyed and made unavailable to support the

2    Movant's postconviction challenge. (*See* ECF 87-1.)

3         Prosecutors' telling tight-fistedness has hindered Mr. Muller from the outset. The Court

4    should now end their embargo. The Movant requests an order that all trial-level discovery be

5    produced to him, or to his attorney if one is appointed. The order should further require the

6    government to certify that the production is identical to what was provided in trial-level

7    proceedings.

8                                        **CONCLUSION**

9         WHEREFORE, the Court should grant an evidentiary hearing, appoint counsel for the

10   Movant, and order the government to produce discovery materials as set forth above.

11

                                        Respectfully submitted,

12

13

14   Dated: January 7, 2020               Signed:

                                          Matthew D. Muller
15                                        *In Pro Per*

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## Movant's Declaration In Support Of Motion Under 28 U.S.C. sec. 2255

MATTHEW D. MULLER
1684 Decoto Road #274
Union City, CA 94587
Phone: (415) 322-0492
Fax: (415) 366-3326
matt@projectjusticeforall.org

*In Pro Per*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Respondent,<br><br>    v.<br><br>MATTHEW MULLER,<br><br>       Movant. | CASE NO. 2:15-CR-205-TLN-EFB<br><br>**DECLARATION OF MATTHEW MULLER IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE** |

1.      Motion under 28 U.S.C. § 2255.

2.      Some of what I discuss below I have only learned in the last year, after efforts that go far beyond ordinary diligence. These efforts included public records requests as well as subpoenas and discovery from my related state criminal matter. It has also included forensic examination of documents and electronics.

3.      Nearly all that I have found are things that the government should have provided in discovery. Some things were concealed from my attorney not just by omission, but by active misrepresentation.

4.      As to some allegations in my motion, I was equipped until recently only with general knowledge that various facts reported by law enforcement in my case could not be true. I did not know the specific means or stories authorities were using to pass off evidence and facts as true that

1  are not.

2  5.      For example, I knew that authorities had taken a large amount of property from my house
3  and planted it in a stolen vehicle.  But I did not know when or exactly how, or how I could prove it.

4  6.      Other lies they told caused confusion for me and my family.  For example, authorities said
5  they found cocaine in the house where I was staying.  I knew it was not mine, so I thought it might
6  belong to one of my stepbrothers who uses the house sometimes.  Of course I did not want him to
7  get in trouble, so I did not deny that it was mine.  Later I saw a photo of what they said tested positive
8  as cocaine, and where they found it.  I knew immediately that it was crushed ibuprofen that I had.  I
9  have since had someone test ibuprofen with some field narcotics identification kit police said they
10  used, and it did not test positive.  So this was another false accusation.

11  7.      I have also had to wait for permission to use some of the discovery materials from my state
12  case.  The federal prosecution has denied me access to discovery.  So I have had difficulty collecting
13  the evidence and details I need to show how my conviction was wrongful.  Again, it is one thing to
14  know that an accusation or alleged fact is false, and another to be able to prove it, or guess what
15  particular evidence is being concealed.  As to some allegations, matters are further complicated by
16  the possibility that some persons involved believe in good faith falsehoods told to them by another.
17  Before I made specific factual allegations, I wanted to ensure I was not accusing someone acting in
18  good faith on false information.

19                                    **Time In Custody**

20  8.      I was in custody at the Santa Rita Jail from mid-June to mid-September of 2015.  I was in
21  very poor mental health for about the first month.  I was told I was in a "mixed episode" with some
22  symptoms of both mania and depression.  I was sent to a psychiatric hospital, which was a very
23  unpleasant experience.  I was involuntarily medicated and left in a room with nothing in it but a
24  padded platform and restraints.  I really needed to distract my mind, so I was miserable there and
25  never wanted to go to such a place again.

26  9.      When I returned, I was kept in the jail's acute psychiatric ward for a short time.  They would
27  not let me back into general population, so they sent me to administrative segregation.

28  10.     At some point in July, I believe, I was placed on suicide watch.  I found out later it was

DECLARATION                               - 2 -

1   because a deputy had overheard me on the phone begging my parents for permission to kill myself.

2   Suicide watch at Santa Rita was also unpleasant, though not as bad as at the Sacramento Jail. It was

3   very hard to get removed from the status, and I felt they kept me on it well past when I needed it.

4   11.    I was transferred to the Sacramento Jail by special agents Jason Walter and Davis Sesma.

5   As my motion states, they took an envelope from me, sealed I believe, that contained privileged

6   material. They said they were going to take it to my attorney's office, but he never received it.

7   12.    Besides notes, the envelope contained two letters and one envelope that a letter had arrived

8   in. One of the letters was a threat, although it would seem innocent to someone without certain

9   information. The other letter I was unsure of. In any event, the FBI seized them and neither I nor

10  my attorney received any information about it. A subpoena to the Santa Rita Jail (Alameda County

11  Sheriff's Office) for copies of all mail I received have not been responded to.

12  13.    I do not allege that the threat directly affected my plea decision, because by that time I was

13  too mentally compromised to care. What matters is that the FBI has it and I want to review it.

14  14.    In Sacramento, I was placed on "Total Separation" (T-Sep) status at my classification

15  interview. The interview was in the middle of the night or early morning. When they told me my

16  status, they referred to it as "T-Sep" and I did not know what it meant. They said it meant I would

17  get my own cell.

18  15.    It did not make sense to put me in T-Sep status. I think I appeared to be in bad shape

19  because I had been up for 36 hours by the time of the interview, or they were reacting to my recent

20  psychiatric hospitalization.

21  16.    My first long-term housing assignment was a grim matter. I was put in a cell only hours

22  after its previous resident had been found dead inside. His belongings were still in the cell when I

23  arrived. Deputies later told me to push them out onto the walkway. I thought other inmates were

24  having fun with me when they saw the last inmate carried out on a stretcher, apparently dead by the

25  look of his face and skin. But they did not change their story, and deputies would not talk about it.

26  17.    I tried to get moved from T-Sep status, but only managed to get moved to the larger T-Sep

27  unit. The conditions I experience are accurately described in the *Mays v. County of Sacramento*

28  lawsuit. Some things they do not mention are the periodic floodings of the unit by upset inmates,

DECLARATION                                    - 3 -

1    and just how seldom T-Sep inmates are allowed into the semi-open recreation area.  I received
2    recreation there just four or five times in twenty months — less than once per season. At some point
3    in early to mid-2016, one of the experts from *Mays* came around for interviews and I talked about
4    some of this with him.

5    18.    In my unit of 32 cells, middle-of-the-night out of cell time was common, with two or three
6    days a week when your time falls into the 11pm to 5am range.  So I would get out of my cell four
7    or five times a week — two or two-and-a-half hours in total.  But as my depression grew worse in
8    the first part of 2016, I would usually come out for only about three of the periods per week — 1.5
9    hours.

10   19.    By mid-2016, I was spending almost all of my time in bed.  On what I thought of as a "good
11   day", I would sleep until 4pm, stay awake for about six hours, and then go to sleep again. And only
12   about two or three of those hours were actually out of bed.

13   20.    I thought of the day as "good" because I was unconscious for most of it.  At one point, I
14   began getting large bumps or sores that would discharge fluid.  I thought at first it was from bedbugs,
15   but later learned they were bedsores.

16   21.    I was lucky to have family and a girlfriend (now my wife) who would come visit me.  It got
17   to the point though, and I am ashamed to admit it, that I resented their visits. I just wanted to stay in
18   bed and hated that I had to go out and put on a show so they would not worry.

19   22.    Severe depression defies description.  The reason you want to die is not because you develop
20   some sort of general deathwish or think it is the best thing to do.  You want it the way an end-stage
21   cancer patient wants to end his misery, because it is just too painful to go on.  For much of 2016, the
22   oblivion of sleep was all I had to escape from it.  My dad had told me that if I killed myself, it would
23   kill him too.  So I held out, and resented my father for not letting me end my misery.

24   23.    I made a deal with myself: I wanted badly to die, and my mom seemed to understand.  So I
25   only had to hold out until my father passed away — and he had been told a year earlier that his life
26   expectancy was eighteen months due to severe congestive heart failure.  I am ashamed to admit that
27   there was part of me that wanted badly for him to pass on so that I could kill myself without guilt.
28   But I could not hold out forever.  So the deal with myself was that I only had to hold out to June 9,

DECLARATION                                    - 4 -

1   2018 — three years from the date of my arrest. No later than that day, I would end my misery.

2   24.    Because of my thinking, my criminal case felt irrelevant to me by mid-2016. The biggest
3   consideration was having to go to court. By then, it was unpleasant even to leave my cell for my
4   30-minutes free time. I would use the shower, the phone, and run errands for other inmates, but that
5   was it. I did not like being in the open space in front of the cells because I felt exposed, like people
6   were watching me even though I was alone in the dayroom. Court was immeasurably worse. I came
7   to dread it for days beforehand. I just wanted to be left alone, to sleep.

8   25.    The June hearing on my motion to suppress was very difficult. I would have avoided it if
9   possible, but since I had to go, I was at least going to listen to the Court's ruling.  But the
10  consequence of the ruling for my case felt inconsequential for me.

11  26.    At the hearing, I just could not pay attention. I felt too exposed, like I wanted to get out. I
12  think I remember that I was allowed to sit. That is the sort of detail that would stand out, because it
13  meant I was less exposed or in view than if I had to stand. That is what I remember as being most
14  important to me. Not the actual ruling. I knew afterwards that the motion had been denied, but not
15  on what grounds. Nor did I care enough to ask, despite having had interest in it the previous year,
16  and despite the fact that the details of the ruling would dictate the viability of an appeal.

17  27.    I had been mentioning to my attorney that I would like to waive my appearance.  After the
18  feeling of panic at the June motion hearing, I insisted. He eventually filed a waiver.

19  28.    When my attorney came to speak with me about a plea agreement, my only real
20  consideration was: do my parents agree? I just wanted them to feel good about it. I did not care
21  about the thing itself. One detail did bother me, though — the factual basis. I was supposed to agree
22  to things I knew to be false. But when it seemed to be a sticking point, I saw that what I was actually
23  agreeing to was that "[i]f this matter proceeded trial, the United States would establish the following
24  facts beyond a reasonable doubt…" So that did not mean I was agreeing they were true.

25  29.    I simply have no memory of the September 29, 2016 change of plea hearing.  I remember
26  every one of my court appearances in Alameda County in 2015, and I remember my arraignment
27  and initial hearings in federal court. I think I remember the June motion hearing because I was
28  allowed to sit for it. And I remember my sentencing hearing and that my depression was starting to

1  abate around January 2017.

2  30.     As to any other hearing, I just have a general memory of dreading it for days beforehand
3  and of feeling intense anxiety at the hearing itself. I remember most clearly the small staging
4  corridor between the holding area and the courtroom, and feeling like I was waiting in the wings of
5  something between a stage and an arena. It felt unreal, like it was happening to someone else.

6  31.     Usually, I do my best to conceal it if I am in mental distress or am having symptoms — for
7  a variety of reasons. First, it is embarrassing. Second, it tends to just burden people, and there is no
8  good reason for that. If I need help, I can seek it myself. At the Sacramento Jail that was of course
9  usually a bad idea. But that is still no reason to say much to my family. They can't do anything. It
10 would pointlessly worry them. Third, I may not actually know myself that I am having the
11 symptoms. And fourth, I am generally stoic. That is how my father taught me to be. "Tough it out."
12 He was a wrestling coach and champion athlete, and himself virtually never showed pain or
13 difficulty.

14 32.     And of course being a Marine instills that as well. You are supposed to be able to stand at
15 attention and give no sign of discomfort while. For example, sand fleas are biting you. I got yelled
16 at once just for following with my eyes a five-inch long scorpion that was crawling towards
17 formation. So I am quite able to keep a neutral expression and calm demeanor even at moments of
18 great stress. After long practice, it is my instinct to do so. (Although I have become more reactive
19 since being beaten and raped in prison, for whatever reason.)

20 33.     Reading through the plea hearing transcript, it appears I was just saying whatever could get
21 me out of the crowded courtroom as soon as possible. That was simple as to questions where the
22 expected response was obvious from the last sentence or two of the question. But for a few questions
23 I did not respond accurately. And there are some things I noticed that would not stand out to others,
24 such as my addressing the Court as "sir" at various times. Nothing seems unusual about it, but it is
25 not the correct honorific. I am a former Marine whose position involved matters of protocol and
26 custom. I try to strictly adhere to protocol, and cringe slightly when I see myself getting it wrong in
27 the transcript. To myself or someone who knows me, my addressing the Court as "sir" is equivalent
28 to repeatedly addressing the Court as the wrong gender. It is a small detail, but something that stood

DECLARATION                                    - 6 -

1   out to me as reflecting my impaired state along with other indicators.

2   34.     I would have known what my medication was at that time, even if I was not doing well

3   overall. I cannot think of any reason I would say I was taking mood stabilizers when I was not. I

4   think I just automatically replied with what the correct treatment would be for Bipolar Disorder,

5   because I was just trying to say whatever would get me out of there.

6   35.     I would usually reply with "education consultant" when asked my last job. In general I

7   preferred not to talk about having been an attorney when I can avoid the subject. I probably replied

8   "lawyer" because the answer to the previous question was "law school." Also, if I was going to

9   acknowledge practicing law in the past, I would use the word "attorney" rather than "lawyer."

10   36.     After court I usually would recuperate for a couple of days — which meant not getting out

11   of bed for more than a few minutes as opposed to a few hours. I do remember feeling relieved that

12   I would not have court for a while. And I remember asking my attorney to postpone the sentencing

13   hearing — for the sole reason that I did not want to go to court any sooner than I had to.

14   37.     I was also extremely apprehensive about moving from the jail. Objectively speaking, my

15   living conditions could only get better. In Santa Rita Jail, I heard inmates talk about how much

16   better prison was than jail. But I had been in my cell — or another just like it — for so long that by

17   2017, I did not want to leave it. I just wanted to continue to sleep the days away until the time came

18   when I could kill myself.

19   38.     In early 2017, though, my depression started to abate on its own. Mental health treatment

20   at the jail was generally poor. There was little point in asking for help, because none was available.

21   In fact, there was very good reason not to ask for help — "the classroom."

22   39.     Soon after I arrived, I tried to have my medication corrected. After I received no reply, I

23   sent another request that I could eventually become suicidal if my medication was not corrected.

24   The next day, an irritated mental health worker came to my cell and verified that I was not suicidal

25   right then. She told me that if I used any variation of the word "suicide" in a request slip again, I

26   would likely have all of my clothes and belongings taken and be put in "the classroom," a glass-

27   enclosed space where everybody could see you. The point was for staff to be able to observe you,

28   but so could all the inmates. Presumably it was not intended, but the classroom was effectively a

1    pillory — both restrictive and humiliating.  There was no water or toilet and you had to sleep on the

2    ground and pee into a drain.

3    40.     So not only was there no real treatment (besides drugs) for depression or suicide, trying to

4    get help could also just make matters worse.

5    41.     When I arrived at a holdover (temporary) prison facility in May 2017, I was classified with

6    low security.  I arrived at the dormitory-style unit, and almost immediately suffered a panic attack.

7    Too open, too many people.  I requested to be put in solitary confinement and stayed there until I

8    was transferred.

9    42.     At my long-term prison, I rarely left my cell during my first month, even though it was

10   unlocked for 14 hours of the day.  I slowly came back to life, and understood after a few months just

11   how changed I had been.

12                                **Assisting In My Own Defense**

13   43.     I was initially eager to help my attorney with my case.  After I regained my mental

14   equilibrium in August of 2015, I researched the legal issues surrounding my case in some depth.  I

15   wrote a detailed legal memorandum and talked with my attorney about the case.

16   44.     I would estimate that I wrote my attorney close to 100 pages of information and research

17   about the case, including my desire to see evidence and find out more about things authorities were

18   saying that I knew could not be true.

19   45.     Soon after I arrived in Sacramento, my mind and thinking became attenuated from the case.

20   I sent one request slip in about legal materials and did not follow up when there was no reply.

21   46.     When my attorney filed the federal motion to suppress, I did not even ask to see a copy of

22   it.  He might have given me one, and I might have looked it over.  But what I remember is not caring.

23   It was a strong contrast to how I felt and how involved I was for the state motion to suppress.

24   47.     When my attorney talked with me about the plea agreement, I understood the basics.  I

25   probably understood about as well as many defendants, though not as well as any who bothered to

26   read about the Sentencing Guidelines or more information about plea agreements and appeal

27   waivers.  Relative to the amount of research I would usually do and level of understanding I would

28   seek, I was completely oblivious.

48.     One thing I do know, is that there is no way I would have told my attorney that I would include in any plea agreement something saying that I was responsible for three attacks on the Peninsula. It is false and I do not see how there could have been any manner of miscommunication about that.

49.     As an example of things I did not even bother to learn about, the Guidelines seemed arbitrary to me and I did not understand how they worked. I understood that there were recommended sentences and factors that increased them. But the numbers made no sense. My final understanding was that my "score" would add up to 43, then they would subtract three points for pleading guilty, leaving me with 40— and that was my recommended sentence, 40 years. I had a feeling then that this was not quite right. I just did not care enough to try to figure it out. That neglect is mind-boggling to me now. I did more research on Amazon to find the right kind of printer than I did to understand the system behind a potential life sentence.

50.     That really shows just how compromised any mental health was then. It is inconceivable to me that I had no interest then in using my training, like a physician with no interest in finding out it was common pneumonia killing him, nor in obtaining antibiotics.

51.     After recovering for a few months in prison, I took the normal interest in criminal law that I would just from being around people for whom it mattered. Six months after believing that the number of my offense level was the number of years being recommended, I wrote a certiorari petition for an inmate on a complex Guidelines issue — whether revisions implicated the *ex post facto* clause and whether the holding in *Peugh v. United States* could be retroactive on collateral review without the high court pronouncing it so. Soon I was teaching criminals in a class with a waitlist over one hundred inmates long.

52.     About a year after being sentenced to federal prison, I was charged by state authorities for the same alleged conduct. This time I have taken an active role in my defense, as I started to before coming to jail in Sacramento in 2015.

53.     Specifically, I sought right away to view evidence in my case. That was important, since I found out that police had accessed my email account and sent a fake inculpatory email, which email also told me that they had been in my house without a warrant.

54.     When my public defender was elevated to the bench and her replacement said he could not proceed on a statutory speedy trial, I opted to self-represent. I appeared on my own behalf at the preliminary examination and two evidentiary hearings on a motion to suppress. For one hearing, I prepared and presented an expert witness. I stayed up to date on relevant law, so a few days after the Ninth Circuit issued a Fourth Amendment decision to conflict with the ruling on my motion to suppress, I found out about it. I prepared an interlocutory appeal and also obtained the ACLU's agreement to file an amicus brief (although it was ultimately not filed for strategic reasons.).

55.     I also came within two days of trial and had subpoenaed witnesses, created my own jury survey and voir dire worksheets, and prepared most of my trial exhibits. Then the prosecution finally turned over much of the discovery I had been seeking, on 67 optical discs. After reviewing them for just a few hours, I knew I needed to postpone trial because of what I was finding.

56.     I have turned down a plea offer for a 10-year sentence. I am aware that if my federal sentence is overturned and I go on to receive any federal sentence after that, the new sentence will likely be run concurrent with a state sentence involving the same "relevant conduct." So it is a favorable offer. But I chose to proceed to trial.

57.     If I had been mentally healthy while detained in Sacramento, I would have actively aided my own defense — just as I had done before that and just as I did after. I certainly could not have pleaded guilty in exchange for a 40-year sentence recommendation.

## Availability of Claims and Evidence

58.     I have diligently sought both to investigate and document all claims available to use. But I have faced active interference from the government and from former counsel.

59.     In particular, I still have not seen a single sheet of the federal discovery, although presumably it crosses over with the state discovery I have received — which is an order of magnitude smaller than the federal discovery. My attorney committed to the discovery protective order specifically contemplating that I would receive access to the files for any appeal or postconviction motion. But the government required my attorney to destroy all materials, and has refused to produce it itself.

1  60.    I would know very little if not for discovery in my state matter, and even that has faced

2  obstacles. I did not receive a great deal of crucial discovery until shortly before trial. On March 29,

3  2019, I received the last two of three documents I had to triangulate among to determine that the

4  victim's SART exam had yielded two DNA profiles, at least one not mine.  The information was

5  buried in a large number of documents as well as 67 optical discs I need to review. So it was about

6  two months before I saw it.

7  61.    To find other information, I have had to go to extraordinary lengths.  Reviewing the

8  discovery, I see things that I know simply cannot be true.  For example, there was an e-mail sent

9  from my account that was not mine, and evidence attributed to me that was never in my possession.

10  But a bare assertion "they faked that e-mail" or "they planted that evidence" carries little if any

11  weight. As maddening as it is, I have to find evidence to prove their wrongdoing.

12  62.    All that I have had to guide me is personal knowledge of various claims' falsity, which

13  sometimes guides me to evidence of police misconduct.  I knew there were misrepresentations in

14  the warrant documents and eventually realized there were actual forgeries.  That is what prompted

15  my family to spend a large amount of money on a document forensicist.

16  63.    The DNA reports are the most substantial example of concealed evidence.  But even now I

17  do not know for certain if they were concealed, because the prosecution will not show me the

18  discovery. I will lose credibility with the Court if I claim withholding of Brady evidence that it turns

19  out was not withheld.  But I have to bring the claim eventually.

