



FILED

JAN 2 7 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
                    DEPUTY CLERK

1   MATTHEW D. MULLER
    1684 Decoto Road #274
2   Union City, CA 94587
    Phone: (415) 322-0492
3   Fax: (415) 366-3326
    matt@projectjusticeforall.org
4

5   *In Pro Per*

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,           CASE NO.  2:15-CR-205-TLN-EFB

12                    Respondent,        **MOVANT'S VERIFIED MOTION
                                         FOR LEAVE TO AMEND
13            v.                         SUPPLEMENT TO MOTION TO
                                         VACATE, SET ASIDE OR
14   MATTHEW MULLER,                     CORRECT SENTENCE**

15                    Movant.

16

17

18          COMES NOW the Movant Matthew Muller and requests leave to amend his motion under

19   28 U.S.C. § 2255. The attached Second Amended Supplement to Motion to Vacate, Set Aside or

20   Correct Sentence would supersede the currently operative supplement (ECF 77). The form motion

21   (ECF 75-1) would remain unchanged.

22          Except for allegations about the government's concealment of DNA evidence and

23   manipulation of state charging decisions, the proposed amendments fall entirely within existing

24   allegations. The amendments set forth further details about facts already averred. The additions

25   include facts the Movant could not have pleaded in his original motion or first amendment, due to

26   the unlawful conduct of the government and other circumstances that concealed facts from him.

27   No new claims are made. However, even should the Court treat the material as a new material, as

28   a new claim, it both relates back to facts already alleged, and also false under a statutory extension

1  of the time in which to add a further claim.

2      The primary change from the existing supplement is the addition of a section headed

3  "General Allegations" setting forth the added factual details the Movant has learned.

4  **I.      LEGAL STANDARD**

5      Rule 12 of the Rules Governing § 2255 Proceedings provides that the Federal Rules of Civil

6  Procedure may be applied in § 2255 proceedings, to the extent not inconsistent with more specific

7  rules and statutes.  Rule 15 of the Federal Rules of Civil Procedure provides for the amendment of

8  pleadings, leave for which is to be "freely give[n]... when justice so requires."  Fed. R. Civ. P.

9  15(a)(2).  Pleadings may also be amended in the course of a trial, at which time "[t]he court should

10  freely permit an amendment when doing so will aid in presenting the merits and the objecting party

11  fails to satisfy the court that the evidence would prejudice that party's action or defense on the

12  merits."  Fed. R. Civ. P. 15(b)(1).

13      A new claim relates back to an original pleading where it arises "out of the conduct,

14  transaction, or occurrence set out — or attempted to be set out — in the original pleading."  Fed.

15  R. Civ. P. 15(c)(1)(B).  In addition, a claim under 28 U.S.C. § 2255 is not time-barred until one

16  year after the date an unlawful impediment to making the claim is removed, or one year after "the

17  date on which the facts supporting the claim or claims presented could have been discovered

18  through the exercise of due diligence."  28 U.S.C. § 2255(f).

19      The Movant makes no new claims.  All added averment meet an exception to the general

20  one-year limitations period, or relate back to the original pleading—or both—even if the newly

21  discovered facts are treated stringently as "claims."

22  **II.     ALL ADDITIONAL FACTS ALLEGED FALL WITHIN THE MOVANT'S**
23  **EXISTING CLAIM THAT HIS PLEA WAS NOT KNOWING, INTELLIGENT**
     **AND VOLUNTARY**
24

25      The Movant is proceeding on the claim that his guilty plea was not knowing, intelligent and

26  voluntary.  As set forth in his original motion, this was a broad claim.  It included mental health

27  issues, the impact of other circumstances alleged elsewhere in his motion, and the combined effect

28  of the mental health issues interacting with those circumstances. (*See* ECF 61 at 36 (the "Movant's

1   psychiatric illness... interact[ed] with other factors in his case" to deprive him of the right to a

2   knowing and voluntary plea decision; had the Movant "been aware of all relevant factual and legal

3   circumstances, Movant would not have pleaded guilty").)

