1    MATTHEW D. MULLER
     1684 Decoto Rd. #274
2    Union City, CA 94587
3    PHONE: (415) 322-0492
     FAX: (415) 366-3326
4    matt@projectjusticeforall.org

5    *In Pro Per*

**FILED**

**JAN 27 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              CASE NO.  2:15-CR-205-TLN-EFB

12              Respondent,
                                            **SECOND AMENDED SUPPLEMENT TO**
13        v.                                **MOTION TO VACATE, SET ASIDE OR**
                                            **CORRECT SENTENCE (VERIFIED)**
14   MATTHEW MULLER,

15              Movant.

16

17

18        COMES NOW the Movant Matthew Muller and moves for relief under 28 U.S.C. § 2255

19   from his criminal conviction in this Court, based upon the grounds set forth below.

20                            **INTRODUCTION**

21   1.    This motion challenges Movant's 480-month sentence of imprisonment and 60-month term

22   of supervised release, as well as the conviction and plea underlying this sentence. The judgment at

23   issue was entered on March 16, 2017. *See* United States District Court, Eastern District of

24   California, Case No. 2:15-cr-205-TLN-EFB (ECF 60).[1]

25   2.    Movant incorporates by reference the information and procedural history set forth in his

26   previously filed Form Motion to Vacate, Set Aside or Correct Sentence (ECF 75-1) (hereinafter

27   "§ 2255 Form Motion").

28   _____
     [1] All further docket references in this motion will be to this case number in the Eastern District of California.

3.  As has been the case throughout the pendency of this motion, Mr. Muller still has been unable to obtain all documents needed to fully frame and support his § 2255 Motion despite exercising due diligence in seeking those materials.

4.  In particular, the Movant has been denied access to discovery materials to investigate and support this motion, due to the prosecution's effort to ensure that Movant's former counsel destroyed the materials and made them unavailable to the Movant.

**PARTIES**

5.  Movant Matthew Daniel Muller is currently in custody in Fairfield, California.  He is serving a sentence imposed by this Court following a guilty plea to a single count of kidnapping in violation of 18 U.S.C. § 1201(a)(1).

6.  Respondent United States of America ("Respondent") was represented in the underlying criminal matter by Matthew Segal and Heiko Coppola of the Sacramento United States Attorney's Office.

**JURISDICTION AND VENUE**

7.  Jurisdiction and venue are proper in this Court under 28 U.S.C. § 2255, as it is the court in which the underlying judgment of conviction was entered.

8.  Judgment against Mr. Muller was entered on March 16, 2017.  The judgment became final when the time for appeal expired on March 30, 2018. *See* ECF 60; Fed. R. App. P. 4(b).  Movant submitted the instant motion to prison authorities for mailing on March 30, 2018 and it is deemed filed as of that date. *See Houston v. Lack*, 487 U.S. 266 (1988) (petition of a *pro se* inmate is deemed filed the day it is given to prison authorities for mailing).  Accordingly, this motion is timely filed under 28 U.S.C. § 2255 and this Court has jurisdiction to proceed.

**PROCEDURAL HISTORY**

9.  The relevant procedural history is set forth in the accompanying § 2255 Form Motion.

///

///

///

1

### GENERAL ALLEGATIONS

2 **A.    Unlawful Conduct and Falsification of Evidence By Alameda County Authorities**

3    10.    The following allegations relate to unlawful searching and other illegalities committed by
4    Alameda County authorities whose investigation and seizures led to the charges in this matter, and
5    who worked in conjunction with federal authorities.

6    11.    On June 5, 2015, police in Dublin, California obtained a cell phone they believed had been
7    left at a crime scene by an intruder who attempted to rob a house. The incident was investigated
8    by Dublin Police Services (DPS), a subunit of the Alameda County Sheriff's Office (ACSO).

9    12.    The phone was transferred to detectives Kevan Woods and Misty Carausu soon after police
10    obtained it. They successfully guessed the simple swipe pattern that would unlock the phone and
11    allow it to be searched. Carausu and Woods then searched the phone before having any warrant to
12    do so. They determined that it belonged to the Movant.

13    13.    The search included using the phone to access online accounts — such as electronic mail
14    — that contained information not stored on the phone. Carausu and Woods could not have
15    identified the Movant as the user of the phone without accessing these accounts. These off-phone
16    accounts were also used to determine that the Movant was staying in South Lake Tahoe, California.

17    14.    Woods, Carausu and other Alameda County officers then travelled to South Lake Tahoe.
18    At least one officer entered the Movant's home there the afternoon or evening of June 5, 2015. The
19    home was searched and several items taken, all without a warrant or the Movant's knowledge or
20    consent.

21    15.    One of the officers took from the home a Macintosh Mini computer.

22    16.    Using either the Macintosh or the lost cell phone, police accessed the Movant's Yahoo! e-
23    mail account. They sent what seemed to be a "to-do" list the Movant had compiled and e-mailed
24    to himself in preparation to flee authorities. This falsified e-mail was then used to obtain a warrant,
25    with officers claiming they had seen the (faked) e-mail appear on the phone they found, implicating
26    the Movant and making it appear he was about to flee arrest.

27    17.    The Movant did not flee. Authorities continued their investigation using information from
28    the Movant's online accounts and from the warrantless search of his home. They attempted to

1   conceal the actual source of their information.  Since the Movant showed no signs of fleeing,

2   authorities delayed his arrest until they could create the appearance of a lawful investigation, and

3   of evidence that seemed to implicate the Movant.

4   18.      Authorities planted the Movant's driver's license, and possibly other property taken from

5   his home on June 5 in a stolen vehicle that had been recovered in South Lake Tahoe.  The bulk of

6   evidence planted in the vehicle was taken from the Movant's home when a search warrant was

7   executed on June 9, 2015.  Authorities took evidence from their morning search of the home and

8   moved it to plant during their midday search of the towed stolen vehicle.  The relocated evidence

9   included the Movant's mail and clothing, which were planted as "indicia" to associate him with the

10  vehicle.  At some point, authorities also wiped down all surfaces in the car that might bear

11  fingerprints, to avoid discovery of any prints inconsistent with their story once the vehicle was

12  examined.  That examination found no prints at all anywhere on the vehicle where they would be

13  expected to be.

14  19.      Dublin authorities took other steps both to falsify evidence and to make their investigation

15  appear legal when it was not.  Police reports were extensively revised and made it appear as if they

16  had originally been submitted in the altered form.  This technique was used in particular to support

17  officers' story that they were conducting searches under exigent circumstances because they

18  believed the suspect was still in the area 20 minutes after the crime.

