MATTHEW D. MULLER
1684 Decoto Rd. #274
Union City, CA 94587
PHONE: (415) 322-0492
FAX: (415) 366-3326
matt@projectjusticeforall.org

*In Pro Per*

FILED

MAY 06 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:15-CR-205-TLN-EFB |
| Respondent, | |
| v. | **SECOND AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE (VERIFIED)** |
| MATTHEW MULLER, | |
| Movant. | |

## INTRODUCTION

1.     On June 29, 2015, federal authorities filed a complaint with this Court attesting to six different ways the Movant was implicated in a high-profile kidnapping. Each and every one of their claims was a fraud.

2.     Using false evidence, forgery, and Photoshop, this District's authorities obtained the quick conviction they needed to avoid a mire of controversy. That controversy involved conflicts of interest that nearly caused the U.S. Attorney's Office to prosecute crime victims — an embarrassment for all agencies involved. The facts underlying the conflicts touch on private matters. They are discussed only as needed to show why authorities would stage so sophisticated a fraud.

3.     The mechanism of the FBI agents' fraud was complex, but the concept was simple: go back

1 in time and plant evidence before there would have been any apparent opportunity to do so. Then

2 happen to "discover" that evidence in photographs of an earlier search conducted by another

3 agency. Claims the evidence was planted would fall flat. At the time of their search, the other

4 agency was unaware of the FBI's investigation of a separate crime. They could not have known

5 what distinctive evidence to plant.

6     4.     To achieve their fraud, agents did not use a time machine. They used photoshop, digitally

7 inserting faked evidence into photographs of the earlier search. In a similar ploy, agents used items

8 seized in the earlier search as props in a reenactment of that search. They then added new items of

9 their own, photographed them, and passed off the photos as ones taken during the original search.

10     5.     In one instance, a warrant from this Court was used to reenter a previously searched home

11 and reenact that search. Agents brought the evidence they wanted with them — the same evidence

12 their warrant application said had already been seized. The agents then retroactively "found" the

13 evidence, using the home as a set piece for their fraud.

14     6.     Agents also harvested items from the home to plant elsewhere. One of these included a

15 distinctive medical device the Movant had received after surgery a month before. Attempting to

16 incriminate the Movant, the agents unwittingly inserted the device into a photograph they claimed

17 was taken by the kidnappers in March — two months before the Movant had the item.

18     7.     Prosecutors were aware of the fraud. They required the defense to sign a restrictive

19 discovery agreement that enabled them to claw back all records of the faked evidence as soon as it

20 had served its purpose. If not for his access to FBI evidence during a state case, the Movant never

21 would have discovered the fraud.

22     8.     The prosecution compounded FBI agents' fraud by concealing evidence that undermined

23 their case. This included crucial DNA evidence that authorities kept hidden not only from the

24 defense, but even from the victims — deflecting her repeated requests for the results of her sexual

25 assault exam while they hid them from the defense.

26     9.     The Movant's mental illness left him especially vulnerable to the FBI's revision of reality.

27 In poor health both before and after his arrest, he believed his own mind was to blame for what he

28 could not understand. His plea was in any event invalid due to psychiatric issues. They were

1  compounded by over a year of isolation in what a successful class action called "a concrete sensory

2  deprivation chamber."

3  10.    The government needed a conviction before this case became more of an embarrassment

4  than it already was.  The Movant was their best prospect. His conviction is a product of fraud,

5  concealed evidence and mental illness.  It cannot stand.

6  ## PROCEDURAL HISTORY

7  11.    This motion challenges Movant's 480-month sentence of imprisonment and 60-month term

8  of supervised release, as well as the conviction and plea underlying this sentence.  The judgment at

9  issue was entered on March 16, 2017.  *See* United States District Court, Eastern District of

10  California, Case No. 2:15-cr-205-TLN-EFB (ECF 60).[1]

11  12.    Movant incorporates by reference the information and procedural history set forth in his

12  form motion filed herewith.

13  ## PARTIES

14  13.    Movant Matthew Daniel Muller is currently in custody in Fairfield, California.  He is

15  serving a sentence imposed by this Court following a guilty plea to a single count of kidnapping in

16  violation of 18 U.S.C. § 1201(a)(1).

17  14.    Respondent United States of America ("Respondent") was represented in the underlying

18  criminal matter by Matthew Segal and Heiko Coppola of the Sacramento United States Attorney's

19  Office.

20  ## JURISDICTION AND VENUE

21  15.    Jurisdiction and venue are proper in this Court under 28 U.S.C. § 2255, as it is the court in

22  which the underlying judgment of conviction was entered.

23  16.    Judgment against Mr. Muller was entered on March 16, 2017.  The judgment became final

24  when the time for appeal expired on March 30, 2018. *See* ECF 60; Fed. R. App. P. 4(b).  Movant

25  submitted the instant motion to prison authorities for mailing on March 30, 2018 and it is deemed

26  filed as of that date. *See Houston v. Lack*, 487 U.S. 266 (1988) (petition of a *pro se* inmate is

27

28  [1] All further docket references in this motion will be to this case number in the Eastern District of California.

SECOND AMENDED § 2255 MOTION                  - 3 -                        *United States v. Muller*

1    deemed filed the day it is given to prison authorities for mailing).  Accordingly, this motion is

2    timely filed under 28 U.S.C. § 2255 and this Court has jurisdiction to proceed.

3    **EVIDENCE AND OFFER OF PROOF**

4    17.    The Movant did not begin to learn of and understand the fraud described herein until

5    approximately three weeks before the instant filing.  The amended motion and its supporting

6    material were expeditiously assembled in order to file a superseding request to amend within the

7    timeframe already set for the motion being superseded.

8    18.    As set forth in FBI reports and affidavits, the government's case against the Movant began

9    with a set of photographs.  The digital images were purportedly taken by a Dublin Police Services

10   (DPS) detective during searches not then associated with the federal case.  FBI reports state that

11   agents reviewed these photographs during an interagency meeting on potentially linked

12   investigations.  The agents state that they recognized distinctive evidence associated with their case

13   depicted in the photos.  They then took custody of items the agents claim were all originally seized

14   by DPS including purported physical, electronic, and trace evidence.

15   19.    The Movant obtained the digital photographs from prosecutors in his related state matter.

16   They advised that the files were received directly from the FBI.  Chain of custody logs confirm

17   this.  The memory card containing the photograph files was forensically copied by a defense

18   computer expert.  In addition, the defense copied evidence inventory photographs taken by the FBI

19   computer analysis response team (CART).  The photographs are relevant to this motion because

20   (1) the altered images embody fraud in themselves; (2) the images depict large amounts of falsified

21   and or planted evidence; and (3) the images are a visual map of the government's case.

22   20.    The search photographs were purportedly all taken by a single DPS detective.  The

23   electronic device inventory photographs were represented as all taken by a single CART expert.

24   Both sets of images include metadata embedded in each file purporting to show when the

25   photographs were taken.

26   ///

27   ///

28

**DPS Detective**  **FBI Computer Forensics Expert**

# Figure 1

21.     For the reasons set forth below, the metadata do not accurately represent the time all photographs were taken. The images all purport to depict items and conditions that were not actually present when the photograph was taken.  It is believed that all or most digital alterations were made by FBI personnel due to their sophistication and centrality to the federal case.

22.     The Movant recalls being shown certain of the below images and received copies of several in the client file he subpoenaed from trial counsel. The Movant has no reason to believe the full set of images he has now reviewed is any different than what was provided to the defense in federal discovery.

1   23.     The photographs number over 500 in all, and the Movant cannot easily provide full copies

2   within the timeframe available.  He has accordingly excerpted relevant images and placed them in

3   line with the text describing their significance.

4   24.     No attention has been made to the original images except as follows.

5   25.     Most images are resized to allow for compact presentation.  Except where noted, the images

6   contain the significant portion of the original photograph.  None is presented in any way known to

7   be misleading.  Images may be trimmed and juxtaposed with another relevant image, but it will be

8   clear that the images are distinct.

9   26.     For example, the images below depict a cell phone that was seized from the Movant, and a

10   subtly different one that was switched in by FBI agents after they inserted inculpatory digital

11   evidence.  The two photos have been trimmed and set side-by-side for comparison.  As in other

12   images below, red arrows indicated the relevant feature discussed – here, in the small differences

13   in trim color between the two phones.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22




Left Top: DPS Image
P103036 06/09/2015 12:11 PM

Left Bottom: FBI Image
DSCN0053 08/18/2015 12:45 PM

### Figure 2

23
24
25

26   27.   As set forth in detail below, many images have been digitally altered by authorities.