20  64.    I knew that prosecutors had made up a story about how they believed there was a connection

21  between a burglary in Dublin and the Vallejo kidnapping.  But I did not know the details of the story,

22  or more importantly, the extent of the fraud authorities had perpetrated to conceal their unlawful

23  searching. February 11, 2019, is the very earliest I had enough information to allege more specific

24  facts about illegal searching and further illegalities to cover up the illegal searching.  I knew more

25  after an evidentiary hearing on March 22, 2019.  But I did not know enough to be reasonably certain

26  I would not be making false accusations until October 2019.  It has not been for lack of trying.

27  65.    Another consideration is that I or my attorney will have to prove officers' misconduct in

28  court. There is seldom indisputable evidence available of such misconduct, so witness examination

DECLARATION                                              - 11 -

1   will play an important role. I have needed to save what evidence I have to impeach law enforcement

2   witnesses or to confront them with evidence that is inconsistent with the story they are telling. If I

3   disclose all of my evidence in advance, they will have the opportunity to coordinate and conform

4   their stories to the available evidence. I have wanted to avoid this if at all possible, and so I sought

5   an abeyance of this matter. Now I will need to disclose the evidence, since the alternative is to risk

6   a 40-year prison sentence that might otherwise be overturned.

7   66.     I very much need an attorney's help with my case in this Court. My parents came close to

8   being able to retain an attorney because my state appointed attorney was going to be able to do it for

9   less money. But he determined he could not take both the state appointment and a private retainer.

10

11         I, Matthew Muller, declare under penalty of perjury that the foregoing is true and correct.

12   Done this fifth day of January, 2020, in Fairfield, California.

13

14

15                         Signed: _____

                                    Matthew Muller

16                                     *In Pro Per*

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION                              - 12 -

# EXHIBIT B

Declaration Of Matthew Muller
Authenticating Support Exhibit

1   MATTHEW D. MULLER
    1684 Decoto Road #274
2   Union City, CA 94587
3   Phone: (415) 322-0492
    Fax: (415) 366-3326
4   matt@projectjusticeforall.org

5   *In Pro Per*

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,            CASE NO. 2:15-CR-205-TLN-EFB

12                   Respondent,          **DECLARATION OF MATTHEW**
                                          **MULLER AUTHENTICATING**
13          v.                            **SUPPORTING EXHIBITS**

14   MATTHEW MULLER,

15                   Movant.

16

17

18   I, Matthew Muller, declare:

19   1.      I am the Movant in this matter and am making this declaration to authenticate documents

20   I am submitting in support of my motion under 28 U.S.C. § 2255.

21   2.      All documents are true and correct copies of the originals obtained from the sources set

22   forth below.  Some documents have been highlighted in relevant part, or have been redacted in part

23   for confidentiality or other legal reasons.  Unless otherwise noted on an exhibit's coversheet,

24   highlighting and redactions were made by the Movant and were not in the original document.  In

25   general, all documents are what they purport to be on their face, unless otherwise noted.  Some

26   items are out of sequence because exhibits have been reordered.

27   3.      Exhibit D is filed under seal and includes laboratory reports from Denise Huskins's SART

28   examination and a laboratory report in which Matthew Muller's DNA was sequenced.  The last

DECLARATION                           - 1 -

1   page is a side-by-side comparison of DNA sequences from the reports.  All reports were obtained

2   from the Solano County District Attorney's Office as discovery in a state prosecution.

3   4.     Exhibit G is a discovery request letter sent by Thomas Johnson to the prosecution in this

4   matter.  It was obtained via subpoena to Thomas Johnson.

5   5.     Exhibit F comprises excerpts from two witness depositions in the civil matter *Huskins, et*

6   *al. v. City of Vallejo, et al.*, No. 2:15-cv-603-TLN-EFB in this Court.  They were obtained via a

7   public records request to the City of Vallejo.

8   6.     Exhibit E is an excerpt from an FBI evidence manifest in this case provided to the Movant

9   by the Solano County District Attorney's Office.

10   7.     Exhibit Q purports to be an email the Movant sent himself in June, 2015, but it was not

11   actually authored by the Movant.  It was obtained from the Solano County District Attorney's Office.

12   8.     Exhibit N is a series of FBI reports obtained as discovery from the Solano County District

13   Attorney's Office.

14   9.     Exhibit P is a transcript of interviews with Aaron Quinn made by the FBI.  It was obtained

15   from the Solano County District Attorney's Office.  The Movant believes the transcript may not be

16   a verbatim record of the original recording.

17   10.    Exhibit O is a series of reports of the Vallejo Police Department.  They were obtained from

18   the Solano County District Attorney's Office.

19   16.    Exhibit R is a report from the Silicon Valley Regional Computer Forensic Laboratory.  It

20   was obtained from the Solano County District Attorney's Office.

21   17.    Exhibit Q is a redacted investigative report from Alameda County.  It was obtained from

22   the Solano County District Attorney's Office.

23   18.    Exhibit T is a report from the FBI Computer Analysis Response Team (CART).  It was

24   obtained from the Solano County District Attorney's Office.  It appears to be altered from its original

25   form.

26   19.    Exhibit U is the declaration of computer forensicist Allison Young.  It was obtained from

27   Ms. Young.

28   ///

20.     Exhibit V is a report by document forensicist Mark Songer.  The report was obtained from its author. Information authenticating the documents examined appears in the report.

21.     Exhibit I is a custody record obtained from the Sacramento County Sheriff's Office.

22.     Exhibit H is a transcript of the change of plea hearing in this matter.  It was obtained from the CM/ECF docket.

23.     Exhibit J is a redacted investigative report from Alameda County, obtained from the Solano County District Attorney's Office.

24.     Exhibit K comprises excerpts of Matthew Muller's medical and mental health records obtained from the Sacramento County Sheriff's Office.

25.     Exhibit L is a memorandum and a letter the Movant wrote and gave to his attorney Thomas Johnson in August of 2015.  It was obtained from Thomas Johnson via state court subpoena.

26.     Exhibit M is a printout of a portion of the electronic docket records of the Solano County Superior Court, available on the Internet.

27.     Exhibit W is a letter from Denise Huskins's attorney Douglas Rappaport to the Solano County District Attorney, and a letter in reply from the District Attorney.  They were obtained via a public records request to the City of Vallejo.

28.     Exhibit X is a series of e-mails between AUSA Matthew Segal and Thomas Johnson.  They were obtained from Thomas Johnson, by way of a state court subpoena for the Movant's client file.

        I, Matthew Muller, declare under penalty of perjury that the foregoing is true and correct. Done this fifth day of January, 2020, in Fairfield, California.


                                        Signed: _____
                                                Matthew Muller
                                                *In Pro Per*

DECLARATION                                    - 3 -

# EXHIBIT C

## AUTHORIZED EXCERPTS FROM NONFICTION MANUSCRIPT BY DENISE HUSKINS AND AARON QUINN, DESCRIBING EVENTS OF MARCH TO JUNE, 2015

# EXHIBIT D

## Denise Huskins And Matthew Muller DNA Profiles

# EXHIBIT E

## List Of Evidence In Possession Of The FBI As Of July 8, 2015

804 21

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7A-SC-6226276 | GENERAL | 1B139 | (U) 2 swabs from Quinn (VPD case #15-3817, Item #2053-2) | 7/8/2015 | E5557249 | ROW E, SHELF 18 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B140 | (U) DNA sample from Quinn (VPD case #15-3817, Item #569-5) | 7/8/2015 | E5557250 | ROW E, SHELF 18 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B141 | (U) Blood sample from Quinn (VPD case #15-3817, Item #522-3) | 7/8/2015 | E5557251 | REFRIGERATOR 3 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B142 | (U) Urine kit - Huskins (VPD case #15-3817, Item #658-5) | 7/8/2015 | E5557252 | REFRIGERATOR 3 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B143 | (U) Sexual Assault Evidence Kit - Huskins (VPD case #15-3817, Item #658-6) | 7/8/2015 | E5557253 | ROW E, SHELF 18 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B144 | (U) Christmas greeting card (VPD case #15-3817, Item #522-4) | 7/8/2015 | E5557254 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B145 | (U) Consent to search form signed by Aaron Quinn (VPD case #15-3817, Item #522-5) | 7/8/2015 | E5557255 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, d. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B146 | (U) Indicia - Huskins's mail, Kaiser (VPD case #15-3817, Item #522-5) | 7/8/2015 | E5557256 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, d. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B148 | (U) Photo line up (VPD case #15-3817, Item #522-7) | 7/8/2015 | E5557258 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | CART | 1B149 | (U) 6 CDs: #1- Interviews with A. Quinn, #2- Recording of D. Huskins provided to SF Chronicle, #3- Interviews with L. Vancitter, #4- Interview with Arvinitis, #5- Interviews with Goldenberg and Atwal, #6- Cell phone records (VPD case #15-3817, Items #566-1, 566-2, 566-3, 566-4, 566-5, 566-6) | 7/8/2015 | E5557259 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | CART | 1B150 | (U) 20 discs: #1- CD with audio of W. Ethan interview, #2- DVD of A. Quinn, #3-4 DVDs of Denise interviews from 3/26 and 3/27, #4- 10 DVDs from interview rooms burned from hard drive, #5- CD recording of Tip Line, #6- CD of audio with W. Beach, #7- CD with audio of Steve Ruiz phone call 3/31/15, #8- DVD interview of Andrea Roberts and Laura Belen  (VPD case #15-3817, Items #569-1, 569-2, 569-3, 569-4, 569-7, 569-8, 569-9, 569-10) | 7/8/2015 | E5557260 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B151 | (U) #1- Pics used in interview with Denise on 3/26/2015 and #2- Printed pictures with a CD of digital pics (VPD case #15-3817, items #569-6, 569-11) | 7/8/2015 | E5557261 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al.) |
| 7A-SC-6226276 | CART | 1B152 | (U) #1- Interview DVD recording w/ co-workers, #2- CD containing Kaiser employee interview 3/31/15: Josten, Pham, Fisher, Cole, Marias, etc., #3- CD containing HBPD interviews, #4- HBPD photos by CSI, #5- DVD video of 1838 Lake Street Huskin's arrival, #6- Huskin CD interview with HBPD (VPD case #15-3817, Items #638-1, 638-2, 638-3, 638-4, 638-5, 638-7) | 7/8/2015 | E5557262 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | CART | 1B153 | (U) #1- Phone rips/exigent records, #2- CD of interview with Quinn's parents, #3- CD of 911 call to dispatch, #4- CD of Andrea Roberts interview 3/31/15 (VPD case #15-3817, items #620-1, 620-2, 620-3, 620-4) | 7/8/2015 | E5557263 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7A-SC-6226276 | CART | 1B154 | (U) CD containing phone records Huskins 3/1/15 thru 3/24/15 from AT&T (VPD case #15-3817, Item #578-3) | 7/8/2015 | E5557264 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | CART | 1B155 | (U) #1- CD recording of McGrew interview, #2- CD containing Microsoft SW return, #3- Passport drive with footage of Lowes CCTV, #4- DVD containing CCTV from Napolis (VPD case #15-3817, Items #618-1, 618-2, 618-3, 618-4) | 7/8/2015 | E5557265 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | GENERAL | 1B156 | (U) #1- Forensic Medical Report SART (VPD case #15-3817, Item #658-4) | 7/8/2015 | E5557266 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | CART | 1B157 | (U) #1- Bay Alarm flash drive and #2- San Disk flash drive containing video from 500 Kirkland Ave (VPD case #15-3817, Item #658-3 and 658-7) | 7/8/2015 | E5557267 | ROW D, SHELF 20 | (U) Evidence received from Vallejo PD (524 Kirkland, A. Quinn, 111 Amador, D. Huskins, et al) |
| 7A-SC-6226276 | CART | 1B158 | (U) Photo log and CD containing photographs of latent print 1B160 for laboratory analysis. | 7/10/2015 | E5276082 | ROW A, SHELF 21 | (U) Photographs of latent print 1B160 for laboratory analysis |
| 7A-SC-6226276 | GENERAL | 1B159 | (U) Piece of red tape (BFS Case # LP-15-000212) | 7/20/2015 | E5554668 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B160 | (U) Piece of red tape (BFS Case # LP-15-000212) | 7/20/2015 | E5554669 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B161 | (U) Piece of red tape (BFS Case # LP-15-000212) | 7/20/2015 | E5554670 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B162 | (U) Three pieces of red tape (4A top piece, 4B middle piece, 4C bottom piece) (BFS Case # LP-15-000212) | 7/20/2015 | E5554671 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B163 | (U) Piece of red tape (BFS Case # LP-15-000212) | 7/20/2015 | E5554672 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B164 | (U) Piece of red tape (BFS Case # LP-15-000212) | 7/20/2015 | E5554673 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B165 | (U) Piece of silver duct tape (BFS Case # LP-15-000212) | 7/20/2015 | E5554674 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B166 | (U) Pair of scissors (BFS Case # LP-15-000212) | 7/20/2015 | E5554675 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B167 | (U) Drinking glass containing a clear liquid (BFS Case # LP-15-000212) | 7/20/2015 | E5554676 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B168 | (U) Pair of goggles (BFS Case # LP-15-000212) | 7/20/2015 | E5554677 | ROW E, SHELF 18 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B169 | (U) Motion detector (BFS Case # LP-15-000212) | 7/20/2015 | E5554678 | ROW W, SHELF 02 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B170 | (U) Bottle labeled "Nyquil" (BFS Case # LP-15-000212) | 7/20/2015 | E5554679 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B171 | (U) Bottle labeled "Nyquil" (BFS Case # LP-15-000212) | 7/20/2015 | E5554680 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B172 | (U) Drinking glass containing a clear liquid (BFS Case # LP-15-000212) | 7/20/2015 | E5554681 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B173 | (U) Drinking glass containing a clear liquid (BFS Case # LP-15-000212) | 7/20/2015 | E5554682 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B174 | (U) Drinking glass containing a clear liquid and orange wedge (BFS Case # LP-15-000212) | 7/20/2015 | E5554683 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B175 | (U) Drinking glass containing a clear liquid and orange wedge (BFS Case # LP-15-000212) | 7/20/2015 | E5554684 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |
| 7A-SC-6226276 | GENERAL | 1B176 | (U) Knife labeled "Ginsu" (BFS Case # LP-15-000212) | 7/20/2015 | E5554685 | ROW T, SHELF 15 | (U) Evidence Received from California Department of Justice (Latent Prints) |