4          The Movant also situated the claim that his plea was invalid at the end of the guilt phase

5   claims, and incorporated all preceding averments by reference. (ECF 61 at 53.) The incorporation

6   paragraph was not mere ritual incantation. *See San Luis & Delta-Mendota Water Authority v. U.S.*

7   *Dept. of Interior,* 236 F.R.D. 491 (E.D. Cal. 2006) (allegations elsewhere in a pleading can supply

8   even basic elements of a claim set forth separately). Prosecutors were on notice that the totality of

9   the government's conduct was at issue in relation to the plea challenge. *See Erickson v. Pardus,*

10  551 U.S. 89, 93 (2007) (per curiam) (federal pleading standards require no more factual detail than

11  is necessary to give the opposing party "notice of what the ... claim is and the grounds for relief")

12  (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Prosecutors appear to have

13  made a strategic choice to say as little as possible about the misconduct Movant alleged. Having

14  made that decision, the government should not now claim surprise now that the Movant has come

15  forth with facts they hoped they had successfully concealed from him.

16         Eliminating all doubt that the Movant's claim encompassed the totality of the allegations

17  set forth, his first amended supplement — now the operative pleading — confirmed that all

18  allegations were "submitted... as evidence that Movant's plea was not knowing, intelligent and

19  voluntary[.]" (ECF 77 at 3.) The Movant also specified in his response to the magistrate's report

20  and recommendation that even if his allegations concerning pre-plea defects were dismissed as

21  independent claims, they were also pleaded as allegations in support of the Movant's claim his plea

22  was invalid. (ECF 84 at 6.)

23         The Movant's incorporation of all averments into his plea claim is a choice in lock-step

24  with doctrine governing that claim. The validity of a plea is to be assessed in view of "all of the

25  relevant circumstances surrounding" that plea. *Brady v. United States*, 397 U.S. 742, 749 (1970).

26  Under this totality approach, the effects of multiple factors on the plea decision are cumulated and

27  weighed together. *See Sanchez v. United States*, 50 F.3d 1448, 1452 (9th Cir. 1995) (weighing "the

28  totality of the government's activity" in a challenge to a guilty plea); *see also Benn v. Lambert*, 283

F.3d 1040, 1053 (9th Cir. 2002) (weighing the cumulative effect of multiple government nondisclosures); *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) ("[t]he cumulative effect of multiple errors can violate due process even where no single error" would by itself). Consistent with doctrine, all the relevant factors affecting the Movant's plea decision should be considered, including those factors with details the Movant has only recently been able to specify in his proposed amendments.

## III.   NEARLY ALL ADDITIONAL DETAILS ALLEGED SIMPLY EXPAND ON FACTS ALREADY PLEADED

The Movant's second amended supplement adds 48 paragraphs numbered 9 to 57. Paragraphs 9 to 22 provide further factual detail about the unlawful searching and warrants already alleged and discussed in paragraphs 10 to 15 and 19 to 33 of the original supplement, and in the identical paragraphs of the first amended supplement. Paragraphs 25 to 46 of the proposed second amended supplement go on to add additional information about federal authorities becoming involved in the case and concealing illegal searches and activities by Alameda County authorities. These same subjects were already raised in the original motion at paragraphs 34 to 41 and particularly in paragraphs 60 to 62, which specifically allege that federal authorities knew of these illegalities and actively concealed them. The remaining paragraph give further details concerning the Movant's mental health.

Given authorities' efforts to hide their illegal activities, it is unsurprising that the Movant was unable to immediately set forth all of the details that they concealed. If anything, he made allegations that were *more* detailed and accurate than could reasonably be expected under the circumstances. Those circumstances included efforts by the government to ensure that defense counsel would destroy all discovery before the Movant could use it for his motion. (*See* ECF 16 and 87-1.)

The Movant also alleged in paragraph 60 of the first amended supplement that prosecutors failed to make complete disclosures concerning facts affecting the integrity of the investigation — including a lead FBI investigator's conflict of interest. Paragraphs 35 to 37 of the proposed second amended supplement expand on this to describe how prosecutors appear to have tampered with a

1   witness and induced her to convince a major news outlet not to report on the conflict of interest.

2          Accordingly, even if treated stringently as "claims" rather than the mere amplifying factual

3   allegations they are, the vast majority of added averments relate back to the original motion.