19  20.      Police in fact already had a suspect vehicle that was seen by them departing soon after the

20  crime.  Misty Carausu obtained security video from a Chevron station nearby that showed the

21  suspect vehicle and police in pursuit soon after.  However, she checked the video out of evidence

22  so that it would not be obtained by the defense.  She did not check it back in for nearly a year, and

23  at that time deleted footage from the particular cameras that would show relevant material.  Police

24  also altered the 911 logs and withheld tapes maintained of radio traffic during the incident, to

25  prevent the defense from learning of their falsifications.

26  21.      Detective Carausu next engaged in extensive searching of electronic devices seized from

27  the Movant, both with and without a warrant.  Most of the devices had basic password protection

28  and were brought to the Silicon Valley Regional Computer Forensic Laboratory for a simple

SECOND AMENDED SUPPLEMENT TO § 2255          - 4 -                    *United States v. Muller*

1    password bypass. The devices were forensically copied and loaded into a computer program that

2    allows police to search the forensic copy without disturbing the original evidence.

3    22.    However, Carausu was able to access one device — the Apple Macintosh Mini — without

4    a password. The computer was searched and also used to access the Movant's Internet-based

5    accounts. These searches and uses would leave traces a forensic examination could detect.

6    23.    Carausu abandoned all pretense of searching electronic devices within the scope of what

7    warrants might even arguably authorize. She engaged in a roving search for leads involving any

8    manner of criminal activity.

9    24.    Carausu's wide-ranging search disclosed the Movant's residence history and general

10    movements in the years prior to his devices being seized. This included information showing the

11    Movant had been on Mare Island in Vallejo, where the Movant had lived for a time in 2014.

12    Carausu began requesting police reports and conducting interviews to determine whether the

13    Movant may be responsible for crimes on Mare Island — far outside both Carausu's jurisdiction

14    and the scope of warrants that related to a different crime and different place.

15    **B.     Unlawful Conduct by Federal Authorities to Prevent the Defense from Learning Of**

16    **Illegal Searches and Falsified Evidence**

17    25.    Subsequent conduct by federal officials was aimed at preventing defense counsel from

18    learning of illegal searching and falsification of evidence by Alameda County authorities. Carausu

19    convinced FBI agents that the Movant was connected to the kidnapping for which he was charged

20    in this matter. However, the agents and government counsel understood that Carausu had made

21    this connection through illegal searching, and that any evidence connecting the Movant to the

22    kidnapping was likely to be suppressed if the defense learned of Carausu's unlawful conduct.

23    26.    Upon further inquiry, federal authorities learned of even more extensive illegalities

24    committed by Alameda County authorities in the course of their investigation. They realized that

25    the chain of evidence was likely to be severed by a suppression motion at a point in the investigation

26    even before Carausu's illegal electronic searching occurred.

27    27.    Accordingly, federal authorities advised and assisted Alameda County authorities in

28    concealing the illegalities from the defense. They devised a plan where FBI agents would at a

1    routine meeting learn that the Vallejo and Dublin crimes were connected by similar evidence —

2    some of which were planted. As one DPS report puts it, FBI agents "were shocked to learn" of the

3    similarities in the evidence. In fact, this was a staged revelation to conceal the illegality of the

4    actual connection made.

5    28.     Federal and Alameda County authorities also recognized and agreed that all evidence of

6    unlawful searching of electronics would need to be concealed or destroyed. They developed a story

7    whereby the devices had been brought to the RCFL and underwent initial processing, but no

8    searching or examination. In fact, the devices had been searched.

9    29.     Authorities recognized that the illegal searching and accessing of Internet accounts from the

10    seized Macintosh Mini could be detected by forensic examination, since the computer had been

11    searched directly and not only via the RCFL system. Accordingly, federal and Alameda County

12    authorities cooperated to conceal the Macintosh and any record of it being seized. This included

13    removing it from FBI, RCFL, and DPS records.

14    30.     Since the computer had been listed on the warrant returns already filed with the court, that

15    record needed to be eliminated as well. Authorities forged a new warrant return that omitted the

16    Macintosh while still including other items that were needed as evidence. On information and

17    belief, other seized items reflecting illegalities by police were removed from judicial records as

18    well at this time. This included at least one item that police had removed from the Movant's home

19    and planted in the stolen vehicle, but that the police had inadvertently listed on warrant returns for

20    both search sites.

21    31.     FBI agents also manufactured another avenue by which the Vallejo and Dublin crimes had

22    been connected. They claimed that Aaron Quinn's laptop had been stolen and recovered from the

23    Movant, and that this laptop connected the Dublin and Vallejo incidents. However, chain of

24    custody logs and evidence markings were missing from the laptop. Authorities also could not even

25    in theory connect the crimes using the laptop unless they searched it electronically, since there was

26    no record of the laptop's serial number or other information that would connect it to Aaron Quinn

27    except in its digital contents.

28

32. Authorities nonetheless used the laptop story in aid of obtaining search and arrest warrants for the Movant. In doing so, they enlisted the assistance of Aaron Quinn and Denise Huskins, whom they had treated as suspects up until this point. Quinn and Huskins were told that helping to shore up the illegal investigation of the Movant would help clear their names and allow federal authorities to announce they had another suspect.

33. Consequently, authorities were able to conceal illegalities in their investigation. Although Quinn and Huskins credited Misty Carausu with making a connection that cleared their name, they agreed not to speak about this publicly, because it would reveal unlawful electronic searching by Carausu. Huskins also agreed to conceal a meeting federal authorities held with her soon after the connection was made, as it too would reveal unlawful searching. The meeting was intentionally omitted from FBI investigative reports provided to the defense.

34. Quinn and Huskins were less enthusiastic about agreeing to federal authorities' requests that they refrain from speaking publicly about their understanding that there were multiple kidnappers involved, and who they believed those people might be. The prosecution's theory relied on the Movant being a lone kidnapper with sexual motives. The victims' claims of multiple kidnappers were inconsistent with this theory, and also with the prosecution's desire to link the Movant to other crimes.

35. For this reason, the government hid the test results of Huskins's SART DNA kit — even from Huskins herself. The results showed at least one contributor who could not have been the Movant. This supported the assertion that there had been multiple kidnappers and was inconsistent with prosecutors' theory. So the government concealed it.

36. On June 8, 2015, the FBI obtained all evidence relating to the kidnapping that was in the custody of the Vallejo police. This included a Sexual Assault Response Team (SART) examination report, DNA kit and a report from a California of Justice laboratory on the DNA that was found to be present on samples from the SART exam.