27   Alterations to some images are evident by sight and common knowledge, and an expert opinion

28

1    will be confirmatory. For example, the evidence photos on the next page show a license plate that

2    was photographed during the search. The actual plate number that was present has been altered,

3    which only an expert could discern in an image of the plate's front. The back of the plate was

4    edited with less care. The letter indentations were wiped smooth except for a single 'J', probably

5    left so that the plate would look natural at a glance. However, the 'J' should face the opposite way

6    when viewed on the back of the plate. Also , in the process of rotating or mirroring the plate, the

7    editor accidentally left the reflection of the blue blanket at the top of the plate. It should be at the

8    bottom, where the blanket folds correspond to the reflection.



**DPS Images**:

**Left:**
**P1030193 06/09/2015 09:02 AM**

**Below:**
**P1030194 06/09/2015 09:02 AM**

**Figure 3**

28.     Other errors are more subtle and will require explanation by an expert.  Below is an image in which an error can to some extent be discerned by a layperson, but not so plainly as in figure 3. The image below contains a box of evidence that was not actually present in the original search photograph.  The box has been merged into other photographs as well, and several show a roll of white gauze from the original image at the foot of the box.  In the top-down view, however, the editor has made a mistake of perspective.  When the box was inserted into the photograph, the editor blended the gauze into the top lip of the box even though the real object was a foot below and should not have impinged into the box's top edge.





### Figure 4: DPS Images
### P1030154.jpg 06/09/2015 08:06:00AM

29.     For these and all other images alleged to be altered, an expert would establish that fact through a number of means.  First, the expert may apply photogrammetries to show, for example, that the size of known items relative to each other is inaccurate because the photo alterer misjudged the correct proportions.  The expert may also establish that the lighting and focus is inconsistent across the image.  The expert may also make observations with reference to other photographs.

## GENERAL ALLEGATIONS

30.     On March 23, 2015, intruders broke into a home in Vallejo, California.  The homeowner and his girlfriend were awoken, detained for a time, and then told there had been a mistake.  The intruders stated that they had confused the girlfriend with their intended target, the homeowner's former fiancé with whom the homeowner was still intermittently involved.

31.     The intruders took the girlfriend instead, and demanded a ransom of $17,000.  The homeowner reported his girlfriend as missing approximately twelve hours later.  The ransom was not paid, and the girlfriend was released near her home in Southern California.

32.     The homeowner identified two people he believed might target him and or his former fiancé.  The first was her ex-husband, who had stalked the former fiancé after their divorce.  The second was a recently fired police officer with whom she had had an extended affair while still engaged to and living with the homeowner.  The homeowner believed this man could be responsible because there was a past and ongoing romantic rivalry over the ex-fiancé, and because the intruders had had detailed information about his personal and financial affairs.  The former officer had been terminated for illegal use of law enforcement databases to investigate persons in his private life.

33.     The FBI became involved in the case while the homeowner's girlfriend was still missing.  One of two lead agents on the case had been in a romantic relationship with the intended victim.

34.     The agent was aware when he began work on the case that the kidnapping had been intended for his former romantic partner.  Part of their relationship occurred while the intended victim was married to and living with the ex-husband, whom the homeowner had identified as a possible

1    suspect.  The other part of the relationship occurred while the intended victim had been dating both

2    the FBI agent and the homeowner.  The intended victim had chosen to end her relationship with

3    the FBI agent and become engaged to the homeowner.  The homeowner has stated that the FBI

4    agent had an ongoing and unrequited romantic interest in the intended victim.

5    35.    The kidnapping generated widespread media coverage.  When the abducted girlfriend

6    resurfaced in her hometown with no ransom being paid, the FBI agents endorsed the theory that the

7    kidnapping had been faked.  The FBI agent and his partner threatened to charge the girlfriend and

8    the homeowner who had been the agent's romantic rival.

9    36.    The record does not disclose that the agents investigated either of the two potential suspects

10   identified by the homeowner.  Both lines of investigation would involve issues of infidelity by the

11   woman who was the lead agent's past and reportedly present romantic interest.  An investigation

12   of her former husband would touch on the agent's extramarital affair with the woman.  The affair

13   was a factor in her divorce and the ex-husband's ongoing vindictiveness.  Given the high degree of

14   media interest, it was likely that these affairs would receive substantial public attention if the lines

15   of inquiry came to light.

16   37.    In April and May of 2015, the FBI investigation stalled.  The agents continued to

17   investigate, but did not change or disclaim their assertion that the kidnapping was a hoax.  The U.S.

18   Attorney's Office agreed to prosecute the homeowner and girlfriend for lying to federal agents if

19   charges were requested.

20   38.    On June 5, 2015, police responded to an attempted home robbery in Dublin, California.  On

21   June 9, 2015, Dublin Police Services ("DPS") arrested a suspect – the Movant Matthew Muller –

22   in South Lake Tahoe, California.

23   39.    In conjunction with the arrest, DPS executed warrants for the search of a home and a stolen

24   vehicle.  The vehicle was purportedly recovered within a mile of the home.  Police reports state that

25   it was found with the Movant's license inside, as well as upwards of one hundred items associated

26   or alleged to be associated with the Movant.  However, when the vehicle was later processed for

27   fingerprints, none belonging to the Movant was found.

28

40.     As described below, items purportedly found in the stolen vehicle were brought there from the home search that was conducted immediately before.  Some items did not belong to the Movant. Other items did not even exist yet when the search was conducted.

41.     As shown below, the last category included all evidence purportedly linking the Movant to the kidnapping in Vallejo.

42.     Sometime before the arrest, DPS – a branch of the Alameda County Sheriff's Office ("ACSO") – contacted neighboring agencies to determine whether there were similar break-ins for which the Movant could be a suspect.  Vallejo was among the jurisdictions contacted, and it in turn passed the information along the FBI via its task force officer.

43.     On June 10, 2015, the FBI contacted the woman who was said to be the intended victim of the Vallejo kidnapping, and who was previously involved with the lead agent on the case.  The woman was asked whether she knew the Movant or recognized his photograph. She did not.

44.     According to the FBI reports, the actual victims of the kidnapping were not contacted until over two weeks after agents spoke with the woman who had been a putative victim only.

## I.     EACH AND EVERY CLAIM FBI AGENTS MADE TO THIS COURT THAT PURPORTED TO CONNECT THE MOVANT TO A KIDNAPPING WAS A FRAUD-BACKED LIE.

45.     On June 30, 2015, federal officials filed a criminal complaint against the Movant and an associated search warrant application.   The supporting affidavits swore that the Movant was connected to the Vallejo kidnapping by six facts: (1) a blacked-out set of swim goggles, similar to those used in the kidnapping and with a blonde hair attached consistent with the victim's, was found in a search of the stolen vehicle associated with the Movant; (2) a water pistol spray-painted to look like a gun was also found in the car, and matched one shown in a photograph a kidnapper had e-mailed to a newspaper; (3) GPS destinations programmed into the car included the Huntington Beach address where the victim had been released; (4) a cell phone seized from the car matched one that had been used during the kidnapping and contained evidence of the kidnapping; (5) items found in the Movant's residence during the search by DPS matched several shown in the

1  aforementioned photograph; and (6) a laptop seized during a search of the Movant's residence

2  matched one stolen during the kidnapping.

3  46.   The lead FBI agents claimed that they learned of these purported connections on June 25,

4  2015, during a meeting with DPS to discuss whether the Vallejo and Dublin crimes could be linked.



Figure 5: DPS Report Excerpt

21  47.   The affidavit submitted to the Court described the meeting, the photographs, and the

22  connections. Every one of them was a fraud.

### Blacked-Out Goggles With a Long Blonde Hair Attached

24  48.   A series of photographs purportedly taken by DPS on June 9, 2015, show items found in a

25  green duffel bag removed from the trunk of a stolen vehicle. The bag contained clothing, a replica

26  of a firearm, and a utility belt in which a pair of blacked-out swim goggles was found.







Figure 6: DPS Images

49.     The digital image files produced by DPS contained metadata indicating that the photographs above were taken on June 9, 2015. The images were arranged to establish three facts: that the utility belt was found in the duffel bag, that the goggles were found in the utility belt, and that a blonde hair was found adhering to the duct tape.

50.     The utility belt was shown emerging from the bag with other evidence laid out on the pavement in subsequent photos. The distinctive straps of the goggles were also shown emerging from the utility belt pouch, leaving no doubt what was inside and that it was found with other evidence depicted. Also part of the tableau was the replica firearm silencer protruding from the bag. It had a distinctive silver tip with reflective edges. However, a photograph purportedly of the same silencer taken minutes later depicts a plain black tip as well as more subtle differences.



P1030216 06/09/2015 11:07 AM     P1030211 06/09/2015 11:04 AM

**Figure 7: DPS Images**

51.     The photographs of the duffel bag, utility belt and goggles with a long blonde hair attached were not taken on the same day as other photographs shown. FBI agents staged a reenactment of the DPS search using evidence previously seized, and added evidence they wished to plant: the

blonde-haired goggles.  According to evidence records, the replica pistol was able to shoot plastic "BBs" and so was classified and stored as "Firearm, Other" in a more controlled section of the evidence room.  The agents likely could not check the pistol out for their reenactment as easily as they could other evidence.  So they used a substitute, which may have been a genuine – and illegal – firearm silencer.