# EXHIBIT F

## Excerpts From Depositions Taken In *Huskins v. Vallejo*, No. 2:16-cv-603-TLN-EFB

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF CALIFORNIA
 3                              --oOo--
 4   DENISE HUSKINS and AARON QUINN,   )
                                       )
 5             Plaintiffs,             )
                                       )
 6             VS.                     ) No. 2:16-CV-00603-
                                       )      TLN-EF
 7   CITY OF VALLEJO, a public entity,)
     KENNY PARK, MATHEW MUSTARD,       )
 8   and DOES 1-25,                    )
                                       )
 9             Defendants.             )
                                       )
10                                     )
11
12                            --oOo--
13        VIDEOTAPED DEPOSITION OF RICHARD BOTELLO
14                            --oOo--
15
16
17
18                    Vallejo, California
                      Tuesday, March 21, 2017
19                         12:15 p.m.
20                            --oOo--
21
22                    DOUCETTE & ASSOCIATES
                        1219 Marin Street
23               Vallejo, California 94590
                       (707) 554-9970
24
25   REPORTED BY: REBECCA K. DOWELL, CSR, RPR
                   CSR License Number 8043
```

Page 22

1  A.     Um, as far as the CDs or the DVDs go, or
2  digital as far as recordings?
3  Q.     Well, anything that you would be maintaining
4  in the warehouse that would be in a digital format.
5        MR. CHALFANT: Objection; vague and
6  ambiguous.
7  BY MR. NABITY:
8  Q.     Let me sort of give you a hypothetical.
9  A.     Okay.
10 Q.     Remember cassette tapes?
11 A.     Yes.
12 Q.     So they're not the most reliable thing in the
13 world. If you had a recording on a cassette tape
14 that had been booked into evidence is there anything
15 special that you would do to make sure that it
16 didn't, you know, succumb to wear over time, or
17 something like that?
18 A.     Right. Not -- not at this time for CDs or
19 DVDs that are booked, or flash drives.
20        Cassettes, we do have older cassettes, VHS
21 tapes, and things of those, and that was prior to my
22 assignment there, and I don't think there were any
23 safeguards for those, but as far as CDs and DVDs, we
24 haven't had any issues with them deteriorating at
25 this point.

Page 23

1  Q.     Sure. Okay.
2  A.     So no safeguards at this point.
3  Q.     Is it fair to say that either you or your
4  assistant are the only two people that can take
5  evidence out of the evidence warehouse?
6  A.     Yes.
7  Q.     So does someone -- would someone need your
8  approval to take something? Could they -- let me
9  reask it.
10        Could they go in there and get something and
11 just tell you that he had taken it out, or do you
12 need to actually physically go get it, hand it to
13 them, and, you know, have it reflected somewhere in a
14 record?
15 A.     No, they -- nobody has access besides myself
16 and my coworker.
17        If an individual is requesting an item out of
18 evidence for whatever reason, then they would give
19 us the case number and the item number, we research
20 it and then pull it. So we go back and pull it from
21 the warehouse, bring it to the front work area, lobby
22 area, and then it's checked out to that officer, and
23 there's a reason -- usually there's a couple
24 different reasons why they would do that.
25        We note that in a written format, there's a

Page 24

1  written log that we keep, and then it's also noted in
2  the RIMS property module as to which officer checked
3  it out, the date, the reason, and then it's entered
4  that way so that when it's returned then it's logged
5  back into its same storage location, or location that
6  we have for it.
7  Q.     Okay.
8  A.     So nobody has access besides myself and my
9  coworker.
10 Q.     Are you aware whether your evidence locker
11 kept the blood taken from Aaron Quinn on March 23rd?
12 A.     If it was booked, then yes, we did have it.
13 Q.     I'm asking a slightly different question. I
14 think you answered, "If it was booked," I'm just
15 wondering if you know whether it was actually booked
16 or not.
17 A.     I'd have to double-check on my list, but I --
18 just to confirm that.
19 Q.     Okay. And how about the sexual assault kit
20 that was administered to Denise Huskins, do you know
21 if that was ever booked into evidence at the Vallejo
22 Police Department?
23 A.     Yes, I did see that on the list.
24 Q.     Okay. And do you know where that actual kit
25 is located today?

Page 25

1  A.     It was turned over to Officer Billy Badour,
2  who was working with the FBI task force at the time.
3  Q.     At some point did the FBI essentially take
4  all of the information -- or, excuse me, all the
5  evidence that the City of Vallejo had in this
6  investigation?
7  A.     They did take everything that we had, and
8  then also there was evidence at the Department of
9  Justice that was taken by them because they assisted
10 in the processing of the residence. And there were
11 certain items that we requested testing, and they
12 were there when we were at the scene in conjunction,
13 and we decided which items were going to go with
14 them, and they went to Department of Justice.
15 Q.     Okay. What, if any, evidence was kept by the
16 Vallejo Police Department when the FBI basically took
17 everything?
18 A.     Nothing that I'm aware of.
19 Q.     So all evidence that had been booked into the
20 Vallejo Police Department warehouse or evidence
21 department was taken by the Federal Bureau of
22 Investigation; is that correct?
23 A.     Yes.
24 Q.     Okay. And do you remember when that
25 occurred?

Page 26

1   A.    I believe it was July 8th, 2015.
2   Q.    Are you aware of any of the events
3   surrounding this investigation?
4   A.    Not at the time, no.
5   Q.    Okay.
6   A.    No, not at the time.
7   Q.    Are you aware whether there was a
8   precipitating event to the FBI taking all of the
9   evidence that the Vallejo Police Department was
10  maintaining?
11  A.    No.
12  Q.    You don't know whether there had been an
13  arrest of a suspect, for example?
14  A.    No, I didn't know.
15       MR. NABITY: Counsel, I'll revisit my
16  question about whether --
17       MR. CHALFANT: You're back onto the
18  percipient stuff?
19       MR. NABITY: Yes.
20       MR. CHALFANT: Yeah, I mean, here's the
21  thing. I read those cases you gave me, and I'm
22  familiar with the cases. They both say it's a split
23  call or there's a split decision as to whether you
24  can do this. I'm good allowing it. I mean I'm not
25  interested in fighting over something like that, or

Page 27

1   bringing him back.
2        What I would ask is can I take a couple
3   minutes? He hasn't been prepared for a percipient
4   witness depo, just like to talk to him a couple
5   minutes.
6        MR. NABITY: That's fine. Why don't we go
7   off the record, and maybe we can take lunch too if
8   that would be even easier, or -- we'll figure it out
9   off the record.
10       MR. CHALFANT: Yeah. Let me have a couple
11  minutes.
12       THE VIDEOGRAPHER: The time is 12:44 p.m. We
13  are off the record.
14       (Recess taken from 12:44 p.m. to 12:50 p.m.)
15       THE VIDEOGRAPHER: The time is 12:50 p.m. We
16  are on the record.
17  BY MR. NABITY:
18  Q.    You had mentioned that you had been called to
19  investigate the residence following the initial
20  report of the disappearance of Denise Huskins; do you
21  recall --
22  A.    Yes.
23  Q.    -- do you remember earlier mentioning that?
24       MR. CHALFANT: Just one quick objection
25  before we get going.

Page 28

1        All this testimony is non-city testimony,
2   it's just percipient testimony, is my understanding.
3        Go ahead.
4        MR. NABITY: And we'll just keep that as a
5   running objection going forward, unless we go back to
6   something; is that fair?
7        MR. CHALFANT: That's fair. Thank you.
8        MR. NABITY: Great.
9   BY MR. NABITY:
10  Q.    And you had mentioned that you had been told
11  that there were some circumstances that were unusual
12  about the disappearance; is that correct?
13  A.    Yes.
14  Q.    Okay. And with whom did you initially meet
15  when you were called to assist in this investigation?
16  A.    With Detective -- I believe it was Matt
17  Mustard.
18  Q.    And do you recall approximately what time you
19  were called?
20  A.    We had a briefing with my coworker,
21  Department of Justice personnel, and I'm not sure --
22  I don't remember who the supervisor was of the
23  investigations unit, and that was about 8:00 a.m., I
24  believe, the day after the reported incident.
25  Q.    Okay. So March 24th then?

Page 29

1   A.    Yeah.
2   Q.    And so that -- was the first time that you
3   had been called was 8:00 a.m. on March 24th?
4   A.    Yes.
5   Q.    Okay. When you said DOJ personnel were
6   there, who from the DOJ was in attendance?
7   A.    There were -- there were two teams, it was a
8   latent print team, and then there was a crime scene
9   team, and I don't remember their names.
10  Q.    Okay. And was the supervising investigator
11  James O'Connell at the time?
12  A.    Yes.
13  Q.    Okay.
14  A.    It was.
15  Q.    Captain James O'Connell?
16  A.    Yes.
17  Q.    You mentioned this first briefing. What was
18  said at the briefing, that you can recall?
19  A.    Just that we had a suspected kidnapping, that
20  there was an individual reporting his girlfriend
21  missing, that individual had entered the residence,
22  and they were bound, and that -- he said there were
23  some -- they were drugged. And I think that was
24  pretty much -- that was pretty much it, and then it
25  was just directed that we would go to the residence

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---


DENISE HUSKINS and AARON QUINN,          )
                                         )
                                         )
                Plaintiffs,              )   Case No.
vs.                                      )   2:16-cv-00603
                                         )   TLN EFB
                                         )
CITY OF VALLEJO,  public entity,         )
KENNY PARK, MATHEW MUSTARD,              )
and DOES 1-25,                           )
                                         )
                Defendants.              )
_____ )


VIDEOTAPED DEPOSITION OF JAMES O'CONNELL

March 3, 2017, 9:10 a.m.


701 University Avenue

Sacramento, California


Reported by:

Stefanie Herrera Eastman
CSR No. 9177

Page 182

1  contemporaneous with when they occurred a high
2  percentage of those interviews in whole or in part?
3  A        While I may not have monitored them, I was
4  advised of the content of many of them.
5  Q        So I just want to make sure that we have it for
6  the record that you did not actually listen to or
7  otherwise physically observe the majority of those
8  interviews, correct?
9  A        Yes, sir.
10 Q        I can't remember if you answered this question,
11 so apologies, but did you find any witnesses who
12 directly contradicted anything that Aaron was saying?
13          MR. CHALFANT:  Asked and answered.  Calls for
14 speculation.  Did he find any witnesses from the people
15 he said he didn't interview.  He didn't interview a
16 single person.
17 BY MR. CLUNE:
18 Q        You can answer the question.  Are you aware of
19 any witnesses who directly contradicted anything that
20 Aaron was saying up to that point in time?
21 A        I don't know that anything contradicted.
22 Again, things were learned that we had to consider and
23 I mentioned what those things were.
24 Q        Are there any other things that you learned
25 that you had to consider other than what we've already

Page 183

1  spoken about just a few moments ago?
2  A        There probably was.  It's not coming to mind at
3  this very moment.
4  Q        Were you aware that Aaron Quinn had stated that
5  Andrea Roberts was the intended victim of the
6  kidnapping according to the kidnapper?
7  A        I had heard that.
8  Q        And did you learn about any discussions that
9  occurred with Andrea Roberts?
10 A        I know she spoke with our detectives at one
11 point.
12 Q        And what did you understand -- well, strike
13 that.
14          Did the fact that Aaron had said Ms. Roberts
15 was the intended target and not Ms. Huskins, lead you
16 in any way to question Aaron's story?
17 A        I don't know at that time if it caused us to
18 question his story.  We wanted to make sure that she
19 was okay and speak with her to see if there's something
20 she could tell us that might shed light on what had
21 happened.
22 Q        Was she ever considered a possible suspect,
23 Ms. Roberts?
24 A        I don't think I ever considered her a suspect.
25 At that kind early phase of the investigation, she was

Page 184

1  someone that we needed to talk with and see what she
2  had to say.  That was the paramount importance.
3  Q        Did anyone ever suggest that she was a subject
4  to you -- strike that.  Let me rephrase.
5           Did anyone suggest that Ms. Roberts was a
6  suspect to you?
7  A        I don't think so.
8  Q        Did you come do learn that Andrea Roberts had
9  been Aaron Quinn's former fiancé?
10 A        I had.
11 Q        And did that cause you in any way to question
12 whether or not Ms. Roberts might be somehow involved in
13 the disappearance of Denise Huskins?
14 A        It made me want to have one of my officers talk
15 with her to see what she had to say.
16 Q        Do you know which officer spoke to Ms. Roberts?
17 A        I don't.
18 Q        Did you come do learn that one of the FBI
19 agents, David Sesma, had also had a previous
20 relationship with Ms. Roberts?
21 A        I learned that in discussions with counsel.  I
22 had never heard that before last week.
23 Q        Would that concern you if one of the
24 interrogating officers had had a relationship with one
25 of the witnesses?

Page 185

1  A        I don't know that he interrogated her.  I don't
2  know who interviewed Ms. Roberts.  That's something I
3  would like to know so we can make the best decision as
4  to who is going to handle something.
5  Q        Would you agree that it's generally
6  inappropriate for someone with a personal relationship
7  to one of the witnesses in an investigation to take a
8  substantial role in that investigation?
9           MR. CHALFANT:  Objection.  Vague and ambiguous.
10 Calls for speculation.
11          Go ahead.
12          THE WITNESS:  I think it depends on the
13 circumstances.  In the most ideal world, it's better
14 for there to be no connections in any way, but we're
15 people and we end up being somehow connected in many
16 ways to folks that might be a witness or a victim or a
17 suspect in the case.  I don't know that he interviewed
18 her; I don't know his role with her.  I would like to
19 know that so I can make a determination as a manager.
20 BY MR. CLUNE:
21 Q        Did you also come to learn whether or not
22 Ms. Roberts had a relationship with a Fairfield police
23 officer name Steven Ruiz?
24 A        I had learned that sometime in the -- between
25 the 23rd and 24th.

Page 186

1  Q    And did you speak to Steven Ruiz?
2  A    I did not.
3  Q    Did one of your subordinates speak to Mr. Ruiz?
4  A    I believe so.
5  Q    In fact, Mr. Ruiz called the Vallejo Police
6  Department after Andrea Roberts had been asked to come
7  into the police department, correct?
8  A    I believe that's true.
9  Q    Was Mr. Ruiz ever considered as a suspect?
10 A    I think at that point, because everything was
11 relative to time, there were many considerations as to
12 who may have been involved.
13 Q    And out of those many considerations, was it
14 ever considered that Mr. Ruiz in particular might have
15 been involved?
16 A    I think that could have been a possibility.
17 Q    Are you aware of who interviewed Mr. Ruiz?
18 A    I'm not.
19 Q    Did you ever consider the possibility of
20 whether or not somebody might have hired somebody like
21 a kidnapper to commit the crimes that Aaron Quinn had
22 reported to the police department?
23 A    That information had been shared to -- with us,
24 maybe by Mr. Quinn.  I forget when we heard that, so
25 that was a possibility, as well.

Page 187

1  Q    Is that a possibility that you took seriously?
2  A    It's a possibility that we had never heard
3  before in a set of circumstances we had never
4  experienced before, much like the other facts we talked
5  about earlier, but it was something that was
6  considered.
7  Q    And because you had never heard of those set of
8  circumstances before, does that mean you did not
9  consider those circumstances to be a likely explanation
10 of what actually occurred?
11 A    We didn't know what had happened other than the
12 fact she wasn't around and we wanted to find her, so we
13 took everything in.  And, again, I didn't balance out
14 and attach percentages myself to different hypotheses.
15 I just knew that she wasn't there and I knew that we
16 didn't discount that.
17 Q    Did you come to learn at any point in time that
18 Steven Ruiz had been investigated by the Fairfield
19 Police Department for improperly using police data
20 bases to look up information about Aaron Quinn and
21 Denise Huskins?
22 A    No.
23 Q    Have you ever come to hear that information?
24 A    No.
25 Q    Would that be a piece of information that would

Page 188

1  be important for you to know if in fact it was true?
2        MR. CHALFANT:  Objection.  Vague as to timing.
3  Go ahead.
4        THE WITNESS:  It would be important when that
5  happened.  If it was post incident in her recovery,
6  that would be one thing.  It's still improper and still
7  wrong no matter how you look at it.
8  BY MR. CLUNE:
9  Q    Do you know what investigation, if any, has
10 been undertaken with respect to Steven Ruiz at all to
11 see whether or not he might have been involved in the
12 disappearance of Ms. Huskins to this day?
13        MR. CHALFANT:  Vague as to time.
14        THE WITNESS:  I retired April 3rd.  I don't
15 recall any investigation other than a discussion with
16 him occurring prior to my leaving.  As to what may have
17 happened after, I have no idea.
18 BY MR. CLUNE:
19 Q    Before Denise reappeared, did anyone tell you
20 that they thought it was most likely that Denise was
21 dead and that Aaron had killed her?
22 A    No.
23 Q    At any point in time up to today, have you ever
24 spoken directly with any member of the media concerning
25 this case?

Page 189

1  A    I did some press work, very little, other than
2  I think that I spoke with maybe someone from the
3  Times-Herald.
4  Q    Did you speak with anyone else?
5  A    Maybe some other outlet.  I remember we got a
6  lot of calls.  As someone that dealt with the press, I
7  got a lot of inquiries.  I don't recall specifically
8  what I said because Kenny was handling that part of it.
9  Q    Do you recall speaking with the Times-Herald
10 once or more than once?
11 A    I don't even know that I did.  I'm thinking
12 that I did, because I recall being at the press
13 conference and seeing someone from there and I think
14 they asked me a question.  I don't know that I was
15 quoted; I don't remember what I said, but it wasn't --
16 I wasn't really in the lead role.
17 Q    Do you recall who the reporter was of the
18 Times-Herald?
19 A    I don't.
20 Q    Do you recall ever speaking with any TV
21 reporters concerning the case?
22 A    I may have.  I spoke with some press folks.
23 Again, I wasn't the primary person.  So I may have
24 spoken with them, it wouldn't be out of the ordinary
25 for me to do that.

# EXHIBIT G

## Defense Discovery Request Letter

LAW OFFICE OF
**THOMAS A. JOHNSON**

400 Capitol Mall, Suite 1620   |   Sacramento, CA 95814   |   Tel: (916)442-4022   |   Fax: (916) 442-4262
Web: www.tomjohnsonlaw.com   |   E-mail: taj@tomjohnsonlaw.com

October 22, 2015

Mr. Matthew Segal
Mr. Heiko Coppola
Assistant United States Attorneys
United States Attorney's Office
501 I Street, Suite 10-100
Sacramento, CA 95814

**RE:    Formal Discovery Letter**
**U.S. v. Matt Muller,  2: 15-cr-205-TLN**

Dear Matt and Heiko:

Pursuant to Fed. R. Crim. P. §§ 12, 16, and 26.2, Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and 18 *U.S.C.* § 3500 ("Jencks Act") and U.S. District Court, Eastern District of California, Local Rule 440, and all other applicable rules and statutes, I am writing to request discovery in the above-captioned case. Providing discovery is a continuing obligation. *See* Fed. R. Crim. P. 16(c). Accordingly, the defense requests that such materials are promptly disclosed should responsive evidence or material be obtained by the Government after the issuance of this request.

We are requesting compliance with Fed. R. Crim. P. 16(a)-(d) as follows:

**(1) The Defendants' Statements**: Under Fed. R. Crim. P. 16 (a)(1)(A), the defense is entitled to disclosure of all copies of written or recorded statements made by the defendants; the substance of any statements made by the defendant that the government intends to offer in evidence at trial; any response by the defendants to interrogation; the substance of any oral statements that the government intends to introduce at trial, and any written summaries of the defendants oral statements contained in the handwritten notes of any government agent; any response to any Miranda warnings that may have been given to the defendant, *see* U.S. v. McElroy, 697  F.2d 459 (2d Cir.

1



LAW OFFICE OF
# THOMAS A. JOHNSON

400 Capitol Mall, Suite 1620   |   Sacramento, CA 95814   |   Tel: (916) 442-4022   |   Fax: (916) 442-4262
Web: www.tomjohnsonlaw.com   |   E-mail: taj@tomjohnsonlaw.com

1982); and any other statements by the defendant that are discoverable under Fed. R. Crim. P. 16(a)(1)(A).

**(2) Arrest Reports, Notes and Dispatch Tapes and Transcripts:** The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding the arrest or any questioning, be turned over. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendants or any other discoverable material is contained. This is all discoverable under Fed. R. Crim. Plural. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). *See also* Loux v. U.S., 389 F.2d 911 (9th Cir. 1968); U.S. v. Johnson, 525 F.2d 999 (2d Cir. 1975); U.S. v. Lewis, 511 F.2d 798 (D.C. Cir. 1975); U.S. v. Pilnick, 267 F. Supp. 791 (S.D. N.Y. 1967).

**(3) Reports of Physical or Mental Examinations:** The defense requests all results or reports of physical or mental examinations, scientific tests or experiments, or copies thereof, and all documents referring or relating to such reports, that were conducted in connection with any investigation of the charges contained in the indictment, including, but not limited to, forensic analyses of any documents, physical, mental or polygraph examinations, handwriting analyses, finger-print comparisons, and electronic testing. Fed. R. Crim. P. 16(a)(1)(F);

**(4) The Defendants' Prior Record:** The defense requests, under Fed. R. Crim. P. 16(a)(1)(B), that the government provide a copy of the defendant's prior criminal record, if any, as within possession, custody or control of the government;

**(5) Brady Material:** The defense requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Impeachment as well as exculpatory evidence falls within Brady's definition of evidence favorable to the accused. U.S. v. Bagley, 473 U.S. 667 (1985); U.S. v. Agurs, 427 U.S. 97 (1976);

**(6) All Documents Pertaining to Defendant:** All books, papers, documents, photographs, videotape recordings, audiotape recordings, microfilm, microfiche, computer data storage systems or tangible objects, or copies or portions thereof (hereinafter referred to in this letter as "documents"), which were obtained from or belong to Defendant. This does not include videos of any taped sex acts between the defendant and any other person. It does not include any taped sex act between the complaining witnesses in Vallejo, CA on or about March 23, 2015. Upon request I ask

2



LAW OFFICE OF
# THOMAS A. JOHNSON

400 Capitol Mall, Suite 1620   |   Sacramento, CA 95814   |   Tel: (916)442-4022   |   Fax: (916) 442-4262
Web: www.tomjohnsonlaw.com   |   E-mail: taj@tomjohnsonlaw.com

that you make those videos available for further review.    Fed. R. Crim. P.
16(a)(1)(E)(iii);

**(7) Documents Material to the Defense**: All documents or copies or portions thereof, which are within the possession, custody or control of the government that are material to the preparation of the defense. Fed. R. Crim. P. l6(a)(l)(E)(i);

**(8) Case Documents**: All documents or copies or portions thereof, which are within the possession, custody or control of the government that the government intends to use at trial in its case in chief. Fed. R. Crim. P. 16(a)(1)(E)(ii);

**(9) Evidence Seized**: Evidence seized because of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(C) and is now requested;

**(10) Request for Preservation of Evidence**: The defense specifically requests that all videotapes, dispatch tapes, or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case be preserved;

**(11) Tangible Objects**: The defense requests, under Fed. R. Crim. P. 16(a)(2)(C), the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects;

**(12) Documents Regarding Drug and Alcohol Usage**: All documents and other evidence regarding drug and alcohol usage and/or dependency by any individual the government intends to use as a witness at trial, including, but not limited to, records relating to treatment of such individual in any federal, state, territorial, city or military drug or detoxification program;

**(13) Evidence of Bias or Motive to Lie**: The defense requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony. Pennsylvania v. Richie, 480 U.S. 39 (1987); U.S. v. Strifler, 851 F.2d 1197 (9th Cir. 1988);

**(14) Impeachment Evidence**: The defense requests any evidence that any prospective government witness has engaged in any criminal act, whether or not resulting in a conviction, and whether any witness has made a statement favorable to the defendant. *See* Fed. R. Evid. 608, 609 and 613. Such evidence is discoverable under Brady, 373 U.S. at 83. *See* U.S. v. Strifler, 851 F. 2d 1197 (9th Cir. 1988) (witness' prior

3



LAW OFFICE OF
**THOMAS A. JOHNSON**

400 Capitol Mall, Suite 1620   |   Sacramento, CA 95814   |   Tel: (916)442-4022   |   Fax: (916) 442-4262
Web: www.tomjohnsonlaw.com   |   E-mail: taj@tomjohnsonlaw.com

record), Thomas v. U.S., 343 F. 2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility);

**(15) Evidence of Criminal Investigation of Any Government Witness**: The defense requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct. U.S. v. Chitty, 760 F.2d 425 (2d Cir. 1988);

**(16) Names of Witnesses Favorable to the Defendant**: The defense requests the name of any witness who has made an arguably favorable statement concerning the defendant. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis v. North Carolina, 637 F.2d 213, 223 (4th Cir. 1980); Jones v. Jago, 575 F.2d 1164, 1168 (6th Cir. 1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979);

**(17) Jencks Act Material**: The defense requests all material to which defendant is entitled pursuant to the Jencks, 18 U.S.C. 3500, and Fed. R. Crim. P. 26.2. The defendant specifically requests pretrial production of these statements so that the court may avoid unnecessary recesses and delays for defense counsel to properly use any Jencks statements and prepare for cross-examination;

**(18) *Giglio* Information**: Pursuant to Giglio v. U.S., 405 U.S. 150 (1972), the defense requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information that could arguably be used for the impeachment of any government witnesses;

**(19) Government Examination of Law Enforcement Personnel Files**: The defense requests that the government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers and agents who may have been controlling or contacting the confidential informant in this case. The defense requests that these files be reviewed by the government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under U.S. v. Henthorn, 931 F.2d 29 (9th Cir. 1991). *See* U.S. v. Jennings, 960 F.2d 1488, 1492 (9th Cir. 1992).

**(20) Expert Witness**: Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the defense requests disclosure of the identities, qualifications, and testimony of any expert witnesses the government intends to call at trial.

4



LAW OFFICE OF
THOMAS A. JOHNSON

400 Capitol Mall, Suite 1620   |   Sacramento, CA 95814   |   Tel: (916)442-4022   |   Fax: (916) 442-4262
Web: www.tomjohnsonlaw.com   |   E-mail: taj@tomjohnsonlaw.com

**(25) <u>Search Warrant</u>**: Please produce the search warrants, the affidavits, and any exhibits that were used to establish probable cause for the warrants.


Thank you for your assistance in this matter.

Respectfully Submitted,


Thomas A. Johnson
Attorney for Matthew Muller

5

# EXHIBIT H

## Transcript Of Change Of Plea Hearing

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
 2

 3    United States of America,
              Plaintiff,
 4
      vs.                            Sacramento, California
 5                                   No. 2:15-cr-00205
      Matthew D. Muller,             Thu., Sep. 29, 2016
 6         Defendant.                10:28 a.m.
      _____/
 7
                      TRANSCRIPT OF CHANGE OF PLEA
 8      BEFORE THE HONORABLE TROY L. NUNLEY, DISTRICT JUDGE
                            ---oOo---
 9

10    APPEARANCES:

11     For the Plaintiff:           United States Attorney
                                    501 I Street, Suite 10-100
12                                  Sacramento, California  95814
                                    By:  Matthew Dean Segal
13                                  Heiko Philipp Coppola
                                    Assistants U.S. Attorney
14

15     For the Defendant:          Johnson, Greene & Roberts,
                                    LLP
16                                  400 Capitol Mall, Suite 1600
                                    Sacramento, California  95814
17                                  By: Thomas A. Johnson
                                    Attorney at Law
18

19
       Official Court Reporter:    Kimberly M. Bennett,
20                                  CSR, RPR, RMR, CRR
                                    501 I Street
21                                  Sacramento, CA 95814

22

23    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription
24

25
```

2

```
 1        (Court called to order, 10:28 a.m.)

 2             THE CLERK:  Calling criminal case 15-205; United

 3   States versus Matthew D. Muller.  On for change of plea.

 4             MR. SEGAL:  Good morning, Your Honor.  Matthew Segal

 5   and Heiko Coppola for the United States.

 6             MR. JOHNSON:  Good morning, Your Honor.  Tom Johnson

 7   on behalf of Matthew Muller.  He's present in court, in

 8   custody.

 9        May I have a moment with my client, Your Honor?

10             THE COURT:  Yes, you may.

11        (Pause in proceedings.)

12             MR. JOHNSON:  Thank you, Your Honor.

13             THE COURT:  All right.  You have a written plea

14   agreement?

15             MR. COPPOLA:  Yes, Your Honor.

16             THE COURT:  All right.

17             THE CLERK:  Thank you.

18             THE COURT:  All right.  The Court has been provided

19   with a written memorandum of plea agreement which the Court

20   understands represents the agreement of the parties.

21        Is that correct?

22             MR. SEGAL:  Yes, Your Honor.

23             MR. JOHNSON:  It does.

24             THE COURT:  Thank you.  All right.

25        Mr. Johnson, does your client still wish to enter a plea of
```

```
 1   guilty?

 2              MR. JOHNSON:  He does.

 3              THE COURT:  Madam clerk, please administer the oath.

 4              THE CLERK:  Yes, Your Honor.

 5         Please raise your right hand.

 6         (Defendant sworn.)

 7              THE DEFENDANT:  I do.

 8              THE CLERK:  Thank you.

 9              THE COURT:  Mr. Muller, do you understand that after

10   having been sworn by my clerk your answers to my questions will

11   be subject to the penalties of perjury for making a false

12   statement if you do not answer truthfully?

13              THE DEFENDANT:  Yes, Your Honor.

14              THE COURT:  Sir, there are a number of questions I

15   will ask you to make sure this is a valid plea.  If you do not

16   understand any of the questions I ask you, or if at any time

17   you need to speak with your attorney, please say so.  It is

18   very important that you understand each question before you

19   answer.

20         Do you understand what I've just said?

21              THE DEFENDANT:  I understand, Your Honor.

22              THE COURT:  All right.

23         All right.  Sir, what is your -- please state your true and

24   correct name for the record.

25              THE DEFENDANT:  Matthew Daniel Muller.
```

4

```
 1              THE COURT:  What is your date of birth?

 2              THE DEFENDANT:  March 27, 1977.

 3              THE COURT:  What is your highest level of formal

 4   education?

 5              THE DEFENDANT:  Law school.

 6              THE COURT:  And what is your current or most recent

 7   occupation?

 8              THE DEFENDANT:  Lawyer, sir.

 9              THE COURT:  And have you ever been treated for any

10   mental illness?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Are you currently being treated for a

13   mental illness?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  I want you to describe for me, if you

16   will, what type of medications are you currently taking?

17              THE DEFENDANT:  Your Honor, I receive mood

18   stabilizers, antidepressants, and an antipsychotic.

19              THE COURT:  All right.  Now, are those medications

20   affecting your ability to understand everything that's going on

21   here this morning?

22              THE DEFENDANT:  No, Your Honor.

23              THE COURT:  All right.  If at any time you need me to

24   stop because you don't understand anything, let me know.

25         Is that understood?
```

1          THE DEFENDANT:  I understand, Your Honor.

2          THE COURT:  All right.  Great.

3      Have you ever been treated for addiction to drugs or

4   alcohol?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Are you under the influence of any drug

7   or alcohol today?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  Have you consumed any drugs or alcohol in

10  the last 24 hours?