4   **IV.   EVEN IF CONSIDERED A NEW CLAIM, THE ADDED AVERMENTS RELATE
        BACK TO MATTERS ALREADY ALLEGED AND IN EVENT FALL WITHIN
5       THE APPLICABLE LIMITATIONS PERIOD**

6          As stated above, most new averments are intertwined with or expand upon existing

7   allegations.  These averments accordingly relate back to the original pleading even if found to

8   embody new claims.  Those facts that are wholly new and that the Movant advances in support of

9   his existing claim describe two circumstances. The first is the government's concealment of DNA

10  evidence inconsistent with their theory of the case.  The Movant could not have discovered this

11  evidence any sooner.  If a team of attorneys working on behalf of the actual victim was unable to

12  unearth her SART exam results for two years, it is not reasonable to expect that the Movant could

13  have.  (*See* ECF 126 at 3.)

14         The second set of circumstances involves prosecutors' behind-the-scenes machinations to

15  deprive the defense of information, or to block avenues of inquiry or challenge.  Many of these

16  circumstances are already described in the initial allegations, with further detail supplied by added

17  facts.  Other information the Movant learned only recently.  The attached declaration states how

18  the Movant learned the information in his amendment, and why he was unable to learn it sooner.

19  *See* Ex A.  It sets forth the particular dates on which new information was learned, and in every

20  case it is less than a year before the date of this filing.  The declaration also documents how the

21  Movant and his spouse have spent literally thousands of hours working on this case and matters

22  related to it.  The Movant's spouse Huei Dai took time away from employment to assist.  They

23  have had to confront a campaign of concealment by law enforcement agencies with resources vastly

24  outstripping their own.  The Movant and Ms. Dai have used every resource they have in this effort,

25  and consequently have been forced into bankruptcy.  They have shown diligence far beyond what

26  the law requires.

27  ///

28

1    The averments added are items that by their nature — evidence and acts intentionally

2    concealed from the defense — are facts the Movant could not have discovered sooner.  If the

3    Movant proves his allegations that the government concealed evidence meeting the *Brady*

4    materiality and prejudice tests, he will also have established an obstacle to the discovery of that

5    information imposed by the government in violation of the Constitution.  *See* 28 U.S.C. §

6    2255(f)(2).

7    The new material is encompassed within a claim that was already asserted: that the

8    Movant's plea was not knowing and voluntary because of nondisclosure and concealment of key

9    evidence.  Prosecutors cannot reasonably contend that the Movant should from the outset have

10   precisely alleged this material.  The Movant's original motion gave sufficient notice to the

11   government of his allegations that they had concealed evidence.  The new averments simply state

12   further details prosecutors already know about what they hid and how they hid it.

13   **V.   CONCLUSION**

14   WHEREFORE, the Court should grant leave to amend and adopt the proposed Second

15   Amended Supplement as the operative pleading in conjunction with the existing form motion (ECF

16   75-1).

17                                    Respectfully submitted,

18

19   Dated: January 25, 2020              Signed:

20                                    Matthew D. Muller
                                     *In Pro Per*
21

22                              **VERIFICATION**

23   I, Matthew Muller, swear under penalty of perjury that the foregoing is true and correct.

24   Done this January 25, 2020, in Fairfield, California.

25

26

27                          Signed:

28                                    Matthew D. Muller
                                     *Pro Se*

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:15-CR-205-TLN-EFB |
| Respondent, | |
| | MOVANT'S DECLARATION IN |
| v. | SUPPORT OF MOTION FOR |
| | LEAVE TO AMEND |
| MATTHEW MULLER, | |
| Movant. | |

I, Matthew Muller, declare:

1. I am the Movant in this matter and am making this declaration to describe circumstances relevant to the time at which the limitations period should begin to run in my case and to state how and when I learned various information that I needed to bring or describe in detail my claims under 28 U.S.C. § 2255.

-1-

2. When I first filed my § 2255 motion in 2018, I was working from limited information. Essentially, I knew numerous statements the government was making relevant to both guilt and punishment were false. While in Sacramento in 2016 and 2017, I had been too depressed or otherwise ill to care about these things or even to be conscious of them.

3. In the last half of 2017, I went about figuring out how, why and from whom these falsehoods had arisen. The most important step in this was to obtain my client file from my former attorney Thomas Johnson.

4. Mr. Johnson did not reply to the first letters I sent in late 2017 continuing into early 2018. Finally, in early March 2018, I received what Johnson represented was my complete client file.