37. The report reflected that foreign DNA was present on Denise Huskins in areas where it was unlikely to be deposited except through intimate contact. Two foreign DNA profiles were found.

1   They were not complete, but at least one could not belong to the Movant.  The other contained too

2   few allele markers in common with Mr. Muller's profile to be of any probative value.

3   38.      Prosecutors and FBI agents were aware that this evidence detracted from their theory that

4   the Movant committed the kidnapping, and also that it was detrimental to their theory that a lone

5   actor had committed the kidnapping.  So they concealed the evidence—not just from the Movant,

6   but even from Denise Huskins, whose lawyers repeatedly inquired into the location and results of

7   the DNA kit.

8   39.      Prosecutors also lied to conceal impeaching evidence of a lead FBI agent's conflict of

9   interest.  The agent had been romantically involved with Andrea Roberts, who appeared to be the

10   intended victim of the kidnapping.  His affair with her had ended Roberts's marriage, and the agent

11   had continued seeing her after.  For a time, the agent was dating Roberts at the same time Aaron

12   Quinn was.  The victims' claimed this romantic rivalry as well as the agents' ongoing interest in

13   Roberts influenced the investigation of the kidnapping.

14   40.      A national television journalist was poised to report on this conflict and its effect in the

15   investigation.  Prosecutors believed that this "media distraction" would interfere with their case,

16   and told Roberts so.  Roberts then contacted the journalist and lied to her about her relationship

17   with the agent, saying they had only been on "one date."  The journalist agreed to drop the story.

18   41.      Prosecutors and FBI agents knew Robert's "one date" claim was a lie.  They nevertheless

19   reported it and provided the information to the defense, drawing attention away from a conflict of

20   interest and concealing impeachment evidence.

21   42.      The government also sought to limit the information the Movant had to make his plea

22   decision by preventing state authorities from filing charges.  The prospect of state charges would

23   have caused the Movant to refuse the government's plea offer and proceed to trial, since a guilty

24   plea could be used against him in a state proceeding.  The government asked state prosecutors to

25   delay filing charges.  The government also refused to release or allow inspection of any evidence

26   or information in the case, nearly all of which had been taken from local agencies by the FBI.

27   Accordingly, state prosecutors had insufficient information to make a charging decision.

28

1   43.    Ultimately, federal prosecutors succeeded in convincing the victims and state authorities

2   from proceeding with charges until after the deadline had expired for the Movant to challenge his

3   sentence in postconviction proceedings, to avoid prompting the Movant to file a challenge he

4   otherwise might not.   State authorities waited exactly one year from the Movant's federal

5   sentencing to announce charges, incorrectly believing the deadline for a challenge had expired.

6   44.    Prosecutors also convinced Quinn and Huskins to wait until after the Movant's

7   postconviction challenge to continue their assertions that multiple kidnappers were involved.  One

8   week after they believed the deadline expired, Quinn and Huskins went on national television to

9   reassert that multiple people had been involved in the offense.

10   45.    As an additional and pre-planned means of preventing their fraud and concealment from

11   coming to light, prosecutors required defense counsel to agree that he would destroy all discovery

12   materials after the trial phase of proceedings.   This extraordinary step ensured that the Movant

13   could not inspect the evidence and detect the fraud.   It would also allow the government to claim

14   that it had earlier disclosed evidence that it actually had not, since the government would be in

15   control of all records of what they had provided.

16   46.    The above concealment measures prevented the Movant from learning sooner of the details

17   of his claims.   He exercised due diligence in investigating these details, but could not ascertain

18   them until after he received the bulk of discovery in his state prosecution on April 5, 2019.  Further

19   details about Movant's diligence and impediments to bringing this motion are discussed in detail

20   in the Movant's concurrently filed motion for leave to amend and its supporting declaration, hereby

21   incorporated as if fully set forth in this verified motion.   From that time, it took months to review

22   the evidence.   Much of it was in digital form, and the Movant was only allowed computer access

23   to review it for approximately two hours per week.   Witness interviews alone comprised over 80

24   hours of video.

25   ///

26   ///

27   ///

28   ///

**C.     The Movant's Mental Health, Profound Isolation, And Extreme Conditions Of Confinement**

47.     Prior to pleading guilty, the Movant was confined for over one year in extreme conditions of solitary confinement at the Sacramento County Main Jail. On account of his mental health issues, the Movant was classified into the severe "Total Separation" detention status. ("T-SEP").

48.     The conditions suffered by Movant and other inmates in T-SEP are well documented in a class action against Sacramento County in this Court, *Mays v. County of Sacramento*, No. 2:18-cv-2081-TLN-KJN. Movant hereby incorporates by reference the expert reports filed as exhibits to the complaint, designated in that matter as ECF Nos. 1-2, 1-3, 1-4, 1-5 and 1-6. The reports were based on the experts' observations and evaluations of the Movant and other similarly situated persons in T-SEP status, and the reports are based on site visits and interviews conducted in the one-year period before Movant's guilty plea, throughout while Movant was in T-SEP status.

49.     The conditions set forth in the reports are consistent with the Movant's experiences in T-SEP during the year before his guilty plea. The Movant was locked down at least 23.5 hours a day in a poorly lit seven by eight foot concrete cell. During the approximately 20 months he was at the jail, Movant was allowed into an open-air area only four or five times for recreation. He was not allowed to interact with other inmates except through steel doors, and he was even then instructed at times to stay away from other inmates' doors.

50.     "Total Separation" was true to its name. In the year before pleading guilty, the Movant was never at the jail in a room with more than three people at once — and even that was rare. Movant was in his cell so often that he felt at first uncomfortable and then fearful to leave it. He was somewhat accustomed to the "dayroom" area in front of the cells in the living units, but also became uncomfortable in that space because it was exposed to the view of other inmates.

51.     The Movant's mental health deteriorated during this time. He became depressed and suicidal. He also developed cognitive slowing and difficulty concentrating. The Movant was embarrassed by these symptoms, knew that no effective help was available from the jail's health services and did not want to worry his family with things they could not change. So he generally

1    said little about his symptoms and tried to present a positive front during his brief and infrequent
2    interactions with others.

3    52.    Medication at the Jail was irregularly administered, with swings of eight hours or more in
4    the times at which it was given. This irregularity combined with the absence of sunlight meant that
5    the Movant's circadian rhythm was constantly disturbed.