52.     The purpose of the reenactment, and of every other such attempt to make it appear as though certain evidence was found during the DPS search, was to anticipate and deflect allegations of evidence planting.  DPS was not investigating or familiar with the Vallejo kidnapping, and so would have no reason to plant evidence or knowledge of what evidence would be inculpatory.

53.     The conflicting silencers are the clearest indicators of the FBI reenactment.  But there are other inconsistencies.  Although a pair of blacked out goggles with a blonde hair conspicuously attached is a very suggestive detail, it is not mentioned in any DPS report.  This is the more unusual because the purported DPS photographs include multiple images of the hair both at the search site and in the evidence room.

54.     There are other indicia of the fraud.  A reflection in part of the googles shows a male taking the photograph rather than the female DPS detective who claimed to have taken all photographs.  Expert enhancement may make the face identifiable.  Below are photographs of evidence bags in which items shown in Figure 6 were placed and transported back to Alameda County.  (The full image shows the seized item listed on the bag.)  The items were purportedly bagged, transported and photographed contemporaneously.  But the bag for the goggles and utility belt looks brand new, while every other bag shows wear.

///

///

///

///

///

///

///

Figure 7.5: DPS Images
P1030256 06/10/2015 10:45 AM

55.     The duffle bag sequence in Figure 6 also conflicts with a photo taken later according to its metadata. That photo shows the green duffel bag still unopened while an officer displays a blacked-out diving mask in a pouch on the same utility belt that held the blonde-haired goggles. (The diving mask is shown, without the tape covering it in the background of a photograph taken during the house search that day, as discussed below.)

///

///

///

///

///

**Figure 7.75: DPS Image
P1030228 06/09/2015 11:20 AM**

56.     The second pouch present in the duffel bag sequence – the one containing the blonde-haired goggles – is not shown in the above photo.  And the main pouch containing the mask above is never opened in the duffel bag sequence, even though all other evidence is carefully laid out and photographed.  In fact, the mask and the goggles never appear together in any photograph, including DPS evidence room photos that juxtapose many other related items.

57.     FBI agents effectively traveled back in time to insert both a modus operandi link as to the goggles and trace evidence in the form of the long blonde hair.  It is not known whether the hair was actually the Vallejo victim's, but FBI agents did have access to previously collected samples.

58.     Authorities also conformed the judicial record to their retroactive "discovery" of the goggles.  Most likely working together with DPS officials, they forged a warrant return and managed to exchange it for the original in the California Superior Court file.  The Movant has already documented an instance of forged warrant returns for the June 9, 2015, searches.  (DE 126.)  The Movant cannot afford another expert analysis for the additional forgeries.  However, he believes inconsistencies are observable by a layperson, and an expert witness would confirm this.

59.    The Movant received in discovery for his related state criminal matter a two-page warrant return for items seized during the search of the stolen vehicle on June 9, 2015. They match records obtained directly from the court. The second page of the return includes the two entries at the bottom of the figure below.



## Figure 8: DPS Warrant Return

1   60.   The above list is inconsistent with DPS reports and other warrant applications, in that they

2   do not list "Speedo Goggles" with the other items shown. Handwriting on the warrant returns also

3   appears to be inconsistent. Comparing the two "Location Searched" entries show differences in

4   what purports to be the same handwriting.



Figure 9: DPS Warrant Return

15   61.   The signatures of the officer submitting the return also differ. In particular, the signatory is

16   Rafael Alvarez, a Supervisory Sergeant, abbreviated as "SST." In the authentic return, the 'T' in

17   the rank abbreviation is ambiguous. The forger mistakes it for a 'D' and enters "SSD" – a

18   nonsensical abbreviation in this context and an error the actual officer is unlikely to make.

Figure 10

1   62.     Having arranged a forged warrant return, the FBI agents may have had some concern that

2   their fabricated goggles would be subject to suspicion if they appeared on an entirely different

3   warrant return page from the utility belt that supposedly held them.  Accordingly, they sought to

4   redesignate the blacked-out mask (referred to as goggles in the warrant return) as "Speedo Goggles"

5   listed on the second page of the warrant return.  By process of elimination, that would leave the

6   blonde-haired goggles as the ones that were listed next to the utility belt on the genuine page of the

7   warrant return.

8   63.     To effect this change, agents removed the original translucent strap from the diving mask

9   and photographed it with opaque and thinner white bands bearing the "Speedo" logo.  The bands

10  do not appear actually to be attached to the mask because it uses an incompatible mechanism.  But

11  the photographer obscured this fact by the pose of the goggles and crop of the photo.

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///



Figure 11: DPS Images
P1030228 11:20 AM

**Black-Painted Water Pistol With Flashlight and Laser**

64.     FBI agents next told the Court that during their meeting with DPS, they recognized a distinctive black-painted water gun with a laser pointer attached.  The agents stated that they recognized the gun from photos sent to a newspaper by a kidnapper.  The two images are compared below.



## Figure 12: DPS and Internet images
## P1030229 06/09/2015 11:20 AM

65.     The Movant is unsure why FBI agents had stated that a laser was attached to the pistol, as the photo appears only to show a flashlight.  In any event, a photograph taken during the June 9 search of the stolen vehicle does purport to show a nearly identical item, seen in the next figure.

///

///

///

///

///



**Figure 13: DPS Image
P1030229 06/09/2015 11:20 AM**

66.     In fact, this item did not appear in the original search image at all. The item was instead created by FBI agents and incorporated into the photograph.

67.     An expert witness would catalog the various indicia of image tampering above.  Loosely speaking, the lighting and perspective are not exactly correct.  At least one artifact of the image editing is visible with nothing more than simple rotation and zoom.



**Figure 14: DPS Images**

68.     There is an observable difference between the two handles shown. The embossing and relief details on the right handle are malformed and have a clay-like quality. This is a result of an imperfect application of three-dimensional digital effects such as lighting and perspective changes, as an expert would testify.

**Inculpatory GPS Destinations in Stolen Vehicle Purportedly Used In Kidnapping**

69.     The affidavit submitted to the Court further states that on June 9, 2015, DPS officers interacted with the on-board GPS system in the stolen vehicle they searched. They located the "recent destinations" menu and photographed destinations that included address in Huntington Beach near where the female victim was released. Accordingly, the affidavit states, it is likely the vehicle used in the kidnapping in light of other evidence.

70.     Below is a group of photographs that, according to the file metadata, were taken in the sequence shown on June 9, 2015.

 

 

## Figure 15: DPS Images
## P1030251 06/09/2015 11:50 AM

71.     In fact, the close-up photographs of the GPS screen were not taken until some later date. The lighting of the photographs is not consistent with other images shown from that day.  Most notably, a reflection of two distinct light sources appears on the screens.  Their color temperature relative to the cooler white of the GPS screen is more consistent with artificial lighting or late-day sunlight than with the midday overcast conditions shown in supposedly contemporaneous photos.





## Figure 16: DPS Images
## P1030252 06/09/2015 11:50 AM

72.     The vehicle is a convertible, and so it is possible the reflection would show artificial lighting reflected while the vehicle is processed for evidence with its top down in a warehouse or garage. However, based on the photograph times shown in the file metadata – as well as the times appearing on the vehicle GPS screen – the indoor photographs likely could not have been taken at the times purported.  This would have required moving the vehicle into a garage, back out again, back in, and then out, all within the space of several minutes.

73.     If officers intended to process the vehicle for fingerprints and other trace evidence – which they did intend and carried out later at a forensic vehicle laboratory – it is unlikely they would disturb the vehicle's in-dash touchscreen.  A touchscreen is arguably the surface most likely in the vehicle to bear fingerprints.  In fact, a photograph taken earlier in the search shows that the touch screen actually had *visible* fingerprints on it that day.



DPS Image:
P1030201 06/09/2015 10:57 AM
Figure 17

1   74.   Expert analysis can provide further evidence that the photographs were taken later, after

2   FBI agents had the opportunity to enter any desired GPS destination. It happened that prior

3   destinations purportedly included a circuitous route from South Lake Tahoe to Huntington Beach,

4   with waypoints indicating the vehicle would have had to cross state lines, consistent with the

5   requirements of certain federal charges.

6   75.   As with nearly all other evidence cited in their affidavit, FBI agents contrived to make it

7   appear the GPS evidence was found earlier by DPS. This tactic anticipated allegations that their

8   evidence was planted. They would be able to respond that the agency discovering the evidence had

9   neither motive nor knowledge to plant it.