11         THE DEFENDANT:  No, Your Honor.

12         THE COURT:  Do either counsel know of any reason why

13  the defendant is not competent to enter a plea here today?

14         MR. SEGAL:  I do not, Your Honor, but I believe that

15  Mr. Johnson is going to elaborate on that and I would ask that

16  the Court inquire with a little more specificity -- or maybe it

17  was planning on doing so later -- about the defendant's

18  psychological diagnosis and the specific medications that he's

19  under.

20         THE COURT:  All right.  Well, the reality is this, I

21  believe the defendant has just stated some of the medications

22  or the medication that he's on.  That's enough of an inquiry at

23  this time.

24      I think the issue, really, is whether or not either side

25  believes he's not competent to proceed any further.  And the

```
1   fact that he's here, and I believe Mr. Johnson can speak to
2   that, maybe the government can, but, quite frankly, based upon
3   the Court's observations, and the Court could declare doubt,
4   right now I don't have any doubts that he's competent or
5   otherwise not ready to proceed.  I can only question him to the
6   extent that I can.
7       But, in any event, Mr. Johnson, do you wish to be heard?
8              MR. JOHNSON:  Your Honor, I have no information that
9   would indicate Mr. Muller is incompetent.  Mr. Muller and I
10  have met over a couple of dozen times over the past year.  I've
11  met with Mr. Muller three times in the last, say, five or six
12  days just to confirm the decisions that we were making.  I have
13  no information from those meetings that would indicate that he
14  is not prepared to do this today.
15      Mr. Muller is asking that you accept this plea and it was
16  arrived at after significant amounts of time and resources in
17  terms of negotiations which Mr. Muller was aware of.  And we're
18  standing here today trying to resolve the case.  I think that's
19  a sufficient inquiry.
20             THE COURT:  All right.  Anything further?
21             MR. SEGAL:  No, Your Honor.  Thank you.
22             THE COURT:  All right.
23      Is that correct, sir?  You heard what your attorney just
24  said, correct?
25             THE DEFENDANT:  I understand, sir.
```

1           THE COURT:  Is what he stated correct?

2           THE DEFENDANT:  Yes, it is.

3           THE COURT:  All right.  Thank you very much.

4      All right.  Are you fully satisfied with the representation

5   and advice given to you in this case by your attorney,

6   Mr. Johnson?

7           THE DEFENDANT:  I am, Your Honor.

8           THE COURT:  All right.  And, to your knowledge, did

9   your attorney meet with the government's attorney concerning

10  your change of plea, which led to the preparation of this

11  written plea agreement that you've signed and submitted to the

12  Court?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  All right.  And are you entering your

15  guilty plea pursuant to the express terms of this written plea

16  agreement?

17          THE DEFENDANT:  I am, Your Honor.

18          THE COURT:  Counsel, were there any previous plea

19  agreements that were conveyed to the defendant that were

20  rejected?

21          MR. JOHNSON:  Yes.

22          THE COURT:  Is that correct?

23          MR. SEGAL:  There was one.

24          THE COURT:  All right.  Is that correct, sir?

25          THE DEFENDANT:  Yes, sir.

```
 1              THE COURT:  I want you to listen very carefully.

 2       I don't want you to tell me about the content of any

 3   discussion between you and your attorney because as you well

 4   know that's privileged, that's attorney-client privilege.  I

 5   don't want you to tell me about any of the terms of any

 6   previous plea agreement or previous plea offer that was made by

 7   the government.  This Court is not involved in plea

 8   negotiations and states no opinion regarding your decision

 9   whether to plead guilty or proceed to trial.  I'm simply going

10   to ask you a couple of questions, and I request only a yes or

11   no answer to each question.  So listen carefully.

12       Did you discuss with your attorney the previous plea offer

13   made by the government?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  All right.  And are you satisfied that

16   prior to rejecting that offer you had a full and complete

17   opportunity to discuss the offer with your attorney?

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT:  All right.  And are you entering your

20   plea of guilty voluntarily?

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  Are you entering this plea because you

23   are in fact guilty?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  Mr. Muller, I want you to listen very
```

1    carefully to the government as they describe the terms of the

2    plea agreement involved in this case.

3         Please, proceed.

4              MR. SEGAL:   Thank you, Your Honor.

5         Your Honor, the scope of this plea agreement is that it is

6    only -- it's between the defendant and only the United States

7    Attorney's Office for the Eastern District of California.   It

8    cannot bind any other federal, state, or local prosecuting,

9    administrative, or regulatory authority.

10        Also, the Court is not a party.   So, Your Honor, the

11   defendant understands that Your Honor can sentence the

12   defendant to any lawful sentence and if -- and that will not by

13   itself allow the defendant to withdraw his plea.   The defendant

14   understands that.

15        The defendant agrees to plead guilty to the sole count of

16   the indictment that was filed on October 1, 2015 that charges

17   kidnapping.   He agrees he's in fact guilty and he agrees to the

18   factual basis.

19        He reserves the right to argue that he's unable to pay a

20   fine but he agrees to pay any fine the Court might order.

21        He knows there is a $100 special assessment.

22        There is a provision for what would happen if the defendant

23   violated the plea agreement or withdrew his plea or attempted

24   to do so.

25        The government, for its part, agrees not to prosecute the

1    defendant for any additional crimes that are complete on the

2    date of the plea agreement and based on the facts set forth in

3    Attachment A but that agreement has certain limits to it that

4    are set forth in the plea agreement.

5        The government agrees not to ask the Court to sentence the

6    defendant to a term of imprisonment in excess of 40 years.

7        The government may argue for all of the guidelines'

8    applications and policy statements identified in the plea

9    agreement so long as its ultimate sentencing recommendation

10   does not exceed 40 years based on the guidelines, 3553(a), and

11   this plea agreement.

12       At the same time, the defendant has to accept

13   responsibility and the government reserves the right to argue

14   that he did not based on the things set forth in the guidelines

15   criteria.  If the defendant does not accept responsibility, the

16   government is relieved of its recommendation obligation.

17       The plea agreement sets forth the elements of the offense,

18   the maximum sentence, warns the defendant about certain

19   guidelines -- sentencing guidelines.

20       The plea agreement has a special condition about the

21   supervised release term that we'll be agreeing upon.  And

22   essentially it is that the defendant should be subject upon

23   release to the most intensive supervision, surveillance, and

24   monitoring that is technologically available at the time of his

25   release.

1          The defendant retains the right to ask the Court to vary

2     from the applicable guidelines range pursuant to 18 USC

3     Section 3553(a) and ask for any sentence he wants.

4          The defendant waives his various constitutional rights

5     associated with trial.  He unconditionally waives appeal.  He

6     waives collateral attack -- all non-waivable collateral attack

7     claims -- excuse me, I said that the wrong way.  All waivable.

8     He waives all waivable collateral attack claims.

9          The plea agreement makes clear that it is the entire plea

10    agreement between the United States and the defendant, the US

11    Attorney's Office and the defendant, there is nothing else.

12         And finally, at the end there is a factual basis for the

13    plea.

14              THE COURT:  All right.  Mr. Muller, did you hear what

15    the government's attorney just said, sir?

16              THE DEFENDANT:  Yes, Your Honor.

17              THE COURT:  Are those the terms of your plea

18    agreement with the government as you understand them?

19              THE DEFENDANT:  They are, Your Honor.

20              THE COURT:  Has anyone made any other promise to you

21    of any kind in an effort to induce you to enter a plea of

22    guilty in this case?

23              THE DEFENDANT:  No, Your Honor.

24              THE COURT:  Has anyone threatened you or attempted to

25    force you to enter a plea of guilty in this case?

1           THE DEFENDANT:  No, Your Honor.

2           THE COURT:  Sir, are you a citizen of the United

3   States?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Have you ever been convicted of a felony

6   before?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  All right.  Are you currently on

9   probation or parole for any other criminal offense?

10          THE DEFENDANT:  No, Your Honor.

11          MR. JOHNSON:  Mr. Muller is pending sentencing in --

12          THE COURT:  Contra Costa County.

13          MR. JOHNSON:  Yes.

14          MR. SEGAL:  Alameda.

15          MR. JOHNSON:  Excuse me, Alameda County.

16          THE COURT:  Where was it?  Was it Vallejo?

17          MR. JOHNSON:  No.

18          MR. SEGAL:  Do you want me --

19          THE COURT:  Go ahead.

20          MR. JOHNSON:  I think I can do this.  Thank you,

21   Mr. Segal.

22          THE COURT:  Go ahead.

23          MR. JOHNSON:  Mr. Muller pled guilty to several state

24   offenses, received a -- will receive a concurrent term to this

25   term, but that sentencing is pending.

1           THE COURT:  What county is it?

2           MR. JOHNSON:  Alameda.

3           THE COURT:  All right.  Thank you.

4      Is that correct?

5           MR. SEGAL:  Yes, Your Honor.  Mr. Johnson was there.

6           THE COURT:  All right.  Thank you.

7      All right.  Sir, although you've pled to offenses elsewhere

8  in state court, at this time you're not on probation or parole

9  through this Court so I can't -- this offense would not violate

10 any probation or parole.  And I think your counsel adequately

11 stated what the sentencing parameters are between state and

12 federal court.

13      Is that understood?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  In addition, the Court may require you to

16 forfeit certain property to the government.

17      And furthermore, I am required to tell you that if you are

18 subject to prosecution for a pending state charge, this Court

19 lacks the authority to run the federal sentence concurrent with

20 any future sentence you may receive.

21      Is that understood?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  All right.  The maximum possible penalty

24 provided by law for a plea of guilty to kidnapping in violation

25 of 18 USC Section 1201 is life imprisonment, a fine of up to

1   $250,000, a special assessment of $100, a period of supervised

2   release of up to five years.

3       In the event you are released from prison and placed on

4   supervised release and you violate any of the terms of that

5   supervised release you could be sent back to prison for an

6   additional five years.

7       Further, a plea of guilty could result in the loss of the

8   right to receive government services and benefits pursuant to

9   21 USC Sections 862 and 862(a).

10      The Court may also order you to provide notice of your

11  conviction to any victims of the offense pursuant to 18 USC

12  Section 3555.

13      Mr. Muller, under the Sentencing Reform Act of 1984, the

14  United States Sentencing Commission has issued advisory

15  guidelines for courts to consider in determining the sentence

16  in a criminal case.

17      In addition, there are statutory sentencing factors in 18

18  USC Section 3553(a) which require the Court to consider the

19  nature and circumstances of the offense and the history and

20  characteristics of the defendant.

21      Sir, have you and your attorney discussed how the advisory

22  Sentencing Commission Guidelines and the statutory sentencing

23  factors might apply to your case?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Do you understand how the advisory

```
 1    guidelines and statutory factors might apply to your case?
 2             THE DEFENDANT:  Yes, Your Honor.
 3             THE COURT:  Do you also understand that this Court
 4    will not be able to determine the sentence you will receive
 5    until after the Court has reviewed all of the advisory
 6    sentencing guidelines, the statutory factors, the presentence
 7    report, and after you, your attorney, and the government's
 8    attorney have had an opportunity to speak at your sentencing
 9    hearing?
10             THE DEFENDANT:  Yes, Your Honor.
11             THE COURT:  And do you also understand that if the
12    government has agreed to make any nonbinding recommendations to
13    this Court regarding your sentencing and if this Court does not
14    accept those nonbinding recommendations you will still be bound
15    by your plea and will have no right to withdraw that plea?
16             THE DEFENDANT:  Yes, Your Honor.
17             THE COURT:  Do you also understand that after it has
18    been determined what advisory sentencing guidelines apply to
19    your case, this Court does have the authority in some
20    circumstances to impose a sentence that may be higher or lower
21    than the sentence called for by the advisory guidelines?
22             THE DEFENDANT:  Yes, Your Honor.
23             THE COURT:  Do you also understand that parole has
24    been abolished in the federal system and that you will not be
25    released on parole after you're sentenced to prison?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Do you understand that by entering this

3    plea of guilty you will have waived or given up your right to

4    collaterally attack or appeal all or any part of this plea, the

5    conviction, and/or any sentence I impose?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Counsel, are you satisfied there's been a

8    knowing and voluntary waiver of the right to collaterally

9    attack or appeal the plea, the conviction, or sentence by your

10   client?

11         MR. JOHNSON:  Yes, Your Honor.

12         THE COURT:  All right.  Mr. Muller, do you understand

13   that at this time you do have a right to continue to plead not

14   guilty to this offense?

15         THE DEFENDANT:  I understand, Your Honor.

16         THE COURT:  Sir, if you do plead not guilty, you have

17   the following constitutional rights:

18       You have a right to a trial by jury.

19       You have a right to be presumed innocent.

20       You have a right to have the government prove your guilt

21   beyond a reasonable doubt.

22       You have the right to an attorney and if you cannot afford

23   one to have one appointed at no cost to you.

24       You have a right to present a defense to the charge.

25       You have a right to see and hear all witnesses and evidence

1   that will be presented against you and to cross-examine those

2   witnesses at trial.

3       You have the right to use the power of this court to bring

4   in witnesses and evidence on your behalf in order for you to

5   present your defense.

6       You have a right to remain silent.

7       You have a right to not have your silence or decision to

8   not present evidence at the trial used against you.

9       Do you understand each of your constitutional rights as

10  I've just outlined them to you?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  With the exception of your right to

13  counsel which you are clearly exercising at this time, do you

14  give up your constitutional rights at this time?

15              THE DEFENDANT:  I do, Your Honor.

16              THE COURT:  And I should say, do you give up each of

17  your constitutional rights at this time and enter a plea of

18  guilty?

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  All right.

21      Counsel, you join in your client's waiver of all

22  constitutional rights?

23              MR. JOHNSON:  Yes, Your Honor.

24              THE COURT:  All right.

25      I want you to listen carefully while the government states

1    each of the essential elements of this charge so that I can be

2    assured you understand this offense before I accept your guilty

3    plea.

4         Please, proceed.

5              MR. SEGAL:  Thank you, Your Honor.

6    Your Honor, at trial the government would have to prove

7    beyond a reasonable doubt the following elements of the offense

8    to which the defendant is pleading guilty, kidnapping:

9         First, the defendant kidnapped, seized, or confined Denise

10   Huskins.

11        Second, the defendant held Denise Huskins for ransom,

12   reward, or other benefit.

13        Third, the defendant used or caused to be used an

14   instrumentality of interstate or foreign commerce in committing

15   or in furtherance of the kidnapping.

16             THE COURT:  Did you hear what the government's

17   attorney just said?

18             THE DEFENDANT:  I did, Your Honor.

19             THE COURT:  Sir, do you understand that charge?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Mr. Muller, attached to the written

22   memorandum of plea agreement is a factual basis for the guilty

23   plea as contained within Exhibit A.

24        Have you read Exhibit A?

25             THE DEFENDANT:  I have, Your Honor.

```
 1              THE COURT:  Did you sign and date Exhibit A?

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT:  And you agree with the factual basis in

 4    Exhibit A?

 5              THE DEFENDANT:  I do, Your Honor.

 6              THE COURT:  Do you agree that it describes your

 7    conduct in this case?

 8              THE DEFENDANT:  Yes, Your Honor.

 9              THE COURT:  All right.  Counsel stipulate to a

10    factual basis for the guilty plea as contained within Exhibit

11    A?

12              MR. SEGAL:  May I have a moment, Your Honor?

13              THE COURT:  Yes.

14         (Pause in proceedings.)

15              MR. SEGAL:  Yes, Your Honor.

16              THE COURT:  Mr. Johnson?

17              MR. JOHNSON:  I -- yes, I do stipulate.  That's fine.

18    Sorry.

19              THE COURT:  All right.  Is there any issue?

20              MR. JOHNSON:  I'm just trying to manage Mr. Segal as

21    we get through this.

22         I'll stipulate, yes, Your Honor.

23              THE COURT:  Anything further on that?

24              MR. SEGAL:  He's not my only boss who tells me

25    different things to do.
```

1          THE COURT: All right.

2      Mr. Muller, how do you now plead to Count 1 in the

3   indictment charging kidnapping in violation of 18 USC

4   Section 1201, guilty or not guilty?

5          THE DEFENDANT: Guilty, Your Honor.

6          THE COURT: It is the finding of this Court in the

7   case of United States versus Matthew D. Muller that the

8   defendant is fully competent and capable of entering an

9   informed plea.

10     And I will say that the defendant appears oriented to time

11  and place and, quite frankly, appears to understand quite

12  clearly what's going on here today.

13     The Court also finds there is a factual basis established

14  for the defendant's plea and that the defendant has made a

15  voluntary, knowing, and intelligent waiver of all his

16  constitutional rights.

17     The plea is therefore accepted and the defendant is now

18  adjudged guilty of that offense.

19     Sir, a written presentence report will be prepared by the

20  probation officer to assist the Court in sentencing.  You will

21  be asked to give information for that report and your attorney

22  may be present if you wish.

23     You and your attorney will be able to read the presentence

24  report before the sentencing hearing.  You and your attorney

25  will be given the opportunity to speak at your sentencing

```
 1   hearing.  If there are any victims of this offense, the victims
 2   will also be afforded an opportunity to speak or be heard at
 3   the sentencing hearing.
 4       The date and time for sentencing is hereby set for
 5   January 19, 2017, 9:30 a.m., in this courtroom.
 6            MR. JOHNSON:  Your Honor, on the date, this is
 7   something I thought about just a moment ago, we communicated
 8   with your clerk yesterday and asked for a date and then the
 9   date that was selected -- I can't recall the date that she
10   originally gave us and then this morning she said 1/19.
11            THE COURT:  That's correct.
12            MR. JOHNSON:  I'm concerned that 1/19 does not allow
13   us enough time because that's your regular calendar day and I
14   think the sentencing hearing will extend out for a full day.
15   We certainly will be putting on evidence in mitigation.  We may
16   call witnesses.  I know that the victim in the case will have
17   the right to appear and speak to Your Honor.  It just feels
18   like a multi-hour event and I'm not certain that 1/19/17 gives
19   us that opportunity.
20            THE COURT:  Let's do this, I want to keep that date
21   but we can do it in the afternoon rather than do it in the
22   morning because I don't have a civil calendar that afternoon.
23       Correct, madam clerk?
24            THE CLERK:  Yes, Your Honor.  You don't have a civil
25   calendar.
```

22

1          THE COURT:  Let's do it in the afternoon.

2          MR. SEGAL:  I should say, Your Honor, there are two

3    victims who we'll be sponsoring to address the Court, both

4    Denise Huskins and Erin Quin.

5          THE COURT:  All right.  We'll do it at 1:30 on the

6    17th.

7          MR. JOHNSON:  19th.

8          THE COURT:  The 19th.  My apologies.

9       Is that understood?

10         MR. SEGAL:  Thank you, Your Honor.

11         MR. JOHNSON:  Yes, Your Honor.  Thank you for

12   calendering that.  I know that we went back and forth with your

13   clerk about how to get on and when we were going to be

14   prepared, so I just wanted to say thank you for the time.

15         THE COURT:  You're welcome.  1/19/2017, 1:30 p.m., in

16   this courtroom, that is the order.

17         MR. SEGAL:  If Your Honor would, the United States'

18   motion to exclude the defense of insanity --

19         THE COURT:  It's hereby denied as moot.

20         MR. SEGAL:  Thank you, Your Honor.

21         THE COURT:  Understood?

22         MR. SEGAL:  Yep.

23         THE COURT:  Thank you very much.

24      The defendant is to remain in the custody of the United

25   States Marshal pending judgment and sentencing.  That is the

1    order.

2                  (Proceedings adjourned, 10:49 a.m.)

3                          ---oOo---

4    I certify that the foregoing is a correct transcript from the

5    record of proceedings in the above-entitled matter.

6

7                          /s/ Kimberly M. Bennett
                           KIMBERLY M. BENNETT
8                          CSR No. 8953, RPR, CRR, RMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT I

Sacramento Jail Record Reflecting
Matthew Muller's
T-SEP Classification

**T·SEP**



| DATE AND TIME ARRESTED Sep 21 2015 12:00A | SACRAMENTO COUNTY JAIL | | LOCATOR CARD |
|---|---|---|---|
| DATE AND TIME BOOKED Sep 21 2015 2:56P | X REF NO 3016510 | DATE ENTERED Sep 21 2015 2:56P | |

| NAME-LST, FST, MID MULLER   MATTHEW | | AKA - NICKNAMES | |
|---|---|---|---|

ADDRESS-CITY, STATE, ZIP 2710   GENOA AV   S LAKE TAHOE   CA 96150   TELEPHONE A/C

| RACE W | SEX M | AGE 38 | DOB 03/27/77 | BIRTHPLACE SACRAMENTO | HT 6'00" | WT 190 | HAIR BRO | EYES BRO |
|---|---|---|---|---|---|---|---|---|

| DRV LIC#-STATE | | SSN 621243225 | R I D (Booking) N° 09903628 | DOCKET # |
|---|---|---|---|---|

CHARGES                                                          COURT

REMARKS

HAND ENTER CHANGES THAT OCCUR WHEN J.I.M.S. IS TEMP DOWN.  J.I.M.S. MUST BE UPDATED ASAP

| DATE | LOCATION | REASON-INFORMATION | OFFICER/BADGE NO | J.I.M.S. UPDATED |
|---|---|---|---|---|
| | 8E326 | | | |
| | 8E128 | JSEP | | |
| | | | | |
| | | | | |
| | | | | |

FLOOR COPY

| | |
|---|---|
| ESCAPE RISK | ☐ |
| VIOLENT | ☐ |
| MENTAL | ☐ |
| SEX OFFENDER | ☐ |
| SEX OFFENDER | ☐ |
| HOMOSEXUAL | ☐ |
| MEDICAL PROBLEMS | ☐ |
| (EXPLAIN ON REVERSE) | ☐ |

**H·6·2**

# EXHIBIT J

## Dublin Police Services Report Discussing Arrest Of Matthew Muller



# INCIDENT / CRIMINAL REPORT

### Alameda County Sheriff's Office

Agency: DPS          ORI: CA00100000          Case Number: D15-01576

## Supplement Information

| Supplement Date | Supplement Type | Supplement Officer |
|---|---|---|
| 06/17/2015 11:19:20 | GENERAL SUPPLEMENTAL | (201929) CAMPOS, MIGUEL A |
| Contact Name | | Supervising Officer |
| | | (103653) ALVAREZ, RAFAEL S |
| | | |

## Supplement Narrative

PRELIMINARY SUMMARY

███████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████

███████████████████████████████████████████████████████
████████████████

████████████████████████████████████████████████████████
███████████████████████████

█████████████████████████████████████████
███████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████

# INCIDENT / CRIMINAL REPORT

## Alameda County Sheriff's Office

Agency: DPS          ORI: CA00100000          Case Number: D15-01576

A Ramey Warrant for MULLER and Multiple Search Warrants were secured and executed

MULLER was located inside the South Lake Tahoe cabin during the execution of that Search Warrant.

During the entire encounter with MULLER, he maintained an extremely calm composure and demeanor

---

# EXHIBIT K

Medical Records Showing Matthew Muller's
Medications As Of Date Of Plea Hearing,
Showing Missed Doses, And Showing That
Mr. Muller Responds With "Education
Consultant" When Asked His Last Job