5. I had sent Johnson a detailed checklist of what I was requesting, such as all correspondence with opposing counsel and all investigative reports. The list was about a page long. What I received was a printout of everything filed on the docket as well as a partial set of police reports from Alameda County. It was a stack of paper about six inches high. By comparison, what I received from his office later when my client file was subpoenaed in my federal case was a 54-pound box of materials,

-2-

including a great deal of material on a USB storage device.

6. Because I was close to the ordinary deadline for my § 2255, I composed a motion based on what I knew then. I could not be precise and detailed. I started with the knowledge that something was false and/or unlawful and had to essentially try to reverse-engineer what happened.

7. I did not bring an "actual innocence" claim because according to my research, such a freestanding claim was not recognized on collateral review. It was relevant only to excuse procedural default under Bousley v. United States. So I specifically reserved that argument, stating in my motion that I would address any excuses to procedural default when that affirmative defense was raised.

8. Within two weeks after I was told my § 2255 had appeared on the ECF docket, I was detained from general population at my prison and sent to the Special Housing Unit (SHU). The charges were absurd — that I had violated prison rules by telling the an inmate his family could use social media to start an innocence campaign. I did not suggest that the inmate himself should do this, and there was no disagreement about that.

- 3 -

9. As far as I could tell, the facts alleged in the disciplinary charge did not state even a low level offense. Nevertheless, I was charged with the highest offense level, in the same category as murdering another inmate — i.e. in the category of offenses where an inmate could be charged with an actual criminal offense.

10. I later learned that federal officials from Sacramento had been in touch with officials at the prison soon after I filed my § 2255 motion. I cannot say for certain that the federal officials told the prison officials "put him in the SHU and make sure he has a hard time litigating his motion." But I certainly believe they let prison officials know I was a problem for them.

11. Even before I was sent to the SHU, about one week after my § 2255 motion appeared on the docket, I was told a class I had been teaching inmates about legal research had been cancelled. The official in the education department was apologetic and said the order had come from "higher up."

12. In the SHU, officials refused to give me my legal materials and said I would not be allowed to make a phone call until the next month. I asked to make a legal call and they refused. My first contact with the outside world came when my family flew to Tucson to find out why I had disappeared. When they had called the prison, nobody would tell them anything.

13. My parents retained an attorney to help me. Prison officials denied her access to visit me for a time, until after she had written formal demand letters and threatened a lawsuit. I became severely depressed in the SHU and she wanted a forensic psychologist to examine me. Officials blocked that psychologist from visiting completely, even though it was a legal visit.

14. Worst of all, I was raped and beaten in the SHU after officials put me in with an inmate they knew was dangerous and whose file said he was "HRA" - housing and recreation alone - only. The attacks themselves were bad. Far worse was the powerlessness, being disappeared from my family, being completely owned by them like a slave to whom they could do anything they wanted.

15. The aftermath of this was long. I was in very poor shape and could not get very much done until about December of 2018. By that time I was in Solano County to contest state charges relating to the same allegations of the federal case.

16. I did amend my motion in November of 2018. The main purpose of that was to ensure it was clear that the various defects I was alleging were in support of my ineffective assistance of counsel and invalid plea claims. I set them out as separate claims both for organization and to preserve an issue for review in case the

law changed and a category of claim became cognizable or unwaivable that was not before.

17. I first obtained information beyond what I had when I wrote my motion when I received initial discovery from the Solano County prosecutor in late September of 2018. This was actually not very informative — and this fact was information in itself. It was clear the discovery had been carefully curated to omit certain information. For example, the purported "break" in the Vallejo Kidnapping case came in June of 2015, when officials said they connected me to the Vallejo Kidnapping. Yet in the discovery I was given, there was not a single Vallejo Police Department report dated from between April 30 and July 8, 2015. Hundreds of pages of materials from late March to August, yet nothing at all from within a huge gap comprising almost half that time — the gap within which they supposedly solved the case.

18. I still have not received any Vallejo Police Department reports from within that gap.

19. My public defender pushed for further discovery, but prosecutors delayed, they had had over a year and a half to prepare. In December of 2018, my attorney was raised to the bench. Rather than accept the delay of a new attorney learning the case, I chose to represent myself. I also wanted to personally see evidence I knew

could be true.

20. On or about January 5, 2019, I received a list of evidence from the prosecution. The next day, I provided them a detailed list of what I wanted to review.