6    53.    The Movant missed at least three doses of medication in the month before he pleaded guilty,
7    including on the morning of his plea hearing. The medication was an antidepressant that increases
8    alertness and that is "habit forming" in that patients feel withdrawal effects when it is not given.

9    54.    Movant has no specific memory of the plea hearing. He remembers generally by mid-2016
10   that he suffered increased anxiety ranging up to panic when required to stand in the packed
11   courtroom. The Movant asked his attorney several times to waive the Movant's appearance, and he
12   eventually did so. The Movant's memories of court appearances from June to October of 2015 are
13   reasonably clear. Movant believes his poor memory of hearing thereafter was symptomatic of his
14   mental deterioration.

15   55.    Upon review of the transcript, the Movant saw that he answered certain questions
16   incorrectly. If asked his most recent occupation, the Movant would not ordinarily have responded
17   "lawyer" because (1) it was incorrect, and (2) the Movant preferred strongly not to talk about his
18   prior legal career and would not mention the matter unless directly asked. It would also be
19   uncharacteristic of him to use the term "lawyer" rather than "attorney."

20   56.    Movant also was generally aware of what medications he was taking, and outside some
21   disturbance in his mental state would not have reported he was taking mood stabilizers when he was
22   not. "Mood stabilizers" are a distinct class of medications and nothing the Movant was taking at any
23   time at Sacramento Jail was in that class of drug.

24   57.    It appears to the Movant from the hearing transcript that he was too mentally impaired to
25   adequately understand the proceedings and to exercise rational choice.

26   ///
27   ///
28   ///

**GROUNDS FOR RELIEF**

58.     Each of the following claims is submitted (1) as an independent ground for relief, to the extent allowed by law; (2) as evidence that Movant's plea was not knowing, intelligent and voluntary; (3) as arguments that the performance of Movant's former attorneys fell below an objective standard of reasonableness, and that but for their errors a reasonable probability exists that Movant would have obtained a different result; and/or ( 4) as matters relevant to the nature of any relief to be granted.

**First Ground for Relief:**
**Unlawful Warrantless Search of Cellular Phone**

59.     Alameda County law enforcement officers effected a warrantless search of Movant's cellular phone in violation of the Fourth Amendment of the U.S. Constitution.

60.     The officers' interaction with the cellular phone's operating system shortly after the phone was discovered, and their manipulation and use of its touchscreen, display, speakers, microphones, transmitted, antenna and calling functions amounted to a search for purposes of the Fourth Amendment.

61.     The phone was not abandoned by its owner and no reasonable law enforcement officer would believe under the circumstances that it had been intentionally abandoned by a suspect fleeing the scene of a burglary.

62.     By the time the warrantless search occurred, no exigent circumstances existed that were sufficient to justify a warrantless search.  Officers did not act with an actual belief that exigent circumstances required a warrantless search.  Rather, they were simply eager to begin their investigation into the burglary and did so without obtaining a warrant to search the phone.

63.     In addition to the above-described search, additional warrantless searches of the cellular phone, including review of its use and digital contents, were conducted by both California state and federal law enforcement officers well after any arguable exigency had dissipated.

Any identifying information obtained in the warrantless searches of the cellular phone, as well as the other fruits of that search, would have been suppressible in any criminal trial of Movant.  In particular, decisions to seek additional warrants relating to Movant's property and premises and/or decisions to seek additional electronic devices for search or to include them in search warrants were

1    reliant upon and tainted by the earlier unlawful searches.  Evidence obtained pursuant to the tainted

2    search warrants would have been suppressible as well.

### Second Ground for Relief:
### Illegal Seizure of Mr. Muller

64.    Movant incorporates all preceding paragraphs as if fully set forth herein.

65.    Alameda County law enforcement used unlawfully obtained information and evidence to

secure an arrest and search warrant for the person of Movant, and did in fact seize and search

Movant.

66.    These searches and seizures were reliant upon and tainted by earlier unlawful acts by law

enforcement.  Any information obtained or law enforcement action taken as a result of these

searches and seizures would have been suppressible in any criminal trial of Movant.  So, too, any

additional "fruits" flowing from these events, including but not limited to subsequently obtained

evidence or law enforcement action taken.

### Third Ground for Relief:
### Defective Warrants in Search of South Lake Tahoe Property,
### Ford Mustang, E-Mail Accounts, Bank Accounts and Cellular Phone

67.    Movant incorporates all preceding paragraphs as if fully set forth herein.

68.    Alameda County law enforcement used a series of warrants issued between June 8 and July

23, 2015, to seize and search the person and various property associated with Movant.  These

warrants were defective in multiple regards.

69.    **First**, the warrants, the decision to seek the warrants and the information used to seek the

warrants were the tainted fruit of prior unlawful searches and of other unlawful acts by police.

70.    **Second**, the warrants were insufficiently particularized with regard to the location and/or

descriptions of the property to be searched and as to the evidence to be searched and/or seized.

71.    **Third**, there was insufficient probable cause to support search and/or seizure of the items

and properties listed.

72.    **Fourth**, the warrant to search the South Lake Tahoe property was so broad as to be

considered an unlawful general warrant of exactly the sort the Fourth Amendment was intended to

proscribe.

1    73.    **Fifth,** the scope of the search warrant was broader than the probable cause upon which it

2    was based.   In particular, there was insufficient probable cause support search warrant terms

3    allowing seizure of electronic devices and storage media taken by authorities from the properties.

4    74.    The above defects rose to such a level that a reasonable law enforcement officer, knowing

5    what the executing officers knew about the investigation and surrounding circumstances, could not

6    have believed in good faith that the warrants were valid.  In addition, several of the warrants used

7    were invalid on their faces.

8    75.    Evidence obtained on the purported authority of the defective warrants would have been

9    suppressible in any criminal trial of Movant.  In addition, any further law enforcement action taken

10   and/or evidence obtained as a result of the above warrants would have been suppressible as tainted

11   fruits of unlawful warrants.

### Fourth Ground for Relief:
### Search and Seizure in Excess of Scope of Warrants
### And/Or Unlawful General Warrant

15   76.    Movant incorporates all preceding paragraphs as if fully set forth herein.

16   77.    Law enforcement officers purporting to act on the authority of the warrants described above

17   seized and/or searched items not described by the warrants, thereby exceeding their scope.  These

18   excessive searches and seizures include, but are not limited to, searches of electronic devices for

19   evidence beyond that named in the warrant.  Movant was in effect subjected to an unlawful general,

20   roving search of exactly the sort that the Fourth Amendment was intended to proscribe.   Any

21   construction of the warrant terms broad enough to encompass all items searched and/or seized

22   would render it an unlawful general warrant.