10                  **Trove of Evidence Found in Box During Search of Tahoe Property**

11   76.   The FBI's most elaborate inculpatory operation was its plan to associate the Movant with

12   objects depicted in a photograph purportedly sent to a newspaper and the police by the kidnappers.

13   77.   The FBI's effort centered on the box depicted below.

14

15

16    

17

18

19

20

21

22

23

24

25                  **Figure 18: DPS Images**

26                  **P1030139 06/09/2015 7:44 AM**

27

28

SECOND AMENDED § 2255 MOTION            - 28 -                    *United States v. Muller*

78.     The figure shows a standard file box with dimensions 15'' x 12'' x 10.5''. In this roughly one cubic foot-sized space, authorities allege they found all of the following: (1) an inkjet printer; (2) a power grinding tool; (3) two CB radios; (4) a radar detector; (5) a key making device about the size of a bottle of shampoo; (6) a full roll of duct tape; (7) what appears to be a roughly twelve fluid ounce plastic bottle; (8) sunglasses case; (9) a wireless router; (10) a metal coil apparatus that occupies about the space of a soda can; (11) an LED light about as large as half a soda can; and (12) zip ties and rope.





## Figure 19: DPS Images
## P1030154 06/09/2015 8:06 AM

1  79.    The box is shown to contain other material, including a camera, a hot glue gun and package

2  of model rocket engines.  But what is significant about the above dozen items is that they all appear

3  in the aforementioned photograph said to be sent by the kidnappers.  Put differently, nearly every

4  item in the box is inculpatory and is held out as connecting the Movant to the kidnapping.

5  80.    In fact, at no point is the above box where it purports to be when it purports to be there.

6  About half of the photographs presented to the defense as inculpatory evidence are altered images,

7  with the box incorporated into existing photos of the original DPS search.  Given the centrality of

8  the deception to the government case, the probability that the photographs should receive some

9  scrutiny, the images were very carefully altered. But the effort was not without error.

10  81.    The images on the following page show three views of the incorporated evidence trove.

11  The first depicts a yellow and black grinding tool with a silver guard above the spinning head area.

12  Seen from another angle, the guard extends out from the tool in a way that should be visible and

13  partially impinge into the duct tape.  However, the guard is absent from the second image, in which

14  it should be visible.  In the third image, the silver guard has been blacked out such that it is visible

15  only as a dark occlusion to the duct tape.  The fourth image is a closer view in which the blacked-

16  out guard is more visible.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22





23

## Figure 20: DPS Images

24
25
26
27
28

82.     Although the Movant believes that it is sufficiently evident these are not natural variations, an expert witness would verify this.

83.     In other image, there is a subtle error or perspective. In most images, the surroundings have been painstakingly and convincingly merged into the box, which was photographed separately. In the image below, however, an item that is shown on the floor in other photos has been accidentally blended into the lip of the box a foot above the floor.






**Figure 21: DPS Images**
**257P1030154.jpg 06/09/2015 08:06:00AM**

1   84.    Such discontinuities are one of the few available markers of where an image has been

2   expertly altered. Another example, below, is from the stolen vehicle search. On the left side of the

3   hand, the image is unaltered and shows a strip of white metal below the trunk's weather-stripping.

4   To the right of the hand, the editor has transferred a portion of another image to cover up some

5   unknown object in the original photo.  However, the editor inadvertently covered the metal rim of

6   the trunk, making a similar error of perspective as that above.



**Figure 22: DPS Image**
**P1030245 06/09/2015 11:32 AM**

21   85.    Other photographs proffered to the defense do in fact show the box inside the home in South

22   Lake Tahoe. But the photographs were not taken on June 9, 2015, by DPS officers executing a

23   search warrant. They were instead taken on July 1 by FBI agents executing a federal warrant that

24   was based in part on seizures they used the same warrant to fake.

25   86.    On July 1, an FBI evidence response team waited in an unmarked van (and presumably

26   other vehicles) for the Movant's mother, stepfather and uncle to leave the home. They then entered

27   the residence, bringing along both evidence they wished to plant as well as items previously seized

28   to use as props in their reenactment of the earlier search.

87.     The agents then created further images of the apparent evidence trove being unpacked. Some of these were taken up close, but others depict the home in the background. It would not be possible to discern that these photos were taken later rather than altered, but for the presence of a different type of error.

88.     The government had some but not all of the items depicted in the background in the earlier search available for its staging. Where they did not have an item, they went to some lengths to obtain a convincing stand-in. For example, the ski boot at left, below, has some but not all the characterizers of the one depicted in the original search.

 

P1030140 06/09/2015 7:45 AM      P1030186 06/09/2015 8:43 AM
Figure 23: DPS Images

///
///
///
///
///
///
///

89.     An even clearer example is the post-surgery shoe shown in the background of one of the reenactment photos. The original show had a square toe as shown in the left photo. The shoe used for the reenactment had a rounded tow, which agents apparently tried to obscure with a pillow.



**Figure 24: DPS Images**
**P1030139 06/09/2015 7:44 AM**

90.     Other than the tow, the shoe used was virtually identical to the original.  That agents would go to such trouble to obtain a specialized medical shoe just to use as a background prop is emblematic of the lengths to which they went to ensure their fraud was a success.

91.     When the Movant's family returned to the home, agents seized the Movant's mother's laptop, which contained irreplaceable family photographs and her teaching materials. Records indicate that agents never searched the laptop nor even submitted it to their in-house forensicists to process or preserve. The agents' conduct at another search site – the Movant's father's home – included an unannounced forced entry with children present, followed by confinement of those

1    children in a room while the home was searched. The only item seized was the Movant's military

2    discharge form. Probably cause for both warrants was based entirely on the fabrications described

3    herein.

4                      **LG Cellular Phone Containing Inculpatory Photos**

5    92.      The FBI affidavit states that an LG brand cellular phone was seized from the Movant.  It

6    further alleges that when searched by DPS, the phone contained the photograph of kidnapping gear

7    described above (The Movant does not know which version of the photograph it purportedly

8    contained).

9    93.      The Movant did have an auxiliary cell phone at the house in South Lake Tahoe, as Verizon

10   cell tower service there was poor and erratic, and the Movant could not always make calls on his

11   primary phone.  The Movant does not recall the phone model but will assume DPS did seize a

12   phone, although it would have been taken from the home and not the vehicle as claimed.

13   94.      The LG phone is shown in both DPS and FBI evidence photographs.  As referenced in a

14   preceding section, the phones are the same model, but subtly different in appearance.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///



Left Top: DPS Image
P103036 06/09/2015 12:11 PM

Left Bottom: FBI Image
DSCN0053 08/18/2015 12:45 PM




Figure 25

95.     The color differences are reliably discerned from trim pieces shown on the back of the phone. The phones also have differing trim on their outside edges, with one trimmed in glossy black plastic and the other in a high-shine silver or mirrored material.



**FBI Image:**
**DSCN0052**
08/18/2015 12:44 PM

**DPS Image:**
**P1030360**
06/10/2015 12:11 PM

**Figure 26**

96.     A mirrored edge trim could appear similar to glossy black trim under some lighting conditions. However, the Movant submits that the difference can be discerned in the above photos by comparing the trim to adjacent black and silver features. The relative difference between the colors should persist across variations in lighting.

97.     The original black-trimmed phone was switched out by the FBI for several reasons. The dearest is that they wished to hold the phone out as one that was used to make calls FBI reports state were made during the kidnapping. This required a change both in carrier – to TracFone- and a change in the type of transmission protocols built into the phone – from GSM to CDMA.

98.     The photograph of the phone being held in front of the stolen vehicle is noteworthy because the phone's edge-trim is plainly silver and not black.



**Figure 27: DPS Image**

**P1030240 06/09/2015 11:27 AM**

99.     This means the photo was taken some time after the switch, and not during the June 9 search as it is made to appear.  This is another example of the FBI essentially reaching back in time to plant evidence.

100.    Once in FBI hands, the phone became a trove of evidence, containing both photos and e-mails relating to the kidnapping.

///

///

///

///

///

1
2
3
4
5
6
7
8
9
10



11
12

## Figure 28: FBI Images
## DSCN0135 08/19/2015 11:17 AM

13
14
15
16

17   101.   The FBI affidavit states that DPS searched the phone and found the photograph of

18   kidnapping gear, but it is implied that DPS did not understand its significance until the June 25,

19   2015, meeting when DPS and the FBI compared investigations.  The story of the revelatory June

20   25 meeting is in tension with the claimed content of the phone.  It is implausible that DPS would

21   search a phone the FBI claims contains the depicted material and not realized the phone is

22   connected to a kidnapping.  The e-mail address alone would allow the connection to be made much

23   sooner than it purportedly was.