```
MULLER, MATTHEW
Sacramento County Sheriff's Department
FROM: 08/25/16 10:44 TO 08/26/16 10:44
ROOM -   ADM: 09/21/15 14:59
AGE: 39Y   SEX: M   : No Doctor Assigned
DOB: 03/27/1977 ID: 09903528  MR: 3016510
REQUESTED:08/26/16 10:44 (GS)
OPT OUT:
```

**Order Confirmation Report - MULLER, MATTHEW**
DEPT: **M8W300** ROOM: - MR: **3016510**
Ordered by: MD SOKOLOV, GREGORY
Authenticated by: MD SOKOLOV, GREGORY - 08/26/16 10:44
Order mode: Direct - Session Id: 765147

| ALLERGY | | | | | | |
|---|---|---|---|---|---|---|
| Charted | Allergy name | Type | Reaction | | Severity Comment | |
| 12/12 09:30 NKA  (NEEDS REVIEW) | | Drug Allergy | | | | |

| DIAGNOSIS |
|---|
| (Unknown) |

**RX**

| Ord# | Action | Order Name | Freq | Priority | Duration | Start | Stop |
|---|---|---|---|---|---|---|---|
| 20 | D/C'd | risperidone | QPM | NEXT SCH | 90 Days | 05/31 19:00 | 08/29 18:59 |
| 21 | D/C'd | diphenhydramine [ BENADRYL ] | QPM | NEXT SCH | 90 Days | 05/31 19:00 | 08/29 18:59 |
| 22 | D/C'd | bupropion xl [ WELLBUTRIN XL] | QAM | NEXT SCH | 90 Days | 06/01 07:00 | 08/30 06:59 |
| 24 | Active | risperidone | QPM | NEXT SCH | 90 Days | 08/26 19:00 | 11/24 17:59 |
| 25 | Active | diphenhydramine [ BENADRYL ] | QPM | NEXT SCH | 90 Days | 08/26 19:00 | 11/24 17:59 |
| 26 | Active | bupropion xl [ WELLBUTRIN XL] | QAM | NEXT SCH | 90 Days | 08/27 07:00 | 11/25 05:59 |

For order 20: Dose: 1 MG, Route: ORAL, Dose Type: MAINTENANCE
For order 21: Dose: 50 MG, Route: ORAL, Dose Type: MAINTENANCE
For order 22: Dose: 300 MG, Route: ORAL, Dose Type: MAINTENANCE
For order 24: Dose: 1 MG, Route: ORAL, Dose Type: MAINTENANCE
For order 25: Dose: 50 MG, Route: ORAL, Dose Type: MAINTENANCE
For order 26: Dose: 300 MG, Route: ORAL, Dose Type: MAINTENANCE

MD Signature (date)   __/__/__  : _____

AS4  SANCHEZ, ANA. LVN
NC   CAVANAUGH, NICHOLAS. LVN
MC2  CAVANAUGH, MARIA. LVN

MULLER, MATTHEW
Sacramento County Sheriff's Department
ps_mar Med Admin Report
FROM 09/21/15 14:59 TO 05/09/17 21:34
ROOM '-'  ADM: 09/21/15 14:59
AGE 40Y  SEX: M   No Doctor Assigned
DOB 03/27/1977  ID 09903628  MR: 3016510
REQUESTED:05/14/17 05:09
OPT OUT

Page: 125

\* see end of page for Administration Note
■ see end of page for Not-Given reason
**HOLD**   **DISCONTINUED**

| | start/stop | ord | 09/27/16 Day:373 | | | | | 09/28/16 Day:374 | | | | | 09/29/16 Day:375 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 04 | 08 | 12 | 16 | 20 | 04 | 08 | 12 | 16 | 20 | 04 | 08 | 12 | 16 | 20 |

## SCHEDULED MEDICATIONS

### Diphenhydramine HCl

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 MG/1 CAP ORAL<br>EVERY EVENING | 08/26 19:00<br>10/07 12:50 | 24 | | | | | 21:05<br>AS4 | | | | | 21:03<br>AS4 | | | | | |

### PRENATAL PLUS (PRENATAL VIT-IRON Fumarate-Fa)

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 MG/1 TABLET TAB ORAL<br>EVERY MORNING | 07/06 07:00<br>09/29 07:33 | 23 | 07:24<br>NC | | | | | | 09:56<br>MC2 | | | | | | | | ■ |
| M:GIVE WITH FOOD/CRACKERS | | | | | | | | | | | | | | | | | |

### Risperidone

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 MG/1 TAB ORAL<br>EVERY EVENING | 08/26 19:00<br>10/07 12:50 | 25 | | | | | 21:05<br>AS4 | | | | | 21:03<br>AS4 | | | | | |

### WELLBUTRIN XL (BUPROPION XL)

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 300 MG/1 TB24 ORAL<br>EVERY MORNING | 08/27 07:00<br>10/07 12:50 | 26 | 07:24<br>NC | | | | | | 09:56<br>MC2 | | | | | | | | ■ |

PRENATAL PLUS (PRENATAL VIT-IRON Fumarate-Fa)
  09/29 11:33  MC2 ■ In Court
WELLBUTRIN XL (BUPROPION XL)
  09/29 11:33  MC2 ■ In Court

ACTIVE ALLERGIES NKA

PERM



**Sacramento County Sheriff's Department**
Jail Psychiatric Services
Clinical Assessment

| ☑ Initial Assessment | ☐ Reopen | ☐ Progress Note | ☑ Suicide Assessment |

*(Complete an Initial Assessment if new PT or Initial Assessment is over 1 year. Complete the Suicide Assessment if referred for DTS)*

Name: MULLER, MATTHEW                               Date / Time: 9/25/2015 3:56:25 PM

X-Ref: 3016510                                       DOB:        3/27/1977

Gender:   ☑ Male      ☐ Female    ☐ Transgender      Location:   NMJ8E 3 26A

AVATAR #: none                                       Referral Date:   9/25/15

Arrest Date: 9/21/15                                 Next Court Date: federal

Charges:   Federal hold

Referral Source / Reason: kite-"suicidal thoughts very soon"      Triage Level: A

**INITIAL ASSESSMENT** *(Complete sections A, B, C, D and the Suicide Assessment if applicable)*

### Section A. – Mental Health History
**Presenting Problem**

English speaking male seen after he sent a kite stating, "Please, I need to be put on Welbutrin extended/sustained release 200mg in the morning. I have used this for 7 yrs. Without it I will develop depression and suicidal thoughts very soon. Thank you for the your help, this is urgent, sorry for the trouble. (150mg is too low-I used to be on 400mg/day)". Clt seen at his cell on 8E-he presents as oriented, calm and cooperative. Denies SI, intent or plan. Says he has a hx of extreme depression when not properly medicated-"wanted to avoid that." Clt listed his family as protective factors. States (cont)

**Mental Health History**

| ☑ Yes | ☐ No | During the past 12 months, has the patient been hospitalized for psychiatric treatment? |

Most Recent Mental Health Provider: Jon George in Alameda Cty

| ☑ Yes | ☐ No | Is the patient currently taking psychiatric medications / Last Taken: |

| ☐ Yes | ☑ No | Release of information signed? |     ☐ N/A

| ☐ Yes | ☑ No | Has the patient attempted suicide in the past two years? *(If Yes, Suicide Assessment MUST be completed)* |     ☐ Unable to Assess

**Brief Psychosocial and Mental Health History:**

he just had a visit from a family member (visit verified). Clt denied AH/VH/SI/HI-did not appear to be responding to internal stimuli. Clt cleared. Chart review/clinic.

38 yr old, divorced, male. Law degree. Former Attorney. Last employed in 2014 as an education consultant.

**Alcohol and Substance Use / Abuse** *(Check all that apply)*

| ☐ Alcohol | ☐ Cannabis | ☐ Amphetamines | ☐ Heroin |
| ☐ Opiates | ☐ Methadone | ☐ Benzodiazepines | ☐ Unable to Assess |
| ☐ Other: | | ✓ Denies Substance Use / Abuse | |

| ☐ Yes | ☐ No | Are withdrawal symptoms currently present? *(If Yes, refer to medical for detox evaluation if not currently taking withdrawal medications.)* |

Narrative – ETOH / Substance Use and Abuse

Says he struggled w/ heavy Etoh use years ago.

# SACRAMENTO COUNTY SHERIFF'S DEPARTMENT

## COUNTY JAIL
## MESSAGE REQUEST

DATE 10/21/2015

TO Psychiatry / Medical

- [ ] FEDERAL PUBLIC DEFENDER
- [ ] PUBLIC DEFENDER
- [ ] PROBATION
- [ ] U.S. MARSHAL  [✓]
- [ ] SOCIAL WORKER
- [ ] ICE
- [ ] JAIL ADMIN RECORDS
- [ ] CHAPLAIN
- [ ] RCCC

RECEIVED BY OFFICER | DATE | TIME

MESSAGE

Can you please switch me from 200mg Wellbutrin to a moderate dosage of Lexapro (best) or Zoloft or another SSRI if those are unavailable. I am starting to have anxiety attacks. When this happened before my psych switched me from Wellbutrin to an SSRI, and the SSRI better managed the anxiety + depression I have taken both Lexapro and Zoloft before. Other meds stay the same. Thanks.

FROM NAME Matthew Muller | X REF NO 3016510 | LOCATION 8E 128

REPLY

BY mm 10/28/15

WHITE COPY FOR REPLY – YELLOW COPY TO RECORDS – PINK COPY KEPT BY INMATE

# EXHIBIT L

## Legal Memorandum And Letter From Matthew Muller To His Attorney, Assisting With Case

① Relationship of Smartphone and Phone Number

Other phones/callers -- dial number, switchboard routes calls to the appropriate carrier. Switchboard may pass along caller ID, if it receives it from caller's carrier.

[Carrier] → Touch tone/pulse

carrier ⇄
rrier ⇄     [Switchboard + 911]
rrier ⇄

Info to     Routes calls
about location

IP address; Carrier is ISP and assigns address

Carrier Connect

[Internet]

[Carrier (Verizon)
Reads phone number, finds that number's account, uses SIM ID to route call to the correct device]

↕ Cellular data and voice connection

WiFi connect ↑

IP address: Identifies point of internet access, like a wireless router. Assigned by ISP.
Hard or impossible to change

SIM Card: Identifies user on cellular network. Can be moved from device to device. SIM ID is associated with an account and phone number by carrier.

MAC Address: Unique identifier used for device on network. Sometimes on device. For internet use.

Serial Number and/or IMEA (IMEI?): Unchangeable Identifies device (usually used by manufacturer or support)

Usually printed on phone

Carrier = Cellular provider (eg Verizon)

ISP = Internet Service Provider, (eg. Comcast cable internet)

IP = Internet Presence (?) Address of your point of access to the Internet, tells other computers where to find you on the Internet.

(about dime sized?) ↗ ⑧

② Simple explanation: Cell phones have a "SIM card" (and sometimes a unremoveable on-set) that carriers use to uniquely identify a phone on the network. It can be moved from phone to phone easily, so it might be more accurate to say it identifies and is associated with a user account. That SIM card and the account are in turn linked to a phone number. So when a carrier receives a call from the switchboard (ie. a call is routed to the carrier), it looks for the account and SIM associated with the phone number and links the call.

<u>Where 911 comes in</u> - My best understanding is that 911 is linked into the switchboard. When someone dials 911 from a cell phone, the call is given priority on the network. The carrier feeds to the switchboard extra information about the call - particularly its location - so that it can be routed to a dispatcher at a proper location, providing emergency services nearby the caller.

911 would automatically be fed the phone number of the caller by the carrier but not further information about the account or owner of the phone. That would have to be a special request, like an administrative warrant. Presumably that exists for things like getting information in a medical emergency, locating next of kin, and the like. Using it in an investigation like this may be a misuse of the administrative warrant. A person definitely has a privacy interest in account information held by a private carrier. Perhaps in a medical emergency there is implied consent by the owner to reveal that information. But in a criminal investigation, it would be more appropriate to establish probable cause before a judge to get a regular warrant. They are using a process in place to help someone to investigate him instead. <u>Analogy</u> - 911 called for fight in front of house, homeowner is transported to hospital and nobody else is home. Officer searches house, saying he just wants to see if the owner had a medical bracelet or prescription that should be sent along to hospital. False pretenses



(10)

Seems like a false pretense, if they use it to
obtain information not available to the general
public.

printed on the outside. SCOTUS meant to protect thoughts
and communications, not the electronicity, if something.
Also owner knew or should have known phone could be
used by anyone to dial 911 he had no reasonable expectation
of privacy with regard to use of that function. If there
was any privacy interest, it attached to the account and it
was not owned by suspect (but by his parents, however, this is common—
*one's*
*D would*
*its*
*real*
*number,*
*'inted'*
*n it*

yes, there was privacy interest. The phone number is not the "family
plans"
phone's "identification." The phone number is owned and/or
used by the phone's owner. It can be moved from phone
to phone. In fact the law requires carriers to allow
customers to take their phone numbers with them if they (FCC reg?)
switch their service to a different carrier. And phone CFR cite?
numbers are private information. Would the judge, DA or
defense counsel post their personal phone numbers in the
court for all to see? Phone numbers are also protected
by law, for example, by HIPPA when associated with
a patient's file. And remember, the police were not just
after a phone number that happened to correspond to
that device at that moment. They were after the identity
and account information of the phone owner, information
entrusted to the carrier and in which the account holder has a
privacy interest. Yes, phone numbers are just a collection of numbers that
can be guessed. But the same is true of SSNs. They are linked to identity.
Analogy: Contents of the phone inside the locked portion are like the
inside of a home. The information and functions available while
it's locked are like the curtelage of the home. Yes they are somewhat in
public view. But officers cannot go inside and interact with those functions.

used, including attempts to enter a password pattern. That might be useful to fence in a hostile witness. E.g., if the deputy denies trying to enter any part of the phone besides the 911 function: "Now Deputy X, as I understand it, the log files that can be extracted from the phone will reflect the time of every attempt to enter a swipe code pattern and attempts to enter the locked portion of the smartphone. Are you telling me that those log files are going to reflect zero attempts by deputies to use anything but the 911 function?"

If it's helpful, I'd be happy to draft a response to the reply brief when you get it. Unless the deadline is very short-fused, I should be able to get it to you in time for typing it up and editing. (It's the least I can do to try to make up a little for all the time you've been spending with my parents.) I should also have some research materials in about a week. I will try to take notes during the hearing, if they will unshackle me. Thanks again for everything.

Sincerely,

Matt

# EXHIBIT M

Docket Report In *People v. Muller*
In The Superior Court Of California
For The County Of Solano

Report Selection Criteria

**Case ID:**        VCR231350
**Docket Start Date:**
**Docket Ending Date:**

Case Description

**Case ID:**      VCR231350 - People vs. MATTHEW DANIEL MULLER - DMS
**Filing Date:** Friday , January 26th, 2018
**Type:**        VF - Vallejo Felony
**Status:**      HEARD - HEARD

Related Cases

*No related cases were found.*

Case Event Schedule

| Event | Date/Time | Room | Location | Judge |
|---|---|---|---|---|
| 1538.5 MOTION | 06-FEB-2020 01:30 PM | DPT 2 CRTRM 103 VALLEJO | Vallejo | HEALY, DANIEL |
| MOTION | 06-FEB-2020 01:30 PM | DPT 2 CRTRM 103 VALLEJO | Vallejo | HEALY, DANIEL |
| TRIAL READINESS CONFERENCE | 06-FEB-2020 01:30 PM | DPT 2 CRTRM 103 VALLEJO | Vallejo | HEALY, DANIEL |
| MOT TO COMPEL | 06-FEB-2020 01:30 PM | DPT 2 CRTRM 103 VALLEJO | Vallejo | HEALY, DANIEL |
| PITCHESS MOTION | 06-FEB-2020 01:30 PM | DPT 2 CRTRM 103 VALLEJO | Vallejo | HEALY, DANIEL |
| JURY TRIAL | 21-SEP-2020 08:30 AM | DPT 2 CRTRM 103 VALLEJO | Vallejo | HEALY, DANIEL |

Case Parties

| Seq # | Assoc | Party End Date | Type | Name |
|---|---|---|---|---|
| 2 | | 10-DEC-2018 | JUDGE | **BOWERS, ROBERT** |
| **Address:** *unavailable* | | | **Aliases:** | BOWERS, ROB S BOWERS, ROB S |
| | | | | |
| | | | | |

| 3 | | | DEFENDANT | **MULLER 255332, MATTHEW DANIEL** |
|---|---|---|---|---|
| **Address:** | *unavailable* | | **Aliases:** | *none* |
| | | | | |
| 6 | | | DISTRICT ATTORNEY | **DISTRICT, ATTORNEY** |
| **Address:** | *unavailable* | | **Aliases:** | *none* |
| | | | | |
| 7 | | 15-MAY-2019 | PRO PER | **IN PRO PER** |
| **Address:** | *unavailable* | | **Aliases:** | N/A |
| | | | | |
| 8 | | 21-DEC-2018 | PUBLIC DEFENDER | **PUBLIC DEFENDER** |
| **Address:** | *unavailable* | | **Aliases:** | *none* |
| | | | | |
| 18 | | 13-MAY-2019 | JUDGE | **KAM, TIM P.** |
| **Address:** | *unavailable* | | **Aliases:** | *none* |
| | | | | |
| 27 | | | JUDGE | **HEALY, DANIEL** |
| **Address:** | *unavailable* | | **Aliases:** | *none* |
| | | | | |
| 28 | | 13-DEC-2019 | DEFENDANT'S ATTORNEY | **GORDON, DUSTIN MASON** |
| **Address:** | *unavailable* | | **Aliases:** | *none* |
| | | | | |
| 29 | | | PRO PER | **IN PRO PER** |
| **Address:** | *unavailable* | | **Aliases:** | N/A |
| | | | | |

## Docket Entries

| Filing Date | Description | Name | Monetary |
|---|---|---|---|
| 26-JAN-2018 03:26 PM | COMPLAINT FILED BY DA | | |
| **Entry:** | *none.* | | |
| | | | |
| 07-FEB-2018 | DA NUMBER | | |

| 27-DEC-2019<br>08:17 AM | TIME WAIVED | | |
|---|---|---|---|
| **Entry:** | *none.* | | |

| | | | |
|---|---|---|---|

| 27-DEC-2019<br>09:15 AM | ORDER | | |
|---|---|---|---|
| **Entry:** | RE: INVESTIGATOR - FILED UNDER SEAL | | |

| | | | |
|---|---|---|---|

| 27-DEC-2019<br>10:20 AM | MEMORANDUM | MULLER 255332, MATTHEW<br>DANIEL | |
|---|---|---|---|
| **Entry:** | EX PARTE RE: FEDERAL PROCEEDING - FILED UNDER SEAL | | |

| | | | |
|---|---|---|---|

| 27-DEC-2019<br>10:20 AM | MEMORANDUM | MULLER 255332, MATTHEW<br>DANIEL | |
|---|---|---|---|
| **Entry:** | EX PARTE RE:APPOINTMENTS - FILED UNDER SEAL | | |

| | | | |
|---|---|---|---|

| 27-DEC-2019<br>10:36 AM | MOTION (NO FEE) | MULLER 255332, MATTHEW<br>DANIEL | |
|---|---|---|---|
| **Entry:** | EX PARTE MOTION RE: LEGAL RUNNER - FILED UNDER SEAL | | |

| | | | |
|---|---|---|---|

| 27-DEC-2019<br>10:36 AM | ORDER | | |
|---|---|---|---|
| **Entry:** | ORDER FOR DEFT TO SUBMIT NO MORE THAN 500 WORDS FROM FEDERAL<br>COURT | | |

| | | | |
|---|---|---|---|

| 27-DEC-2019<br>10:39 AM | MEMORANDUM | MULLER 255332, MATTHEW<br>DANIEL | |
|---|---|---|---|
| **Entry:** | MEMORANDUM IN REGARD TO DEFENDANT'S MOTION TO SUPPRESS AND<br>VICTIMS' BOOK PROPOSAL | | |

| | | | |
|---|---|---|---|

| 30-DEC-2019<br>01:53 PM | PROOF OF SERVICE | MULLER 255332, MATTHEW<br>DANIEL | |
|---|---|---|---|
| **Entry:** | PROOF OF SERVICE BY MAIL DATED 12/12/19 FILED 12/30/19/ CDAV | | |

# EXHIBIT N

## FBI Report Regarding
## Andrea Roberts
## And
## Multiple Suspects

FD-302 (Rev. 5-8-10)

- 1 of 1 -

OFFICIAL RECORD

02/20/2018 0782

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/31/2016

On May 19, 2016, at approximately 4:50 p.m., ANDREA ROBERTS was interviewed over the phone at ████████ by SA Jason Walter and AUSA Matt Segal and provided the following information:

Roberts found out information from a friend that NBC reporter Jodi HERNANDEZ was airing a special on May 19, 2016, about the Denise Huskins kidnapping and more specifically about a alleged romantic relationship she had with one of the case investigators during the investigation. Roberts further stated that HERNANDEZ said that it was that relationship that affected prosecution decisions early on. Hearing this second hand, Roberts wanted to contact HERNANDEZ and tell her the truth, which was that she once had a romantic relationship with an agent assigned to the Fairfield Resident Agency, that to the best of her recollection, she and the agent only went out on one (1) date, and that it was six years ago. AUSA Matt Segal, who said that he was in no way giving her legal counsel and that it was her 1st Amendment right to speak freely, said that it it's best for his case to minimize media distractions. During the conversation Roberts expressed how being the "intended" (not actual) victim, has caused hardship, and requested to be labeled a victim in the case.

At approximately 7:11 p.m., Roberts contacted the writer again and stated that she was just interviewed over the phone by Jodi HERNANDEZ and advised her of the truth mentioned above. HERNANDEZ told Roberts that more than likely she would not air the information about Robert's personal affairs.

Investigation on  05/19/2016  at  Fairfield, California, United States (Phone)

File #  7A-SC-6226276                                    Date drafted  05/20/2016

by  Jason R. Walter

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; and its contents are not to be distributed outside your agency

FD-302 (Rev. 5-8-10)

-1 of 1-

 OFFICIAL RECORD

02/20/2018 0772

## FEDERAL BUREAU OF INVESTIGATION

Date of entry      07/29/2015

On July 23, 2015, at 11:40 a.m., SA Jason Walter contacted DENISE
HUSKINS through her attorney Douglas RAPPAPORT, at telephone number
█████████████), where she was advised of the current status of the FBI's
investigation into her kidnapping by suspect MATTHEW MULLER. During the
interview she stated the following:

HUSKINS has read the arrest complaint for MULLER and associated search
warrant affidavits, and advised that there are other suspects in this case.
She recalled that during the kidnapping when she was moved from the bed to
the closet that there were more than two feet visible on the floor that
were not her own and that throughout the incident she "felt the presence of
others" as she heard multiple people talking on different occasions. After
reading the emails she feels as though they were written by someone other
than the main suspect who sexually assaulted her because there was some
aspects of their encounter that were left out.



HUSKINS stated that she has been in contact with both Victims Assistance
Advocates Holly Peacock and Carol Watson and is requesting that they
re-contact her for assistance with obtaining benefits.

---

| Investigation on | 07/22/2015 | at | Fairfield, California, United States (Phone) |
|---|---|---|---|

File # 7A-SC-6226276                                    Date drafted 07/23/2015

by Jason R. Walter

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

# EXHIBIT O

## Excerpt From Vallejo Police Department Report

| | VALLEJO POLICE DEPARTMENT | Page 1 |
|---|---|---|