21. The bulk of the material I wanted to review — electronic evidence and digitally stored documents — was not provided to me until April 5, 2019, only two court days before the state trial was to begin. It was provided on 67 optical discs. At the jail where I am held, I cannot review digital evidence without a court-appointed investigator coming to the jail with a laptop and supervising. So I am only able to spend two or three hours a week on it. It took me two weeks even to load each disc and verify what it held.

22. Besides pushing for discovery in the state case, I have tried to obtain the discovery from my federal matter. I continued seeking it from Thomas Johnson, who told me he had been required to destroy it under the federal protective order. However, I learned he was in possession of the materials over the summer of 2018 and pointed out that the protective order allowed him to provide it to me. He did not.

23. From August to October of 2018, two different attorneys representing me sought my client file from Johnson, one of

-7-

whom had a paralegal who spent hours of billed time dealing
with Johnson's delays and excuses — and who still did not get
the file from him.

24. In February of 2019, I was forced to subpoena my own
client file from Johnson. It did not include any of the federal
discovery, but did contain material that helped me understand
what the state prosecution was withholding from me.

25. I also sought the discovery from federal prosecutors. In
October of 2018, I sent two letters to the U.S. Attorney's Office,
at least one of which asked about discovery. I received no reply.
(One of the communications may have been an e-mail.) In November
of 2019, I asked again about discovery, stating that I needed
it for my reply to the government opposition. They refused. In
December of 2019, I asked for an index of the discovery,
which was a document they had created for Johnson. They refused.

## DATES ON WHICH PARTICULAR INFORMATION WAS LEARNED

26. The material in the amended § 2255 that is new includes the
DNA evidence, details concerning evidence tampering and unlawful
searching, and information about federal prosecutors manipulating
state prosecution decisions.

27. There are three documents that were needed to determine

that prosecutors were hiding exculpatory DNA evidence & the
SART examination report, the laboratory report on samples from the SART
examination, and a report with my own DNA profile. I received
the SART laboratory report in either September or December of 2018,
though the name on it was blacked out. I guessed from context
what it was and was surprised because I had been told before
no such report existed. In late March and early April of
2019 I received my DNA profile and the SART report, respectively.
I expect that some law enforcement official compared my DNA to
the samples from the SART and wrote something down about it.
But I received no such writing. I had to triangulate from
three different documents mixed in with other discovery in unrelated
areas.

28. In approximately October of 2019, I had every single page
of the docket in the civil case Huskins v. Vallejo printed out
so that I could read it. That was when I saw that the DNA
evidence had also been concealed from her.

29. In regard to evidence tampering and unlawful searching, I
was aware of the fact of it because I knew certain claims made
by authorities could not be true. I alleged what I knew in my
original motion. I suspected certain details, but did not want to
allege a detail that turned out to be false. I learned some
more detail in September or December of 2018, but it was in
the nature of more things the police were claiming that I knew

-9-

must be false.

30. The very soonest I could have provided any further detail about how illegalities were committed, and by whom, was on February 11, 2019, when I received a copy of a book proposal Aaron Quinn and Denise Huskins wrote. That told me who handled the electronic devices and what supposedly was done with them. I was appointed a computer forensics expert to examine devices and prove that authorities were tampering with evidence. She reached her conclusions in late March and early April. I have not yet set forth some of those conclusions for strategic reasons, but have alleged enough detail to give notice.

31. Most other information I learned about illegalities began in late March and ran until October of 2019. During that period, my spouse Huei Dai visited various courts over a dozen times trying to track down warrants and determine which were or were not genuine. In October of 2019, a forensic document expert completed his examination to determine that there were likely at least two forgeries on the documents. He only inspected two — there were a great many more to look at that had irregularities. But we could not afford all the examinations. The one we did get came to over $5,000.

32. As to prosecutors manipulating matters to prevent state prosecutors from filing charges that would likely lead me to go to trial,

-10-

I received this information in October of 2019 from a public records request. The response to the request included letters to and from the Solano County District Attorney disclosing that the U.S. Attorney's Office had asked her not to file charges yet, and had also refused to provide any of the evidence in the case, though most of it had been sourced from a local agency in the county.

## IMPEDIMENTS CAUSED BY GOVERNMENT ACTION IN VIOLATION OF THE CONSTITUTION OR LAWS OF THE UNITED STATES

34. The first impediment to my bringing any claims at all was the government's arrangements for discovery to be destroyed by my attorney after the trial phase. This was part and parcel of their efforts to conceal evidence tampering, unlawful searching and other illegal activities. Presumably there was at most trace evidence of those illegalities present in what discovery was allowed. But with my former attorney now adverse to me and actively cooperating with the prosecution, the government has free reign to say whatever it wants about what was or was not in the discovery.