23   78.    Evidence seized and/or searched in excess of the authority of the above warrants would

24   have been suppressible in any criminal trial of Movant.  So, too, would be any further evidence

25   obtained or law enforcement action taken as a result of such illegally obtained evidence.

26   ///

27   ///

28   ///

**Fifth Ground for Relief:**
**Unlawful Warrantless Searches of**
**Property Seized and of Private Accounts**

79.    Movant incorporates all preceding paragraphs as if fully set forth herein.

80.    Law enforcement officers — including both California and federal authorities — illegally searched Movant's electronic devices, electronic media and other property without a warrant and prior to obtaining any proper authorization for doing so.

81.    Officers also searched Movant's e-mail and financial accounts without a warrant and without obtaining any other proper authorization to do so.

82.    Evidence obtained as a result of the above acts would have been suppressible in any criminal trial of Movant.  So, too, would be any further evidence obtained or law enforcement action taken as a result of such illegally obtained evidence, including but not limited to decisions to seek further warrants relating to Movant.

**Sixth Ground for Relief:**
**Defective Federal Search Warrant**

83.    Movant incorporates all preceding paragraphs as if set forth herein.

84.    Beginning by at least June 30, 2015, federal authorities sought and obtained warrants purporting to authorize seizure and/or search of items and premises owned by, occupied and/or associated with Movant.  These warrants were illegal and defective in multiple regards.

85.    **First**, the warrants, the decision to seek the warrants and the information used to seek the warrants were tainted by prior unlawful searches and seizures and by other illegal acts by law enforcement authorities, as detailed above.

86.    **Second**, there was insufficient probable cause to support search and/or seizure of the properties and items described, and the warrant terms were broader than what probable cause did exist.

87.    **Third**, the warrants were issued as a result of knowing misrepresentations by the affiants and/or based on their statements made in reckless disregard of the truth.

88.    **Fourth**, the warrants were insufficiently particularized as to the items or premises to be searched and the evidence to be seized and/or searched.  Any construction of the warrant term broad

1    enough to encompass all items and properties searched and/or seized would render them unlawful

2    general warrants.

3    89.    The above defects rose to such a level that a reasonable law enforcement officer, knowing

4    what the executing officers and agents knew about the investigation and surrounding

5    circumstances, could not have believed in good faith that the warrants were valid.

6    90.    Evidence obtained on the purported authority of the above warrants would have been

7    suppressible in any criminal trial of Movant.  So, too, would be any further evidence obtained or

8    law enforcement action taken as a result of such illegally obtained evidence.

9

10   **Seventh Ground for Relief:**
     **Unlawful Full Shackling of Movant During Court Appearances**

11   91.    Movant incorporates all preceding paragraphs as if fully set forth herein.

12   92.    Movant was shackled in full restraints for all court appearances. Mr. Muller was nonviolent

13   and cooperative when first taken into custody by police in June of 2015. He had been in custody

14   over four months with no incident or disciplinary issues and had made several previous state court

15   appearances with no or only partial restraints. Movant was fully complying with his prescribed

16   psychiatric treatment and was sedated with an antipsychotic drug for all court appearances.

17   Nevertheless, the Court ordered that Movant remain fully shackled throughout all courtroom

18   appearances. It refused to hold an evidentiary hearing on the issue, at which Movant would have

19   presented evidence documenting the above circumstances.

20   93.    Movant suffered actual prejudice as a result of his shackling. The full shackling added to

21   Movant's mental distress during court proceedings. The shackling was unnecessary for courtroom

22   security and instead acted to shame and impugn Movant in front of his family, a large media

23   presence and other courtroom observers. Together with Movant's poor state of mental health, the

24   shackling caused Movant to seek to avoid appearing in Court and to ask that a waiver of his

25   appearance be filed. *See* ECF No. 32. This in turn caused Movant to be less aware of developments

26   in his case, and of incompetent representation by his attorney.

27   94.    In addition, the prosecution improperly sought to portray Movant — who had a perfect

28   record of total compliance with all rules and orders while in custody and who was flanked by

1   multiple armed U.S. Marshals — as an immediate danger to persons present in the courtroom,

2   making such comments as "look at him, he's huge."  Movant was not allowed to take notes during

3   most proceedings, and had his right hand freed only as needed for the Court to swear him in.

### Eighth Ground for Relief:
### No Preliminary Hearing

6   95.    Movant incorporates all preceding paragraphs as if fully set forth herein.

7   96.    Although the Court set a date for a preliminary hearing in Movant's case, that hearing date

8   was vacated after the Respondent was able to secure an indictment against Movant.

9   97.    The preliminary hearing provided by Rule 5 is intended to serve as a forum for

10   determining probable cause, but is also an important means of discovery for the accused, such

11   that the need for a preliminary exam is not eliminated by the return of an indictment.

12   98.    It was a violation of Movant's constitutional rights under the Due Process and Equal

13   Protection clauses to deny him a preliminary hearing simply because the Respondent happened to

14   control when Movant entered its custody and was able to obtain an indictment before Movant's

15   scheduled preliminary hearing.

16   99.    Movant suffered actual prejudice from the denial of a preliminary hearing, including but

17   not limited to loss of the opportunity to discover *Brady* material, *Giglio* material and other

18   exculpatory, impeaching or relevant evidence in possession of Respondent that he did not receive

19   in regular discovery.

### Ninth Ground for Relief:
### Kidnapping Statute Unconstitutional As Applied
### And/Or Factual Basis of Plea Does Not Satisfy Offense Elements

23   100.   Movant incorporates all preceding paragraphs as if fully set forth herein.

24   101.   The statute under which Movant was convicted provides for federal jurisdiction where any

25   means, facility or instrumentality of interstate or foreign commerce is used during the offense.

26   Given the broad and permissive interpretation this language appeared to receive in Movant's case,

27   the statute would exceed Congress's authority under the Commerce Clause.

28   ///

102. Alternatively, given a narrower construction to avoid unconstitutionality, the jurisdictional element of the kidnapping offense would not be satisfied by the alleged conduct Movant conceded that the Respondent could prove at trial.

### Tenth Ground for Relief:
### Unlawful Seizure of Movant's
### Attorney-Client Privileged Legal Materials

103. In September 2015, agents of the Federal Bureau of Investigations ("FBI") took custody of Movant from the Alameda County Sheriff's Department.  At the time he was picked up from Alameda County, Movant had on his person a folder prominently marked with words to the effect of "Legal Materials: Confidential and Attorney-Client Privileged."  The folder contained strategic notes about Movant's case, draft legal documents, letters from Movant's attorney to Movant and draft letters to be sent to Movant's attorney.