24   102.   The FBI also forged chain of custody records for the phone in support of its effort to switch

25   in an inculpatory device and content.  Although the Movant cannot afford an additional handwriting

26   analysis, he believes that indicia of forgery in this example can be discerned by a layperson.  The

27   LG phone chain of custody record appears on the left with a comparison on the right to known

28

1  samples of the DPS detective Miguel Campos.  Two samples are taken from another evidence

2  envelope, two from police reports, and one from a warrant.



## Figure 29: FBI Image and Excerpt
## DSCN0048 08/18/2015 12:44 PM

103.    The formation of the detective's distinctive 'M' is different in the forgery, as is the more

erratic alignment of letters.

104.    Forged chain of custody records appear in numerous other places in the investigation,

including in the supposed discovery of the male victim's stolen laptop, as described below.

**Male Victim's Stolen Laptop**

105.    The FBI affidavit states that DPS recovered a black Asus brand laptop during their June 9,

2015, search, and that the laptop was stolen from the male victim during the kidnapping.

106.    As described in the affidavit, this purported connection was made at a June 26, 2015,

meeting between FBI agents and the male victim.  The Movant was provided a recording of this

meeting in his state discovery material.

107.    The recording discloses that FBI agents had asked the male victim to contact Best Buy and determine whether they could locate his laptop's serial number based on his credit card number and purchased record.  The male victim learned that Best Buy did not keep records of serial numbers during the time he had made the purchase.

108.    In the recording, the male references what the agents had asked him to do, and the agents quickly move him away from that subject.  They then elicit a visual identification of the laptop.  The identification amounts to "that could be my laptop," or "it looks like my laptop" as it is phrased in the FBI affidavit.

109.    The FBI agents went no further than to elicit this visual identification based on a photograph of a nondescript black laptop with an Asus logo.  They did not request the victim's consent to search the laptop in order to verify that it was his.  They did not ask for his log-in information or ask him what his log-in screen looked like, nor show him a picture of it. Any of these would have easily been achieved without difficulty, as the laptop had purportedly been forensically copied and documented by then and its contents were readily available to the agents.  DPS also had a search warrant they stated covered all digital devices, and even without requesting the male victim's consent they believed they had authority to search.

110.    The record available to the Movant contains no indication that the FBI did any of the above even after filing their affidavit.

111.    The reason none of these was done is that the laptop the FBI exhibited in its photographs was not the victim's laptop.  It was acquired by the FBI as a stand-in for the laptop purportedly seized until after it enters FBI custody.  FBI agents did not want to commit to a serial number until they knew whether there would be a conflicting record maintained by Best Buy.

112.    FBI photograph have subtle indicia of digital tampering with Asus label, but expert testimony will be required to explain it.  It is somewhat visible around the ram of the Asus label below.

///

///

///






## Figure 30: FBI images
### DSCN4702 08/17/2015 2:25 PM

113.    The Movant's reply to the government opposition already documented forged warrant returns and inconsistencies in the record for all electronic devices seized from the Movant. (*See* DE 126). The Movant previously stated that multiple electronic devices of his were seized of which there was no record. Among these are either one or two laptops the Movant had used before purchasing his then-current laptop approximately six months before.

114.    To the extent DPS seized any laptop that was logged into evidence and the record of which was said to represent the victim's laptop, those records in fact represented another laptop seized from the Movant.

115.    The FBI agents' forgery and alteration of records is so extensive that it is impossible for the Movant to be certain of the exact mechanism of this particular fraud.  However, and apparent chain of custody forgery at the CART laboratory suggest that it was the locus of the fraud.

## 1B295: Acer Laptop

| Accepted Custody | Date and Time |
|---|---|
| Signature: | 8/17/15 |
| Printed Name/Agency: Hector Garcia Lomeli/FBI | 1:35PM |
| Reason: CART | |

| Accepted Custody | Date and Time |
|---|---|
| Signature: | 1:35PM |
| Printed Name/Agency: Hector Garcia Lomeli/FBI | 8-17-15 |
| Reason: CART | |

## 1B292: Asus Laptop Alleged to be Victim's

## Figure 31: Signatures from FBI Chain of Custody Logs

116.    In addition, it appears that the serial number the FBI has produced for the laptop does not even exist.  The Movant's spouse has an acquaintance who is employed in the purchasing department of Asus U.S.A., which is the sole distributor of Asus products in the United States – including to Best Buy.  Exhibit A (Decl. of Huei Dai).

117.    With uncommon exceptions, a record of the serial number of every Asus laptop sold in the United States is retained in an Asus database consulted by Ms. Dai's acquaintance.  That database has no record of the serial number the government states is affixed to the laptop it claims was the one stolen from the victim.

118.    The Movant's forensic computer expert in his Solano County case has executed a declaration stating that the evidence records of the purported stolen laptop are even more

1   compromised than the FBI's already-irregular record of other devices. (*See* DE 126.) She states

2   that "[w]e did not receive photos of the evidence report nor chain of custody for QSC292-HD0."

3   That evidence number denotes the Asus laptop's hard drive, which is essentially its identity.

4   119.   As shown in an earlier filing, CART records and lab notes are irregular and contain obvious

5   deletions. (DE 126.)

6   120.   The above frauds were perpetrated both against the defense and this Court. Deceived by

7   this sophisticated and thorough ruse, defense counsel could not but see little hope for a favorable

8   verdict at trial. This is especially so where in addition to manufacturing evidence of guilt, the

9   government actively concealed evidence favorable to the defense. Which was the same evidence

10   and circumstances that likely spurred the extensive fraud.

11   121.   In sum, the FBI and government defrauded the defense and this Court by (1) fabricating a

12   set of inculpatory blacked-out goggles, planting on it a blonde hair that was likely either removed

13   from evidence or harvested from the victim under pretext of needing a reference sample, and then

14   contriving to make it appear that these items were fraud at a time it was unlikely they could be

15   faked; (2) altering a search photograph to make it appear an unrelated investigation had discovered

16   a distinctive water pistol purportedly used by the kidnappers; (3) falsifying GPS records to make it

17   appear a vehicle had been used in the kidnapping, and then once again contriving to make it appear

18   these records were discovered before there was any opportunity to falsify them; (4) executing an

19   elaborate scheme to plant evidence in a home both digitally and physically, lying in this Court and

20   acting under color of its authority to enter a house and plant evidence that would make it appear its

21   lies were true; (5) switching an innocent seized cell phone for an nearly identical inculpatory one,

22   with the goal not only of planting digital evidence on the phone, but also of making it appear the

23   phone was the one used by the kidnappers during the crime; and (6) obtaining a laptop identical or

24   similar to one stolen during the kidnapping and then passing it off as that laptop and making it

25   appear to have been found in the Movant's possession.

26   ///

27   ///

28   ///

II.     **THE GOVERNMENT CONCEALED WITNESSES AND DNA EVIDENCE, AND KNEW THAT THE FBI HAD FALSIFIED INVESTIGATIVE REPORTS AND ALTERED KEY DOCUMENTS**

122.    The Movant hereby incorporates the material previously submitted under seal in support of his reply to the government's opposition to this motion. (*See* DE 126) That material comprises the victims' own accounts, based on their direct and personal knowledge, of the circumstances and relationships discussed below.

123.    As stated, authorities were aware of a number of potential witnesses and suspects from the outset of the investigation. The persons of greatest interest as suspects, victims and/or material witnesses comprised: (1) the male homeowner whose house was broken into by kidnappers (Male Victim); (2) the woman who had been engaged to the Male Victim and who the kidnappers claimed was their intended target (Intended Female Victim); (3) the woman the Male Victim was dating who was actually kidnapped (Female Victim); (4) the man the Intended Female Victim was dating and whose affair with her prompted the end of her engagement to the Male Victim (Male Victim's Rival); and (5) the Intended Female Victim's ex-husband who had recently been stalking her and who had been the subject of a restraining order (Ex-husband).

124.    The interrelationships among the above persons could only be described as fraught with strong feelings, rivalries and vendettas. The Movant will not describe them here in detail. He submits that those details include significant and numerous facts that would have been impeaching and/or exculpatory in any trial of this matter. As discussed below, the Movant does not allege that the government merely failed to disclose these facts, but that they actively concealed them and deceived the defense by both omission and commission.

125.    One of the two lead FBI agents on the kidnapping case ("Lead Agent") had preexisting relationships that made his participation in the investigation inappropriate at best. That participation was utterly compromising according to the Male and Female Victim whom the Lead Agent initially blamed for the crime.

///

///

126.    The Lead Agent had previously had an affair with the Intended Female Victim while she was married to the Ex-Husband.  This affair was a factor in their divorce, with the Intended Female Victim's infidelity having prompted acts of abuse against her by the Ex-Husband.

127.    Further, the Lead Agent had been dating the Intended Female Victim at the same time the Male Victim was dating her.  The Intended Female Victim stopped dating the Lead Agent in order to enter a committed relationship with the Male Victim.  The Male Victim has stated that the Lead Agent had an ongoing romantic interest in the Intended Female Victim throughout the investigation.