| | **111 AMADOR ST     VALLEJO, CA 94590** | |
| | **SUPPLEMENT 4 - QUINN INTERVIEW** | 15-3817 |

On 23 MAR 15 at approx. 1500hrs I was requested to interview the victim of a reported kidnapping at the VALLEJO Police department. I was informed that AARON QUINN was being transported to the station from ▮▮▮▮▮▮▮▮ (Mare Island) after calling the police to report he and his girlfriend, DENISE HUSKINS, had been confronted in the middle of the night in his home, and HUSKINS had been kidnapped from the home. On his arrival, Detective GREENBERG and I interviewed QUINN at approx. 1518hrs.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

QUINN said he thought it was around 0300hrs that they awoke ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Both QUINN and HUSKINS were called by their first names ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

QUINN was asked if HUSKINS and ANDREA ROBERTS (previous fiancé) look similar. QUINN told them they both had long blond hair, and he was told that ROBERTS was the target of the operation. QUINN told me that ROBERTS had moved out of the home the previous September. The subject then left for a while to get confirmation about 'something'. The subject returned and told him he knew about QUINN'S bank accounts with Chase, Wells Fargo, as well as an account at Sleep train, and where he grew up in PENRYN (CA). Other information was divulged to QUINN such as where he went to under-graduate school in DAVIS.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 522 | POYSER, TERRY | 03/25/2015 | 541 | CHEATHAM, STEVE | 03/27/2015 |

05/02/2016 000023

I then questioned QUINN about the time frame of the incident, and he told me that he thought it happened between 0300-0530hrs. QUINN told me that ANDREA ROBERTS were previously engaged to be married, but the relationship ended when he found out in MAY 2014 that she had been cheating on him with a FAIRFIELD Police Officer who he thought was named "Peter". QUINN said he had received

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 522 | POYSER, TERRY | 03/25/2015 | 541 | CHEATHAM, STEVE | 03/27/2015 |

| | VALLEJO POLICE DEPARTMENT | Page 3 |
|---|---|---|
| | **111 AMADOR ST   VALLEJO, CA 94590**<br>**SUPPLEMENT 4 - QUINN INTERVIEW** | 15-3817 |

both a voice mail and text message from the officer and said the officer was "not taking it well" over the discovery of his (QUINN) relationship with ROBERTS. QUINN said ROBERTS had moved out of his home in September 2014, but had recently moved items from his garage.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 522 | POYSER, TERRY | 03/25/2015 | 541 | CHEATHAM, STEVE | 03/27/2015 |

| VALLEJO POLICE DEPARTMENT | Page 1 |
|---|---|
| **111 AMADOR ST     VALLEJO, CA 94590**<br>**SUPPLEMENT 10 – Huskins Family Int** | 15-3817 |

WITNESS:     HUSKINS, DEVIN
DOB:          ███████
ADDRESS:     ████████████████

PHONE:        ████████████

WITNESS:     HUSKINS, JANE
DOB:          ███████
ADDRESS:     ████████████████

PHONE:        ████████████

FACTS OF THE CASE:

On 3/24/15 in the late evening hours, I spoke with Witness Devin, the brother of Denise, and Witness Jane, the mother of Denise. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████
█████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

Jane indicated approximately a month ago that she had come to visit her daughter in Vallejo. She knew Aaron and Denise were dating. Jane stayed in Vallejo for two days with her daughter and Aaron. The three of them stayed at Aaron's house in Vallejo on Mare Island. She described the relationship between the two of them at that point as emotional and stressed. She talked about an incident that had taken place where they had gone out to dinner and having drinks, and that Aaron had gotten a text message from Andrea wanting to come over and stay the night. Denise became upset, went into the bathroom and punched the bathroom stall door.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 569 | MUSTARD, MAT | 03/30/2015 | 541 | CHEATHAM, STEVE | 04/03/2015 |

PDF created with pdfFactory trial version www.pdffactory.com

Denise and Aaron's relationship was supposed to be secretive from people at work.  He is an instructor and she is a student and they are not allowed to date.  They'd been dating from sometime in and around September of 2014.  They knew that Denise was applying for a fellowship at Kaiser in Vallejo.  She was competing with 20 other people for two spots, and Aaron would have influence on whether or not she got that fellowship.

Jane and Devin both knew that Aaron was engaged to a lady by the name of Andrea.  Andrea and Aaron were attempting to rekindle their relationship.  This information had been provided to them by way of Denise.  Denise had indicated in the early part of March 2015 that she had found information on Aaron's phone where he was texting with his ex-girlfriend/ex-fiancé Andrea and trying to get back with her.

I asked what Denise's intentions were in the relationship, having known that she had been cheated on.  Jane indicated that she had planned to back off of the relationship and have Aaron seek treatment.  They knew that the week of the 23rd of March was the last week of her residency, and that decisions would be made on the fellowship at work.  She had no contingency other than to return home to Huntington Beach if she did not receive the fellowship job at Kaiser.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 569 | MUSTARD, MAT | 03/30/2015 | 541 | CHEATHAM, STEVE | 04/03/2015 |

PDF created with pdfFactory trial version www.pdffactory.com

| VALLEJO POLICE DEPARTMENT | Page 1 |
|---|---|
| **111 AMADOR ST     VALLEJO, CA 94590**<br>**SUPPLEMENT 15 - andrea roberts initial int** | 15-3817 |

On 3/24/15, I received a phone call from Andrea Roberts.  This was in response to me calling and leaving a couple of voicemails asking for a return call.  Roberts was mentioned as a potential initial "target" of the kidnapping mentioned in this case.  Roberts was hesitant to speak with me on the phone asking what the conversation was regarding.  I explained that it was in regards to her ex-fiance, Quinn.  Roberts asked if he had hurt himself, i stated that he was ok and again asked to speak with her at the Vallejo Police Department.  Robert's agreed and stated she would be on her way.

Shortly after the conversation with Roberts, I received a phone call (around 0520 hrs) from Steve Ruiz. Ruiz indicated that he was a former Fairfield Officer and expressed concern in Roberts coming to the Police Department.

-Det. S.Kenney 620

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 620 | KENNEY, SEAN | 04/01/2015 | 541 | CHEATHAM, STEVE | 04/02/2015 |

# EXHIBIT P

## FBI Transcript Of Interview With Aaron Quinn

**UNCLASSIFIED**

02/20/2018 1003

# UNITED STATES DEPARTMENT OF JUSTICE
# FEDERAL BUREAU OF INVESTIGATION



4500 Orange Grove Ave.
Sacramento, CA 95841

| | |
|---|---|
| Requesting Official(s) and Office(s): | SA Jason R. Walter |
| | SA David J. Sesma |
| Case Number: | 7A-SC-6226276 |
| Disc: | No. 1 of 5 / 03-23-15 |
| Start Date: | 08/04/2015 |
| Transcriber(s) and Office/RA: | OST Debra Kilby / Sacramento / SCFO |

## VERBATIM TRANSCRIPTION

**Participants**

| | |
|---|---|
| JW | Jason Walter |
| DS | David Sesma |
| AQ | Aaron Quinn |
| PO | Police Officer |
| NK | Nailah King |
| UM-1 | Detective |
| UM-2 | Detective Greenburg |

**Abbreviations**

| | |
|---|---|
| Primary language: | (standard) English |
| *Italics* | Spoken in *Spanish* |
| UI: | Unintelligible |
| OV: | Overlapping Voice |
| PH | Phonetic pronunciation |
| RC | Recorded Message |

**UNCLASSIFIED**

02/20/2018 1017

File Number:  7A-SC-6226276

| | | |
|---|---|---|
| 1 | AQ | eh........I'm not sure what else you want to know about, she's.........she went to PT |
| 2 | | School in......Boston or in New York and lived in Boston for a year and was back at |
| 3 | | down in Huntington Beach before she came up here (UI) she came up here in July. |
| 4 | | |
| 5 | UM-1 | Has ever had any problems with the law or with anyone else? |
| 6 | | |
| 7 | AQ | No.  I......I don't think she's had anything, no |
| 8 | | |
| 9 | UM-1 | How about yourself? |
| 10 | | |
| 11 | AQ | No. |
| 12 | | |
| 13 | UM-1 | What about Andrea? |
| 14 | | |
| 15 | AQ | No.  the only person that I can think of  that would have.................that kind of |
| 16 | | ..........cause he was the police officer that she was having the affair with, was |
| 17 | | married and had 2 kids, that's the only person I can think of that would have that sort |
| 18 | | of......she also has an ex-husband..........that she divorced in 2010 but there was.... |
| 19 | | never.......that was never an issue as far as........ |
| 20 | | |
| 21 | UM-1 | But no issues with drugs or anything like that? |
| 22 | | |
| 23 | AQ | No. No issues with drugs (Pause) Neither one of them have.....any....serious.....criminal |
| 24 | | Background or anything that I am aware of. |
| 25 | | |
| 26 | UM-1 | Now what did they tie her hands with? |
| 27 | | |
| 28 | AQ | Zip ties. |
| 29 | | |
| 30 | UM-1 | Did they......put them on your wrists? |
| 31 | | |
| 32 | AQ | They had Denise put them on my wrists and my feet. |
| 33 | | |
| 34 | UM-1 | Did it leave any injuries? |
| 35 | | |
| 36 | AQ | No |
| 37 | | |
| 38 | UM-1 | Did you get hurt? |
| 39 | | |
| 40 | AQ | No.  (UI) |
| 41 | | |
| 42 | UM-1 | Can I see your wrists? |
| 43 | | |

15

**UNCLASSIFIED**

# EXHIBIT Q

## False Inculpatory Email Sent From Movant's Yahoo Account By Unknown Person

**Subject:** Things to get from cabin
**From:** Matt Muller <matt_muller@yahoo.com>
**Date:** 6/5/2015, 8:15 PM

Things to get from cabin

Evidence
-thumb drives and electronic media, sd cards etc
-comforter
-clothes
-duct taped alterations
-mobile phones and gear

Evidence to do
-delete emails
-change Amazon


Assets
-wp pants
-food, calorically dense
-pots pans utensils
-tools, as needed
-Mac mini and monitor (s)
-makeup
-first aid items
-small color printer
-plastic bags


-Ford VCM
-Flashlight
-charger
-blankets

Entertainment
-books
-DVDs

# EXHIBIT R

RCFL Forensic Report  Showing
Missing Serial Number

18-1 (Rev. 08-15-2014)

 **Silicon Valley Regional Computer Forensics Laboratory**

4600 Bohannon Drive, Suite 200
Menlo Park, CA 94025-1044



## REPORT OF EXAMINATION

| | | | |
|---|---|---|---|
| **To:** | Dublin Police Department | **Date:** | August 6, 2015 |
| | Detective Miguel Campos | **Case ID:** | N/A |
| | 100 Civic Plaza | **Request No.:** | SV-15-0112 |
| | Dublin, CA 94568 | | |

**Reference:** Service Request dated June 17, 2015

**Ref. No.:** Dublin Police No D15-01576

**Title:** MATHEW MULLER
ROBBERY, ASSAULT AND BATTERY, BURGLARY

**Date item(s) received:** June 17, 2015

**Item(s) Submitted:**

SVE048812 – Asus laptop, Model: U50F, SN: 15G29N005500

SVE048972 – Hitachi HDD, 500GB Model: 5K500.B-500, SN: Q7CS9EVL

SVE048813 – Lenovo Yoga 2 Pro laptop, SN: YB04740312

SVE048973 – Toshiba SSD, 256GB SN: 14CS10Z0TZVY

SVE048814 – Lenovo Yoga 2 Pro Power Adapter

SVE048815 – Acer Aspire Switch 10 laptop, 64GB, Model: SW5-012, SN: W0I101304E436B97377211

SVE048816 – Acer Aspire Switch 10 laptop, 64GB, Model: SW5-012, SN: W0I101304E436B973A7211

SVE048818 – IBM TravelStar IDE HDD, 20GB SN: TH-04C449-12567-17C-CZGW

SVE048819 – Western Digital My Passport 1.0TB External HDD, SN: WXK1E32ANYSH

SVE048842 – Samsung Galaxy Note 4 phone, Model SM-N910V, IMEI: 990004824579217; previously entered laboratory as SVE048820

SVE048843 – Verizon 4G LTE SIM card, 89148000001685943754; previously entered laboratory as SVE048821

Dublin Police Department took back SVE048821 and SVE048822 on 06/18/15 and returned them on 06/23/15. Upon re-intake they were assigned SVE048842 and SVE048843 respectively

Page 1 of 3

 **COPY**

An ASCLD/LAB-*International*
Accredited Laboratory
Since November 16, 2012



For Official Use Only

# EXHIBIT T

## FBI CART Lab Report Reflecting Apparent Deletions

**FBI Sacramento Computer Analysis Response Team (CART)**
**Examiner: SA FE Scott Medlin**

# Examination Notes 7A-SC-6226276

| DATE | ITEM | NOTES |
|---|---|---|
| 08/17/2015 | Service Request | SR161750 requesting search of submitted items to build timeline |
| | | SR161751 req exam of submitted items for CAIR review |
| 08/17/2016 | Legal Authority | Search Warrant – Eastern District of California |
| 08/03/2015 | Receipt of Evidence | Evidence items received and signed for. |
| | Physical Inventory | **QSC277:** Evidence item 1B277, barcode E5276166, is a inateck FEU3NS-1E SATA HDD enclosure, containing: |
| | | 1B277-HD0: a Seagate ST320LT007 320GB SATA hard disk drive, S/N: W0Q7YQ7W |
| | | **QSC287:** Evidence item 1B287, barcode E5276175, is an Apple A1549 iPhone 6, silver, with cracked screen, IMEI: 354407068131944, S/N: F17NKQ5HG5MG |
| | | **QSC288:** Evidence item 1B288, barcode E5276176, is a Western Digital WD 1TB My Passport Ultra USB3 external hard disk drive, S/N: WX11E33A3461 |
| | | **QSC289:** Evidence item 1B289, barcode E5276177, is a silver/red USB thumb drive, 1GB, labeled "ThinkTank Learning" |
| | | **QSC290:** Evidence item 1B290, barcode E5276178, is an LG (TracFone) LGL34C mobile telephone, S/N: 412CQSF2045454, containing: |
| | | **1B290-SD1:** a Kingmax 4GB MicroSD card, S/N: T04GMRTDS7 |
| | | **QSC291:** Evidence item 1B291, barcode E5276179, is a pink plastic bag RCFL barcode SVE048817, containing: |
| | | 1B291-1: a Western Digital My Passport 1TB external hard disk drive, with USB 2.0 cord, S/N: WXK1E32ANYSH |
| | | 1B291-2: an IBM Travelstar 20GB PATA hard disk drive, S/N: TH04C4491256717CCZGW |
| | | **QSC292:** Evidence item 1B292, barcode E5276180, is an ASUS laptop, black in color, model: U50F, S/N: 9CN0AS112103500, containing: |
| | | 1B292-HD0: a HITACHI HTS545050B9A300 500GB SATA hard disk drive, S/N: Q7CS9EVL |
| | | **QSC293:** Evidence item 1B293, barcode E5276181, is a Lenovo Yoga 2 Pro 20266 laptop computer, S/N: YB04740312, with power cord, containing: |
| | | Toshiba 256GB SSD, S/N: 14CS10Z0TZVY |
| | | **QSC294:** Evidence item 1B294, barcode E5276182, is a Samsung SM-N910V mobile telephone, IMEI: 990004824579217 with no SD card, containing: |
| | | 1B294-SIM1: Verizon 4G LTE SIM 89148 00000 16859 43754 |
| | | |
| | | |
| 08/18/2015 | Imaging | Attached 1B290 to imaging workstation F7000168, with software write protection Writeblocker, version 8.0, activated, and captured an E01 image using AccessData FTK Imager, version 3.3.0.5, to SAN: |
| | | MD5 checksum:    e7c97d08f5e8dd434c990cb04d7c0ec4 : verified |
| | | SHA1 checksum:   12fc455b707204af85543ce2059a7063df4cbf79 : verified |
| 08/18/2015 | Phone Dump | Attached 1B290 to workstation F2718546 and performed a file system extraction using Cellebrite UFED 4PC. |
| | | Parsed the data using Cellebrite Physical Analyzer and generated a report. |
| 08/18/2015 | System Info | **1B287**, iPhone, is locked with a password. |
| 08/18/2015 | System Info | **1B288**, external HDD, is encrypted with a password.  Password hint = "crazygood" |
| | | |
| 08/18/2015 | Imaging | Attached **1B293-HD0** to imaging workstation F7000168 via a Digital Intelligence USB write protection device, S/N: 02080041, generated a directory listing and captured an E01 image using AccessData FTK Imager, version 3.3.0.5, to SAN: |
| | | MD5 checksum:   3df30453852fdb5bb05553e6aca4c66c : verified |

This document and its contents are property of the Federal Bureau of Investigation.
Distribution of this document or information contained herein is strictly prohibited
For Official Use Only



**FBI Sacramento Computer Analysis Response Team (CART)**
**Examiner: SA FE Scott Medlin**

# Examination Notes 7A-SC-6226276

| | | SHA1 checksum:  33e03b725c14b6ffbacdafe4ecbc00552e1b2ee3 : verified |
|---|---|---|
| 08/19/2015 | Imaging | Attached **1B229** to imaging workstation F7000168 via a Digital Intelligence USB write protection device, S/N: 02080041, generated a directory listing and captured an E01 image using AccessData FTK Imager, version 3.3.0.5, to SAN:<br>MD5 checksum:    07c164c3a9d01e08c0510dbb21241964 : verified<br>SHA1 checksum:  652af4dd17b19ac4f494fa79e7e6b78bca5de324 : verified |
| 08/19/2015 | System Info | **1B296**, Acer tablet computer, is running Windows 8, and is locked with a password.<br>User: "livingroomcomputer"<br>System date/time: 08/19/2015 5:04<br>CART date/time: 08/19/2015 5:04:53 a.m. PDT |
| 08/19/2015 | Imaging | Attached **1B277** to imaging workstation F7000168 via a Wiebetech Ultradock V5 forensic write protection device, S/N: 03-009519B, generated a directory listing and captured an E01 image using AccessData FTK Imager, version 3.3.0.5, to SAN:<br>MD5 checksum:    5d18d3dfecedc82ee339a20ecb927260 : verified<br>SHA1 checksum:  938f552798142952faa67d37abd7a911b5f8d8ea : verified |
| 08/19/2015 | Comm Log | SA Drone requested priority be to find video of victim being raped within the submitted evidence.  SA Drone suspects it will be found on the ASUS Laptop.<br>SA Sesma provided examiner with a list of search terms requested by the Palo Alto Police department<br>SA Drone provided a list of search terms also |
| 08/20/2015 | Exam | Found video in question on evidence item 1B293 |
| 08/20/2015 | Comm Log | Informed SA Drone video was found – SA Drone visited the laboratory to view the video. |
| 09/02/2015 | Imaging | Attached a CART-owned and forensically clean external HDD containing a CART copy of Windows To Go to **1B295** and booted 1B295 to the external drive.<br>Obtained an E01 image of 1B295 using AccessData FTK Imager, version 3.3.0.5 to the CART external HDD. |
| 09/02/2015 | Imaging | Attached a CART-owned and forensically clean external HDD containing a CART copy of Windows To Go to 1B296 and booted 1B295 to the external drive.<br>Obtained an E01 image of 1B296 using AccessData FTK Imager, version 3.3.0.5 to the CART external HDD. |
| 09/03/2015 | Exam | Transferred collected images of 1B295 and 1B296 to SAN and verified using AccessData FTK Imager, version 3.3.0.5:<br>MD5 checksum:    e7a2646bc6e05ebc2a458570f0315b50 : verified<br>SHA1 checksum:  d8b9bf1b6286835d29d53d063fb2dcf4f6c20d27 : verified<br>MD5 checksum:    5283b591c4df213b66d5e8c03f94a84d : verified<br>SHA1 checksum:  4b6b50b7280345f8c09d82bc0cb665396b7ba06a : verified |
| 09/03/2015 | Processing | Processed 1B295 and 1B296 using AD Lab, version 5.3.7.2, on workstation F2751665 |
| 09/03/2015 | Exam | Searched for videos depicting victim on 1B295 and 1B296 – found two (one on each device) |
| 09/30/2015 | Comm Log | SA Drone asked for copies of all images. |
| 09/30/2015 | Processing | Copied images to a CART-owned and forensically clean external USB hard disk drive and provided to SA Drone as working copy. |
| 01/18/2017 | Comm Log | SA Walter called requesting copies of rape videos for AUSA. |
| 01/18/2017 | | Checked 1B465 (CART Archive) out of evidence and restored to SAN.<br>Burned videos to disc, one disc for each evidence item, three copies each (burned three sets of three) one copy for SA, one copy for AUSA, one copy for 1B |
| | | |
| | | |
| | | |
| | | |
| | | |

This document and its contents are property of the Federal Bureau of Investigation.<br>Distribution of this document or information contained herein is strictly prohibited<br>**For Official Use Only**

**FBI Sacramento Computer Analysis Response Team (CART)**
**Examiner: SA FE Scott Medlin**

# Examination Notes 7A-SC-6226276

This document and its contents are property of the Federal Bureau of Investigation.
Distribution of this document or information contained herein is strictly prohibited
For Official Use Only

# EXHIBIT U

## Declaration Of Computer Forensicist Allison Young

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF SOLANO**

PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs.

MATTHEW DANIEL MULLER,

Defendant.

Case No.: VCR-231350

**DECLARATION OF EXPERT**
**WITNESS ALLISON YOUNG**

I, Allison Young, declare as follows:

1.      I am employed by Capitol Digital dba Califorensics ("Capitol Digital") in Sacramento, California as a digital forensic examiner. My qualifications and curriculum vitae are attached hereto as **Exhibit A.**

2.      I was retained by Matthew Muller to review digital files and associated metadata in the above-entitled case.

3.      On February 28th, 2019, I sent an email to Aaron Dillon requesting evidence items 1B277, 1B293, 1B288, 1B291, and 1B465. On March 14th. Mr. Dillon arrived at the Sacramento office of Capitol Digital and Califorensics. He dropped off an external drive containing copies of forensic evidence images of the items we requested. with the exception of the CART archive tape. item 1B465. Forensic evidence files provided were 1B277, 1B288, 1B289, 1B290. 1B291, 1B293. 1B295, 1B296. 1B305, QSC01-HD0, and QSC292-HD. Mr. Dillon informed us that the external drive was a copy of the contents of that tape. I copied the files from the external drive to our own evidence drive.

1

4.      The image file provided for 1B288 failed to complete forensic verification processes. The log saved alongside the forensic E01 file includes a note "NOTICE: The imaging operation was cancelled! This image is incomplete!"

5.      On April 4th, Aaron Dillon sent an email to Dustin Gordon and me responding to Mr. Muller's email on March 30th. He indicated that Califorensics could make an appointment to copy evidence at the Solano County DA