35. Efforts by government actors continue to obstruct my ability to bring claims. The prosecution and FBI actively concealed exculpatory evidence and evidence of illegalities in the investigation. As set forth in my reply, they have falsified evidence records and even warrants. I am still working to bore through a wall of fraud they have

-11-

built to conceal important evidence and law enforcement misconduct.

36. The last and worst impediment was what happened to me after I filed my § 2255 in 2018. Getting thrown in the SHU, beaten and raped, falling into extreme depression and coming close to killing myself, was the second worst thing to happen to me ever — the first being my twenty months of "Total Separation" at the Sacramento County Jail. The after-effects continued to be bad until December of 2018. At first I thought it might have been retaliation for my legal work. But that is likely not what caused me to be thrown in the SHU, since my legal work for inmates never included anything having to do with the prison.

37. I found out later that USDOJ officials from Sacramento were in touch with prison officials soon after I filed my § 2255 motion. They probably did not say "throw Muller in the hole and see to it that he gets beaten and raped." But they probably did let prison officials know that my postconviction motion was a problem for them. I remember when I was asking the lieutenant in person about my many requests to make a legal call, after I told him I had a deadline I needed to meet, he stated "the legal office doesn't have any record of your § 2255." I had never said anything about having filed a § 2255, and my requests

-12-

were about talking to my attorney for pending state charges. It was apparent to me from his assuming I was talking about my § 2255 motion that he knew about it, though I did not think anything about it then.

38.   Whether as retaliation for my legal work, as an attack on my ability to litigate my § 2255, or as a simple Eighth Amendment failure to protect claim, any of these possibilities would violate the Constitution, and did in fact hinder my ability to litigate my motion. I was not allowed to visit the legal computer or use any law books for over 60 days. When my family sent legal materials, they were withheld from me. Prison officials told me there was a new policy and any books an inmate in the SHU received would be placed in his property bag until he was released from the SHU. But other inmates apparently were not subject to the "new policy," because they continued to receive books.

39.   It was primarily the government's active concealment of evidence that prevented me from averring more detailed information sooner, but what happened in prison contributed to it.

THE MOVANT'S DILIGENCE IN SEEKING OUT FACTS AND CLAIMS

40.   Since filing my original motion, and especially since recovering from my ordeal in the SHU, both I and my family have

-13-

exercised great diligence in investigating and prosecuting my motion. Since December of 2018, I have done little else but pursue this motion and my related state matter. I eat, I sleep, I take my short out-of-cell time, and I read a novel for about an hour a day. Besides that, I have done nothing but legal work on this case or matters related to it such as my state case. This includes even "social" visits — my wife Huei Dai and I spend easily ninety percent of visiting time working on my case.

41. Working and doing legal research takes far, far longer in prison. The difference is much greater than I ever would have guessed before becoming incarcerated. Much of the work I have done would be time intensive no matter what, such as scrutinizing documents and evidence I know cannot be true, trying to find holes in the false case that was built. This includes things like the forged judicial signatures. It also involves poring over evidence and search photos, finding items that they planted one place in the background of photos taken at another.

42. My wife Huei Dai has worked at least as hard as I have. She left her employment for months to assist and has at this point probably spent close to two thousand hours of work on this case and related matters. This has included research and helping with public records requests, as well as investigation. For example, we knew that authorities had erased certain security video that was

inconvenient to their case, giving the defense footage only from cameras at the site that showed nothing useful. Ms. Dai travelled to the site to photograph the cameras and show that they were oriented toward the most important views, and had been left out of what was produced. Ms. Dai also repeatedly visited four different court branches trying to obtain and verify warrants, obtaining copies of over 150 warrant files.

43. I could continue listing activities, but the crux of the matter is that all of my effort and my wife's have been bent toward this case for over a year, and even before that were making efforts well above a "due diligence" standard. If there is some way I could expend more effort, I do not know it.

I, Matthew Muller, declare under penalty of perjury that the foregoing is true and correct. Done this twenty-fifth day of January, 2020, in Fairfield, California.

Matthew Muller

-15-