104. The FBI agents took this folder from Movant and placed it in the trunk of the vehicle used to transport him.  After arriving at Sacramento County Jail, Movant asked the FBI agents for his folder.  The FBI agents advised that he could not have the folder back.  Movant advised the agents that the folder contained confidential and privileged legal documents and that he should be allowed to retain it.  On of the FBI agents then promised that he would deliver the folder to Movant's attorney.  Movant believes he requested a property receipt for the envelope and was told by the agents they did not have the proper form.  They reassured him again that the folder would be delivered to his attorney.

105. Movant followed up with his attorney multiple times concerning the folder.  As of the last time he remembers asking about it in December of 2015, it still had not been delivered to Movant's attorney.

### Eleventh Ground for Relief:
### Prosecutorial Misconduct

106. Movant incorporates all preceding paragraphs as if fully set forth herein.

107. Movant submits that he was prejudiced by multiple instances of prosecutorial misconduct, including but not limited to those listed below.

108.    The prosecution failed to produce relevant *Brady* and *Giglio* material during discovery.  In particular, the prosecution failed to produce evidence relating to the alleged victims concerning the multiple conflicting accounts they gave of the crimes alleged, evidence of their motive to misrepresent facts concerning the alleged crimes and derogatory investigatory materials pertaining to the alleged victims tending to impugn their credibility as prosecution witnesses.  It failed to disclose conflicts of interest by FBI agents involved in the investigation of formal complaints against agents by the alleged victims.

109.    The prosecution also failed to produce other relevant evidence during discovery, including communications and investigatory records indicating the Movant's electronic devices and other records had been searched and examined by authorities in advance of obtaining any warrants or other authorization.  Prosecuting attorneys were aware that the entire investigation and case against Movant stemmed from unlawful warrantless searches of electronic devices

110.    The prosecution made statements about Movant to the Court and to the public that it knew to be false, and/or made such statements in reckless disregard of their falsity and/or made such statements while in possession of evidence and records clearly indicating the statements were false, and while having a duty to reasonably investigate said evidence and records prior to making the false claims.  In particular, the prosecution reportedly asserted that Movant was involved in a series of sexual assaults in the San Francisco bay area while possessing evidence showing he was not.

111.    The prosecution failed to make a full and truthful disclosure of investigatory sources they relief upon in developing their case against Mr. Muller.  While they purported to have obtained information from a particular source such as pursuant to a lawful search; in fact, they had received it first from a different source and/or under circumstances that could make the information suppressible or that could lead Movant to discover information unfavorable to the prosecution's case.  In particular, Respondent attempted to "launder" electronic evidence against Muller that had already been unlawfully reviewed before Respondent made it appear to have been properly discovered.

112.    The prosecution reviewed confidential and privileged legal papers unlawfully seized from Movant's person when FBI agents assumed custody of Movant.  The prosecution failed to return

1   the papers to Movant's attorney or to notify Movant's attorney that the papers had come into their

2   possession.

3   113.    The prosecution engaged in inappropriate contacts and activities calculated to impugn

4   Movant and to harm his interests and ability to defend against criminal charges.  This conduct

5   includes but is not limited to communications with Movant's ex-spouse and/or her attorneys

6   providing information to help her in a civil action to terminate her spousal support obligations to

7   Movant.  Movant's former spouse was successful in her action as a result.  This in turn diminished

8   the financial resources available to Movant to mount his criminal defense.

9
**Twelfth Ground for Relief:**
**Ineffective Assistance of Counsel**
10

11   114.    Movant incorporates all preceding paragraphs as if fully set forth herein.

12   115.    As explained more fully in a motion to be filed shortly after filing of this amended

13   supplement, Movant has been prevented by his former attorneys from full investigation the

14   circumstances surrounding their representation of him.  The following averments are based on

15   current information and belief.

16   116.    After they were retained, Movant's counsel[2] failed to timely or sufficiently investigate Mr.

17   Muller's then-present and past mental health.  Counsel was aware that Movant had a history that

18   included severe depression, suicide attempts, psychosis, delusions, hallucinations, mania, anxiety

19   and other mental health symptoms.  They were further aware that at several points in his history,

20   Movant had to appeared to family and coworkers to be mentally well, but in fact had been suffering

21   severe symptoms such as delusional beliefs.  Counsel was aware that Movant had been placed on

22   extended suicide watch at the Alameda County Jail, and that while in Alameda County custody he

23   had been committed for a time to an inpatient psychiatric hospital.  Counsel was also aware that

24   Movant was taking multiple psychotropic medications.  They were aware that Movant had taken

25   actions inconsistent with his own best interests while in custody.  Movant had reported suffering

26   ongoing episodic symptoms of psychosis while in custody, including a delusional belief that

27

28   _____
[2] Movant's former attorneys Thomas Johnson and Kristy Horton are collectively referred to herein as "counsel."

1   Alameda County Jail personnel were replacing his medications with placebos as part of an
2   experiment.

3   117.    Despite being aware of the foregoing circumstances, Movant's counsel did not seek a
4   competency hearing for Movant or arrange for him to meet with an appropriate expert for a
5   psychiatric evaluation. Movant was indigent, and under applicable California law counsel could
6   have moved at any time during the three months Movant was in state custody for public funds to
7   retain a defense psychiatric expert.

8   118.    Movant's counsel failed to make sufficient efforts to obtain all of Movant's relevant mental
9   health records in preparation for a planned insanity defense.  Movant and his family provided
10  counsel with detailed information about how to obtain his mental health history and treatment
11  records. However, counsel made only cursory efforts to secure the needed records. These records
12  were later obtained without apparent difficulty by the U.S. probation officer conducting the
13  presentence investigation.

14  119.    Movant informed counsel of numerous electronic records and items of evidence that would
15  corroborate his compromised mental state and other defenses.  Counsel failed to follow up on these
16  leads or to investigate and obtain the relevant evidence.