128.    The Lead Agent knew at the time he began work on the case that the apparent target of the kidnapping was a woman with whom he had had an affair, which affair had prompted the end of her marriage.  He may also have been aware that her Ex-Husband, the man whose wife he had been seeing, had a continuing recording of abuse toward the Intended Female Victim and could be a suspect in the investigation.

129.    The Lead Agent further knew that his former romantic rival, the Male Victim, was involved in the case and was then being treated as a suspect.

130.    After the Female Victim was released, the Lead Agent espoused the theory that the kidnapping was a hoax perpetrated by she and his former rival the Male Victim.  He conducted lengthy interviews with the Female Victim and pronounced that she was lying about the kidnapping.

131.    Assistant U.S. Attorney Matthew Segal agreed that he would institute prosecution for lying to federal officials upon a final request by the FBI to bring such charges.  Grand jury materials the Movant obtained in his state matter suggests that charges were imminent or planned.

132.    Both before and after the Movant became a suspect in the case, the Male Victim and Female Victim had sought the Lead Agent's removal from the case and filed formal complaints.

133.    From the outset of defense investigation and preparations, the government obscured the foregoing facts.  The Movant has been advised in his state matter that he has received the same discovery concerning early witness interviews in the case as was provided in the federal matter.  That material is deliberately confusing and features strategic omissions.

134.    For example, the Intended Female Victim was interviewed within 12 hours of the kidnapping being reported.  A transcript of a recording of the interview was provided, but not the original video.  The transcript was mislabeled, misdated, and does not even contain the Intended Female Victim's name.



UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION

4500 Orange Grove Ave
Sacramento, CA 95841

| Requesting Official(s) and Officer(s): | SA Jason R. Walter |
| | SA David J. Seams |
| Case Number: | 7A-SC-6228276 |
| Disc: | No. 2 of 5   02-23-15 |
| Start Date: | 08/04/2015 |
| Transcriber(s) and Office/RA: | OST Debra Kilby - Sacramento / SCFO |

VERBATIM TRANSCRIPTION

| Participants | | Abbreviations | |
| DS | David Seama | Primary language | (standard) English |
| AQ | Aaron Quinn | *Italics* | Spoken in *Spanish* |
| AR | Denise Huskins | UI: | Unintelligible |
| PO | Police Officer | OV: | Overlapping Voice |
| NK | Natalie King | PH | Phonetic pronunciation |
| UM-1 | Unknown Male one | RC | Recorded Message |
| UM-2 | Unknown Male two | | |

# Figure 32: FBI Transcript

135.    The transcript begins with the female speaker being labeled as "DH," the initials of the Female Victim and not the person being interviewed.  The interviewer begins by noting that it must be "kinda a shock...[t]o get a call in the middle of the morning and what not...  Given common usage and the context of the interview beginning at 5:52am, it is more likely that his actual words were "a call in the middle of the night."  That reference would indicate the urgency and importance of the interview, where otherwise it is not even clear on what day the interview occurred.



18   **Beginning of recording *four* of Disc 4    05:52:03**
19   05:52:03 - 05:54:36 no one in the interview room
20
21   UM-1   Thank you for coming down, I know it's kinda of a shock......
22
23   DH    Yeah....
24
25   UM-1   To get a call in the middle of the morning and what not (UI) do you have any idea
26           of what's going on, you heard anything or the news or anything like that?
27
28   UF    No (UI) I went to bed early last night because we had to be (UI) early to go to the airport
29           so....(UI)
--

## Figure 33: FBI Transcript

136.    The transcript next contains a reference indicating "UF" (unidentified female) had a flight this morning to leave the area with another individual.  This further obscures a key fact: that the Intended Female Victim was preparing to fly out of the jurisdiction with the Male Victim Rival within hours of the kidnapping being reported.  It is very unlikely the interviewer did not follow up on this detail.  But there is no record of it in the transcript, nor any way to review the original recording or even determine who is being interviewed, or when.

137.    This pattern continues in transcripts of interviews with the Male Victim.  There are multiple points in the interview where the transcript indicates he says words to the effect of "the only person I can think of who might do this…" and then the remainder of the phrase is labeled as a pause or "…" or unintelligible.  There is some suggestion by proximity that he could be speaking of the Male Victim Rival.  But according to the transcript he cannot remember the name.

138.    The Male Victim Rival had a nearly two-year affair with the Male Victim's fiancé, the Intended Female Victim with whom he had been living.  The man called and texted the Male Victim repeatedly when he learned the Intended Female Victim was engaged to him.  The affair ended the engagement, but the Male Victim continued to see the Intended Female Victim and to reconcile with her while she was also seeing the Male Victim Rival.  It is not likely that the Male Victim gave an incorrect name for the Male Victim Rival.  It is more likely that his response was changed to divert attention away from someone who actually did become the lead suspect later in the case.

139.     The video of the interview is also consistent with the name the Male Victim gave for the Male Victim Rival being altered. The audio and video of the interview is not synchronized, such that there is a one to two second delay between the video and audio tracks. The delay persists even when the video is played on different devices. This type of error can occur as a result of technical problems. But such delays are usually for less than a second, as can be verified by an expert.

140.     It is more likely the video and audio tracks were deliberately set out of sequence to mask a disparity between lip movement and words spoken. The Movant cannot "read lips," but to the best of his ability, and after accounting for the delay, he believes the Male Victim's lip movements are more consistent with the sibilant 'S' at the beginning of the Male Victim Rival's name than they are with the percussive 'P' that starts the name he seems to give, Peter.

141.     It has been difficult even for the Movant to credit the possibility of manipulation of this degree and sophistication. It nonetheless appears to have occurred, and can be established through expert examination.

142.     Government counsel has actively misdirected the defense as to the involvement and background of key witnesses. The Movant previously submitted a letter purportedly sent by government counsel to the defense via postal mail. The letter mentions the Male Victim Rival, Lead Agent and Intended Female Victim.

143.     As an initial matter, the Movant has no confidence that the letter, obtained from defense counsel, has the same content as any letter that was actually sent. First, it is aberrant that the letter was sent by postal mail. Both the letter and a reference to it specify that it is subject to the protective order, meaning that it is to be destroyed after sentencing. As documented in a prior filing, defense counsel himself stated that this was a very usual term of a protective order. (DE 103.)

144.     As with other prearrangements made by the government, a physical letter renders any statement the government makes about its contents unverifiable after all discovery has been destroyed. Defense counsel apparently only possessed the letter because government counsel "loaned" the discovery materials back to him to aid defense counsel in writing a declaration to oppose this motion.

1    145.    Assuming that the Movant has received a true copy of what was sent, it would have been

2    less damaging to the defense to send no letter at all.  It makes misstatements about the witnesses

3    and goes as far as to say the Intended Female Victim did not appear to be a witness at all. Crucially,

4    the letter falsely states that the Lead Agent and Intended Female Victim's relationship was limited

5    to "[being] intimate on a couple of occasions."  (*Id.*)

6    146.    Government counsel went even further in obscuring key information when advising the

7    Intended Female Victim how to handle a media inquiry.  As documented in an earlier filing, the

8    FBI's own report reflects that the Intended Female Victim conferred with government counsel and

9    was told she should convince a journalist she had never had any significant relationship with the

10    Lead Agent.

11    147.    The Intended Female Victim then called the journalist, lied that she had only gone on a

12    single date with the Lead Agent, then reported back to the government that the lie had worked and

13    the journalist would drop the story.

14    148.    It is difficult to characterize this sequence of events as anything less than witness tampering.

15    It is undisputed that the government counsel knew at very least that the relationships between the

16    Lead Agent and Intended Female Victim extended beyond a first date.

17    149.    As documented in a scaled filing, the government had also concealed key DNA evidence –

18    even from the Female Victim who provided the evidence.  As reflected in filings with this Court in

19    a related civil matter, she sought that evidence and the results of that analysis for over a near, while

20    the government knew exactly where it was.

21    150.    The results of the DNA analysis unambiguously reflect two DNA profiles that likely belong

22    to the kidnappers.  The profiles are partial and the Movant can only be conclusively ruled out as

23    one of them.   However, even the mere presence of two profiles is inconsistent with the

24    government's theory of a sole perpetrator.  And so the government concealed this evidence.

25    151.    Deception of the magnitude described in this and the preceding section would make it

26    impossible to mount a fair defense even with the participation of a defendant who was in perfect

27    health. The Movant was not.

28

SECOND AMENDED § 2255 MOTION          - 51 -                    *United States v. Muller*

**II.    THE MOVANT'S POOR MENTAL HEALTH, EXACERBATED BY THE EXTREME CONDITIONS IN WHICH THE GOVERNMENT CHOSE TO CONFINE HIM, PREVENTED HIM FROM ENTERING A VALID GUILTY PLEA**

152.    Long before the Movant's mental health problems could be of any conceivable benefit in a criminal matter, they laid waste to his life and future.