6.      Evidence photos, notes, and chain of custody logs are stored separately from the forensic images of the evidence. Evidence notes and chain of custody photo files are not labeled as such and appear to be a part of a larger set of documents than what is in the photos. We did not receive photos of the evidence report nor chain of custody for QSC292-HD0. We cannot attest to whether the plain view content of the photos we received are representative of the full computer forensic reports or chain of custody logs.

7.      We would need additional information and reports in order to fully authenticate data received from Mr. Dillon, from the time the devices were seized, then disassembled and imaged, and then eventually delivered to us.

8.      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April  8 , 2019, in Sacramento, California.


ALLISON YOUNG

# EXHIBIT V

## Report Of Document And Handwriting Forensicist Mark Songer

**EXPERT'S REPORT**

**ON THE**

**MATT MULLER DOCUMENT EXAMINATION**

**RFI Case No. 19CA0128**

By:

Mark L. Songer

October 9, 2019

**THE EXPERTS**
**Robson Forensic**

[1]

**MATT MULLER DOCUMENT EXAMINATION**

**EXPERT'S REPORT**                                                                          **October 9 ,2019**

### 1.     INTRODUCTION

In 2015, Matthew Muller became a suspect in a home robbery committed in Dublin, California.  On June 9, 2015, officers from multiple law enforcement agencies executed arrest and search warrants at Muller's residence in South Lake Tahoe, California.  Mr. Muller was taken into custody, and various items were seized from the residence.

According to Mr. Muller, by 2019, two criminal matters arising from the seizures were complete and a third was ongoing.  Mr. Muller filed a motion to return property, and various seizure records were provided to him by authorities.  Mr. Muller stated that he noticed discrepancies in the documents and in the information they recorded.

Mr. Muller believes that seizure records and warrant returns were purportedly altered to conform them to a false story about how the investigation unfolded, specifically the judge's initials appearing on a warrant, which Mr. Muller believes officers added later to aid in justifying their unannounced forced entry into the residence. Mr. Muller also believes one or more genuine warrant returns were removed and replaced by a counterfeit.

The purpose of my investigation was to determine if 1) Judge Jacob Blea III prepared the initials *"JB"* appearing on the questioned search warrant dated 6/8/15, 2) the questioned search warrant contained any evidence to suggest it had been tampered, altered or manipulated,  and 3) Judge Christine Moruza prepared the questioned *"Christine Moruza"* signature as well as the entries *"Alameda"* and *"6/17/2015"* appearing on an Inventory and Affidavit On Search Warrant, dated 6/17/2015.

### 2.  AVAILABLE INFORMATION

2.1 [Q1c] Photocopy of County of Alameda Search Warrant, dated 6/18/15, bearing the purported initials of "Jacob Blea".

2.2 [Q2c] Photocopy of Dublin Police Services Inventory and Affidavit on Search Warrant, dated 6/17/2015, bearing the purported signature and writings of "Christine Moruza".

2.3 [K1c] Photocopy of Superior Court of California Arrest Warrant, dated 6/8/15, bearing the signature and writings of Jacob Blea III.

2.4 [K2c] Photocopy of Police Report prepared by Miguel Campos, dated 6/8/15, bearing the signature and writings of Jacob Blea III.

2.5 [K3c] Photocopy of Superior Court of California Search Warrant, dated 6/9/15, bearing the signature and writings of Jacob Blea III.

2.6 [K4c] Photocopy of Police Report prepared by Brandon Stocking, dated 6/9/15, bearing the signature and writings of Jacob Blea III.

2.7 [K5c] Photocopy of Superior Court of California Search Warrant, dated 7/23/15, bearing the signature and writings of Jacob Blea III.

2.8 [K6c] Photocopy of Dublin Police Services Inventory and Affidavit on Search Warrant, containing the entry "…INDICIA (MAIL)…", dated 6/17/2015, bearing the signature and writings of Christine Moruza.



**THE EXPERTS**
**Robson Forensic**                                                                          [2]

2.9 [K7c] Photocopy of Dublin Police Services Inventory and Affidavit on Search Warrant, containing the entry "…(1) US PASSPORT…" dated 6/17/2015, bearing the signature and writings of Christine Moruza.

2.10 [K8c] Photocopy of Dublin Police Services Inventory and Affidavit on Search Warrant, containing the entry "… (1) WINDOWS BRAND…" dated 6/17/2015, bearing the signature and writings of Christine Moruza.

2.11 [K9c] Photocopy of Dublin Police Services Inventory and Affidavit on Search Warrant, containing the entry "…STREAMLIGHT FLASHLIGHT…" dated 6/17/2015, bearing the signature and writings of Christine Moruza.

## 2.    THE WRITINGS INVOLVED IN THIS EXAMINATION

Documents Q1c-Q2c and K1c-K9c were submitted for my examination by Plaintiff Matt Muller.  It is my understanding that all the known documents provided to me by Muller are true and accurate representations of Judge's Blea and Moruza natural writings.  For purposes of this investigation, documents are labeled as Questioned Documents,[i] "Q's", and Known Documents,[ii] "K's."  The lowercase letter "c" denotes the document is a photocopy.

## 3.    METHODOLOGY

I have been conducting forensic document examinations for over 25 years, having received my initial indoctrination into questioned document examinations as a forensic science graduate student and full-time employee with a private laboratory located in Los Angeles. While working in Los Angeles, I was appointed a Document Analyst with the Federal Bureau of Investigation's Laboratory Division located in Washington D.C. until my appointment as a Special Agent with the FBI one year later.

I conducted an examination[iii] of the questioned documents (Q1-Q2c), and the known documents labeled K1c-K9c. The scientific methodology used in my analysis is based on the **"ACE-V"** method that comprises **A**nalysis, **C**omparison, **E**valuation and **V**erify.  The ACE methodology has been validated as being reliable and generally accepted in the field of forensic document examinations as well as other scientific disciplines.  This methodology involves a four-stage process in which a forensic document examiner can reach an opinion concerning whether two handwritten items were written by the same person, which is outlined below.

**Analysis:** The examination begins with the analysis of the items submitted for comparison to determine if the writing is original, naturally prepared, and exhibits characteristics suitable for comparison.

**Comparison:** The second stage consists of a side-by-side comparison of the items. The numerous characteristics exhibited in the writing between the items are compared to determine the similarities, differences, and limitations, if present.

**Evaluation:** The third stage is the formulation of a conclusion based on the significance and combination of the characteristics observed during the comparison and any limitations, if present.

**Verification:** The final stage of the examination process is the verification. At this stage, another qualified examiner reviews the results of the initial examiner using the same methodology described above. This process is performed to ensure the appropriate examinations have been conducted, the examiner's conclusions are accurate and consistent with technical notes and are within the limits of the



**Robson Forensic**
THE EXPERTS

[3]

discipline, there is supporting data, and all records conform to laboratory standards.

In addition, I subscribe to standards developed by professionals in the Forensic Document Examination discipline and guidelines published by the National Institute of Science and Technology's (NIST), Organization of Scientific Area Sub-Committee in Forensic Document Examinations (OSAC), as well as the Scientific Working Group for Forensic Document Examiners (SWGDOC). These standards have been thoroughly studied through extensive scientific research and validated through rigorous peer review and publication which includes the Kam Proficiency Study (1997), Proficiency of Professional Document Examiners in Writer Identification, *Journal of Forensic Sciences, 1993*. Dr. Moshe Kam, Dean of the Newark College of Engineering at the New Jersey Institute of Technology, found a need to address measurable and controlled studies to address the proficiency of document examiners as compared to laypersons. His study concluded that an expertise and skill in the forensic identification of handwriting did in fact exist when compared to laypersons. Additional studies by Dr. Kam were conducted and published in 1997, 1998, and 2001. In 2002, Dr. Sagur Srihari, a SUNY Distinguished Professor in the Department of Computer Science and Engineering at the University at Buffalo, published his findings, Individuality of Handwriting, *Journal of Forensic Sciences, July 2002, Vol.47, No.4*. Dr. Srihari and his team developed handwriting recognition software to extract and measure handwriting features to determine whether two writings were produced by same or different writers. This controlled study involved 1500 writers in which his software correctly determined with a 98% accuracy rate whether writings were made by the same or different writers.

The fundamental principle of handwriting identification is based on the premise that no two writings are ever exactly alike. Handwriting is a complex motor skill consisting of sensory, neurological, and physiological impulses. Through practice and repetition, writers interject their own individual characteristics into their writings which become a pattern of habitual formations that are repeated from one writing to the next. This is known as the principle of individuality which forms the basis for handwriting analysis. A writer's identity cannot be established through a single individual feature, but rather, is established through a combination of significant and unique identifying features, absent of any significant and obvious differences.

In this case, I was provided with known writings belonging to both Judge Blea and Judge Moruza. These known documents were inter-compared with one another to properly assess each writer's range of natural writing variation. Variation is found in all writers. Because we are not machines, we cannot exactly replicate our own writing every time we write. Range of natural variation, individual letter-form and other writing features contained within the questioned note were compared with the known writings belonging to each writer. These features include size and proportion, alignment, spacing of letters and words, beginning and ending strokes, letter-form, and skill level. My analysis was conducted using visual and computer enhancement techniques and measuring devices to determine letter slant.

Certain limitations were present in this case due to original questioned and known documents being unavailable for comparison at the time of my examination. This means the opinion offered is a qualified opinion based on the evidence discerned from the photocopies provided. Furthermore, I was not provided with comparable exemplars in the same format as the Q1c *"JB"* initials. However, I was able to extract similar uppercase letter features from known writings belonging to Judge Blea.



In the event that the weight and significance of the evidence does not support a positive identification or elimination, forensic document examiners determine what level the weight and significance the evidence supports.  Opinions are then expressed on a scale, or range of opinions [iv], from *indications wrote (or indications did not write), probably wrote (or probably did not write), to highly probable wrote (or highly probable did not write)*.  In some cases, the examiner may express a finding of *no conclusion or inconclusive*.

## 4.    ANALYSIS AND DISCUSSION

### Letter-form

Letter-form is the shape and design of individual letters.  The ACE methodology is applied in evaluating letter-form and recognizing the natural deviations which are repeated in an individual's writing.  This is done by dissecting each of the known writings, letter by letter, to determine all of the different ways in which each writer forms his lower and uppercase letters.  Next, the questioned writing is broken down into individual letters and each letter is compared to the sample of known writings to determine if the questioned letter-forms are within each writer's range of natural variation.

In examining letter-form within the questioned initials (Q1c) and comparing those letters with similar known letters prepared by Judge Blea (K1c- K5c), I noted  differences that appear to be inconsistent with the letter-forms appearing on the questioned writings, as depicted in Figure 1 with red arrows, notably the  beginning stroke of the *"J"* which appears to "touch" the upward loop of the *"J"* which is inconsistent with the  *"J's"* appearing on K1c-K5c,  which contain a notable "gap" between the initial stroke and upward loop.

There also appears to be an artifact contained within the ending stroke of the *"J"* and beginning stroke of the *"B"* as depicted in blue arrow in Figure 1.  However, the Q1c document contains some distortion, which I address in this report under *Analysis of Documents, Page 7*.





Q1c

Q1c   K1c   K2c

K3c   K4c   K5c

**Fig. 1**

Furthermore, I examined and noted the occurrences of letters pertaining to letter-form within the questioned signature and writings and found the known writings of Judge Moruza (K6c-K9c) to be inconsistent with the letter-forms appearing on the questioned *"Christine Moruza"* signature and writings as depicted in Figure 2 with green arrows.

**THE EXPERTS**
# Robson Forensic



**Fig. 2**

## Slant

Slant is the angle of the handwriting strokes away from the vertical position with respect to the baseline of the writing. In this particular case, the slant was determined by measuring the angles of the letters and strokes on both questioned and known writings.

In examining letter slant within the questioned initials (Q1c) and comparing those letters with similar known letters prepared by Judge Blea (K1c- K5c), I noted  a difference pertaining to slant on the initial stroke of the *"B"* that appears to be inconsistent with any of the  *"B's"* contained in Judge Blea's known writings, as depicted in Figure 1 red arrows.  However, as I previously mentioned, the Q1c document contains some distortion, which I address in this report *under Analysis of Documents, Page 7.*

Furthermore, I examined and noted the occurrences of letters pertaining to slant within the questioned signature and writings and found the known writings of Judge Moruza (K6c-K9c) to be inconsistent with the slant appearing on the questioned *"Christine Moruza"* signature and writings as depicted in Figure 2 with blue arrows.

## Analysis of Documents

In reviewing Q1c, I observed that the initials *"JB"* appear to "merge" into one another as depicted in Figure 3.  The Q1c document was also assessed for alignment, line/margin spacing and copy distortion. Measuring templates and grids were used to determine if any distortion existed in terms of alignment throughout the questioned document, specifically addressing the area in which the questioned initials was affixed.  Having factored in the natural distortion emitted from the photocopying process, my examination did reveal an unusual variance that would suggest an issue with Q1c's alignment, as depicted in Figure 4.  However, both reported anomalies could be the result of the scanning technology used to initially scan the Q1c document, primarily the OCR interface of the scanner/printer.  Optical Character Recognition (OCR) is the electronic conversion of images of typed, handwritten or printed text into a machine-encoded text, whether from a scanned document or photo. Defects can include de-skew, which occurs if the document is not aligned properly prior to scanning, line removal, and character segmentation which occurs when multiple characters do not separate correctly with image artifacts due to the OCR's inability to recognize the character.



1A, *attached* hereto and

orporated by reference.

iorized:

rant shall be retained in

1528(a), 1536.

Q1c

**Fig. 3**

**THE EXPERTS**
**Robson Forensic**                    [9]

**FILED SUPERIOR COURT OF CALIFORNIA**

ALAMEDA COUNTY

**County of Alameda**

JUN 17 2015

CLERK OF THE SUPERIOR COURT

# SEARCH WARRANT

**THE PEOPLE OF THE STATE OF CALIFORNIA to:**     **Warrant No.** 2015-1939
Any peace officer in Alameda and El Dorado County

The affidavit below, sworn to and subscribed before me, has established probable cause for this search
warrant, which you are ordered to execute as follows:

**Person(s), place(s) and vehicle(s) to be searched:** Described in Exhibit 1A, *attached* hereto and
incorporated by reference.

**Property to be seized:** Described in Exhibit 1B, *attached* hereto and incorporated by reference.

**Night service:** [If initialed by judge] For good cause, night service is authorized:

**Disposition of property:** All property seized pursuant to this search warrant shall be retained in the
affiant's custody pending further court order pursuant to Penal Code §§ 1528(a), 1536.

6/8/15     2:00 PM                              Jacob Blea III     **ENDORSED**
_____          _____     **FILED**
Date and time warrant issued         Judge of the Superior Court   **ALAMEDA COUNTY**

JUN 08 2015

CLERK OF THE SUPERIOR COURT
By ___Alicia Andrade___

# ♦ AFFIDAVIT ♦

**Affiant's name and agency:** Detective Alan Corpuz, #1493, Alameda County Sheriff's Office / Dublin Police
Services

**Incorporation:** The facts in support of this warrant are contained in the Statement of Probable Cause,
which is incorporated by reference. Incorporated by reference and *attached* hereto are Exhibit 1A, describing
the place(s) to be searched; and Exhibit 1B, describing the evidence to be seized.

**Evidence type:** (Penal Code § 1524)

☐ Stolen or embezzled property.

☑ Property or things used as a means of committing a felony.

☑ Property or things in the possession of any person with the intent to use it as a means of committing
a public offense, or in the possession of another to whom he or she may have delivered it for the
purpose of concealing it or preventing its being discovered.

☑ Property or things that are evidence that tends to show a felony has been committed, or tends to
show that a particular person has committed a felony.

☑ **Night Service:** [If checked] Authorization for night service is requested based on information contained in
the Statement of Probable Cause, filed herewith.

☐ **Hobbs Sealing:** [If checked] Authorization for Hobbs Sealing is requested based on information contained
in the Statement of Probable Cause, file herewith.

**Declaration:** I declare under penalty of perjury that the information within my personal knowledge
contained in this affidavit, including attachments are true and correct. New York,
Ohio, Pennsylvania and ... Carolina.

_____          _____
Date                      Affiant

Q1c
**Fig. 4**

**THE EXPERTS**

# Robson Forensic

[10]

In reviewing the questioned date *"6/17/2015"* appearing on Q2c, I noted that the questioned *"6", "2" and "5"* as compared with the known *"6", "2" and "5"* writings belonging to Judge Moruza were found to be inconsistent in terms of style and design, as depicted in Figure 5 with red circles.



**Fig. 5**

Furthermore, the justaposition of the questioned *"6/17/2015"* appears below the signature line as opposed to the known dates which appear above the baseline (Figure 5). It should be noted that the questioned writings (Q2c) was purportedly prepared the same day as K6c-K9c.

## 5.    FINDINGS

Within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

5.1     The occurrence of letters pertaining to slant and letter-form within the questioned writings (Q2c) was found to be inconsistent with the known writings belonging to Judge Christine Moruza (K6c-K9c). Therefore, Judge Moruza, the writer of K6c-K9c, probably did not write the *"Christine Moruza"* signature and entries *"Alameda"* and *"6/17/2015"* appearing on Q2c. The term "probably did not" indicates the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the *"virtually certain"* range *(ASTM E-1658-08)*.

5.2     Due to distortion within the Q1c document, a qualified opinion could not be reached as to whether Judge Jacob Blea III, prepared the questioned initials *"JB"* appearing on Q1c.

Mark Songer, MS
Forensic Document Examiner

**EXHIBITS**

I may use any or all of the documents listed in Section 2.0 of this Report as Exhibits.   I may combine, enlarge, darken, overlay, bend, fold, and/or enhance the documents to illustrate the approach taken to arrive at my opinions.

---

[i] Questioned documents are documents that are suspected of being fraudulent or whose source or origin is in dispute.

[ii] Known documents are documents in which its source or authenticity has been validated or established as being genuine.

[iii] The known and questioned writings were extracted from the documents using Adobe Photoshop™ software. Documents were digitally enlarged (magnified) and compared side-by-side with one another.

[iv] Opinions regarding writing identification or elimination adhere to ASTM Standard E 1658-08, ASTM international (www.astm.org).