17  120.    Up until September of 2016, Movant's counsel consistently advised Movant and his family
18  that they were planning and preparing a mental health defense.  Counsel reassured Movant and his
19  family that progress was being made on his case and that counsel would retain a psychiatric expert
20  witness.  In September of 2016, Movant's counsel called a meeting with him and advised him that
21  he did not see the grounds for a successful insanity defense.  He stated that Movant's alleged
22  conduct had "just been too organized" to support an insanity defense.  Counseled did not have
23  Movant examined or consult an expert familiar with the case before making this determination.
24  Movant's attorney advised that the best thing for him to do would be to accept a plea offer, and that
25  they had negotiated a recommended sentence of forty years with the prosecution. Movant's attorney
26  opined that this was the best offer Movant would get and that Movant would receive a life sentence
27  if he took the matter to trial. In reliance on counsel's advice and representations, Movant agreed to
28  the plea deal.

121.    Movant later learned that unknown to him, his attorney had missed a key deadline by which to notify opposing counsel of his intention to mount an insanity defense. The prosecution had accordingly moved to exclude any defense of insanity, and a hearing had been set on the motion. Movant does not recall being advised of this motion, nor do Movant's parents, who communicated closely with Movant's counsel concerning developments in the case. Later, Movant's counsel sent him a copy of case materials that counsel stated contained all documents filed by either party with the court. However, the prosecution's motion to exclude a defense of insanity was omitted, as were other documents referencing the fact that counsel had missed a key deadline. Such omission strongly suggests counsel's consciousness of their error.

122.    Following the prosecution's motion to exclude, Movant's attorneys moved quickly to conclude a plea agreement and set a change of plea hearing. They sought a continuance of the hearing on the missed deadline. *See* ECF 35-36. Movant entered a plea of guilty at a subsequent hearing, and Movant's counsel thereby avoided responding to the prosecution motion to exclude a defense of insanity.

123.    Movant submits that his attorney's recommendation to plead guilty was unduly influenced by the prospect of having to explain to Movant, to Movant's parents and to the court why he had failed in the course of over a year to secure a psychological examination of Movant, and to take other steps to research, assess and prepare a mental defense. Throughout this time, counsel had consistently advised his client and his client's family that this was the planned strategy for the case, up until the day that the prosecution filed its motion to exclude an insanity defense. Movant submits that counsel's advice was not in keeping with the best interests of their client, and that it caused Movant to accept a plea agreement and plead guilty when he would not have done so had he received effective legal advice and representation.

124.    Although Movant's counsel had apparently determined that Movant's mental health was not relevant to the guilt phase of proceedings, they later advised Movant and his family that it would be important to have time evaluated for purposes of sentencing. Movant's counsel requested a continuance of sentencing, specifically citing the need to obtain a mental health examination of Movant.

125.     Movant's family paid a large sum of money to retain an expert witness, who examined Movant. This examination entailed the same procedures and time that would have been used had counsel arranged the evaluation a year and a half before when the representation began. Following meetings and various written assessments and mental health inventories completed by Movant, the expert produced a draft report. The report was based on those meetings and exams, on Movant's psychiatric records, and on case and discovery materials reviewed by the expert. The expert report concluded that the Movant's alleged conduct was clearly caused by serious mental illness. Upon reviewing the report with Movant, Movant's attorneys opined that the expert report was in effect *too* good, and too absolving of Movant's criminal responsibility. Counsel expressed concern that it was dissonant with the overall message of Movant accepting criminal responsibility for the alleged conduct. They asked the expert to revise the report and "tone down" such language as a passage stating that Movant: had suffered greatly and was himself a victim in the case.

126.     Ultimately, Movant's counsel decided on to submit the expert report at all. Movant's attorneys told him that the report was just not consistent with him accepting responsibility, since it appeared instead to absolve him. Movant's counsel stated that although such a report might be helpful in the criminal liability phase of a case, it could end up hurting Movant at sentencing. Movant once again deferred to counsel's advice. Movant submits that the choice not to submit an expert report absolving Movant due to his mental illness was consistent with a concern by Movant's counsel that the report could raise questions about why they had not obtained an expert opinion in the first place, and about why they had abandoned an insanity defense.

127.     In their sentencing memorandum and at the sentencing hearing, prosecution attorneys repeatedly highlighted that Movant's counsel had requested a continuance specifically to obtain a psychological examination of Movant, but that Movant had chosen not to submit any expert evidence. The implication was that the presumed evaluation had revealed nothing favorable, and that there must be nothing wrong with Movant's mental health that would bear on his alleged conduct. Accordingly, the prosecution argued Movant should be held fully responsible for his conduct, and that there was no reliable evidence of mitigating mental health circumstances.

1    128.    Slightly less than a year after sentencing in this matter, Thomas Johnson held a meeting

2    with Movant concerning the charges filed by Solano County. Movant and his family were assessing

3    whether to hire Movant's counsel to represent him in the Solano matter. Movant's counsel stated

4    at this meeting that he believed Movant had a strong mental defense, and that he could overcome

5    most or all of the charges Solano County was bringing against him, which included a kidnapping

6    charge.

7    129.    Since pleading guilty, Movant has become more familiar with both the law and the

8    psychiatry relating to a not guilty by reason of insanity plea. Many of his psychiatric symptoms

9    have gone into remission or become better-controlled by medication, allowing Movant more

10    accurate insight into his current and past mental states. Based upon his research and knowledge of

11    relevant facts, Movant submits he would have had a very strong insanity defense to the charge in

12    this case. Had Movant's family (who were acting as Movant's de facto conservator given his then-

13    poor health) known of the strength of this legal defense, they would have prevented Movant from

14    pleading guilty under the offered terms. Had Movant insisted on pleading guilty despite having a

15    strong defense, they would likely have concluded Movant's judgment was compromised by mental

16    illness, and would have requested a competency evaluation or otherwise intervened.

17    130.    Movant submits that counsel also failed to take steps to assert applicable rights and obtain

18    appropriate remedies in connection with all previously asserted grounds for relief in this motion,

19    except grounds one and seven.

20    131.    To wit, Movant's attorney failed to investigate and obtain evidence of authorities'

21    warrantless searches of his electronic devices ( other than the first warrantless search by Dublin

22    Police Services) and to file motions to suppress relating to these unlawful searches.

23    132.    Movant's counsel also failed to advise him of the existence of, and his eligibility for,

24    government-funded experts and investigators in his case, pursuant to 18 U.S.C. § 3006(a). Movant

25    was of the belief that any experts or investigators used in his case would necessarily have to be paid

26    for by his family. Movant repeatedly expressed to his attorney that he felt deeply guilty and

27    ashamed that his family had to pay for his legal defense. Movant agreed that he should be examined

28    by a forensic psychological expert. But he expressed concern over the cost when his attorney

1  suggested retaining a cellular phone expert to testify in relation to Movant's motion to suppress.