153.    The Movant served in the United States Marine Corps after high school, completing two overseas tours and receiving an honorable discharge. He received a nearly full scholarship to attend an elite liberal arts college and graduated at the top of his class. At Harvard Law School, his curriculum and activities focused on public interest law. After graduating, he refused offers from top firms and the U.S. Department of Justice Honors Program to accept a public interest fellowship paying less than one fifth what he would earn in the private sector.

154.    Then the Movant's life stopped. Beginning in law school and progressing over the next decade, the Movant became unable to hold a job and at times even to care for himself. He lost his career, his spouse, his property, and much else that is indefinable.

155.    Government counsel has incessantly trafficked in stereotypes of the malingering defendant. The Movant is not one such. The Movant has a demonstrated history of scrupulous honesty concerning his mental health. The Movant passed the California Bar Exam in 2007 but did not submit his moral character evaluation form until over 40 months later. The sole reason was that the form included a question about his mental health history and whether any condition would interfere with his ability to practice law. The Movant did not feel comfortable submitted the form and obtaining his license until he believed he could honestly answer "no." Conventional wisdom among law students at the time was to answer "no" and not disclose any history that did exist. The Movant did not go that route.

156.    Whether disclose of his mental health state and history will harm or help the Movant, he will state it as accurately as he is able. He does so below.

157.    The United States chose to hold Mr. Muller in a facility well known for its poor treatment of inmates with mental health needs. The extreme conditions are richly documented in a major class action against Sacramento County. *See Mays et al.* v. *County of Sacramento*, No. 2:18-at-

1    01259-TLN-KJN (E.D. Cal. July 31, 2018) (hereinafter "*Mays*").

2    158.    The Movant requests judicial notice of all filings in *Mays*. Fed. R. Evid. 201(c)(2); *United*

3    *States v. Wilson*, 631 F.2d 118 (9th Cir. 1980) (a court may take judicial notice of its own files and

4    records). Rather than reproduce voluminous material, the Movant hereby incorporates herein the

5    expert reports filed with the complaint in *Mays*, identified in that matter as ECF numbers 1-2, 1-3,

6    1-4, 1-5 and 1-6.

7    159.    The expert reports were commissioned by Sacramento County and were based on

8    observations in the nine months leading up to Mr. Muller's guilty plea. Several of the experts

9    visited Mr. Muller's living unit, and he was among the inmates interviewed and observed for the

10   reports.

11   160.    Mr. Muller's isolation and unmet care needs were exacerbated by living conditions that

12   were "stark and unlikely to meet constitutional standards." *Mays* at ECF 1-2, p.10 (report of

13   corrections expert Eldon Vail). The Movant and others on T-Sep status were held "in small, cold,

14   concrete cells" with "few sources of stimulation or links to the outside world," "no method to track

15   time," and with loud, unsettling noises and tirades erupting periodically from the sickest inmates.

16   *Id*. at ECF 62-1, p.21; Ex. A. The T-Sep unit "often smell[ed] of feces and urine," with some

17   inmates who would defecate in the showers, and was generally filthy and infested with insects. *Id.*

18   at 20-22. One inmate in the T-Sep unit was observed to have "so many flies following him, that

19   when he moved there was a silhouette of no flies." *Id*. at 22 (typographical error omitted).

20   161.    At the jail, Mr. Muller spent ninety-eight percent of his time alone in a seven-by-eight foot

21   concrete box. He was in the same room with other humans for a fraction of the remaining two

22   percent, and never more than a few at once. This lasted a full year. Then Mr. Muller was escorted

23   into the middle of a wide-open courtroom, packed with people, all focused on him. The effect was

24   overwhelming. It cumulated with Mr. Muller's existing mental health symptoms and cognitive

25   problems he was experiencing.

26   162.    The impact on Mr. Muller would not have been readily apparent to the Court. First, it is a

27   characteristic response of a sensory-deprived person to react to that deprivation, and to even minor

28   new stimula, by entering a dissociative state.

163.    Second, Mr. Muller is a former U.S. Marine raised by a wrestling coach. The virtue of stoic perseverance has been drilled into him throughout his life. Mr. Muller's outward appearance is therefore not a reliable indicator of his internal state.

164.    Nonetheless, the effects were telling. Except the words "yes," "no," honorifics, and two-word affirmatives such as "it is," Mr. Muller spoke just seventeen words at the hearing. And they were riddled with errors.

165.    Mr. Muller was asked "what type of medications are you currently taking?" He replied "mood stabilizers, antidepressants, and an antipsychotic." This was incorrect — Mr. Muller was not receiving any mood stabilizers, although he should have been.

166.    In sum, Mr. Muller was not receiving a medication that is the standard treatment for his diagnosis, had missed his scheduled dose of psychiatric medication before the plea hearing, and was too impaired even to accurately assist the Court in determining whether he was impaired.

167.    Other responses reflect that in his impaired state, Mr. Muller's presence of mind was severely limited. When the Court asked "what is your current or most recent occupation," Mr. Muller responded "lawyer, sir." That was incorrect. Mr. Muller last worked as an education consultant before taking a mental health leave that continued until the time of his arrest. He had not practiced law since 2012. Mr. Muller's jail intake interview reflects that when asked his last occupation while not mentally impaired, he will accurately respond "education consultant."

168.    Similarly, when Mr. Muller's attorney gave a narrative response describing meetings at which Mr. Muller seemed competent, the Court asked Mr. Muller if his attorney's description of the meetings was correct. Mr. Muller inaptly replied "I understand, sir." This conveyed that he did not understand. The Court had to repeat the question, "is what he stated correct?" The short question made it easier to produce the expected response.

169.    In the wake of one year of extreme isolation and intensifying mental illness, Mr. Muller was in no condition during the plea hearing to enter a constitutionally sound plea.

///

///

///

**GROUNDS FOR RELIEF**

170.    The Movant is proceeding on a single ground of relief, set forth below.   The Movant withdraws his previous ineffective assistance of counsel claim without qualification.   This amended motion withdraws this claim as if it were never brought.   It expresses no position on whether prior counsel did or did not provide competent representation.

**First Ground For Relief:**
**Plea and Plea Agreement Not Knowing, Intelligent and Voluntary**

171.    The Movant incorporates and realleges all preceding paragraph as if fully set forth herein. The Movant further incorporates all material contained in his Reply and supporting memorandum filed on January 7, 2020, including all documents and evidence attached thereto.

172.    State and federal authorities committed crimes in the course of the Movant's investigation and prosecution that at a bare minimum include perjury, forgery, witness tampering and wire fraud. Members of the prosecution team broke the laws in ways not even possible when most caselaw relevant to his motion was made.

173.    Dublin Police Services officers entered the Movant's home in secret and without a warrant and searched his belongings.   They used his electronic device and Internet account credentials to send a faked e-mail making it appear as though he had committed a crime and was preparing to flee.   They then used the e-mail to obtain a search and arrest warrant.

174.    Dublin officers next contrived a more carefully laid plan that would allow them to secure warrants without exposing them to the risk that their unlawful electronic searching and faked e-mail would be exposed and proven.

175.    Dublin officers placed suggestive evidence consistent with the home robbery they were investigating in a stolen vehicle.   They created a false story in which they had happened to learn of the recovered stolen vehicle and that it had been found with the Movant's license inside.

176.    Dublin officers then used this story to obtain new search and arrest warrants.   They concealed the previous warrants, the supporting affidavits of which were inconsistent with their new story.

177.   Dublin officers executed the warrants.  Using both evidence they had brought such as gloves and zip ties and evidence taken from the house search that had occurred earlier in the morning, the officers filed the stolen vehicle with planted evidence their story held had been there all along.

178.   Dublin officials accessed the Movant's electronic devices in order to search and to attempt to erase evidence of their previous illegal activities and accessing of the Movant's accounts.  Where they believed a device might still contain evidence of their activities, they destroyed, stole or otherwise cause it to disappear from the record.

179.   When the FBI showed interest in the Dublin case and decided it could be associated with a Vallejo Kidnapping, Dublin officers participated in the extensive illegal activities that ensued.  They provided items of evidence to the FBI knowing they would be used to fabricate evidence relevant to the Vallejo matter.  The submitted police reports consistent with the story the FBI wished to frame.  They committed perjury in support of the FBI's falsifications as recently as at a March 22, 2019, evidentiary hearing.

180.   As set forth above, FBI agents and persons cooperated with them planned and executed an elaborate scheme to clear an embarrassing case that had mired them in controversy.  Using means ranging from forgery to sophisticated image alteration to reenact previous searched to more convincingly plant evidence, the agents assembled a fraudulent case against the Movant.  They then used their extensive fabrications to support a criminal complaint and warrant applications.