**Robson Forensic** THE EXPERTS

[12]

## DUBLIN POLICE SERVICES
## INVENTORY AND AFFIDAVIT ON SEARCH WARRANT

State of California )
County of: )
) ss.
ALAMEDA )

I, the undersigned, make this inventory to the attached Search Warrant. Said warrant was issued on 6/8/15 .

its authority I, on 6/9/15 , diligently searched the persons and places described as follows, to-wit:

**FILED**

**ALAMEDA COUNTY**

2710 GENOA ST, SOUTH LAKE TAHOE, CA      JUN 17 2015

Location Searched

**CLERK OF THE SUPERIOR COURT**
By _Willia Anderson_

| Item # | INVENTORY & PROPERTY SEIZED |
|---|---|
| 17 | STREAMLIGHT SUPER-TAC FLASHLIGHT (BLK) FOUND ON FLOOR, IN KITCHEN |
| 18 | (1) FORD KEY, LOCATED ON TOP OF REFRIDGERATOR, IN KITCHEN |
| 19 | (1) ROTUNDA DIAGNOSTICS "VCM" (RED), LOCATED ON FLOOR OF BEDROOM #1 |
| 20 | (1) FLAT BLACK "UNCUT" AUTOMOBILE KEY, FOUND ON FLOOR OF BEDROOM #1 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

I, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all property taken by me on the warrant.

_Chauncy Clark_ 7/3/15
Officer's Signature

Magistrate of the County of: Alameda
State of California

Subscribed and sworn: 6/17/2015

**PLAINTIFF'S EXHIBIT**

**Q2c**

# Robson Forensic
### THE EXPERTS

**MARK SONGER**
Forensic Document Examiner
Biometric Security and Law Enforcement Expert

Former FBI Special Agent and FBI Forensic Examiner who has examined hundreds of handwriting cases ranging from violent crimes to the financial exploitation of the elderly. Qualified in both federal and state courts as an expert in forensic document examinations. Other areas of expertise include crime scene investigations, actions of law enforcement officers and security officers in the performance of their duties, use of force by law enforcement and security personnel, event safety and security, employment background screening, casino and hotel surveillance systems and operation, proper procedure and protocol in the handling and destruction of classified materials, and the collection, storage and retention of biometric information. Broad experience including: tribal security and law enforcement practices and procedures and gaming enforcement and compliance.

## PROFESSIONAL EXPERIENCE

2013 to present
**Robson Forensic, Inc.**
*Associate*
Provide technical investigations, analysis, reports, and testimony toward the resolution and litigation related to disputed documents or signatures to include: wills, checks, contracts, deeds, account ledgers, medical records, and voter and ballot card registration forms. Investigation and analysis includes: questioned signatures, suspect documents, identity theft, anonymous letters, alterations, obliterations, indented writings, altered medical records, graffiti and electronic documents. Additional analysis and investigations to encompass actions of law enforcement and security personnel, event safety and security, employment background screening, casino and hotel surveillance systems, the handling of classified materials and addressing issues related to the Biometric Information Privacy Act (BIPA).

2000 to present
**Songer Institute**
*Founder*
Created a team of dedicated educational professionals, furthering the fields of Criminal Justice, Forensic Science, Emergency Management, Homeland Security and Strategic Intelligence, by channeling the training and development of students and practitioners through a continuous improvement model of delivery and content.

2002 to 2005
**Soboba Band of Luiseno Indians, CA**
*Indian Gaming Commission Chairman*
Directed a Commission staff of 112 supervisory employees, who supervised 1,200 employees. Ensured gaming operations were in compliance with both Federal and State laws to include internal audits, internal control standards, approval and review of all tribal gaming ordinances and undertaking enforcement action if necessary as outlined in the Indian Gaming Regulatory Act (IGRA). Worked closely with the FBI, National Indian Gaming Commission and State Gaming Enforcement Division.

- Responsible for all background investigations leading to a gaming license for both individuals and corporations.
- Directed all investigative units to include inspectors, surveillance and security officer actions and operations.

# **Robson Forensic** THE EXPERTS

### MARK SONGER
### Forensic Document Examiner
### Biometric Security and Law Enforcement Expert

- Held administrative gaming license proceedings to determine eligibility of employees and vendors, and took required enforcement actions.
- National Indian Gaming Commissioner (NIGC) certified.

1994 to **Federal Bureau of Investigation**
2000 Los Angeles, CA
*Special Agent*                                                    *1996-2000*
- Designated handwriting expert for the Los Angeles Evidence Response Team (ERT).
- Instructed numerous law enforcement officers and civilian examiners in handwriting identification as well as the collection of writing samples.
- Received training in Threat Assessment Analysis and Behavioral Profiling.
- Served as Relief Supervisory Agent for squad.
- Assigned to various cases involving Foreign-Counter Intelligence (FCI), and Domestic Terrorism (DT).
- Conducted Single Scope Background Investigation (SSBI) checks for new agents, congressional members and their appointees, and task force members.
- Served on protective detail of VIP's and Members of Congress upon visits to the Los Angeles area by providing pre-visit threat assessments identifying escape routes and secure safe locations in conjunction with local law enforcement.  Venues include universities, auditoriums and government facilities.
- Conducted white-collar crime investigations including excessive force, public corruption and other FBI jurisdictional matters.  Gathered and analyzed evidence in preparation for U.S. Attorney review.
- Arrested and apprehended fugitives from justice.
- Conducted numerous surveillance and undercover operations in support of ongoing cases.
- Utilized various interview and interrogation techniques as part of an investigation.
- Developed confidential informants to gather intelligence on illegal activities, domestic terrorism and foreign-counter intelligence matters.
- Obtained a classification rating of Top Secret (TS) and Sensitive Compartmented Information (SCI) clearances for cases deemed Special Access Programs.

**Questioned Documents Unit, FBI Headquarters, Washington D.C.**
*Document Analyst*                                                    *1994-1995*
- Trained under the direction of renowned handwriting experts who have worked on such cases as the OJ Simpson Case, Oklahoma City Federal Building, the Vince Foster suicide, investigation of the former *President Ferdinand* and *First Lady Imelda Marcos* of the Philippines, the *Joey Buttafuoco/Amy Fisher* affair and the investigation and subsequent conviction of *Chief Justice Sol Wachtler* of the New York State Supreme Court.
- Conducted examinations on cases to include bank robbery notes, death threats to Congressional members and suicide letters.
- Examined paper, typewriters, computer generated documents, faxes, printers, copiers, inks, indented writings, tracings, cut/pastes, simulations and disguised writings.

# Robson Forensic
**THE EXPERTS**

MARK SONGER
Forensic Document Examiner
Biometric Security and Law Enforcement Expert

| 1993 to 1994 | **Howard Rile, Los Angeles, CA** |
|---|---|

*Trainee*

Prepared case exhibits and demonstratives, instructed in the use of laboratory equipment, attended QD meetings and networked with other examiners, conducted experiments, read numerous textbooks pertaining to document examinations and prepared reports for review. Training log available upon request.

| 1989 to 1992 | **Sycuan Band of the Kumeyaay Nation, CA** |
|---|---|

*Tribal Police Officer*
- Responsible for providing enforcement of Federal, State and Tribal laws.
- Responded to emergency calls such as traffic accidents, confrontations, altercations and disorderly conduct.
- Maintained law and order within the patrol assigned areas.
- Investigated traffic accidents involving property damage or personal injury, and incidents of burglary or vandalism.
- Administered first aid when required that included the use of oxygen, CPR, and Automated External Defibrillator (AED).

| 1984 to 1988 | **United States Marine Corps** |
|---|---|

Camp Pendleton, CA
- Field Radio Operator assigned as Tactical Air Control (TACP) team member and Classified Materials Control Custodian (CMCC) for the Battalion.
- Under the direction of the Battalion Commanding Officer and Executive Officer, was responsible for the security of all classified materials and information.
- Received, safeguarded and distributed classified materials in support of Battalion Operations.
- Performed Operational Security (OPSEC) inspections to include vulnerability assessments in which classified materials are kept and stored, ensured security clearances and communication security (COMSEC) training for individuals who have access to classified information, identified security violations and the compromise of classified information.
- Reviewed and updated CMS Operating Procedures and Emergency Protocols to protect, remove, or destroy classified material in case of fire, natural disaster, civil disturbance, terrorist activities, or enemy action.
- Ensured all personnel received instructions on how to properly handle classified materials pursuant to the Secretary of the Navy (SECNAV) directives.

# **Robson Forensic**
THE EXPERTS

MARK SONGER
Forensic Document Examiner
Biometric Security and Law Enforcement Expert

## TEACHING EXPERIENCE

2016 to
present

**Bethune-Cookman University** (Regionally Accredited by the Southern Association of Colleges and Schools)
*Adjunct Faculty Member, Criminal Justice Studies*
*Instruct the program's undergraduate **Introduction to Forensic Science** course using innovative technology designed and produced to maximize each student's learning experience.*

2015 to
2016

**Colorado Technical University** (Regionally Accredited by the North Central Association of Colleges and Schools)
*Adjunct Faculty Member, Forensic Science Programs*
*Instruct courses in **Advanced Criminalistics**, by providing quality instruction to students through well prepared classes and assignments.*

1999 to
2001

**National University** (Regionally accredited by the Western Association of Schools and Colleges)
*Adjunct Faculty Member, Criminal Justice/Forensic Science Programs*
*Taught undergraduate and graduate level courses in Criminal Justice and Forensic Sciences to include Document Examinations, Forensic Anatomy and Physiology, Death Investigations, Forensic Anthropology: Identification of Human Remains, White Collar Crimes, Major Case Investigations and Criminal Justice Leadership.*

## PROFESSIONAL CREDENTIALS

Certified Biometrics Security Professional (CBSP)

## EDUCATION

Masters in Forensic Science, College of Letters and Sciences, National University, San Diego, CA, 1993
Bachelors in Criminal Justice, Excelsior College, regionally accredited through the University of the State of New York (Courses completed during active military service), 1992

*Specialized Training:*

- *Law Enforcement:*
  New Agents Training, FBI Academy, Quantico, VA
  San Diego Sheriff's Academy, Class 82, (Basic POST), Chula Vista, CA
  FBI Post Blast Course
  FBI FCI/DT Training Courses
  Defensive and Operational Tactics
  Arrest and Control Procedures

# Robson Forensic
**THE EXPERTS**

MARK SONGER
Forensic Document Examiner
Biometric Security and Law Enforcement Expert

Operational Planning
Operation of Witnesses and Informants
Physical and Electronic Surveillance
Undercover Operations
Development and Dissemination of Intelligence

- *Questioned Documents:*
  FBI Handwriting Identification School for FBI Examiners
  FBI Typewriter Identification Training
  FBI Printing Examination Training- Rochester Institute of Technology – Course for FBI
    Document Examiners
  INS Course on counterfeit documents
  During my questioned documents training phase in L.A. and in Washington D.C., I visited
    the following laboratories:
      Naval Criminal Investigative Service – San Diego, CA.
      U.S. Postal Crime Laboratory- San Bruno, CA.
      United States Secret Service Forensic Laboratory – Wash. D.C.
      Los Angeles Sheriff's Crime Laboratory – Los Angeles, CA.
      Los Angeles Police Department – Los Angeles, CA.

- *Military Training:*
  USMC Communications and Electronics School, 29 Palms, CA
  Tactical Air Control Party (TACP)
  Jungle Warfare School, Ft. Sherman, Panama
  Jungle Land Navigation Course, NTA, Okinawa
  Jungle Environmental Survival Training (JEST), Subic Bay, Philippines
  USMC Mountain Warfare School, Bridgeport, CA
  Nuclear, Biological and Chemical Warfare School, Camp Pendleton, CA

- *Additional Forensic Training:*
  International Association for Identification Educational Conference, San Antonio, Texas,
    July 29-August 4, 2018
      Courtroom Testimony A Practical Approach Workshop
      Using Gel Lifts for Footwear, Latent Print, and Indented Writing Evidence Workshop
      Improving Your Image Workshop
  Public Status Reports & Open Discussions, Organization of Scientific Area Committees
    (OSAC), New Orleans, LA, February 2017
  Seak Certificate of Completion, "How to Be an Effective Expert Witness", Nashville, TN,
    2015
  Footwear Impression, Certificate Phase II, Sirchie Education and Training, Youngsville, NC,
    October 2015
  Footwear Impression, Certificate Phase I, Sirchie Education and Training, Youngsville, NC,
    July 2015
  NADE Annual Conference, March 2015

# **Robson Forensic**
### THE EXPERTS

### MARK SONGER
### Forensic Document Examiner
### Biometric Security and Law Enforcement Expert

Applied Polarized Light Microscopy, McCrone Research Institute, August 2014
AAFS Annual Meeting( Past Member), Little Rock, AR, 1997
ASQDE Annual Meeting (Guest), Long Beach, CA, 1994
SWADFE Meeting (Guest), 1993
FBI Evidence Response Team /Rapid Deployment Team - in-house training

## MEMBERSHIPS

The Chartered Society of Forensic Science
Member (Voting) - ASTM E-30 Forensic Science Committee
International Association for Identification (IAI)
Collaborative Testing Services (CTS) – ANAB Accredited – participate in annual proficiency
testing in Questioned Documents
American Society for Industrial Security (ASIS)
International Biometrics and Identity Association-Member

## ACCOMPLISHMENTS

Founder of the Songer Institute in partnership with Sorenson Forensics and iLawVentures.
Created several notable academic programs with several institutions to include
La Sierra University and Marymount California University.  Established the first forensic science
studies curriculum (CHED approved) for the Republic of the Philippines.
DOD- Certificate of Recognition, 2006
DOJ-FBI Certificate of Commendation, 2000
DOJ-FBI Certificate of Achievement, 1999
DOJ-FBI Performance Award, 1999

## PUBLICATIONS

Songer, M., Forensic Document Examinations, OTLA Business Law Edition, 2017
Songer, Mark, Document Analysis: A Summary of Possibilities, American Bar Association Tort Trial
and Insurance Section, January 2017
Practical Applications in Forensic Science: Crime Ink Publishing, Coronado, CA (2nd
Edition, 2015)

# EXHIBIT W

Correspondence Between
Solano County District
Attorney And Victims'
Attorney Reflecting Federal
Prosecutors' Efforts To Delay
Filing Of State Charges

LAW OFFICES OF
DOUGLAS L. RAPPAPORT
260 CALIFORNIA STREET. SUITE 1002
SAN FRANCISCO. CA 94111
(415) 989-7900
FAX (415) 989-7950

May 16, 2016

Krishna Abrams, District Attorney
Solano County District Attorney's Office
675 Texas Street, Suite 4500
Fairfield, CA 94533

*Re:*     ***State Court Prosecution of Matthew Muller***

Dear Ms. Abrams,

On behalf of Denise Huskins, I wanted to relay her appreciation for your time and more importantly, for making an informed decision whether to bring state court charges against Matthew Muller rather than automatically deferring to the Assistant United States Attorney's request to officially defer filing.



1

DHAQ00000967

███████████████████████████████████████████████████

███████████████████████████████████████

Again, thank you and please know that Denise and Aaron are immensely appreciative that someone like you and your team are on their side.

Very truly yours,

DOUGLAS L. RAPPAPORT

w/enc.

cc:   Sharon Henry, Chief Deputy District Attorney
      Amy Morton
      Denise Huskins, via email only

2

DHAQ00000968



**OFFICE OF THE DISTRICT ATTORNEY**
**COUNTY OF SOLANO**

**KRISHNA A. ABRAMS**
**DISTRICT ATTORNEY**

Sharon S. Henry
Chief Deputy

Paul D. Sequeira
Chief Deputy

Ken L. Kramer
Chief Investigator

June 14, 2016

Douglas Rappaport
Law Offices of Douglas L. Rappaport

San Francisco, CA 94111

Re: State Court Prosecution of Matthew Muller

Dear Mr. Rappaport:

Thank you for meeting with us together with your client on April 25, 2016. As we stated in the meeting, our office had never been forwarded this case for prosecution. When we recently became aware of the status of the pending federal case, we reached out to you, on behalf of your client, to meet and discuss your client's wishes. It is my understanding from the meeting that your client did want local prosecution in Solano County for the crimes that had not been charged federally. I agreed that we would obtain the reports, and review the case to determine if charges would be filed locally.

I have recently obtained the police reports from Vallejo Police Department while they were involved in the investigation. I also recently met with the US Attorney's Office, and was informed by the trial counsel for US Attorney's office that their office is precluded from giving over any evidence during the pendency of their case. I was informed a jury trial is currently scheduled to commence in January 2017. Unfortunately, that makes a filing decision extremely difficult for our office, because we will not be able to have the necessary discovery to proceed through the local court process. At this point, it appears that we are in a holding pattern until the federal case concludes.

Sincerely,

Krishna A. Abrams
District Attorney

☐ County Administration Center, 675 Texas Street, Suite 4500, Fairfield, CA 94533-6340    Ph: (707) 784-6800   FAX: (707) 784-7986
☐ Solano County Services Center, 355 Tuolumne St., Ste. 3200, P.O. Box 12002, Vallejo, CA  94590-5700    Ph: (707) 553-5321   FAX: (707) 553-5654

DHAQ00000981

# EXHIBIT X

Letter Reflecting False Information
Provided To The Defense Regarding
Witnesses And Impeachment
Information



**U.S. DEPARTMENT OF JUSTICE**

*United States Attorney*
*Eastern District of California*

*Benjamin B. Wagner*
*United States Attorney*

---

501 I Street, Suite 10-100         Phone 916/554-2700
Sacramento, CA 95814               Fax   916/554-2900
                                   TTD  916/554-2855

February 5, 2016

VIA U.S. MAIL

Thomas A. Johnson, Esq.
Johnson, Greene & Roberts LLP
400 Capitol Mall, Suite 1620
Sacramento, CA 95814

      Re: *United States v. Matthew D. Muller*
        2:15-cr-205 TLN

Dear Tom:

      This discovery letter contains private information and must be handled pursuant to the strict confidentiality provisions set forth in the Stipulated Protective Order (Dkt. 16).

      There is some evidence that the intended victim in this case was Aaron Quinn's ex-girlfriend, a woman named Andrea Roberts.

      Andrea Roberts has had some social connections with law enforcement officers. Her relationship with Quinn ended when she had an intimate liaison with a Fairfield police officer named Stephen Ruiz. Ruiz was terminated after it was discovered that he had accessed sensitive law enforcement data to investigate women he dated. Early on, Ruiz was a subject in the investigation of the Denise Huskins kidnapping. That is why you can find, among other things, Ruiz's bank records in the discovery.

      Roberts was also once involved with Special Agent David Sesma, whom she met outside of Fairfield. At the outset of the investigation, Sesma disclosed to the appropriate federal officials that in 2010 or 2011, he and she had been intimate on a couple of occasions. He reported that no more substantial romantic involvement had ensued due to his own lack of interest.

      The victims have nonetheless asserted that the agent maintained an unreciprocated romantic interest in Roberts. They have expressed strong dissatisfaction that the agent was not recused from work on this case.

Should this case proceed to trial, the United States will move *in limine* to bar any argument that any of the foregoing was in any way improper. Roberts does not appear to be a witness. Moreover, the agent promptly disclosed to the appropriate officials his brief, years-old episode with her and he did not participate in her interview.

The appropriate offices have found his conduct unproblematic and the undersigned concurs completely.

Sincerely,

BENJAMIN B. WAGNER
United States Attorney

By: _____

MATTHEW D. SEGAL
Assistant United States Attorney

2

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2020, I filed the foregoing with the Clerk of the Court for U.S. District Court, and that all other parties are signed up for the CM/ECF system, and will be served electronically when the Clerk files the instant filing on the electronic docket.

Date:  January 8, 2020

Sigend: /s/ Huei J. Dai

iv