2  Had he known it was possible to obtain litigation expenses through public funds, Movant would

3  have insisted on expert testimony in his case. This would have included a computer forensics expert

4  to investigate and prove that authorities had accessed various electronic devices of Movant before

5  obtaining proper authorization to do so. This analysis in turn would have been the basis of motions

6  to suppress key evidence in Movant's case.

7  133.    On information and belief, Movant's counsel failed to timely communicate to him a plea

8  offer more favorable than that ultimately accepted by-the Movant. The prosecution offered a plea

9  agreement in which it would recommend a sentence of 32 years and also include and bind the

10  Solano County District Attorney's Office in the same agreement not to bring any charges against

11  Movant. By the time this offer was communicated to Movant, it had been withdrawn by prosecutors.

12  Based on the fact that he ultimately accepted a plea agreement under less favorable terms, Movant

13  submits that he would have accepted the better plea agreement had it been timely communicated to

14  him by counsel.

15  134.    Movant's counsel failed to object to statements in the presentence report that were

16  inaccurate. When reviewing the draft report, Movant expressed to counsel that various facts were

17  incorrect. His attorneys stated that he could raise those matters in his objections, but that ultimately

18  it would be up to the probation officer what to include in her report. Upon reviewing objections

19  his attorneys submitted to the probation officer, Movant saw that some of the matters he had

20  discussed with his attorneys were raised and some were not. The omitted matters were not raised

21  in objections to the final presentence report.

**Thirteenth Ground for Relief:**
**Plea Agreement and Plea Not Knowing, Intelligent and Voluntary**

23  135.    Movant incorporates all preceding paragraphs as if fully set forth herein.

24  136.    At the time he pleaded guilty, Movant was suffering a severe depressive episode, including

25  suicidal ideation with specific plans to take his own life, anxiety attacks, sleep disturbances and

26  pervasive thoughts of guilt, of hopelessness, of pointlessness and of no future, among other

27  psychiatric symptoms. Movant's poor mental health was exacerbated by being locked down in

1   solitary confinement for the preceding year an average of 23.6 hours a day, with no more than four

2   periods of recreation in an enclosed area during that entire year.   The profound isolation deeply

3   affected the Movant's mental state and his ability to interact with people outside the small area of

4   his confinement.

5   137.   At the change of plea hearing, the Court ascertained a rudimentary report of Movant's

6   mental health and the medications he was taking. The Court did not rely upon the Movant's medical

7   records or any expert report on his psychological health. Instead, it relied upon Movant's own self-

8   report.  The Court's questioning of Movant relied upon an incorrect assumption that Movant had

9   adequate insight into his own mental health and the effects of the multiple psychotropic medications

10  he was taking.  In fact, the Movant was unable even to accurately answer questions intended to

11  ascertain his competence. The Court further assumed that Movant would be able to freely discuss

12  his acute psychiatric symptoms — symptoms most patients would find highly personal and

13  embarrassing — in open court and in front of a large media presence.  In fact, simply being present

14  in court with a large number of people was acutely alarming to the Movant.  After almost ten

15  thousand hours of nearly uninterrupted solitude in a small concrete box, the Movant could think

16  only of how to get out of the courtroom as quickly as possible.

17  138.   Movant submits that due to the above symptoms and circumstances, his guilty plea was

18  neither competent nor knowing, intelligent and voluntary.

19  139.   Movant's guilty plea was also the result of misrepresentations by the prosecution and their

20  concealment of material evidence.  This included DNA evidence as well as evidence concerning

21  an FBI agent's conflict of interest that undermined the integrity of the investigation.

22  140.   The Movant's guilty plea was also strongly influenced by the ineffective assistance of

23  counsel alleged under the previous ground. As a result of counsel's poor performance, Movant

24  entered the plea bargain process in a far worse position than he would have had he received

25  adequate representation. Had he been in this better bargaining position and been aware of all

26  relevant. factual and legal circumstances, Movant would not have pleaded guilty and would have

27  insisted on going to trial.

28  ///

1   141.    In addition, whether or not Movant's psychiatric illness rendered him incompetent to plead

2   guilty, it did interact with other factors in his case to deprive him of protections and rights to which

3   he was entitled under the Constitution and U.S. statutes.  For example, Movant was especially

4   susceptible to accepting erroneous legal advice from his attorney due to his compromised mental

5   state.  The Movant due to his psychiatric illness had no interest in assisting with his own defense.

6   Although he had been previously licensed to practice law, Movant conducted no legal research of

7   his own while incarcerated at the Sacramento County Jail. By contrast, during a period of

8   temporarily improved mental health while in custody in Alameda County-before Movant had

9   lapsed into a depressive episode-Movant requested multiple legal materials from his attorneys

10  concerning his state charges and sent his attorneys a detailed legal memorandum to assist them in

11  filing a pretrial motion.

**Fourteenth Ground for Relief:**
**Sentence Enhanced Based on Facts**
**Not Admitted or Found by a Jury Beyond a Reasonable Doubt**

15  142.    Movant incorporates all preceding paragraphs as if fully set forth herein.

16  143.    Movant submits that his sentence was enhanced based upon alleged facts and conduct that

17  was not admitted in the factual basis of his plea agreement, nor found beyond a reasonable doubt

18  by a jury.  Movant submits that such enhancements are in effect an end-run around his fundamental

19  trial rights and amounted to punishment for crimes with which Movant was never charged or tried.

20  144.    Movant submits that all enhancements applied to him that were not necessarily part of an

21  essential element of the charged offense were imposed in violation of Movant's constitutional rights

22  under the Fifth and Sixth Amendments.

**CONCLUSION**

24  WHEREFORE Movant respectfully requests that the Court:

25  (1)    Vacate his conviction and sentence in this matter;

26  (2)    Set aside Movant's guilty plea and all purported waivers of trial rights by Movant;

27  (3)    Order Respondent to preserve all evidence relating to the Movant's claims herein; and

28  (4)    Grant such other relief as the Court deems appropriate.

1   Respectfully submitted this sixteenth day of January, 2020.

2

3

4                                              Signed:

                                                        Matthew D. Muller
5                                                       *In Pro Per*

6

7

8                                       **VERIFICATION**

9          I, Matthew D. Muller, declare under penalty of perjury and the laws of the State of

10   California that the foregoing is true and correct.  Done this fourteenth day of January, 2020, in

11   Fairfield, California.

12

13                                             Signed:

14                                                      Matthew D. Muller

15

16

17

18

19

20

21

22

23

24

25

26

27

28