181.   Government counsel used the above fabricated evidence to obtain an indictment of the Movant, knowing that evidence was fabricated and having consulted in its creation.

182.   Together with FBI agents, government counsel provided the defense with discovery materials they knew was false, fabricated, and/or misleading.  They provided altered and inaccurate transcripts of witness interviews and edited crucial portions of the interview videos to conceal information unfavorable to their case.

183.   Government counsel lied to the defense about the extent of a lead agent's involvement with a crucial witness, also misrepresenting that person as someone who was not a relevant witness at all.   Government counsel instructed the same witness to deflect media attention from the

1   relationship with the agent, and was at very least complicit in her lies to a journalist – which lies

2   accomplished government counsel's goal that the story be dropped.

3   184.    Government counsel deliberately concealed crucial DNA evidence not only from the

4   defense, but also from the victim and the victim's representatives.

5   185.    The Movant relied on purported evidence he was shown or told of in making his plea

6   decision.

7   186.    The foregoing conduct and circumstances unlawfully crippled the Movant's defense and

8   prevented him from making a plea decision and entering a plea that was knowing, intelligent and

9   voluntary.  Had the above illegalities come to life, or had they not been committed in the first

10  instance, the Movant would not have pleaded guilty, and would instead have chosen to proceed to

11  trial.

12  187.    Federal officials chose to detain the Movant at a jail they knew had been documented as

13  having unconstitutional conditions of confinement.

14  188.    Federal officials knew in particular that the Movant suffered from serious mental health

15  problems, and that detention at the jail was especially deleterious for inmates with such problems.

16  Officials further knew that the Movant was being held in a highly restrictive solitary confinement

17  and that the severe conditions there were among the worst in the country.

18  189.    As a result of depression, anxiety, suicidality and other mental health symptoms the Movant

19  was unable to meaningfully assist in his own defense.  Absent these symptoms, exacerbated by

20  solitary confinement, the Movant would have aided counsel in discovering the illegalities described

21  herein.

22  190.    Even had the Movant not discovered the government's criminal conduct, he would still have

23  chosen not to plead guilty and enter a plea agreement under the terms offered, had he been of sound

24  mind and able to make decisions unaffected by depression and other symptoms.

25  191.    The Movant was unable on the day of his change-of-plea hearing to offer a competent plea

26  in a courtroom packed with people while he was suffering the effects of over a year of profound

27  isolation and sensory depreciation.  Defendant was effectively unable to make any choice that was

28

1   the product of rational thought rather than a fear reaction to extreme stress and conditions beyond

2   his ability to cope.

3   192.    Had the Movant been both competent and able to meaningfully assist in his own defense,

4   he would not have found himself at a hearing to plead guilty.  Assuming that he did and that his

5   faculties were restored for the hearing, the Movant would have advised counsel at the hearing that

6   he did not wish to change his plea, and would not have pleaded guilty that day.

7                                          **TIMELY FILING**

8

9   193.    The instant motion amends and supersedes the original motion filed within one year of the

10   date the challenged conviction and sentence became final.

11   194.    The original motion included a claim that the Movant's guilty plea was not knowing,

12   intelligent and voluntary.  The claim was subsequently allowed to proceed after review of the

13   motion by the Court.

14   195.    The original motion did not include general allegations, but instead incorporated the facts

15   and allegations set forth under each claim heading into every other claim.  A subsequent amendment

16   approved by the Court stated expressly that all allegations were offered in support of the claim that

17   the Movant's plea was not knowing, intelligent and voluntary.

18   196.    The original motion contained claims concerning the Movant's mental health that are

19   substantially the same as those set forth herein, but their factual basis is significantly expanded

20   upon by this motion.  These facts relate back to the original claims.  Some of the factual material

21   was not available to the Movant through the exercise of due diligence.

22   197.    The Movant was also hindered by acts of the government in violation of the Constitution

23   and laws of the United States.  As set forth above, the government's expansive and convincing

24   fraud effectively altered reality and created a story that did not actually exist.  Such an altered reality

25   was not unfamiliar to the Movant, who had previously suffered episodes of psychosis and delusions.

26   The Movant believed it more plausible that it was his own mind that had altered reality, and not

27   elaborate and convincing fraud perpetrated by the prosecution team.

28

198.    The Movant's original motion contained allegations concerning both unlawful conduct and outright fraud by government actors.  Some of the factual material in the amended motion expands on these allegations and relates back to them.  Other factual material is new, but supports the existing claims that unlawful conduct by government actors prevented the Movant from entering a knowing, intelligent and voluntary guilty plea.

199.    To the extent the new factual material is found not to relate back to the original claim, the allegations were still made within one year of the date when the impediment caused by illegal government acts were removed.

200.    That impediment is inherent in the nature of the illegal acts alleged.  The government's fraud was nothing short of exquisite, if also appalling.  When altering images, they went as far as to alter reflective surfaces such as glasses, bottles and a fireplace cover to ensure the reflections were consistent with their alterations.  The government appears even to have created and publicly disseminated a photograph purportedly sent by the kidnappers.  The only way for the government to meaningfully remove the impediment its illegal act created would be to admit and repudiate them.

201.    The Movant was only able to discover the fraud described herein because of his family's extraordinary diligence and donation of their time.  The Movant's spouse left her job in January of 2019 in order to work full time on this case and a related matter.  She has spent thousands of hours of her time and a great deal of money in order to discover the facts set forth in this motion.

202.    Assuming the exercise of due diligence, the Movant could not have discovered the facts set forth any sooner than within the past three months.

## CONCLUSION

WHEREFORE Movant respectfully requests that the Court:

(1)    Vacate his conviction and sentence in this matter;

(2)    Set aside Movant's guilty plea and all purported waivers of trial rights by Movant;

(3)    Order Respondent to preserve all evidence relating to the Movant's claims herein; and

(4)    Grant such other relief as the Court deems appropriate.

1     Respectfully submitted this fifth day of May, 2020.

2

3

4                    Signed:_____

                            Matthew D. Muller

5                              *In Pro Per*

6

7

8

9

10                       **VERIFICATION**

11     I, Matthew D. Muller, declare under penalty of perjury and the laws of the State of

12  California that the foregoing is true and correct.  Done this fifth day of May, 2020, in Fairfield,

13  California.

14

15                    Signed: _____

16                        Matthew D. Muller

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                    FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9    UNITED STATES OF AMERICA,              No. 2:15-cr-0205-TLN-EFB

10                    Respondent,            **DECLARATION OF HUEI DAI**

11          v.

12   MATTHEW MULLER,

13                    Movant.

14

15          I, Huei J. Dai, declare:

16   1.      I am Matthew Muller's spouse and have known him since long before he went to jail about

17   this case.

18   2.      In January of 2019, I left my job to work full time on helping my husband fight this case

19   and the one with Solano County. I have lived on saving for a year and half and think I have worked

20   at least two thousand hours for this case. Actually it is probably more.

21   3.      This is my choice and I want it, and I think it is not fair for someone to say we not try hard

22   enough. It is all we have done for almost two years. I do not know what more we could do.

23   4.       I made an office just for work on this case and have spent thousands of dollars for it with

24   Matt's parents' help.

25   5.      Some of the other things I have done are going from court to court filing and trying to get

26   official papers like warrants. I have visited courts fifty times and more in a year and half. A lot of

27   them were from finding warrants that they try not to give us because they are hiding things.

28

                                            - 1 -

6.      Matt and I have problems getting legal papers to him.  The last time this happen was just a week and a half ago.  I sent him about 50 frame prints from a Body Cam video so he could look for places where they show things different from the photos.  It disappeared, and jail say it just lost in mail.  But that is at least seven times this year now.  And it is always certain types of legal matters that disappear, never just letter or cards.

7.      In the last month, the jail increase the video visits we can have because of COVID19 and regular visits are gone.  So then we have more time to go through evidence, and because no filings are due so we do not have to work on documents.

8.      Our whole finding of fraud started earlier in April when Matt see that a gun they say he have was different colors in different photos.

9.      Matt has say to me that there were a lot of things he did not understand, and that it is better not to think about them because if it is true then he is "crazy," in other words he does not remember things they say happen.

10.     But with what we find this month, we start to understand.

11.     I did not know how we could find this sooner.  If you see a photo, you think it is true unless it show something impossible.  We see some thing now with zoom, but they are not normal things you can see.

12.     The FBI somehow even change what is on the Internet about the case.  They take things from a photo and put them in a box in his house.  If they can do that, they can do anything.  That should not be something we have to guess in time.

13.     I also want to say that I have check with a friend who works at Asus USA.  They said that laptop serial number 9CN0AS112103500 is not in their database, and should be if the laptop was sold in the U.S.

///

///

///

///

///

- 2 -

1    I, Huei Dai, declare under penalty of perjury that the foregoing is true and correct.  Done

2  this fifth day of May, 2020, in Union City, California.

3

4

5    Signed: _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28